Steve Rennick
2 Peachtree Ct.
Fairfield, Ohio 45014
December 2, 2003

Judge Dlott
Federal Court

Dear Judge Dlott:

I have been told that I may write you a letter prior to my sentencing which is scheduled for December 9, 2003. I am writing this letter to make you aware of all the circumstances surrounding my case.

During the summer of 2002 I met two Jamaicans, Phillip Davidson and Kareem Cole. They were promotors of Reggae music and traveled throughout the United States setting up Reggae concerts. They approached me and asked if I would transport them to the various concerts. Phillip also showed an interest in sponsoring my racecar. We gave him a proposal and sent proposals to companies in Jamaica which he claimed to have connections with. I actually talked to people in Jamaica and so did our marketing director for the race car team.

I was so eager to get a sponsor for the race car I would have done anything and Phillip made sponsorship seem possible. Wayne Benjamin and I took Phillip and Kareem to Phoenix Arizona March 2002. Phillip had arrangements for us to stop at a camping spot in Goodyear Arizona. He was picked up by a group of Jamaicans in an SUV. We didn't see him again until Sunday night when they dropped him back off. Nobody asked any questions when they came back they had the same luggage they left with. I was paid $5000 for this trip and out of the $5000 I paid Wayne $1000 and it cost about $1200 for fuel out and back and $30 a day at the campsite.

We made a total of 3 trips with Phillip and Kareem. On the second trip Phillip flew out from his wife's house in New York. All the while he kept promising to sponsor the race car and I kept going along with him. On the last trip Phillip flew back because he had a Reggae show scheduled for Friday at Swifton Commons "The Ritz". I personally attended 2 of his shows at the Ritz and Wayne and I did go to a couple of them in Arizona. He was a legitimate band promotor.

Exhibit 1

During this time Kareem rented the front shop for storage of equipment and also planned to start an auto service center.

On October 16, 2002 Eddie Moore was caught selling Marijuana to the RENU squad in Norwood.  Marijuana was found at the property on North Bend Road in the front shop rented by Kareem Cole.  I was in turn arrested.  I knew nothing about the Marijuana at the shop.  They arrested my son, Wayne and Matt Elliot.  The charges were eventually dropped against my son.

After postponement after postponement we were advised to plead out.  I decided to plead out mainly because I have a past record.  From the time of our plea till the time we went in front of the judge the wording on the plea got entirely turned around.  For instance they said I gave Wayne a pound of marijuana.  I never gave Wayne and pound of marijuana and he will verify this.  They also said I sold Matt Elliot marijuana and he will also deny this.  Matt has said this to several people.  I have never sold Marijuana to anyone.

Even though I have never sold drugs in my life since I had a past record I thought it would be better to plead to something so I could get a sentence reduction.  I am accepting responsibility for taking the Jamaicans to Arizona.  I am accepting responsibility for not really asking or caring what they were doing in the hopes I could get a race car sponsor.

At the pleading I spoke to Bill Gallagher, my lawyer, about the possibility of working with the RENU squad.  I meant to show them where I dropped the Jamaicans off in Arizona and anything I thought might be helpful for them to bust the guys the Jamaicans were getting the Marijuana from.  Bill Gallagher said he spoke to Mr. Brickler and he would be willing to work with me on my sentence reduction in exchange for working with them to find the people who were the Arizona connection.  Mr. Goldberg who had been my son's attorney advised me this would be very dangerous and I should reconsider.

I was desperate.  I haven't been in trouble in almost 10 years.  I have a profitable trucking business and a family.  I have never had anything to do with drugs and I just wanted all this to be over.  I chose to work with the RENU squad.  The next day I spoke to John Mercado of the RENU squad.  He gave me a card and said to get with him so we could get working on a drug bust.  I called Bill Gallagher immediately and asked him if he would go

with me to speak to John Mercado because I wanted my lawyer present. He said just go ahead and work with Mercado and do what he says.

This was the beginning of my worst nightmare. At my first meeting with John Mercado I signed three papers called C.I. papers and was fingerprinted. At this time I learned they didn't want any information related to Arizona.   Mr. Brickler wanted a drug bust in the Eastern District of Ohio. I was told Phoenix was out of their jurisdiction and they didn't really care about out there. Since the information related to Arizona was really all I knew, I knew I was in trouble.

This was a real problem for me because I have never sold or used drugs in my life and I don't know any drug dealers. I soon found out contrary to what everybody says about drug dealers being on every corner they are not easy to find or approach. Especially when you are trying to buy over 500 pounds, which I was told was the amount I needed to buy to get my sentence reduced.

One of my friends, Tony Battles, had recently gotten out of the Justice Center for Domestic Violence. While he was there he met a Jamaican named Solje Anderson. Solje told Tony any time he needed Marijuana just come to him and he'd get him as much as he needed. Tony wanted to help me out so we called Mercado and told him about Solje Anderson. Tony and I both went down to the Renu Center and met with John Mercado. At this time John Mercado punched up Solje Anderson's rap sheet and got a picture of him which Tony identified. At this time Mercado told Tony and I if this bust was over 500 pounds I would only get probation. We were given a tape recorder by John Mercado and told to tape any phone conversations which we did. I have copies of all the tapes.

The days went buy, Tony and I talked to Solje Anderson or his people on several occassions. They didn't have that large of an amount of Marijuana in Cinti. They told us they could make us a good deal if we wanted to go to Arizona and help them bring Marijuana back. We talked to John Mercado about this and said yes, and to try to get the details worked out.

The way it was supposed to work was they were supposed to get us 1500 lbs. For $600 a lb. We were also going to help them bring back 2000 pounds of their own Marijuana. John Mercado said he would do this at first.

Ex 1

He later said his boss said we couldn't do it this way because it wasn't by the book and they could lose their money.

