FILED
JAMES BONINI
CLERK

05 APR 14 PM 2:31

U.S. DISTRICT COURT
SOUTHERN DIST OHIO
WEST DIV CINCINNATI

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

| | |
|---|---|
| STEVEN RENNICK, SR., | |
| Movant/Defendant, | Case No.: CV-1-05-00050 |
| vs | CR-1-02-157-3 |
| UNITED STATES OF AMERICA, | Hon. Susan J. Dlott |
| Respondent, | U.S. District Judge |

### REQUEST FOR JUDICIAL NOTICE

Comes the defendant, Steven Rennick, Sr., pro se, and does pray this court to Notice and Supplement the Record with the contents herein which are offered under oath and under penalty of perjury, and defendant does state as follows:

On January 26, 2005, defendant filed his timely petition pursuant to 28 USC Section 2255. On February 22, 2005, the defendant filed a "Motion to Supplement by Addendum" said Section 2255 motion which this court granted leave to file. (The addendum was filed simultaneous with said motion).

On February 17, 2005, Assistant United States Attorney (AUSA) Robert Brickler filed a request for 30 additional days to respond citing the need to investigate newly raised allegations which defendant raised in his Section 2255 motion. (The defendant has never received advice as to whether said continuance was issued).

-1-

The respondent's response, assuming the extension was granted, was due on March 17, 2005, which date has passed without response.

Among the allegations included in defendant's pleading are facts and allegations suggesting that defendant's Case Agent, John Mercado, may have been involved in the shooting of the defendant <u>while the defendant was registered with the government as a Confidential Informant.</u> This matter is currently under investigation by the Cincinnati Police Department.

During the course of this investigation the police have had numerous hours of conversations with people associated with or related to the defendant. Many of these telephone conversations were recorded, (defendant's family having previously disclosed the fact that all such calls are being recorded, which is the result of continuing threats by phone which they have received).

Transcripts of these conversations indicate that the police are being partially directed by AUSA Brickler and to the extent that police have discussed the defendant's motion pursuant to 28 USC Section 2255, it seems that their investigation is now related to the matters presently before the court. Since it appears this investigation may be the one alluded to in respondent's Motion for Extension of time; and because there is a fair amount of misstatements of fact, the defendant does provide the following sworn and attested statement under penalty of perjury:

STATE OF KENTUCKY       )
                        )
COUNTY OF FAYETTE       )
                        )

## SWORN AFFIDAVIT

I, Steven Rennick, Sr., the pro se defendant in the above captioned matter, do swear, attest, and affirm, under oath and penalty of perjury as to each of the following:

1. It has been stated that I have said that John Mercado shot me. I did <u>not</u> make that statement. I do not know the identity of my would-be assassin.

2. I have always, from the very night of my shooting, said I heard two voices. The first voice directly behind me said, "Rennick you're dead." At that moment I swung backwards and a shot fired, hitting my left shoulder; a second voice yelled "Get Him" as I moved toward the door and the second shot hit my left leg. I have always maintained that the first voice was that of the same man who threatened me days earlier because he was determined I was setting him up on a drug deal. I have always maintained the second voice was that of John Mercado, and I earnestly so maintain again herein.

3. Transcripts record a conversation between my sister, Joanne Childers (J) and Cincinnati Detective Bob Randolph (R) as follows:

   (R) "Hold on a minute. Here is the problem that I have, okay. He got shot in November of 2003. In December, after the trauma of getting shot is beginning to wear off and he is healing, and he is getting a little better, he doesn't say that. In January of '04 he doesn't say the voice and Mercado. In February of '04 he doesn't say the voice of Mercado. In March of '04 he doesn't say the voice of Mercado. Do you see the point? April, May, June, July, August, September, October, November, December. In Jaunary of 2005"-
   (J) "When he was in prison."
   (R) "Fifteen months later, he says there was another voice. I recognize that voice as Agent John Mercado. The voice said 'get him.'" [Tape 2, pg 4].

4. Detective Randolph made multiple statements through many conversations intimating that I never implicated John Mercado until January 2005.

5. Detective Randolph has never interviewed me on these matters despite the fact that I recently was housed in the Justice center where an interview would have been more convenient for him.

