FILED
JAMES BONINI
CLERK

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

05 NOV 21 AM 9: 28

UNITED STATES DISTRICT
SOUTHERN DISTRICT OHIO
WEST DIV. CINCINNATI

|  |  |  |
|---|---|---|
| STEVEN RENNICK, SR., | ) | |
| | ) | |
| Defendant, | ) | Case No.: CR-1-02-157-3 |
| | ) | |
| vs | ) | Hon. Susan J. Dlott |
| | ) | |
| UNITED STATES OF AMERICA, | ) | U.S. District Judge |
| | ) | |
| Respondent, | ) | |
| | ) | |

## DEFENDANT'S TRAVERSE OF THE GOVERNMENT'S
## RESPONSE TO DEFENDANT'S MOTION FOR BAIL
## PENDING APPEAL

Comes the defendant, Steven Rennick, Sr., pro se, and does herein reply in traverse to the Government's Response to defendant's motion for bail pending appeal and in opposition to the Government's Response does state as follows:

As a preliminary matter, the defendant avers that he is not an attorney; has no legal or professional training pertaining to the preparation and filing of legal motions or memorandums. The defendant seeks notice of such limitations and prays this court to construe his pleadings liberally in light of the Supreme Court holding in Haines v. Kerner, 404 U.S. 519, 30 L.Ed.2d 652 (1972); Cruz v. Beto, 405 U.S. 319 (1972); Lawler v. Marshall, 898 F.2d

-1-

1196 (6th Cir. 1990); <u>Hill v. U.S.</u>, 368 U.S. 424, 430 (1962).  The
allegations and averments in a pro se pleading must be taken as
true and construed in favor of the defendant.  See <u>Malone v.
Colyer</u>, 710 F.2d 258, 260 (6th Cir. 1983).

The entire basis for the government's opposition of defen-
dant's appeal bond is rested on an assumption that the defendant
has no trial issues that present a "substantial likelihood" that
they could lead to a reversal or a new trial; and further, the
government contends the defendant has no issue that presents a
"close question" or could go "either way" on matters that would
not be harmless error as set forth in <u>United States v. Pollard</u>,
778 F.2d 1177, 1182 (6th Cir. 1985).  The respondent's reliance
on his prediction of defendant's issues is misplaced.

The defendant did not dwell on his issues on appeal in his
bond motion because he did not feel he was obligated to do so.
In response to the government's opposition the defendant under-
stands the burden of proof has shifted and Congress has attempted
to make continued incarceration on post-conviction matters, the
standard.  With that reality recognized, the defendant would re-
mind the court that defendant is not required to prove herein that
his conviction will be reversed, but rather his burden is to show
a substantial likelihood he will gain a reversal or new trial.
Defendant accepts this burden and states as follows:

<u>APPELLATE ISSUES</u>

The first issue the defendant will present is a challenge to

his plea on the basis that it was neither knowing nor voluntary. The defendant will establish the government was directly and covertly involved in inducing defendant's plea, by mental coercion, overbearing the defendant's will.  See; <u>Brady v. United States</u>, 397 U.S. 742, 750 (1970).

The defendant will further show the government's role was intentional and deliberate and was not limited to one incident or one person, but involved several people and events.  The defendant will establish that AUSA Brichler intentionally lied about having certain evidence and witnesses that were untrue, but were designed to shake the defendant mentally and manipulate a plea.

This single issue, if sustained, is enough to reverse the conviction for prosecutorial misconduct, fraud, and deceit.  This issue, in essence, is a claim of actual innocence.  In truth, and in fact, the defendant is innocent and has always so maintained. Even the defendant's PSI statement for acceptance of responsibility makes clear the defendant did not admit any criminal activity.

The defendant will further show, on the record, that AUSA Brichler enlisted the services of a co-defendant to further coerce the defendant into entering the plea in this matter.  The defendant will show that the government's involvement and use of this private actor rises to the level demanding reversal because the improper conduct is directly attributable to the prosecution.  See; <u>United States v. Gwiazdzinski</u>, 141 F.3d 784, 788 (7th Cir. 1998), see also; <u>Sanchez v. United States</u>, 50 F.3d 1448, 1454-55 (9th Cir. 1995).

SECOND ISSUE

Was the defendant denied his 5th & 6th Amendment Rights when his sentence was based upon a quantity and type of controlled substance that was never proven to any trier of fact beyond a reasonable doubt?

In this case the defendant's sentence is initially based upon an estimation or other conclusory statement as to the quantity and type of drug and often the assignment of a range of quantity is little more than an arbitrary decision of a prosecutor with little or no verifiable basis. Such assignment of quantity is pure sophistry in most causes and the numbers are subject to negotiation at all stages because often there is not proof to support the entire amount a prosecutor chooses to hold a defendant liable for.

Defendant's third issue is based on the legal principles established in Blakely, supra, and applied to federal defendants in Booker, supra. Since the initial announcement of Blakely there has been overwhelming emphasis placed on its violation of a defendant's right to have all aspects affecting his sentence place before a jury or specifically admitted to by the defendant. The Blakely opinion even speaks of the need to provide intelligible meaning to the 6th Amendment jury trial guarantee. However, this is secondary to the affect of Blakely on the Fifth Amendment's Due Process concerns.

