FILED
JAMES BONINI
CLERK

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

05 DEC 29 PM 1:39

STEVEN M. RENNICK, SR., )
)
    Movant/Defendant, ) Case No. 1-02-CR-157
)
vs ) Hon. Susan Dlott
)
UNITED STATES OF AMERICA, ) U.S. District Judge
)
    Respondent, )
)

MEMORANDUM IN OPPOSITION TO RESPONDENT'S MOTION

TO STRIKE DEFENDANT'S MOTION TO WITHDRAW GUILTY

PLEA AND RESPONDENT'S MOTION TO STRIKE DEFENDANT'S

OBJECTIONS TO THE PRESENTENCE REPORT

Comes now Steven Rennick, Sr., and does hereby file this Memorandum In Opposition to Respondent's two motions; (1) to Strike Defendant's Motion to withdraw plea and; (2) to Strike Defendant's Formal Objections to the pre-sentence report. The defendant in opposition to these two motions states as follows:

I.    Matters Subject to Reconsideration at Resentencing

    In this court's order vacating defendant's sentence to allow for the filing of a direct appeal the court describes the procedure as follows:

    In light of the facts and authorities reviewed above,

the Court concludes Petitioner is entitled to <u>immediate relief on his fifth claim</u>, and therefore GRANTS Petitioner's motion as to that claim. Therefore, in accordance with the procedure laid out by the Sixth Circuit in <u>Johnson</u> the Court will (1) vacate Petitioner's January 28, 2004 sentence; (2) <u>reimpose Petitioner's sentence</u>; (3) upon reimposition, advise Petitioner of "all the rights associated with an appeal from any criminal sentence," including the right to have a notice of appeal filed by the clerk of court; and (4) advise Petitioner that he will have ten days from the day his sentence is reimposed to file a timely notice of appeal in accordance with Federal Rule of Appellate Procedure 4(b)(1)(A)(I). <u>Johnson</u>, 2005 WL 1506050, at *2 (citing <u>Phillips</u> at 1201). <u>This procedure will also permit the Court to reconsider Petitioner's sentence in light of Booker and Blakely</u>. See, e.g., UNITED STATES v. Cash, 131 Fed. Appx. 200, 202 (11th Cir. 2005) (unpublished op.) (vacating and remanding district court order re-imposing sentencing according to procedure outlined above because district court failed to consier <u>Booker</u> in resentencing). [DE 210 p. 7].

This order is very important and in their Motion to Strike the United States concurred that "defendant's sentence must take into account the holding in <u>Booker</u>. Thus, because of <u>Booker</u>, the defendant's sentence must be a reasonable sentence within the statutory minimum of 60 months and maximum of 40 years." [DE 220 p. 2 fn 1].

The requirement to consider <u>United States v. Booker</u>, 543 U.S. ___ (2005) and <u>Blakely v. Washington</u>, 542 U.S. ___ (2004) is based upon the decision in <u>United States v. Cash</u>, 131 Fed. Appx 200 (11th Cir. 2005); in which the appellate court was forced to re-remand the case for the failure of applying the new holding set forth in <u>Blakely</u> and <u>Booker</u>.

In the United State's concurrence that <u>Booker</u> should be considered at resentencing, the government concludes the defendant

must now receive "a reasonable sentence between 5 and 40 years." This statement is presuming a mandatory minimum which is based solely on the quantity of drugs which has never been established by a jury (or judge) beyond a reasonable doubt. The mere mention of a quantity in an indictment or in the description or heading of a crime does in no manner prove with any measure of certitude the amount of drugs and further he was not even asked to agree. There is no evidence supporting any quantity in the record. Because the government never set out to prove any quantity; the record itself cannot support the requisite amount of marijuana to reach the threshold to effect the mandatory sentence. This fact alone changes the sentencing range to 0 months.

The defendant was sentenced under 21 USC 841 (b)(1)(B), which carries an imprisonment which may not be less than five (5) years and not more than 40 years. The absence of proof or admission of quantity make the defendant eligible for the penalties of § 841(b)(1)(C), which has no minimum and a maximum of 20 years; or § 841 (b)(1)(D) which has no minimum and a maximum of five (5) years.

The <u>Booker</u> consideration is, therefore, very important in that it will require the proof of quantity beyond a reasonable doubt. The government cannot prove any amount to be attributed to this defendant because the defendant is innocent and the evidence will so demonstrate.

It must further be considered that the requirements under the remedial fix of <u>Booker</u> require the court to consider the

guidelines as advisory. The guidelines, however, must still be considered and to do so requires the consideration of the Pre-Sentence Report (PSR). At the first sentencing the defendant never read his PSR. The defendant relied solely on his counsel. When the defendant finally read the PSR he came to realize the number of things that were simply incorrect.