We cut communications with Solje Anderson and did not hear any more from him. We turned off our cell phones.

The next deal I tried to put together was also a disaster thanks to the RENU squad. A driver at the shop told me about a guy in Northside named Yamine Israel. This driver gave him my number and he called me. I told him I was looking to buy 500 lbs. of Marijuana. He gave me a number to call him back to discuss the deal. He told me he would only answer 541-3777 my shop number. He had a throw away phone and changed numbers every few days. I called John Mercado and told him about the deal. He said to make sure I tape record all the conversations. I called Yamine and set up a deal for 500 lbs. John Mercado insisted we do the deal at my son's trucking company which everybody including Kevin Coo thought was stupid and risky.

The first night the deal was set up John Mercado had about 20 agents at the garage. I was wired. Yamine's phone was not working so we couldn't get a hold of him. Yamine was supposed to have called us by 7:00PM. When he didn't call the RENU squad waited till about 9:00 then went home. The next day I got a hold of Yamine. (If you listen to the tape you can see how desperate I sound and how I know nothing about Marijuana) We set up another deal with Yamine a few nights later. The same scenario 20 cars parked out back, sheriffs running in and out with their flack jackets on. It was really obvious to anyone passing by what was going on. Again I was unable to reach Yamine. I called my friend who knew Yamine and was told that Yamine came by, pulled through the drive way and noted all the cars, and sheriffs coming in and out and stated "this guy is a cop, this is a set up". Since then I have not been able to contact Yamine.

Using my son's business location was a very big mistake. This not only jeopardized me but my family as well.

After these two attempted drug busts failed I was getting desperate. I had no other prospects. Then out of the blue a guy called on the garage phone 541-3777 saying the 1500 lbs. of marijuana I ordered from Solje Anderson was in. He said the price was now $800 lb. Since they brought it from Arizona. He said we would agree on a location and he would come

alone with a money counter (the machines like they use at the bank) and count the money. When he was certain it was all there he would make a phone call and the marijuana would be delivered to the agreed upon location.

I called John Mercado and told him what was going on. He said that he couldn't come up with any money. The guy was set up to call back on Sunday at 2:00PM and for me to 3 way John Mercado. John instructed me to call him Joe Wilson, the money man. John planned to tell the guy that he couldn't get the money out of the bank till Monday or Tuesday and they he could probably only get half and the drug guy would have to front him the other half of the Marijuana. This sounded crazy to me since this guy had never met either one of us, but what do I know.

At 2:00PM on Sunday the drug guy called as he said he would. I did a 3 way call and dialed John Mercado's cell phone number. A woman answered. I asked for Joe and she said I had the wrong number and hung up. I told the drug guy to hang on that I was going to dial the number again. This time I got John Mercado's answering machine. By this time the drug guy was really upset. His exact words were "You're dead Rennick, we've had a bead on you for two days, you're dead". Then he hung up the phone.

I tried John back a few more times. I finally got him and told him about the guy's threat on my life. John said if he calls back again try to get me back. I then called Bill Gallagher, my lawyer, because I was scared to death. Bill said to call the RENU squad and to talk to the person on duty. That there is always somebody on duty 24 hrs a day. I left a message and a guy named Brian called me back. I explained what had happened and about the death threat and he said don't worry, be careful and go home. Bill Gallagher also said he would call me back.    I waited at the shop with all the doors locked for several hours. Nobody called me back, I couldn't get a hold of anybody. Finally I went home. I went a different route making sure nobody was following me.

Monday came I didn't hear from anybody. I finally got a hold of Bill Gallagher and I asked what was going on, why hadn't he called me. He stated since he hadn't seen anything on the news or read about me in the paper I was all right.

EX 1

During the next few days I talked to John Mercado and was told if the guy calls back see what I could work out. I knew nothing would ever be worked out and that I was a dead man.

On Friday night I was getting ready to leave the shop about 9:30PM. I had just finished working on the Autocar dump truck which was scheduled to go out the next morning. I was alone and had just finished washing my hands in the washroom. The lights were out in the other shop and only one light was on in the washroom. I came out of the washroom and turned to the left out to pick up my jacket when I felt someone come up behind me, placing a gun to the back of my head and saying "Rennick you're dead". I knew the front door was unlocked and I turned to push the gun away. I heard two shots go off and felt my whole body move like I was hit with a baseball bat. I started running and yelling out the front door toward the drive thru next door. I got halfway and fell to the ground. I was yelling and screaming for help. The people at the drive-thru heard me yelling and saw me laying in the parking lot between the garage and the drive-thru.

Wesley Hahn and his worker came running toward me to see what was wrong. I kept yelling "Don't let him kill me, don't let him kill me" They tried to call 911 from the phone booth a few feet away and were put on hold. Wesley then ran into the street (North Bend Rd.) and flagged down several cars looking for someone with a cell phone. A few people had cell phones and called 911. I was taken to University Hospital E.R.

At the E.R. John Mercado and Kevin Coo came in to see how I was doing. They looked at my x-ray and asked if I saw who shot me. I told them I hadn't seen the guy's face but the voice was the same one I heard a week ago on the phone when I was trying to set up a deal for 1500 lbs. I told John Mercado days before and even let him listen to the tape with the guy threatening me.

I spent two days in the hospital and was released on the third day because my wife is an RN and the doctors felt she would be able to manage my care at home. I was scared to death that going home would put my family at risk. I have only been out of my house twice since being released from the hospital. Both times it was to see the doctor. I have a Physical Therapist come to the house three times a week and work with me. I sleep in a hospital bed in my living room and have blinds drawn on all my

windows. My family makes sure I am never alone. There is always someone with me.