-3-

6.  When my sister told me the problem Detective Randolph was having over his belief that I never mentioned hearing Mercado's voice until 15 months later, I gave my sister some of the names I told right after the shooting and asked her to relate those to Randolph so he could resolve the matter. The following conversation took place:

7.  (J) "He said if you would talk to Dave Munis (sp) at OMI [Office of Municipal Investigations] he knew that had all come up before that. Ken Lawson knew. Todd Morris knew, who is the probation officer, do you know him?"
    (R) No, I don't.
    (J) "He is in the Federal Building, I think. I can give you their phone number. He said, I told him, he is real anxious to talk to you."
    (R) "I don't even know we are going to at this point. It is up to my supervisors. We will wait and see when Steve gets here next week. I don't know. I have to review what we have come up with at this point with my bosses. They need to make a decision <u>along with Brickler</u>. Which way they want to go with this."
    (J) "What is Mr. Brickler saying?"
    (R) "I need to review it all with him. I have had discussions up to this point. I told you what he said about considering opening up a conspiracy investigation, that is on him. If that is what he chooses to do? At this point I need to sit down with my supervisors, which I have to do here and there as things have developed. Now we need to sit down and go over everything. And let them decide if they even want me to go talk with Steve when he comes here." [Tape 3, pp 17-18].

8.  It is my understanding from these conversations that even though there are numerous witnesses who know I have made the same statements from the very night of the shooting until the present, the police have now determined they have no need to interview me or verify my position with any of the witnesses.

9.  For the record; I was shot on Friday, November 7, 2003. I recall telling a doctor in the emergency room words to the effect of, "a cop was involved in my shooting." I have no knowledge of who I told. I also remember an emergency room doctor talking to me about removing the bullets and commenting to me, if a cop was involved you should probably leave them in so the police don't lose them.

10. On Sunday, November 9, 2003, I was visited by my wife Phyllis and two daughters, Melissa and Becky. I was also seen by probation officer Todd Morris. I told all four of them about

      hearing Mercado's voice. This was within 48 hours of the shooting.

11. I also advised my lawyer, William Gallagher, as well as my co-defendants and their attorneys, Kenneth Lawson and Gregory Cohen about my suspicions.

12. On advice of counsel, I met with Mr. Dave Munis (sp) with the Office of Municipal Investigation (OMI). He seemed interested in the matter and promised he would look into it. I specifically reported to him that I heard Mercado's voice during the shooting.

13. I was subsequently informed that the matter was transferred to an Agent Green, with the FBI and OMI was no longer involved; I have no first hand knowledge if that is true.

14. After I was sent home to recover, I was never left at home alone. My family started getting threatening phone calls and cars would slow and sometimes stop at the house. Within the first two weeks I called the Fairfield Police who came to the house. I advised them I had been shot, that I was afraid, and that I had heard a Cincinnati detective's voice during my shooting. The police started routinely checking by my home.

15. I also told my orthopedic doctor, Dr. Metidge, all about my shooting and my hearing of Mercado's voice at the shooting.

16. At this same time period I was having treatment and therapy for my condition of Post Traumatic Stress Syndrome. All details of the shooting, including Mercado's role, was discussed and recorded in my Veteran's Classified Mental Health Record.

17. These are only some of the people told of Mercado's voice being at the shooting, and were told contemporaneously to the time of the shooting.

18. The detective's assertion that I waited until January 2005 is not supported by the verifiable evidence in this matter. I have told the same facts to everyone involved all along.

19. As stated in other documents, John Mercado arrived at the University of Cincinnati Hospital very soon after I was brought in. I recall that even a doctor made the comment, "You must have been on scene." When Mercado came in where I was, I was very afraid and, understandably, I did not say that I heard him say "Get Him" while bullets tore into my flesh.

20. Mercado asked; "Didn't Tony Battles leave the shop about 20 minutes before this happened?"

21. I said, "I don't know." That was not true. I did know, and Tony Battles had left almost exactly 20 minutes before the shooting. The fact that Mercado was correct confirmed in my mind that I heard his voice because there was no way to know when Battles left unless you were there or you were watching from somewhere near by and, if you were watching, you would have seen the shooter(s) leave the building.

22. Detective Randolph also advised my sister that the statement I received from a witness was a scam. He advised that there was no such person and the entire document was false. He specifically said many parts were fraudulent, including, inter alia; (1) There is no person named Antonio Louis employed by CG&E nor has there ever been; (2) The phone number listed in the witnesses statement is disconnected and never belonged to an Antonio Louis, (many people use phones not in their own name); (3) The notary is a "90 year old black man" who claims his notary stamp and impression seal were stolen 18 months before this signing, so the notary signature is forged; (4) there is no date on the document.

23. In the month of May 2004, I received a message to call my friend Demetrius Ball (hereinaftger referred to as "Duke"). When I called him he informed me that the owner of the Drive Thru next to the shop where I was shot had spoken with a customer of his, and this customer, Antonio Louis, had observed two men exiting the rear of the shope while I was lying on the front parking lot, bleeding and awaiting help.

24. I have never met or spoken with the witness and all communications with this witness have occurred through Duke Ball or an investigator, infra.

25. The witness gave Duke a description of one of the men and the vehicle the man got in. The man and the vehicle description fit John Mercado, and the witness believes he could pick the man he saw out of a line-up.