"The Due Process Clause requires the government

-4-

to prove a criminal defendant's guilty beyond a rea-
sonable doubt and trial courts must avoid defining
reasonable doubt so as to lead the jury to convict on
a lesser showing than due process requires." <u>Victor
v. Nebraska</u>, 511 U.S. 1, 114 S.Ct. 1239 (1994).

The concept of proof beyond a reasonable doubt is the corner-

stone of the entire concept of due process. There is no authority

to support any contention that a defendant can consent to a change

in the burden of proof for a criminal prosecution. This is so

because the burden of proof is not the defendant's to waive. See

<u>In re Winship</u>, 397 U.S. 358, 364, 90 S.Ct. 1068 (1970) (noting

the importance "in a free society that every individual going

about his ordinary affairs have confidence that the government

cannot adjudge him guilty of a criminal offense without convincing

a proper factfinder of his guilt with utmost certainty").

Facts and circumstances that incrementally increase a defen-

dant's sentence "are nothing more or less than criminal elements

and as such they trigger the requirements of the 5th & 6th Amend-

ments to the Constitution requiring separate indictment by a Grand

Jury, criminal trial quality due process, the right of confronta-

tion, trial by jury, and proof beyond a reasonable doubt." See

<u>U.S. v. Haddad</u>, 10 F.3d 1262 n. 2.

> "These concepts are deeply rooted in our system
> of jurisprudence; if a statute annexes a high degree
> of punishment based on certain circumstances, exposing
> a defendant to a higher degree of punishment requires
> that those circumstances be changed in the indictment
> and proved beyond a reasonable doubt." <u>Apprendi v.
> New Jersey</u>, 530 U.S. 466, quoting J. Archibald, <u>Plead-
> ing and Evidence in a Criminal Case</u>, 51 (15 Ed. 1862).

The concept of beyond a reasonable doubt is the common man's check and balance on the judiciary system, and is essential to our system of ordered liberty.  It should be clear that "The prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense."  Estelle v. McGuire, 502 U.S. 62, 72 n. 4, 112 S.Ct. 475.

> "A waiver of the right to a trial by jury, however, does not equate to a waiver of the right to have the government prove its case beyond a reasonable doubt."  Boykin v. Alabama, 395 U.S. 238, 243, 89 S.Ct. 1709 (1969).

This is the real meaning behind Blakely and Booker.  The entire reason for the fall of the mandatory federal guidelines was their disregard of the requirement of proof beyond a reasonable doubt and the obvious due process violations associated with judicial factfinding to a mere preponderance standard of proof.

In Blakely the Supreme Court, in an effort to give intelligible meaning to a defendant's 6th Amendment jury trial rights, made a finding forever changing our bedrock understanding of this most important of rights; namely, the right to have any and all aspects which affect the amount of liberty a defendant might lose to be proven to a jury beyond a reasonable doubt.

> "We hold that both courts [Booker & Fanfan] correctly concluded that the Sixth Amendment, as construed in Blakely, does apply to the [Federal] Sentencing Guidelines."  Booker, supra, at 2 slip op.

In this instant case the court made factual determinations

not supported by a verdict or a plea and made same to only a pre-
ponderance standard.  This was unconstitutional.

> "When a judge inflicts punishment that the
> jury's verdict alone does not allow, the jury has
> not found all the facts which the law makes essen-
> tial to the punishment, [then] the judge exceeds
> his proper authority."  Bishop, supra, § 87 at 55.

From the announcement of Blakely the focus quickly was on
judge vs jury on the question of factfinding.  The rule of
Apprendi,  "other than the fact of a prior conviction any fact that
increases the penalty for a crime beyond the statutory maximum
must be submitted to a jury and proved beyond a reasonable doubt."
Apprendi, supra, at 490; was in fact the applicable rule in
Blakely and, therefore, was touted as defining the 6th Amendment
jury right.

To this time some courts are still clinging to the notion
that Blakely/Booker matters are merely procedural because they
deal with replacing judicial factfinding with a jury; this is the
smaller picture.  The judge vs jury question was the central theme
in Schriro v. Summerlin, 124 S.Ct. 2519 (2004) in which the
Supreme Court refused to apply the holding in Ring v. Arizona, 536
U.S. 584, retroactively.  (A fact some courts now use to support
non-retroactivity of Blakely and Booker).

The 5th Amendment Due Process question is reasonable doubt vs
preponderance.  There is simply no question that a finding made to
a higher level of certitude will be considered more reliable than
one made on a basis of which side has the greater likelihood of

being correct.

Although a misallocation of factfinding responsibility (judge vs jury) may not warrant retroactive application, Schriro, supra, the same cannot be said for the retroactivity of application of a preponderance of evidence standard as opposed to a reasonable doubt standard. See; Hankerson v. North Carolina, 432 U.S. 233, S.Ct. 2339. (Giving retroactive effect to rule requiring proof of all elements of crime beyond a reasonable doubt and widening presumptions that shift the burden of proof to the defendant). The purpose of the reasonable doubt standard is "to overcome an aspect of a criminal trial that impairs the truth-finding function, and Winship is thus to be given complete retroactive effect"). Application of a lower standard of proof may be an error that significantly affects factfinding accuracy and undermines society's confidence in the outcome.