During defendant's first meeting with appointed counsel, W. Kelly Johnson, counsel asked defendant to make a list of all the objections to the old PSR. When the defendant realized how many there were, it made sense to just write the objections and file them pro se to save time. The defendant would not have made the formal objections absent the suggestion of counsel. There is no doubt that a defendant has the right to object to an erroneous PSR and, further, that the government bears the burden of proof at the sentencing. Defendant's first counsel failed to object to anything, but there is no procedure to consider <u>Booker</u> at resentencing without resolution of errors and objections in the PSR.

Since the court and the government agree the resentencing must reflect the holdings in <u>Booker</u>, it seems appropriate to discuss exactly how these holdings will be applied. <u>Booker</u> states:

> "It requires a sentencing court to consider Guidelines ranges, see 18 USCA § 3553(a)(4)(Supp 2004), but it permits the court to tailor the sentence in light of other statutory concerns as well, see § 3553(A)(Supp 2004).

Under this advisory system the court must consider the Pre-Sentence Report. This will require the court to extend all rights

and procedures afforded a defendant in challenging the contents of said report. The court will further be required to consider any and all evidence which may or might mitigate the defendant's role in said offense. The court shall entertain background and character witnesses, as well as any other material or testimony likely to affect the sentence outcome.

The defendant also has the right to place before the court the defendant's medical records and history, both physical and mental, that might be relevant to defendant's sentencing.

The defendant fully intends to take full advantage of each and every opportunity allowable. In addition, the defendant retains the right to argue for any allowable departures from the guidelines. Certainly this would allow a request for a medical departure. It would also allow the defendant to again argue for a departure for substantial assistance to the government, and this time the defendant has a right to shield himself against clear errors made at the first sentencing, including past counsel's refusal to call witnesses and play tape recordings that will indicate what took place during defendant's attempt to help the government.

Of central concern to the defendant will be the issue of being shot twice while assisting the government. It is very rare for a federal confidential informant to be shot twice and then receive no substantial assistance reduction. It is more rare for there to exist evidence indicating the case agent (John Mercado)

was present at said shooting and was involved. Finally, it is more rare for the defendant to have numerous audio tapes documenting everything that transpired while serving as a confidential informant. The court offered to allow defendant to present this material at the first sentencing, but defense counsel erroneously declined. However, the defendant intends to enter all such material at this sentencing hearing and the material is appropriate and necessary for the development of a fair and just sentence. The defendant also intends to call several witnesses in connection with this portion of the hearing.

Clearly, in light of the above, it becomes apparent that objections to the PSR are an essential part of the procedure; otherwise the mandatory consideration of the advisory guidelines would be meaningless. The defendant has set forth those portions of the PSR to which he objects, and it is the defendant's understanding that the United States has the burden of proving, beyond a reasonable doubt, those matters objected to.

To strike the defendant's PSR objections would be to ask the court to proceed with matters already objected to in the record and, thus, could contaminate the results of the new sentencing.

II. <u>Reasons to Consider Withdrawing Guilty Plea</u>

The United States is also asking the court to strike defendant's Motion to Withdraw Guilty Plea. Before arguing the matter, it is important to note that appointed counsel, W. Kelly Johnson, wrote said motion to withdraw guilty plea and brought same to the

Grant County Jail for defendant's signature (Johnson executed the Certificate of Service). This motion is 100% Johnson's doing and it appears to be done to look like a pro se motion, which clearly it isn't.

When Johnson brought said motion to the jail, he said he had read so much of the file and it appeared that the reason the defendant's first motion to withdraw plea was unsuccessful was because it was made after the defendant was sentenced and he felt the actual innocence claim should be put before the court and give the court the chance to withdraw the plea and allow the United States to prove its case, if it can.

The defendant has told this court over and over that he never wanted to plead guilty and that he was improperly manipulated into entering an untrue plea. The defendant has previously advised the court tht AUSA Brichler hired Matthew Elliot to persuade a plea and paid him with a 5K1.1 reduction for a job well doen.

The defendant has submitted Mr. Elliot's sentencing transcript in which Elliot's attorney, Kenneth Lawson, informs the court of the whole deal. The defendant has also shown that when Mr. Lawson expressed a possible need to listen to the Rennick tapes and evaluate the level of cooperation - Mr. Brichler quickly granted a downward departure for Elliot to keep Lawson from going any further.

Clearly all of the above has been presented before this court and it is all reincorporated here by reference. The real issue

is what does it all mean - it means that defendant did not enter his plea knowingly or voluntarily and, therefore, it should be reversed.

A.   Court has Authority to Withdraw Plea

It is well established that a district court may allow a defendant to withdraw a plea of guilty. One of the allowable reasons for withdrawing a plea is that the defendant provides "a fair and just reason" for the withdrawal. See Fed. R. Crim. P. 11(d)(2). One such fair and just reasons exists when a defendant asserts his legal and actual innocence as has this defendant. United States v. Ford, 993 F.2d 249 (D.C. Cir. 1993).