I know I made a serious mistake getting mixed up with Phillip Davidson and Kareem Cole. I take full responsibility for driving them out to Arizona in the hopes that they would sponsor my racecar. I am not a drug dealer. I have never dealt or even used drugs in my life. I was willing to do anything in the world to make this nightmare go away and not destroy my family, my business, and my life.

When I agreed to plead it was supposed to be to some kind of possession charge since the Marijuana was found on property I rented to Kareem Cole. I didn't go to court because I do have a past record (never any drug charges) and they were threatening to drag my family into this.

When I got to court everything had changed. All of a sudden they read Wayne Benjamin had received a pound of Marijuana from me and Matt Elliott had bought Marijuana from me. Both of these statements are totally false. My lawyer told me this was a fictional plea. With this fictional plea I was to get a reduction in my sentence for accepting responsibility. I have no problem accepting responsibility but I am NOT a drug dealer. I have never had any Marijuana on me to give or sell to anyone.

I agreed to be a C.I. and told Bill Gallagher I would take the D.E.A. to Arizona where I dropped off Phillip and Kareem and try to find them a connection for Marijuana there. I don't have any connections here. I tried everybody I could think of to help me and I feel I not only jeopardized my life but theirs too.

Now I have two bullets in me. I can barely walk. I have a steel rod down my left leg and can't lift any weight with my left arm for three months. I have received phone calls at my house that were hang ups. I never go outside or stay alone at home. My son can never go to the trucking company alone and my whole family looks over their shoulders everytime anyone goes to work or even outside. This is a painful awful life. I honestly feel this guy isn't finished. I think he's just waiting for another opportunity to finish me off.

I feel I've already been sentenced. I've got a death sentence. It doesn't seem anyone has much concern for my safety. Injuries aside I don't

Ex 1

feel I'd last long in prison. I'm sure if these people want me bad enough they'll find a way to get me even in jail.

Judge Dlott, I was made a deal by John Mercado. I was told that he worked for Bill Brickler and whatever they said they would stand by it. I was told if I got them a Marijuana deal over 500 lbs. I would get probation. I tried my best and almost got killed. As desperate as I was I did get together 2 separate deals that went bad due to the RENU squad not coming through.

I'm sorry for this whole thing. I wish to God I never met Phillip and Kareem. I'm really afraid for my safety if I am incarcerated. I can hardly walk and spend most days in excruciating pain.

I'm sorry this letter has gotten so long. I know you are a very busy person and I'd like to thank you for taking the time to read this letter.

Sincerely,


Steve Rennick

Ex 1

# Medication

Jan 26, 2004

QUETIAPINE FUMARATE 25MG TAB
    TAKE ONE TABLET BY MOUTH AT BEDTIME

          Status: ACTIVE
      Start date: JAN 21, 2004
       Stop date: JAN 21, 2005
Refills remaining: 1
      Days supply: 30
         Quantity: 30

Comments:

---

SERTRALINE HCL 100MG TAB
    TAKE ONE TABLET BY MOUTH EVERY MORNING FOR DEPRESSION/MOOD

          Status: ACTIVE
      Start date: JAN 21, 2004
       Stop date: JAN 21, 2005
Refills remaining: 1
      Days supply: 30
         Quantity: 30

Comments:

---

WARFARIN (COUMADIN) NA 5MG TAB (SP)
    TAKE ONE AND ONE-HALF TABLETS BY MOUTH EVERY DAY TO THIN BLOOD

          Status: DISCONTINUED (EDIT)
      Start date: JAN 21, 2004
       Stop date: JAN 21, 2005
Refills remaining: 1
      Days supply: 30
         Quantity: 45

Comments:

---

WARFARIN (COUMADIN) NA 5MG TAB (SP)
    TAKE ONE AND ONE-HALF TABLETS BY MOUTH EVERY DAY ON SUN,TUES,WED,FRI - , ALL O

          Status: ACTIVE
      Start date: JAN 21, 2004
       Stop date: JAN 21, 2005
Refills remaining: 1
      Days supply: 30
         Quantity: 50

---

**PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)**

RENNICK, STEVEN
2 PEACHTREE COURT
FAIRFIELD, OHIO  45014
300463291

**VISTA Electronic Medical Documentation**

Printed at CINCINNATI

Comp EX 2A — 1 of 4

# Medication

Jan 26, 2004

---

Comments:

RISPERIDONE 1MG TAB
    TAKE ONE TABLET BY MOUTH AT BEDTIME

        Status: DISCONTINUE
    Start date: JUN 16, 2003
     Stop date: JUN 16, 2004
Refills remaining: 1
    Days supply: 30
       Quantity: 30

Comments:

---

SERTRALINE HCL 100MG TAB
    TAKE ONE TABLET BY MOUTH EVERY MORNING FOR DEPRESSION/MOOD

        Status: DISCONTINUE
    Start date: JUN 16, 2003
     Stop date: JUN 16, 2004
Refills remaining: 1
    Days supply: 30
       Quantity: 30

Comments:

---

TRAZODONE HCL 100MG TAB
    TAKE TWO TABLETS BY MOUTH AT BEDTIME

        Status: ACTIVE
    Start date: JUN 16, 2003
     Stop date: JUN 16, 2004
Refills remaining: 1
    Days supply: 30
       Quantity: 60

Comments:

---

IBUPROFEN 800MG TAB
    TAKE ONE TABLET BY MOUTH THREE TIMES A DAY WITH FOOD

        Status: DISCONTINUED
    Start date: APR 17, 2003

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)

RENNICK, STEVEN
2 PEACHTREE COURT
FAIRFIELD, OHIO  45014
300463291

**VISTA Electronic Medical Documentation**

Printed at CINCINNATI

Comp Ex 2A  2 of 4

# Medication

Jan 26, 2004

```
Comments:
NOT TO EXCEED 4GM PER DAY
```

```
    ANTACID/SIMETHICONE LIQUID   PO    Q4H PRN
        15ML

            Status: DISCONTINUED
        Start date: JAN 15, 2004@10:33
         Stop date: JAN 22, 2004@11:19:34
Comments:
indigestion
```