26. The witness claimed to see one of the two men throw something like a bag into the woods behind the shop.

27. Relying on this information, I hired Jay Etter, with Stealth Investigations out of Dayton, Ohio (A referral from the law firm of Rion, Rion, and Rion) to search the woods for a possible weapon. The initial search was fruitless.

28. There were subsequent searches and, finally, a weapon was found, retrieved, and now is in police possession. The advising of Police Chief Striker of the finding of the gun was the reason the current investigation was started.

29. There would never have been a search or a gun found had the witness not come forward.

30. On September 28, 2004, Investigator Jay Etter met in person with Duke Ball and the witness and received the witness statement from the witness. I am told it was already notarized.

31. Detective Randolph has been very adamant that this witness is a fake and does not exist. (There are pages of transcripts in which the detective seeks to convince the defendant's sister that the witness is a fake.).

32. Duke Ball maintains that not only is the witness real, but that he is in contact with him.

33. Duke Ball now claims the witness has been threatened to not cooperate in this matter. However, the witness has agreed to an in-camera private inquiry with the court at a non-disclosed time. (If the court consents, the witness will contact the court for the court's scheduling).

34. I have never had contact with the witness nor has any member of my family. All the material and statements concerning the witness are the results of Demetrius Ball.

35. On February 25, 2005, I was in the Court of Common Pleas for Hamilton County, to testify in a state forfeiture hearing. One of my federal co-defendants in this matter, Mr. Wayne Benjamine, testified for me under subpoena. Officer Mercado testified for the state.

36. Several days after the testimony, Mr. Benjamin, who presently lives with his elderly grandmother at 4651 Buxton Avenue, Cincinnati, Ohio 45242, was the subject of a breakin vandalism of his grandmother's garage. Mr. Benjamine's truck and his grandmother's vehicles were severely damaged. A note was found at the scene that said; "Testify again and bad things happen to good people." Other than his testifying for me, Mr. Benjamine has not testified for anyone.

37. I am not accusing anyone of being a part of Mr. Benjamine's misfortune, I merely raise the coincidence to the court's attention.

38. Throughout Detective Randolph's conversations he has made many references to my 2255 motion and to AUSA Brickler:

    A.   (R)  "I have your brother's motion that he has recently filed."
          (J)  "The 2255."
          (R)  "Yes, with signed affidavits from Anthony Battle, Demetrius Ball, Wayne Benjamine, and your brother, Steven." [Tape 2 at 34-35].

    B.   (R)  "Well, listen to this. You know Mr. Brickler?"
          (J)  "Yes, ... I know who he is?"
          (R)  "Okay, he is the Assistant U.S. Attorney. I have had conversations with him about this. At this point, depending on how this all shakes out, he is preparing to open up a conspiracy to commit fraud case on everybody involved in this. It is all bogus" ...

    C.   (J)  "Are you saying the judge are (sic) not going to even look at this?"
          (R)  "No, no, no, no."
          (J)  "That 2255?"
          (R)  "No, no, no. I never said that. I never said that. I am just telling you that Mr. Brickler informed me that with the information I have presented to him so far there is serious consideration. Depending on how it all evolves, okay. They may open up a conspiracy to commit fraud investigation. This thing is just kind of blowing up here. [Tape 3 at 3-4].

39. As a result of Detective Randolph's comments concerning AUSA Brickler, my family members are extremely frightened that they are going to be charged with the crime of conspiracy for attempting to help me.

40. For the record, I was shot twice on November 7, 2003, inside my son's place of business. I did not see who shot me, but I heard the voices I say I heard. Detective Randolph told my sister that Mr. Brickler has a statement and evidence that I had myself shot - that is not true, and is patently absurd.

41. I believe Detective John Mercado was present when I was shot. I ascribe no motive for his actions, but I believe it is the truth. Whether he was part of my shooting or not is irrelevant to my sentence, or my crime, and is separate from the other legal issues.

42. I have provided this lengthy material simply to make it a

part of the public record. All tapes and transcripts are available on request.

Further affiant saith naught.

_____
Steven M. Rennick, Sr.
Defendant, Pro Se

The foregoing was subscribed to before me by Steven M. Rennick, Sr., Inmate No: 04050-032, who provided photo identification, this ___13th___ day of April 2005.

S E A L

_____
Notary, State at Large, KY

6/23/06 — Forsyth C.

-9-

CERTIFICATE OF SERVICE

I, Steven M. Rennick, Sr., do hereby certify that the original of this document was filed with the Court Clerk identified below and a true and correct copy was further sent to the other party or parties identified below by depositing same into the prison legal mail box, postage prepaid, on the 12TH day of April 2005.

Steven M. Rennick, Sr.
#04050-032

Clerk of the Court
U.S. District Court
Southern District of OH
100 East Fifth Street
Cincinnati, OH 45202

Robert C. Brickler
AUSA
221 E. 4th Street
Suite 400
Cincinnati, OH 45202