The undeniable reality resulting from Blakely is simple. If the government desires to increase sentences by additional months and years, it is not too much to ask the government to prove the elements of quantities, amounts, and other enhancements to a jury and beyond a reasonable doubt. "The Framers would not have thought it too much to demand that, before depriving a man of more years of his liberty, the State shoudl suffer the modest inconvenience of submitting its accusation to 'the unanimous suffrage of twelve of his equals and neighbors.' 4 Blackstone, Commentaries at 343, rather than a lone employee of the state." Blakely, supra, at 18.

The defendant is entitled to have the government prove the quantity and type of controlled substance which supports his sentence. This is the duty of the government and this burden of proof cannot be waived by the defendant. The defendant contends his sentence should be vacated and a new sentencing hearing convened for the purpose of the government to meet its burden to prove such items that affect his sentence.

This court has already, correctly, stated that Blakely, and Booker will apply at resentencing and will be reviewed on direct appeal. This fact is a firm indication of substantial likelihood the defendant will succeed on appeal. The government made no effort to prove beyond a reasonable doubt its contention as to drug quantity and no quantity was knowingly or voluntarily stipulated to by the defendant.

There can be no question that failure to prove the drug quantity will result in a sentence reduction as the defendant will be sentenced under 841(a)(1) and (b)(1)(C) which will not then be subject to a mandatory minimum. The creates a "substantial likelihood" the defendant will end up with a sentence lower than the amount of time the defendant has already served. This also establishes a "close question" that could be decided either way.

As discussed in the next issue, the defendant will also claim a structural error demanding reversal. It becomes clear from these issues that  there is every likelihood the defendant will not face additional incarceration.

THIRD ISSUE

Does the Fifth Amendment violation of utilizing the wrong and less demanding preponderance standard of proof, as opposed to the constitutionally guaranteed standard of beyond a reasonable doubt, as identified in Blakely v. Washington and applied to federal defendants in United States v. Booker; rise to the level of a structural error, thereby making such error per se retroactive including to matters on collateral review?

Since the first ruling handed down after the Supreme Court decided Blakely v. Washington, 542 U.S.___ (2004) until the present there has been non-stop argument over what it meant and to whom it applied.  The Attorney General's first response was to hold firm to a position that it had no application to federal defendants or to the United States Sentencing Guidelines (U.S.S.G.).  This school of thought was quickly dashed six months later when the Supreme Court ruled 5 to 4 in United States v. Booker, 543 U.S.___, 2005, that the holdings in Blakely did apply to federal defendants.

The Supreme Court added to the national legal confusion when a separate 5-4 majority determined the remedial "fix" in Booker by excising the statutes that made the U.S.S.G. mandatory, leaving the embattled guidelines as an advisory regime that must mandatorily be consulted, but nevertheless, may be descretionarily ignored.

From the onset the focus on Blakely became the 6th Amendment jury right.  The rule from Apprendi v. New Jersey, 530 U.S. 466

-10-

(2000), which was the cornerstone of Blakely, clearly established
that "other than the fact of a prior conviction, any fact that in-
creases the defendant's sentence beyond the statutory maximum must
be proven to a jury beyond a reasonable doubt." Seemingly over-
night the topic became judicial factfinding and whether the Sixth
Amendment jury right was a substantive vs procedural rule. The
Supreme Court added to the significance of the importance of the
jury's position when it said its purpose in Blakely was to give
substantive importance to the Sixth Amendment.

For all the immediate fury, the larger issue was going some-
what unnoticed. On the same day as the Blakely decision, the high
court also addressed Schriro v. Summerlin, 542 U.S. ___(2004).
This case dealt with the issue as to whether or not the Apprendi
type holding announced in Ring v. Arizona, 536 U.S. 584 (2002).
The issue here was jury versus judge factfinding and the determi-
nation was that Ring should not be applied retroactively because
there was no clear proof that a jury's factfinding was necessarily
any more accurate than that of a judge. In other words, the
Schriro Court looked only at the factfinder, not at the standard
of proof used to reach the finding. This was true because under
Arizona Law both the judge and the jury were constrained to make
their findings beyond a reasonable doubt. Once this logic began
to spread many circuits used Schriro to find Blakely and Booker
could never be held retroactive. See; Humphress v. United States,
398 F.3d 855 (6th Cir. 2005); McReynolds v. United States, 397

-11-

F.3d 479 (7th Cir. 2005); <u>Barela v. United States</u>, 400 F.3d 864
(11th Cir. 2005).

All of these courts essentially concluded that <u>Schriro v.
Summerlin</u>, supra, was dispositive and further concluded <u>Booker</u> and
<u>Blakely</u> were not substantive rules, but mere procedural rules and
that <u>Booker</u> was not a "watershed" rule that implicated the fair-
ness and accuracy of the proceedings.

These courts missed a major part of the <u>Blakely/Booker</u> rulings;
namely the Fifth Amendment issue concerning the standard of proof
being, preponderance versus reasonable doubt. In <u>Schriro</u> the
Supreme Court clearly stated; "the question of whether the "beyond
a reasonable doubt standard of <u>Apprendi</u>, supra, would be retroac-
tive on collateral proceedings is not before the court as Arizona
requires that judges find aggravating factors beyond a reasonable
doubt in death cases."