B.   Defendant has Steadfastly Maintained His Innocence

A fair reading of the plea hearing makes it clear that the defendant became visibly upset during the reading of the "factual basis" for the plea. The "facts" were not true. In order to make the facts align with the reductions given the co-defendants for their help in manipulating the defendant's plea, the government simply created a fictional story. In this story the defendant returned to Cincinnati in the pre-dawn hours of October 16, 2002, driving a custom Freightliner Semi-Tractor with no trailer. This tractor allegedly contained three (3) adults, their luggage for five days, and 500-800 pounds of marijuana. The story further said the marijuana was unloaded into a part of a warehouse the defendant leased to another co-defendant, Karem Cole. Later the

-8-

same day co-defendants Matthew Elliot and Eddie Moore dropped by the warehouse and bought 50 pounds of marijuana from the defendant. Finally, and completely from left field, the government claims that on July 19, 2002, the defendant gave co-defendant Wayne Benjamin one pound of marijuana. This date of July 19, 2002, is an interesting date in that, for reasons not known to the government, no such transaction could have ever occurred on that day or during that 24 hour period.

As these untruths were read the defendant began shaking his head from side to side, indicating no, these things were not true. The judge advised him to state if they were true. Counsel Gallagher whispered to the defendant, "you'd better say yes." The defendant lied to the court and stated the factual basis was true.

When the defendants left the courtroom, all three were upset. The three defendants and their three attorneys, Gallagher, Lawson, and Cohen, all huddled together. Several of the family joined in. The lawyers kept saying, "calm down, it is just a fictional plea." The defendant has recorded evidence that these lawyers acknowledge the concept of a fictional plea and claim to do them "all the time."

At this point the defendant started wanting to withdraw his plea and go to trial, but the lawyers all told him everything would be okay and he should work with the government and possibly "work off" all or most of his sentence. The defendant has previously filed affidavits concerning all the events which occurred while working with Detective Mercado as a Confidential Informant (CI).

The defendant's experience as a CI culminated when the defendant was shot twice while closing his son's business. This has also been discussed in prior pleadings. When the defendant was shot, he heard one unidentified voice say, "Rennick, you're dead!" He heard a second voice yell, "get him!, get him!" The defendant recognized the voice as being Detective John Mercado. The defendant has no doubt at all as to this fact. Because he was certain about the voice he became very fearful for his life.

The defendant was taken by EMS to the hospital. The next day or two he was visited by his pre-trial Probation Officer, Todd Ellis. At the time of this visit, defendant's wife and daughters were also present. The defendant told Officer Ellis about the shooting and about hearing Mercado's voice at the shooting. Ellis advised the defendant that he believed him and that the defendant should write Judge Dlott a letter and explain all of this. Ellis further agreed he would be responsible for delivery of said letter to the judge. The letter was immediately prepared and given to the judge. The letter categorically maintained defendant's innocence and indicated his plea was not voluntary.

In this letter to the court, the defendant made several unambiguous statements: "I knew nothing of the marijuana at the shop;" "I have never sold marijuana to anyone;" "I have never sold drugs in my life;" "I have never had anything to do with drugs;" "I am not a drug dealer!" These statements establish that this defendant was maintaining his innocence and such statements were made

well in advance of the first sentencing.

There is one uncontroverted truth in these proceedings; the defendant has always maintained he was innocent of these charges. The only time the defendant did not so maintain was the moment when the mental and emotional manipulation was more force on the defendant that he ws able to bear.

C.  **Defendant's Co-Defendants Excused From Conspiracy**

In United States v. Schwartz, 785 F.2d 673 (9th Cir. 1986) the court found that a fair and just reason for allowing a plea to be withdrawn existed where defendant's co-defendants were acquitted or removed form the same conspiracy charge. Both co-defendant Elliot and co-defendant Benjamin were named in the original conspiracy charge, but each was removed from the conspiracy to a lesser included offense in order to reward the co-defendants for their role in the manipulation of the defendant.

For the record, co-defendant Benjamin's charges were reduced to one count of simple distribution for which he only received probation. Co-defendant Elliot was charged with a lesser quantity of 50 pounds and received a 5K1.1 reduction departure for talking the defendant into entering a plea to the conspiracy charge.

D.  **Defendant Shot Twice While Acting as a Federal C.I.**

The defendant has previously well pled the details of his shooting and has unambiguously told of hearing Agent Mercado yell "get him - get him" while the shooting was taking place. As a

result of the defendant's accusations several key personalities in this case have done and said things that are at best confusing, and leave questions suggesting a cover-up or an attempt to obstruct justice.