✓
```
    LORAZEPAM TAB   PO    TID7 PRN

            Status: DISCONTINUED
        Start date: JAN 15, 2004@10:54
         Stop date: JAN 22, 2004@11:19:34
Comments:
```

```
    SERTRALINE TAB   PO    QD7
        100MG

            Status: DISCONTINUED
        Start date: JAN 15, 2004@10:33
         Stop date: JAN 22, 2004@11:19:34
Comments:
```

```
    DOCUSATE SODIUM U.D. CAP,ORAL   PO    QD7
        100MG

            Status: DISCONTINUED
        Start date: JAN 15, 2004@14:12
         Stop date: JAN 22, 2004@11:19:34
Comments:
```

```
    QUETIAPINE FUMARATE TAB   PO    QHS
        25MG

            Status: DISCONTINUED
        Start date: JAN 16, 2004@09:46
         Stop date: JAN 22, 2004@11:19:34
Comments:
    WARFARIN TAB   PO    QD17
```

---

**PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)**

```
RENNICK, STEVEN
2 PEACHTREE COURT
FAIRFIELD, OHIO   45014
300463291
```

**VISTA Electronic Medical Documentation**

Printed at CINCINNATI

Comp Ex 2A  3 of 4.

# Medication

Jan 26, 2004

```
        7.5MG

            Status: DISCONTINUED
        Start date: JAN 18, 2004@12:04
          Stop date: JAN 22, 2004@11:19:34
Comments:
```

```
    OXYCODONE TAB   PO      QHS
        5MG

            Status: DISCONTINUED
        Start date: JAN 20, 2004@21:00
          Stop date: JAN 22, 2004@11:19:34
Comments:
```

```
    OXYCODONE TAB   PO      QHS
        5MG

            Status: EXPIRED
        Start date: JAN 19, 2004@21:01
          Stop date: JAN 20, 2004@21:00
Comments:
```

```
    OXYCODONE TAB   PO      QHS
        5MG

            Status: EXPIRED
        Start date: JAN 16, 2004@09:46
          Stop date: JAN 19, 2004@21:00
Comments:
```

```
    WARFARIN TAB   PO      SU-TU-FR@1700

            Status: DISCONTINUED
        Start date: JAN 16, 2004@00:01
          Stop date: JAN 18, 2004@12:04:14
Comments:
```

```
    WARFARIN TAB   PO      MO-WE-TH-SA@1700

            Status: DISCONTINUED
        Start date: JAN 15, 2004@14:28
          Stop date: JAN 18, 2004@12:04:13
```

| PATIENT NAME AND ADDRESS (Mechanical imprinting, if available) | VISTA Electronic Medical Documentation |
|---|---|
| RENNICK, STEVEN<br>2 PEACHTREE COURT<br>FAIRFIELD, OHIO   45014<br>300463291 | Printed at CINCINNATI |

Comp Ex 2A 4of4

# Progress Note

Ja.

```
              TITLE: MHICM SCREENING INPATIENT (B/T)
DATE OF NOTE: JAN 23, 2004@10:09      ENTRY DATE: JAN 23, 2004@10:09:21
     AUTHOR: CARTER,AMY L            EXP COSIGNER:
     URGENCY:                           STATUS: COMPLETED
```

This patient has met the high-risk criteria for consideration as a
candidate for the mental health intensive case management (MHICM) team.
This includes an ICD-9 diagnosis of 295-298, and either 3 or more
admissions in the past 12 months or 30 days total of inpatient
psychiatric care in the past 12 months.

Is this patient's discharge plan to a nursing home, domiciliary or other
inpatient setting ?    No
If the answer is Yes, further assessment for MHICM is not warranted at
this time. If the answer is No, the following assessment is required.

This patient also meets the following clinical criteria:

1. Diagnosis of Severe and Persistent Mental Illness: Diagnosis of severe
and persistent mental illness includes, but is not limited to:
schizophrenia, bipolar disorder, major affective disorder, or severe
post-traumatic stress disorder.
    Patient meets criteria?    Yes
2. Severe Functional Impairment: Severe functional impairment is such
that theveteran is neither currently capable of successful and stable
self-maintenance in a community living situation nor able to participate
in necessary treatments without intensive support.
    Patient meets criteria?    Yes
3. Inadequately Served: This means inadequately served by conventional
clinic-based outpatient treatment or day treatment.
    Patient meets criteria?    Yes
4. High hospital use as evidenced by over 30 days of psychiatric hospital
care during the previous year or three or more episodes of psychiatric
hospitalization.
    Patient meets criteria?    Yes
5. Clinically Appropriate for MHICM Approach: Patients who are more
appropriately managed clinically as inpatients need to remain in the
inpatient setting; that is, the positive aspects of MHICM should not be
used to justify moving patients who would be better served by inpatient
care to this ambulatory care model.
    Patient meets criteria?    Yes

Does patient meet all five criteria for treatment by MHICM?    Yes
If patient meets all five criteria, he should be referred to the MHICM
team for follow-up care prior to discharge.
    Patient referred to MHICM?    Yes
If patient meets all five criteria, but is not being referred to MHICM,
please explain

---

**PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)**

RENNICK, STEVEN
2 PEACHTREE COURT
FAIRFIELD, OHIO   45014
300463291

**VISTA Electronic Medical Documentation**

Printed at CINCINNATI

Comp Ex 2B 1 of 1

# Progress Note

Jan 26, 2004

/es/ AMY L CARTER
MSW
Signed: 01/23/2004 10:09

Receipt Acknowledged By:
01/23/2004 16:13          /es/ CYNTHIA S MARTINELLI
                              MSW,LSW