The above makes it very apparent the Supreme Court's deci-
sion in <u>Schriro</u> was never intended to be "dispositive" on the is-
sue of <u>Booker's</u> Fifth Amendment issues, including the potential
of its retroactive application. This point is driven home in
Justice O'Connor's dissent in <u>Blakely</u> supra, that, "despite
<u>Summerlin</u>, even final guideline judgments arguably remain open to
collateral attack." <u>Blakely</u>, 124 S.Ct. at 2549.

It is patently obvious that the standard of proof guarantee
of proof beyond a reasonable doubt is a foundation principle of
American jurisprudence with unwaivering precedent. This single

precise level of certitude is the most solemn constitutional pro-
tection between the accused and the government.  There is no ambi-
guity in such rulings as In re Winship, 397 U.S. 358 (1970) and
Mullaney v. Wilbur, 421 U.S. 684 (1975) in which violations of the
Fifth Amendment protections were deemed to be "structural errors"
and were held to be retroactively applicable because they were
essential to accurate factfinding.  See; Ivan V. v. City of New
York, 407 U.S. 203 (1972) (holding Winship retroactive); Hankerson
v. North Carolina, 432 U.S. 233 (1977) (holding Mullaney retroac-
tive).  Given the historical significance and precedents support-
ing the constitutional protection of proof beyond a reasonable
doubt, it is difficult to understand the complete avoidance by
most courts to recognize this type of error as a structural error
requiring per se retroactive applicability.

One of the reasons many courts such as McReynolds have used
for support of their belief that Blakely/Booker are not retroac-
tive under the standards of Teague v. Lane's, 489 U.S. 288 (1989)
second exception is that; "[N]o conduct that was forbidden before
Booker is permitted today and no maximum available sentence has
been reduced."  This statement is simply not true.  Blakely clear-
ly pointed out:

> "Our precedents make clear, however, that the 'statu-
> tory maximum' for Apprendi purposes is the maximum
> sentence a judge may impose solely on the basis of the
> facts reflected in the jury verdict or admitted by the
> defendant." Ring v. Arizona, supra, at 602.

If this quote from Ring is not clear enough, the Supreme

-13-

Court went on to say; "In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." Blakely, supra, slip op at 7 [emphasis added].

When the Supreme Court applied the Blakely holdings to federal defendants in Booker, it applied all of Blakely, including this reaffirming of the definition of statutory maximum. Booker, therefore, potentially affects every federal statutory maximum by limiting the enhancing factors of every sentence to only those found by a jury to a standard of certitude of beyond a reasonable doubt or else specifically admitted to by the defendant. Clearly this changes the maximum sentence  available for certain crimes by limiting the sentence to only those facts which are proven beyond a reasonable doubt.

Most courts, but not the Supreme Court, have termed Booker as a new procedural rule, not of the "watershed" type contemplated in Teague, supra. However, the Supreme Court has subsequently recognized that the Teague exceptions not only involved new rules according constitutional protection of an actor's primary conduct, but also included the remainder of the Constitution's substantive guarantees. See; Penry v. Lynaugh, 492 U.S. 302, 329-30 (1989); Saffle v. Parkes, 494 U.S. 484 (1990). In particular, the court held that Teague's exception applied to a newly announced rule whereby the constitution "deprives the state of the power to

impose a certain penalty." Perry, 492 U.S. at 330.

So much of what is now being dealt with are sentencing rules, such as the United States Sentencing Guidelines (U.S.S.G.), which determines how much or what type of punishment can be imposed for a crime. These rules are clearly substantive as is aptly demonstrated by Furman v. Georgia, 408 U.S. 238 (1972) (which was later held retroactive in Walker v. Georgia, 408 U.S. 936 (1972) and Moore v. Illinois, 408 U.S. 786 (1972)), in which the Supreme Court held that the constitution forbids the imposition of the death penalty under the circumstances and statutes presented in the case. The decision merely forestalled imposition of a particular punishment and did not require the readjudication of guilty. This case, as in Apprendi, Blakely, and Booker did not relate to the processes by which criminal judgments are obtained. Instead, they all recognized that a court did not have the authority to impose the sentence that was imposed. In other words, Blakely/Booker reinterpreted the statute (the perspective guidelines) so as to narrow their scope and range as to some defendants. See; Davis v. United States, 417 U.S. 333, 346 (1974) and United States v. Johnson, 457 U.S. 537, 500 (1982).

In Penry, supra, as in Apprendi/ Blakely/Booker, it was not established that the defendant's conduct was not a crime, or that he deserved no punishment; the cases merely restricted the application of a particular punishment. Moreover, in Penry, the Supreme Court unanimously agreed that this new constitutional

-15-

interpretation fell squarely within Teague's exception for sub-
stantive criminal rules.

The holdings in Blakely, supra, which have now been extended
to the Federal Guidelines by Booker supra, are structural errors
which are not subject to harmless or plain error review and re-
quire reversal and are, therefore, immune from any question of
retroactivity.