In prior pleading the defendant has advised the court as to the existence of an actual witness who saw two men, (one resembling John Mercado), leaving the rear of defendant's business and throwing something into the woods behind the defendant's garage while the defendant lay bleeding in the front parking lot.

Once these papers were filed with the federal court, AUSA Brichler provided them to the Cincinnati Police, who assigned them to Detective Robert Randolph to investigate. In the meantime, the defendant hired investigators to search the woods. After several attempts, a firearm appearing to be a "Tech Nine" was found. The weapon was photographed, examined, documented, and turned over to two special agents assigned by Police Chief Strickler, an acquaintance of defendant's family.

Detective Randolph spent an inordinate amount of time on the phone with defendant's sister, Joann Childress. The two had several hours of conversation. During one of the early calls, defendant's sister comments; "I record all my calls!' Even after this direct warning, Detective Randolph talked on with every word being preserved. There are now transcripts of all these conversations. The tapes make it abundantly clear that Randolph wanted to make the matter go away. Randolph used Mr. Brichler's name over and

over. Randolph told Ms. Childress, "Brichler just today said if Steve doesn't drop this whole matter then he [Brichler] would indict all of Rennick's family." This threat was taken seriously enough that defendant's sister, wife, and son, all retained separate criminal counsel just in case. This threat has also served to strengthen everyone's fortitude all the more.

There is no way to know if AUSA Brichler really made such a foolish remark, but the hours of tapes indicate the AUSA wanted this matter to be dropped. One could well wonder why an AUSA would turn over federal court pleadings to local police in the first place.

The shooting of a CI is rare. As Officer Todd Ellis of the Probation Office said, "this has never happened [before]." If any law enforcement agency could find the would-be-assassain, that case would be considered more significant than most of the routine drug cases that CI's produce, yet in this case law enforcement has done little or nothing to investigate this matter. This is best demonstrated by two facts; (1) The victim searches and a gun is found in the vicinity of the shooting, the weapon is turned over to the police; (2) The victim advises the police the bullet has dislodged from his shoulder bone and "floated to just below the skin," where it's removal would take minutes as an outpatient, yet no one wants to see if the gun found shot the defendant. Why?

The tape recordings make very clear that Randolph is trying to give reasons to ignore the defendant's story. He tells on tape

to sister Joann; "Steve gets shot and why does he wait over a year to say he thinks he heard Mercado's voice?"

This would be a good point if it were true. Joann then tells Randolph, "there is a list of people he told right after the shooting, including Officer Todd Ellis, the ER doctors, Dave Monitz with 'OMI,' and more." As soon as this list came forth, Randolph said; "well, I don't need those anymore, Brichler has closed the investigation."

There should be no misunderstanding here; the defendant knows how ridiculous some of this sounds; bad cops, cover-ups, threatened witnesses, bought off attorneys, it does sound crazy and that is exactly what some bad folks are counting on. This is exactly why this court has an obligation to see this matter is looked at piece by piece.

The Cincinnati Police try to say there is no witness and yet a friend of the detective drove Detective Randolph to the witness' home and waited in the car while Randolph talked with the witness. After this meeting the witness became very afraid, but has continued to help.

The defendant could continue on and on, but the point is, there are many, many factors that suggest the truth has not come forth.

## CONCLUSION

The defendant respectfully prays this court to not strike either defendant's Formal Objections to the PSR or defendant's

Motion to Withdraw Plea for the grounds provided herein.

### PRO SE PLEADINGS

This pleading was written to be sent to appointed counsel for his approval and filing. Counsel has advised the defendant that the government and court are upset with defendant's pro se filing while appointed counsel is on the case. The defendant is filing this response solely because appointed counsel is out of town and unavailable.

It is important that the court understands that much of the defendant's problems are the result of dependence on prior counsel and whatever progress the defendant has made was done pro se. In the future, all matters will be sent through appointed counsel to file.

Respectfully submitted,

*Steven M Rennick Sr*
Steven M. Rennick, Sr.
#04050-032  HCU
Federal Medical Center
P.O. Box 14500
Lexington, KY 40512

<u>CERTIFICATE OF SERVICE</u>

I, Steven M. Rennick, Sr., do hereby certify that the original of this document, Memorandum in Response to Respondent's Motion, was filed with the Court Clerk identified below and a true and correct copy was further sent to the other party or parties identified below by depositing same into the prison legal mail box, postage prepaid, on the 27th day of December 2005.

Clerk of the Court
U.S. District Court
100 E. 5th Street
Cincinnati, OH 45202

Robert C. Brichler, AUSA
221 E. 4th Street
Suite 400
Cincinnati, OH 45202

W. Kelly Johnson
2000 URS Center
36 E. 7th Street
Cincinnati, OH 45202

Steven M. Rennick, Sr.
#04050-032   HCU
Federal Medical Center
P.O. Box 14500
Lexington, KY 40512