---

        TITLE: PT ED - DIAGNOSIS/HEALTH STATUS (B)
DATE OF NOTE: JAN 22, 2004@10:49    ENTRY DATE: JAN 22, 2004@10:49:49
      AUTHOR: RONSHEIM,DONNA J    EXP COSIGNER:
      URGENCY:                        STATUS: COMPLETED

PATIENT EDUCATION:
Interdisciplinary Patient/Family Education for Diagnosis/Health Status
  Patient/Family received education at this encounter.
    Specific Topic Taught/Learned: Symptoms Management-Saying NO
    Knowledge of Disease/Problem: Group-no assessment
  The best method(s) for learning is group class.
  Patient has no barriers to learning.
  Patient was taught using verbal discussion method.
  Patient agrees to follow instruction.
Thirteen patients attended group co-led by D. Ronsheim, RN,C and S. Harper,
RN.  Purpose of the group is to increase assertiveness by recognizing certain
situations in which it is difficult to say "no".  Group discussed each of the
listed situations and assertive ways to handle these situations.  Gave group
guidelines to saying "NO":
Be honest, open and direct.
Don't make excuses.
By saying "NO' you're gaining self-respect.

/es/ DONNA J RONSHEIM
RNC
Signed: 01/22/2004 10:50

---

        TITLE: PT ED - SAFE AND EFFECTIVE USE OF MEDICATION (B)
DATE OF NOTE: JAN 21, 2004@22:24    ENTRY DATE: JAN 21, 2004@18:55:02
      AUTHOR: ROWEKAMP,ALAN L    EXP COSIGNER:
      URGENCY:                        STATUS: COMPLETED

PATIENT EDUCATION:SAFE & EFFECTIVE USE OF MEDICATION
INTERDISCIPLINARY PATIENT/FAMILY EDUCATION DOCUMENTATION

Each health care professional documents both formal and informal

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)

RENNICK, STEVEN
2 PEACHTREE COURT
FAIRFIELD, OHIO  45014
300463291

**VISTA Electronic Medical Documentation**

Printed at CINCINNATI

Comp Ex 2C    1 of 1

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT CINCINNATI

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CASE NO. 1:02-CR-00157** |
| Plaintiff, | **JUDGE DLOTT** |
| vs. | |
| **STEVEN M. RENNICK, SR.** | **AFFIDAVIT** |
| Defendant. | |

---

STATE OF KENTUCKY )
                      ) SS.
COUNTY OF CLAY )

Now comes **STEVEN M. RENNICK, SR.,** who being first duly cautioned and sworn, deposes and state from his own personal knowledge as follows:

1.      I am the Defendant in the above-captioned matter.

2.      I entered a guilty plea to one count of conspiracy to distribute marijuana on August 19, 2003.

3.      I entered into this plea to protect my friends and family and to ensure a lower sentence because of my criminal record.

4.      The plea as read on the record was not truthful, and was not the way my lawyer, William Gallagher, told me it would be.

5.      My lawyer told me I was entering a fictional plea to a possession charge since the drugs were found on my property and to go along with it so I would receive a sentence reduction for accepting responsibility.

LT

Comp Ex 3A   1 of 4

6. After I entered my plea, I asked my lawyer if I could get a sentence reduction by working for the RENU squad. He spoke with the U.S. Attorney on the case who agreed to help reduce my sentence if I helped find the Arizona connection.

7. The next day I spoke with John Mercado of the the RENU squad about teaming up. Mr. Gallagher said he did not need to be present and to just do what Mercado said.

8. I signed CI papers, was fingerprinted, and discovered that the government was only interested in uncovering drug activity in Ohio, not in Arizona.

9. My lawyer told me that since Mercado was working on a federal case, he was a federal agent having pull with the U.S. Attorney and that I should work with him. [This conversation is on tape.]

10. A friend of mine had a marijuana connection in Cincinnati. My friend, Tony Battles, came with me to meet with Mercado, who told us if we could organize a bust over 500 pounds, I would be sentenced only to probation.

11. Over the next few days, my friend and I worked on setting up a buy with Tony's marijuana connection, Solje Anderson. They said they couldn't get 1500 pounds of marijuana in Cincinnati, but could from Arizona in about a week and that it could be cheaper if we made the deal out in Arizona. [This conversation was on tape.]

12. After this deal was in place and although he initially approved it, Mercado later said we could not do this deal. He said it was too big a financial and safety risk and his boss would not authorize it. [This conversation is on tape.]

13. I cut off all communication with Solje and assumed he realized this meant the deal was off.

14. I later found out about another Cincinnati dealer named Yamine Israel. I told him I needed 500 pounds of marijuana. He and I worked out how we would execute the deal. [This conversation is on tape.]

15. I told Mercado about the set-up, I also asked him if I would receive credit if this worked out and he promised I would. [This conversation is on tape.]

16. During this time, I received threats from the drug dealers that if this did not pan out, I would be in danger. [One such threat is on tape.]

LT

Comp. E,3A    2 of 4

17.    The deal with Yamine did not materialize because the drug dealers found out it was a set-up.

18.    Soon after this, one of Solje's representatives called me on the same number Solje always used. He told me the 1500 pounds of marijuana I wanted had arrived and that Solje wanted his money. He also said the price had increased because they had brought it here from Arizona themselves. I now owed them 1.2 Million Dollars ($1,200,000.00) rather than Nine Hundred Thousand Dollars ($900,000.00).

19.    I called Mercado, who said he could not get me the money. He did say he would pretend to be a Joe Wilson, who handled the money, and that he would talk to Solje's people when I three-way conference him on Sunday, when they called me back.