The Supreme Court has long recognized that some basic trial
errors can never be treated as harmless error.  See; Brecht v.
Abrahamson, 507 U.S. 619, 113 S.Ct. 1710 (1993); Arizona v.
Fulminante, 499 U.S. 279, 111 S.Ct. 1246 (1991); Sullivan v.
Louisiana, 508 U.S. 275, 113 S.Ct. 2078 (1993); McKaskle v.
Wiggins, 465 U.S. 168, 104 S.Ct. 944 (1984); Waller v. Georgia,
467 U.S. 39, 104 S.Ct. 2210 (1984); Gideon v. Wainwright, 372
U.S. 335, 83 S.Ct. 792 (1963).

While most constitutional errors are subject to the harmless
error analysis, "structural errors are conclusively presumed to
affect the substantial rights of the defendant." United States v.
Higgs, 353 F.3d 281, 304 (4th Cir. 2003) (citing Neder v. United
States, 527 U.S. 119 S.Ct. 1827 (1999)).  Examples of structural
error include: "the failure to honor the core principle of proof
beyond a reasonable doubt; the complete deprivation of counsel;
the denial of the right to self-representation at trial; a biased
judge, and; the failure to preserve open and public trials." Id.,
(citing Sullivan, supra).

-16-

An understanding of structural error is enhanced by consideration of the class of errors that has traditionally been deemed as "per se structural error." In Gideon, supra, the complete denial of counsel unquestionably violated the Sixth Amendment right to representation and, therefore, required reversal without further analysis. An openly biased judge violated the Fifth and Fourteenth Amendments right to Due Process in Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437 (1927), and required immediate reversal. Similarly, racial discrimination in Grand Jury selection is now known to require reversal because of Vasquez v. Hillery, 474 U.S. 254, 106 S.Ct. 617 (1986). Defective reasonable doubt instruction as in Sullivan, supra, recognized that a violation of any portion of reasonable doubt rendered Fifth Amendment incurably mute. This was furthered by the holding in In re Winship, 397 U.S. 358, 90 S.Ct. 1068 (1970), which stressed the fundamental foundation of beyond a reasonable doubt to our entire structure of American jurisprudence.

These types of structural error have demanded automatic reversal without regard to harmlessness or any other analysis. In contrast, errors such as the omission of an element of an offense do not defy the harmless error review or affect the framework within which the trial proceeds, and thus, are not grounds for automatic reversal. See; Neder, supra.

All of these cases, however, are part of a cohesive whole - a "spectrum" of constitutional error. See; Brecht, supra, at 629.

-17-

The ultimate determination is always whether a substantial right was implicated. A substantial right is "an essential right that potentially affects the outcome of a legal action and is capable of legal enforcement and protection, as distinguished from a mere technical or procedural right." Black's Law Dictionary, 613 (7th Edition 1999). Clearly the cases reviewed above indicate that errors which violate constitutional rights such as due process, jury trial guarantees, counsel representation, and confrontation are substantial rights and the errors are therefore structural.

The understanding of substantial rights is apparent in Supreme Court precedential case law that indicates the difference between trial errors and structural errors is not a question of when the error occurred in the proceedings, but rather what right was violated as a result of the error. Structural errors implicate basic protections and render a trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence and no resulting punishment may be regarded as fundamentally fair. Neder, supra, at 8-9.

In United States v. Olano, 507 U.S. 725, 113 S.Ct. 1770 91993), the Court left open the question of whether structural error analysis fell within the Fed. R. Crim. P. 52(a) requirement of "affecting substantial rights." Id., at 735 (raising, but not deciding whether requirement that an error affecting substantial rights was synonymous with prejudicial or whether some errors falling under Rule 52(a) should be presumed prejudicial or could

be corrected regardless of their impact on the outcome).  That
question was resolved in Neder, supra, which applied the struc-
tural error analysis to the rule 52(a) context, recognizing that a
limited class of fundamental errors "defy analysis by 'harmless
error' standards."  Errors of this type are so intrinsically harm-
ful as to require automatic reversal (i.e., 'affect substantial
rights') without regard to their affect on the outcome.  Neder,
supra, cf. United States v. Harbin, 250 F.3d 532, 542-43 (7th Cir.
2001), (the errors impacting "structural rights" require reversal
because they impact the very foundation of a fair trial).  See
also; United States v. Santos, 201 F.3d 959-60 (7th Cir. 2000)
(Structural errors are reversible per se "because the error either;
is serious yet its affect on the outcome of a particular case is
difficult to establish, (an example is the denial of the right to
a jury trial); or it infringes a right unrelated or only distantly
related to the interest of making sure (as far as possible) that
innocent people aren't convicted; (allowing racially motivated
peremptory challenges of prospective jurors is an example.").
Therefore, those errors are conclusively presumed to be prejudi-
cial.

     It is beyond debate that the government must prove each ele-
ment of a charged offense beyond a reasonable doubt in order to
sustain a conviction.  See; In re Winship, supra.  This burden of
proof has been referred to as "an ancient and honored aspect of
our criminal justice system."  See; Victor v. Nebraska, 511 U.S.