20.    On Sunday, I tried to call Mercado as we had arranged. The first time, his wife answered and said I had the wrong number. The second time, we got his answering machine. The drug connection became angry, threatened my life and hung up. [These conversations are on tape].

21.    When I was finally able to reach Mercado, he told me to just let him know if the guy called me back. Then I called my lawyer, who simply instructed me to call RENU, and that he would call me back. He never did. When I left a message for the RENU squad, an agent named Brian returned my call and told me to be careful and go home. After sitting in my locked shop for a few more hours, that is what I did.

22.    The next day I was finally able to reach Mr. Gallagher who said he assumed nothing had happened since he did not hear about it on the news.

23.    Also during that week, Mercado told me just to see what I could work out if I heard back from Solje's people.

24.    That Friday, I was working late at the shop. Around 9:30 p.m., as I ws leaving, someone came up behind me and put a gun to my head and said, "Rennick, you're dead!" I tried to escape and wound up getting shot twice, though I managed to make it outside, one-half way to the Drive-Thru next door.

25.    Two people from the Drive-Thru came to help me. I was taken to University Hospital Emergency Room, where I later saw Mercado and Kevin Coo. I told them I didn't see the person who shot me, but recognized his voice as the person I spoke with when trying to setup the 1500 pound buy.

LT

EX 3A    3of 4

26. To this day, as recent as October 30, 2004, I and my family receive threats. This most recent one is on tape, the caller stating he will shoot me in the head because the bullets in my shoulder and thigh did not get the message across.

27. The two bullets are still lodged in my body. I still walk with a cane and experience medical problems including a blood clotting disorder.

28. Since my sentencing and surrender, many other facts surrounding my attempt to substantially assist the government have come to light. One is that a witness from my shooting has come forward and executed an affidavit as to what he saw that night. His observations lead me to believe Mercado was nearby when I was shot. My memory leads me to believe he was involved with the shooting.

29. Even if Mercado was not directly involved, the person who shot me was the same person with whom I negotiated the 1500 pound drug deal. As such, my being shot was directly related to my working with the government.

30. I have always maintained my actual innocence of the crimes charged in the original and superceding indictments.

31. I believe my trial attorney was ineffective for promising me probation if I worked with Mercado, for convincing me to go along with this "fictional plea," and for letting me enter a plea while on medications affecting my judgment.

32. I believe the government had no real case against me and that my lawyer never prepared for trial because he always expected me to enter a plea, despite my constantly maintaining my innocence.

33. I believe my sentence must be vacated and my case remanded to comport with constitutional requirements.

34. Affiant further sayeth naught.

*Steven M Rennick Sr*

**STEVEN M. RENNICK, SR.**

Sworn to before me, a notary public in and for state and county and subscribed in my presence this _14th_ day of ___November___, 2004.

_____
Notary Public

LT

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION AT CINCINNATI

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v | ) | Case No. 1:02-CR-00157 |
| STEVEN M. RENNICK, SR., | ) ) | Judge Susan J. Dlott |
| Defendant, | ) ) ) | |

AFFIDAVIT

| | | |
|---|---|---|
| STATE OF OHIO | ) ) | |
| COUNTY OF HAMILTON | ) ) | SS. |

Now comes, Dimetrious A. Ball, whose address is: 1132 Intercircle Avenue, Cincinnati, Ohio 45240, who being first duly cautioned and sworn, does state from his personal knowledge as follows:

1. I am not a defendant or party in the above-captioned matter.

2. I have no vested interest in any manner in the outcome of the above-captioned matter.

3. I am providing this sworn and truthful statement voluntarily. I have not received nor been promised anything in connection with this statement.

4. I have been a personal friend with Steven Rennick, Sr. for over 15 years.

5. I was present in the Courtroom on or about August 19, 2003, to provide support for Steve when he entered his

-1-

Comp Ex 3B  1of2

plea on federal marijuana charges.

6. I was shocked to hear the prosecutor state that Steve Rennick, Sr. sold marijuana to Matt Elliott and gave marijuana to Wayne Benjamine, both matters I was sure did not occur.

7. I observed Steve Rennick, Sr. motion his head from side to side gesturing these statements were untrue.

8. I listened as the judge made several inquiries of Steve as though she, too, had visually seen his surprise and denial.

9. I observed Attorney Gallagher nudge Steve and whisper to him.

10. Finally, Steve said those statements were true.

11. After the hearing I was with Steve and the other parties and lawyers and Steve was very upset with Gallagher over those two lies he insisted Steve agree with.

12. Attorney Gallagher kept telling Steve to calm down, he said it was a <u>fictional plea</u> to allow the court to give him acceptance of responsibility.

13. Steve continued to get more upset; he kept saying that those statements gave the court the impression that Steve dealt in drugs, which he never did.

14. All of the lawyers continued to tell the defendant's that they could not let probation know they made <u>fictional pleas</u> or the deals would be void.

15. Affiant saith nothing further.

_____
Demetrious A. Ball

Sworn to before me, a notary public in and for the State and County and subscribed in my presence this ~~day of November~~ 2004.
December 3 2004

_____
Notary Public

NOTARIAL SEAL

SEAL

TAMI McCOY ERVIN
Notary Public, State of Ohio
My Commission Expires October 15, 2007

STATE OF OHIO

-2-

Comp Ex 3B 2of2

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION AT CINCINNATI

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v | ) | Case No. 1:02-CR-00157 |
| | ) | |
| STEVEN M. RENNICK, SR., | ) | Judge Susan J. Dlott |
| | ) | |
| Defendant, | ) | |
| | ) | |

## AFFIDAVIT

Now comes Wayne Keith Benjamine, whose address is: 4561 Buxton Avenue, Cincinnati, Ohio 45242, who being first duly cautioned and sworn, deposes and states from his own personal knowledge as follows:

1. I am a co-defendant in the above-captioned matter.

2. On or about August 19, 2003, I appeared in U.S. District Court for the Southern District of Ohio before the Honorable Judge Susan J. Dlott for the purpose of entering a plea in the above captioned matter.