-19-

1, 5, 114 S.Ct. 1239 (1994), noting that it plays "a vital role in the American scheme of criminal procedure... reducing the risk of conviction [or in the instant case, sentences] resting on factual errors." Victor, supra, also held it unconstitutional to shift the burden of proof because of the likelihood that the jury [or judge] could apply it to convict [or sentence] on the lesser burden of proof than the beyond a reasonable doubt standard.

This notion was emphasized as Sullivan, supra, taught; improperly instructing a jury on the burden of proof in a criminal case is structural error, thus, for a judge, who is without the authority to assess alleged facts that were not authorized by a jury verdict or admitted by a defendant, to judge those allegations to be true by a preponderance standard equally constitutes structural error.

The Supreme Court's holding in Blakely, supra, clearly establishes that Blakely errors must be viewed as structural errors. From the very onset Blakely was viewed predominantly as establishing a rule based upon the Sixth Amendment right to a jury determination and while this is true; it has also been wrongly characterized as only and primarily transferring factfinding from judge to jury. Again, while this fact is true, it is nonetheless secondary to its prohibition on shifting the burden of proof standard from beyond a reasonable doubt to the mere civil preponderance standard. It is the lesser standard of proof that violates the Fifth Amendment's Due Process Clause that should be the focus of paramount concern.

Part of the perception problem with both Blakely and now Booker, **supra,** is that they are viewed through a filter of various sentencing guideline systems and their impact on those systems has been more of a concern than the underlying principles of which they represent. The Blakely decision ultimately destroyed the Washington State Sentencing Guidelines, but, however, we must look to the cause and not the effect. What Blakely said was, any fact that increases a defendant's sentence must be proven to a jury beyond a reasonable doubt or admitted by the defendant. It made clear that the judicial factfinding by only a preponderance of the evidence violates the defendant's constitutional rights. It also made clear that this has always been the case as far back as Blackstone's writings on jurisprudence. Blakely deals with the clear violations of a defendant's substantial Fifth and Sixth Amendment rights and as such, constitutes structural error.

In a similar manner Booker supra, did not make new law, but merely settled the question as to whether Blakely applied to federal defendants. It is crucial to understand that Booker did not alter any part of Blakely nor did it expound on its holdings or alter the interpretation of anything found in Blakely, rather it merely deemed those same holdings announced in Blakely accurately, totally, and completely apply to every federal defendant, past, present, or future. The remedial portion in Booker has been the source of much debate, but none has any role in the structural error analysis. Booker's remedy is a self-admitted temporary

quick fix to keep the federal courts in operation until Congress can create a new system, and as such provides no clear instruction as to the correction of the structural errors created by the system it replaced.

Applying the Blakely structural error it becomes readily apparent that most existing sentences are not, nor indeed can be, supported by the jury's verdict beyond a reasonable doubt, or the specific facts admitted to by a defendant.  This is true because the prior sentencing regime was one in which, "a defendant with no warning in either his indictment or plea, would routinely see his maximum potential sentence balloon from as little as five years to as much as life imprisonment, based on facts not found by his peers beyond a reasonable doubt, but on facts extracted after trial from a report compiled by a probation officer who the judge thinks more likely got it right than got it wrong."  Blakely, supra, at 2542.

Obviously the violations of a defendant's substantial Fifth and Sixth Amendment rights of this magnitude render a review by the plain error standard inappropriate.  Moreover, since structural error is apparent, no further assessment of prejudice is required.  See; Sullivan, supra, (eschewing harmless error analysis since "there being no jury verdict of guilt beyond a reasonable doubt, the question of whether the same verdict of guilt beyond a reasonable doubt would have rendered absent the constitutional error is meaningless.").  The reality is that; to sentence a

defendant on facts found by a judge to an unconstitutional standard of proof has been unconstitutional throughout the entire history of the American criminal justice system.  As the Supreme Court emphatically stated in Sullivan, supra, that "to hypothesize a guilty verdict that was never in fact rendered, no matter how inescapable the finding to support the verdict may be, would violate the jury trial guarantee."

The government contends the right to a jury determination and the right to have all facts proven beyond a reasonable doubt are merely procedural formalities and should, therefore, render the holdings in Blakely as a new procedural rule not retroactive to matters on collateral review.  This position is misplaced and contrary to established and well settled precedents.

The government further advocates that such error must be subjected to the plain error doctrine of review as specified in Olano, supra.  This is inappropriate as it would require the Court to speculate on a jury's verdict had the sentencing factors been properly submitted.  This is not the same as dispensing with a minor element of "materiality" in a federal tax case found subject to the harmless error analysis in Neder, supra.  The Supreme Court decreed that, [T]he Sixth Amendment requires more than appellate speculation about a hypothetical jury's action, or else directed verdicts for the state would be sustainable on appeal." Sullivan, supra.

There is no logic to the position that Blakely is a procedural rule, it simply cannot be, nor can it be subjected to the

question of retroactive application as presented in Teague, supra.
Violations of due process to this magnitude are structural and go
to the very root of our system of justice.  As Justice Black wrote
for the unanimous Court in Cole v. Arkansas, 333 U.S. 196, 68 S.Ct.
514 (1948);

> "It is as much a violation of due process to send an
> accused to prison following conviction on a charge for
> which he was never tried as it would be to convict him
> on a charge that was never made...  To conform to Due
> Process of law, petitioners were entitled to have their
> conviction appraised on consideration of the case as it
> was tried and as the issues were determined in the trial
> court."  Id., at 201-02.