3. At the plea I was represented by attorney Greg Cohen.

4. During the plea the prosecutor said that I went to Mr. Rennick's garage and he gave me a pound of marijuana for my personal use.

5. That statement was a lie.

6. Attorney Cohen told me to say it was true so I would get less time.

7. After the hearing I was upset over telling the lie.

-1-

Comp Ex 3C (of 2

Attorney Cohen told me not to worry because it was a <u>fictional plea</u>; he also said I wouldn't get probation unless I said it was true.

8.    My Attorney, Greg Cohen, told me not to tell the PSI people that it was a lie or I would not get probation.

9.    I never received any marijuana from Mr. Rennick, Sr.

10.   At my sentencing I got probation.

11.   I do not have more to say.

_Wayne Benjamine_
Wayne Benjamine

Sworn to before me, a Notary Public in and for the state and county and subscribed in my presence this _4_ day of _December_ 2004.

_Notary Public_
Notary Public

LAURA R. NEIHEISEL
Notary Public, State of Ohio
My Commission Expires May 22, 2009

SEAL

-2-

Comp Ex 3c  2 of 2

SWORN DECLARATION

State of Kentucky          )
                           )
                           )
County of Fayette          )

I, Steve Rennick, Sr., being first duly sworn and cautioned do swear, attest, and affirm under oath and penalty of perjury the following are the truth, the whole truth and nothing but the truth so help me God:

On August 19, 2003, I appeared before the above captioned court and entered a plea of guilty, pursuant to an executed plea agreement to one count of "conspiracy to distribute marijuana in violation of 21 USC §§ 846 and 841(a)(1) and (b)(1)(B)."

Immediately following the plea hearing my counsel, William R. Gallagher, contacted Assistant United States Attorney Robert C. Brickler, who agreed I could benefit myself by "cooperating" or providing "substantial assistance" to the government. I was told to work with RENU Agent John Mercado, (on information and belief John Mercado is a Cincinnati police employee who at all relevant times was assigned to the Regional Narcotics Unit Task Force and was working in conjunction with the United States Attorney's Office).

Comp Ex 30          1 of 6

During my first meeting with Detective John Mercado (Mercado) had me execute three documents pertaining to being a "Confidential Informant" and I was fingerprinted.

I tape recorded every phone conversation with Mercado and I took a witness to every meeting.

I first arranged to purchase 1500 pounds of marijuana from a Solje Anderson. This transactions was to occur out of state. Mercado was fully aware of the details all along. At the last moment Mercado said his boss would not approve the deal because it was not in Ohio, and involved too much money. All conversations are again recorded.

I then arranged the purchase of 500 pounds of marijuana from a Yomiune Israel. All conversations are recorded. Mercado insisted I set this deal up at my son's trucking company. Israel spotted numerous police and SUV's behind the business and didn't show. He called me and said; "You're a cop." This attempt also failed. Mercado's boss, Kevin Coo, later told me the trucking company was a "dumb" location. I had no more possible suspects.

A little later I received a surprise male caller who advised me the 1500 pounds I ordered from Solje Anderson was now in Cincinnati and the price was now higher.

I notified Mercado at once. Mercado advised he needed time to organize the money, etc. I told Mercado I was to receive a

Comp Ex 3D 2 of 6

call at 2:00 p.m. Sunday.  Mercado instructed I was to call him
on a three-way call.  I was to say that the money man "Joe
Wilson" needed to speak with the seller (Joe Wilson was an alias
for Mercado).  Mercado was to buy time.

The dealer called on time.  I attempted a three-way call to
the number Mercado provided.  A woman answered.  She said there
was no "Joe Wilson" at that nubmer.  After several attempts I
could not get Mercado on the phone.  The dealer was very irate,
he said, "YOU'RE DEAD RENNICK; WE'VE HAD A BEAD ON YOU FOR TWO
DAYS, YOU'RE DEAD," and hung up.

I was terrified, could not reach Mercado.  Finally, reached
someone with RENU who merely told me to drive around and go home.
After several hours I went home.

On Friday, November 7, 2003, at 9:30 p.m. I was alone at
work.  I was washing up to leave when two men came from behind,
out of the darkened garage.  One person placed a gun at the back
of my head and said, "Rennick, you're dead."  I shoved the gunmen
backward.  Shots were fired as I headed out the door.  I was shot
in the leg and shoulder.

Another distinct voice yelled to the shooter, "Get him."
That voice was, without hesitation or doubt, the <u>voice of Cincin-
nati Police Detective and RENU Agent John Mercado</u>.

I fell in the front parking lot.  Wesley Hahn and one of his

co-workers from the Drive Thru Store next door ran to me and
called 911.  I was taken to University Hospital.

Within 20 minutes of the shooting, Mercado arrived at the
hospital.  There was no explanation as to how or why he would
have arrived so soon.  He asked if I knew who shot me.  I said I
did not, but that the shooter's voice was the same as the caller
who threatened me after he botched 1500 pound deal.  I did not
tell him I also recognized his voice saying "Get Him" at the
shooting.

Subsequent to the shooting an eyewitness has come forward
who was in his car in the Drive Thru adjacent to my son's business.
The witness saw one man throw an object into the woods behind the
shop.  The description of one of the suspects fits Mercado.  The
witness further described a vehicle the suspect entered and it
matched the description of a vehicle driven by Mercado.

Acting on the information of the eyewitness a search of the
woods behind the shop located a paper bag containing a firearm
possibly used in the shooting.