The substantial rights violated by Blakely/Booker are clearly
not procedural, but are fundamental principles of fairness required
to ensure society's perception of reliability in the outcome of
all criminal proceedings and these doctrines "apply with no less
force at the penalty phase of a trial... than in the guilt deter-
mining phase of any criminal trial."  Gardner v. Florida, 4320 U.S.
349, 97 S.Ct. 1197 (1977).  This was clearly stated in Blakely,
supra:

> "For reasons explained in Jones, Apprendi, and Ring,
> the requirements were clear.  The application of
> Washington's sentencing scheme violated the defendant's
> right to have the jury find the existence of any par-
> ticular fact that the law makes essential to his punish-
> ment."  Blakely, supra, (slip op. at 5).

That right is implicated whenever a judge seeks to impose a
sentence that is not solely based on facts reflected in the jury
verdict or admitted by the defendant.  Id., slip op. at 7.
Blakely/Booker impacts not only judicial factfinding, but equally

-24-

impacts the burden of proof by which the facts are found to be true. There is no logical way to deny the importance of a jury finding beyond a reasonable doubt and these fundamental rights are the cornerstone of our judicial system and their violations are structural errors demanding automatic reversal.

The Supreme Court has recognized that some cases do not fall neatly into any category or trial or structural error. In footnote nine of Brecht, supra, the Court opined that; "[o]ur holding does not foreclose the possibility than in an unusual case, a deliberate [as in mandatory guideline scheme] and especially egregious error of the trial type [as in the lower standard of proof under the guidelines], or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceedings as to warrant the grant of habeas relief even if it did not substantially influence the jury's verdict." Brecht, supra, at 638. The Court supported this conclusion in Greer v. Miller, 483 U.S. 107 S.Ct. 3102 (1987), which defined the four types of constitutional error. The fourth type is of concern in the instant matter as it includes "those errors that are so fundamental that they infect the validity of the underlying judgment itself, or the integrity of the process by which that judgment was obtained.

The Supreme Court's primary function has never necessarily been to correct mistakes or even reverse horrid manifest miscarriages of justice, but their primary function is to remove

disputes and splits between the circuits, thereby, hopefully, allowing the federal judiciary to all read from the same page.

Every federal court has been bombarded with pleadings focused squarely on <u>Blakely/Booker</u> errors and to date no court has identified the retroactivity issue in conjunction with the clearly established Fifth Amendment right to have all the facts of the conviction and sentenced proved beyond a reasonable doubt with the exception of <u>United States v. Kelley</u>, 355 F.Supp.2d 1031 (D.Neb. 2005). However, many have identified <u>Booker</u> errors as structural error. See; <u>United States v. Barnett</u>, 398 F.3d 516 (6th Cir. 2005) (adopting presumed prejudice holding of <u>Barnett</u>) (denied government's motion for en banc).

This issue alone, regardless of the context of whether the structural error lies with the violation of the Fifth or Sixth Amendments is the subject of much debate amongst jurists of reason, and now requires resolution by the high court. See; <u>U.S. v. Rodriguez</u>, 406 F.3d 1261 (11th Cir. 2005) (denying en banc) (Carnes, J., holding no structural error; Tjoflat, J., holding <u>Booker</u> error is structural; Barkett, J., concurring with dissent and finding structural error). Thus, the issue of structural error is not only debatable amongst jurists of reason in other Circuits, but also most emphatically with the justices of the Eleventh Circuit Court of Appeals.

-26-

The decision in U.S. v. Barnett, 398 F.3d 516 (6th Cir. 2005) defined the Booker error as structural, which pursuant to established Supreme Court precedent, "Each of these constitutional deprivations is a... structural defect affecting the framework in which the trial proceeds, rather than simply an error in the trial process itself." Arizona v. Fulminante, 499 U.S. 279 (1991) cf. U.S. v. Rodriguez, 406 F.3d 1261, 1282 (11th Cir. 2005). In Johnson v. U.S., 520 U.S. 461 (1997), the high court held that an erroneous jury instruction on the reasonable doubt standard was structural error in line with Sullivan v. Louisiana, 508 U.S. 275 (1993) (Because structural error affects the framework of the trial itself, its consequences... are necessarily unquantifiable and indeterminate). The late Chief Justice Rehnquist held explicitly in his concurrence of Fulminante that "we divided the class of constitutional violations that may occur during the course of a criminal proceeding, be it at trial or sentencing, into two categories [trial errors and structural errors] (emphasis added." Fulminante, at 499 U.S. at 310.

The debatability of the issue is abundantly apparent. In the Eleventh Circuit Court of Appeals, there is heated debate as to the Booker errors constituting structural error. As explained by Judge Tjoflat in his dissent in Rodriguez, that "there is constitutional error (based on the Sixth Amendment) when a judge enhances a sentence in a mandatory sentencing system based on facts not admitted by the defendant or proved to a jury beyond a reasonable doubt," and "there is statutory error (based on the severability

principles) when a federal judge applied the guidelines as man-
datory rather than advisory."  406 F.3d at 1284-85.