The bullets that hit me remain in my shoulder and leg.  I am
most willing to have them removed in order for any needed forensic
testing.

At my arrest the RENU agents seized a 2001 Freight-Liner/
Classic Semi Tractor.  This seizure was predicated on a theory

Comp Ex 3D 466

that this tractor was used to haul large quantities of marijuana. This tractor has been verified to the extent that it has never pulled a trailer before its purchase or since and, therefore, could never have been used for said purpose.

While on bond pending sentencing and after being shot. Mercado, in concert with a security representative from Provident Bank, obtained an "Emergency Arrest Warrant" for myself and stopped me on the highway and charged me with bank fraud concerning the financing on the truck.

Mercado appeared in court and asked a State Court Judge to hold me without bond or a $500,000.00 cash bond. The Hamilton County Superior Court Judge was irritated over Mercado's request since he had gotten an Emergency Warrant over a several years old transaction. I was released without bond and the case was ultimately dismissed.

Mercado has further followed and harrassed several of my family members and has made his presence known at various work sites of my son's business and continues to intimidate my family.

On information and belief I understand Mercado has been accused in at least one other shooting and may have been suspended for some period of time.

I am praying this court will refer this information to the proper agencies for investigation. I live in fear for myself and

my family.

Further Affiant Saith Naught.

Date: _January 12_ , 2005

_Steve Rennick Sr_
Steve Rennick, Sr.
Defendant, Pro Se
#04050-032  HCU
Federal Medical Center
P.O. Box 14500
Lexington, KY 40512

Sworn to before me, a notary public in and for the State and County set forth above; Steven Rennick, Sr., who provided photo identification, did subscribe hereto in my presence on the _12th_ day of _January_ 2005.

_____
Notary Public

n/p. 6/28/06
Fayette Co Ky

-8-

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION AT CINCINNATI

UNITED STATES OF AMERICA,                    )
                                             )
              Plaintiff,                     )
                                             )
         v                                   )    Case No. 1:02-CR-00157
                                             )
STEVEN M. RENNICK, SR.,                      )    Judge Susan J. Dlott
                                             )
              Defendant,                     )
                                             )

AFFIDAVIT

STATE OF OHIO                   )
                                )
COUNTY OF HAMILTON              )   SS.
                                )

Now comes, Anthony Battle, Sr., whose address is 8819 Grenada Avenue, Cincinnati, Ohio 45231, who being first duly cautioned and sworn, deposes and states from his own personal knowledge as follows:

1.  I am not a defendant or party in the above-captioned matter.

2.  I have no vested interest in any manner in the outcome of the above-captioned matter.

3.  I am providing this sworn and truthful statement voluntarily. I have not received nor been promised anything in connection with this statement.

4.  I have known and been friends with Steven Rennick, Sr., for over twenty five years.

5.  On or about November 1, 2002, I became aware that Steve

-1-

Comp Ex 3 E    1 of 3

Rennick, Sr. had been arrested of some type of federal drug offense.

6.    I was present when Steve Rennick entered a plea to the federal charge on August 19, 2003.

7.    Shortly after the plea, Steve advised me that the case agent on the Federal Case, John Mercado, had told him he could get a lesser sentence by becoming a Confidential Informant and assisting the government in developing other drug cases.

8.    Steve asked me if I could help him because he didn't know any people to set up.

9.    I advised Steve that I had met someone in the Justice Center where I was locked up for a period of time for domestic violence. Steve asked if I would go with him to meet with Mercado.

10.   I was present with Steve Rennick at his first meeting with Detective John Mercado.

11.   I observed Steve get fingerprinted and sign several documents relative to him becoming a registered Confidential Informant.

12.   At the meeting I personally heard Detective John Mercado promise that if Steve could set up a 500 lb marijuana bust that Steve would receive a sentence of straight probation.

13.   I informed Mercado that my contact, Solje Anderson, could supply that quantity.

14.   Mercado presented Steve and I with a photo of Solje Anderson and I identified the photo as the man I came to know at the justice center.

15.   I listened in and recorded the telephone communications between Steve Rennick and Agent Mercado. Agent Mercado clearly promised that Rennick would get probation if he assisted the government with this proposed deal.

16.   I also listened to and recorded a conversation between Steve Rennick and his attorney, Gallagher, during which Steve asked Gallagher if Mercado had the power to promise a sentence of probation. Attorney Gallagher told Steve that Mercado was working with the Assistant U.S. Attorney and, therefore, had the power to recommend such a sentence.

-2-

Comp Ex 3 E   dob 3

17. Even though I was not the Confidential Informant, Mercado issued me a tape recorder and told me to get all calls involving the drug transaction on tape.

18. I am completely knowledgable about all tape conversations, and tapes exist to confirm statements herein.

19. Steve and I had four more personal meetings with Mercado concerning the drug bust.

20. We originally set up a deal with Soje Anderson to purchase 1500 pounds from his connection in Arizona.

21. After setting up the 1500 pound drug buy, Mercado advised Steve and I the deal could no longer take place in Arizona, but would now have to occur in Cincinnati.

22. When the 1500 pound deal fell through, I further helped Steve by getting another buyer for a 500 pound buy in Cincinnati.

23. Mercado told Steve and I that the 500 pound deal would also end up getting Steve a sentence of no more than probation.

24. During this entire period of time I electronically recorded conversations with drug dealers, and I also recorded conversations with Mercado. There are about 15 taped conversations in all.

25. Further Affiant saith naught.

*Anthony D. Battle Sr.*
Anthony Battle, Sr.

Sworn to before me, a notary public in an for the State and County and subscribed in my presence this <u>2nd</u> day of <u>December</u> 2004.

JANIE HENRY
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES
March 29, 2009

Notary Public

SEAL

-3-

comp ex 3E 3of3