It is debatable at present as to the structural nature of the
Sixth Amendment violation and it not being subject to harmless
error analysis, thus, with the jury never even being given the
elements that enhanced the sentence for them to decide beyond a
reasonable doubt, the holdings of the 5th Amendment and <u>Sullivan</u>,
supra, are obviously implicated.  Therefore, due to the double
constitutional deprivation which defies analysis by the harmless
error standard, it must be structural error.  See; <u>Chapman v.
California</u>, 386 U.S. 18 (1967).

The debatability is further bolstered by Judge Carnes exhau-
stive list of what doesn't constitute structural error, none of
which involved the Sixth Amendment right to a jury trial <u>and</u> the
Fifth Amendment's proof beyond a reasonable doubt, singularly, or
in the conjunctive, as in the case at bar.

Most wisely Judge Carnes did concede that improper jury in-
struction on the beyond a reasonable doubt standard is structural
error, as in <u>Sullivan</u>, supra.  See; <u>Rodriguez</u>, 406 F.3d at 1268-
69.

The debate needs to be resolved.  Clearly, the longer this
matter lingers without decision, the greater the clogs upon the
federal courts.  It is obvious no court wants to be the one to ex-
pose hundreds of thousands of cases to review, but problems of
such scale never go away until confronted, dealt with, and resolved.

For all the reasons set forth herein this court should answer the question in the affirmative and find Blakely/Booker errors to be structural errors requiring remand and retroactive application.

The defendant avers that he has now demonstrated some of the issues which will be included in the defendant's appeal, there are several other issues not set forth herein which will also support a reversal or resentencing.

Finally, the government raises the traditional bond considerations of flight risk or danger to the community, neither of which would ever apply to this defendant.

The defendant is a lifelong member of this community and is an example of a strong family oriented father, husband, and brother. These family members need the defendant and he needs them. To eliminate the question of flight, the defendant and his family are proposing the following bond if the court deems such as appropriate:

The defendant's wife will pledge the family home located at 2 Peachtree Ct., Fairfield, Ohio, valued at $155,000.00. Defendant's wife further will pledge commercial property at 1975 & 1979 North Bend valued at $650,000.00 as well as 200 acres in Irvine, Kentucky, valued at $100,000.00.

The defendant's son, Steve Rennick, Jr., will pledge his home on Peachtree Court valued at $148,000.00. In addition, Steve Rennick, Jr., as sole shareholder of Earth Management, will pledge a lien on 31 vehicles or heavy equipment valed at over $1,100,000.

The defendant's daughter and son-in-law; Tom and Mellisa
Otten will pledge their home on Signon Way valued at $165,000.00;
and Joel and Becky Turnbull, another daughter and son-in-law, will
pledge their home at 5299 Fieldstone Ct., valued at $120,000.00.

The defendant's sister, JoAnn Childress will pledge her home
at 8260 Stahly Drive, valued at $20,000.00.

The defendant's other sister, Mary Scott, will pledge her
house on Hermie Street, valued at $102,000.00.

The family of the defendant is freely willing to pledge a
total of more than 2.5 million dollars in assets to secure the
defendant's bond.  Considering the fact that a default on the bond
would financially destroy an entire family, there is no doubt the
defendant would not pose any risk of flight.

This court should consider the excessive amount of time the
defendant remained free, both before and after sentencing.  There
was never any risk of flight and even when the defendant was shot,
under questionable circumstances while assisting law enforcement
officers, he still performed every condition of his bond.

Mr. Brichler is accurate about the defendant having the bur-
den of proof, but the defendant has met his burden at each junc-
ture.  Finally, the question of dangerousness is raised.  Despite
a pre-determined mantra that all drug crimes are done by dangerous
people, the government cannot allude to one matter suggesting the
defendant is a danger to anyone.  The plain reality is this defen-
dant is not a drug dealer and never has been, he is falsely con-
victed by a plea that the defendant was brainwashed and manipulated

into making.

The defendant does not own, or have access to, firearms or other weapons, nor as any such matters ever been claimed against this defendant.  The truth is this defendant poses no danger to this community and the government knows this, despite the pre-scribed claims of their opposition.

For the reasons set forth in defendant's original motion for release on bond pending appeal and the additional matters set forth herein, the defendant prays this court to grant its motion and release him on a bond the court deems appropriate pending the outcome of his direct appeal.

Respectfully submitted,

Dated: November 17, 2005

Steven Rennick, Sr.
#04050-032   HCU
Federal Medical Center
P.O. Box 14500
Lexington, KY 40512

-31-

## CERTIFICATE OF SERVICE

I, Steven Rennick, Sr., do hereby certify that the original of this document was filed with the Court Clerk identified below and a true and correct copy was further sent to the other party or parties identified below by depositing same into the prison legal mail box, postage prepaid, on the 17th day of November 2005.

Clerk of the Court
U.S. District Court
100 E. 5th Street
Cincinnati, OH 45202

Robert C. Brichler, AUSA
221 E. 4th Street
Cincinnati, OH 45202

Steven Rennick, Sr.
#04050-032  HCU
Federal Medical Center
P.O. Box 14500
Lexington, KY 40512