# FILED

JUL 3 0 2007    Page 2

MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT
SENTENCE BY A PERSON IN FEDERAL CUSTODY JAMES BONINI, Clerk
CINCINNATI, OHIO

| United States District Court | Southern Distict of Ohio |
|---|---|
| Name (under which you were convicted): Steven M. Rennick | Case No.: CR-1-02-157- |
| Place of Confinement: Federal Medical Center P.O. Box 14500, Lexington, KY 40512 | Prisoner No.: 04050-032 |
| UNITED STATES OF AMERICA | Movant (include name under which you were convicted) |
| v. | Steven M. Rennick, Sr. |

## MOTION

1. (a) Name and location of court that entered the judgment of conviction you are challenging: _____
   United States District Court, Southern District of Ohio
   Western Division located in Cincinnati, Ohio

   (b) Criminal docket or case number (if you know): __CR-1-02-157-3-SD__

2. (a) Date of the judgment of conviction (if you know): __January 27, 2006__

   (b) Date of sentencing: __Re-sentenced January 23, 2006__

3. Length of sentence: 63 months, 4 years supervised release, $10,000.00 fine
4. Nature of crime (all counts): Conspiracy to distribute      Assessment $100.00
   100 kilograms or more of a controlled substance, (marijuana) in
   violation of 21 USC § 841(a)(1) and § (B)(1)(B).  The other two
   counts (count number 2 & 4) were dismissed on a motion by the
   government.

5. (a) What was your plea? (Check one)
   (1)  Not guilty ☐         (2)  Guilty ☒         (3)  Nolo contendere (no contest) ☐
   (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count
   or indictment, what did you plead guilty to and what did you plead not guilty to? ___N/A___

6. If you went to trial, what kind of trial did you have? (Check one)    Jury ☐    Judge only ☐

Page 3

7. Did you testify at a pretrial hearing, trial, or post-trial hearing?    Yes ☐    No ☒

8. Did you appeal from the judgment of conviction?    Yes ☒    No ☐

9. If you did appeal, answer the following:

(a) Name of court: __United States Court of Appeals for the Sixth Circuit__

(b) Docket or case number (if you know): __06-3186__

(c) Result: __Conviction and Sentence Affirmed__

(d) Date of result (if you know): __March 12, 2007__

(e) Citation to the case (if you know): _____

(f) Grounds raised: __Guilty plea was not knowingly or voluntarily enterd;__
__2. Ineffective Assistance of Counsel in advising the defendant he__
__was entering a fictional plea; 3. 5th and 6th Amendment violation__
__in calculating sentence; 4. Breach of the plea agreement__

__This appeal was subsequent to defendant's re-sentencing to allow__
__for an appeal.  On March 26, 2007 defendant filed a Motion for Re-__
__Hearing and Rehearing in Banc which was ultimately denied.__

(g) Did you file a petition for certiorari in the United States Supreme Court?    Yes ☐    No ☒

If "Yes," answer the following:

(1) Docket or case number (if you know): _____

(2) Result: _____

_____

(3) Date of result (if you know): _____

(4) Citation to the case (if you know): _____

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

10. Other than the direct appeals listed above, have you previously filed any other motions,
petitions, or applications concerning this judgment of conviction in any court?

Yes ☐    No ☒

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: _____

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your motion, petition, or

application?   Yes ❑ No ❑

(7) Result: _____

(8) Date of result (if you know): _____

(b) If you filed any second motion, petition, or application, give the same information:

(1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: _____

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your motion, petition, or

application?   Yes ❑ No ❑

(7) Result: _____

(8) Date of result (if you know): _____

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your

motion, petition, or application?

(1) First petition:   Yes ❑   No ❑

(2) Second petition:   Yes ❑   No ❑

Page 5

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly
why you did not: _____

_____

_____

12. For this motion, state every ground on which you claim that you are being held in violation of the
Constitution, laws, or treaties of the United States. Attach additional pages if you have more
than four grounds. State the facts supporting each ground.

## GROUND ONE: Sentence did not fully comply with 18 USC § 3553(a)

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

See attached Memorandum

_____

_____

_____

_____

_____

_____

_____

### (b) Direct Appeal of Ground One:

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐   No ☒x

(2) If you did not raise this issue in your direct appeal, explain why: A similar issue was
raised as a "Booker" error.  _____

_____

### (c) Post-Conviction Proceedings:

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐  No ☐

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion, petition, or application?

    Yes ❑   No ❑

(4) Did you appeal from the denial of your motion, petition, or application?

    Yes ❑   No ❑

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

    Yes ❑   No ❑

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue: _____

_____

_____

_____

**GROUND TWO:** _Ineffective Assistance of Counsel_

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

              _See attached Memorandum_

_____

_____

_____

_____

_____

_____

_____

_____

_____

**(b) Direct Appeal of Ground Two:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

        Yes ☒   No ☐

    (2) If you did not raise this issue in your direct appeal, explain why: _____ _____ _____

_____

_____

**(c) Post-Conviction Proceedings:**

    (1) Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ☐   No ☒

    (2) If your answer to Question (c)(1) is "Yes," state:

    Type of motion or petition: ___ _____ _____

    Name and location of the court where the motion or petition was filed: _____ _____

_____

    Docket or case number (if you know): ___ _____ _____

    Date of the court's decision: _____ _____

    Result (attach a copy of the court's opinion or order, if available): _____ _____

_____

_____

    (3) Did you receive a hearing on your motion, petition, or application?

        Yes ☐   No ☐

    (4) Did you appeal from the denial of your motion, petition, or application?

        Yes ☐   No ☐

    (5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

        Yes ☐   No ☐

    (6) If your answer to Question (c)(4) is "Yes," state:

    Name and location of the court where the appeal was filed: _____ _____ _____

_____

    Docket or case number (if you know): ___ _____ _____

    Date of the court's decision: _____ _____

    Result (attach a copy of the court's opinion or order, if available):_____ _____

_____

_____

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue: _____

_____

_____

_____

_____

**GROUND THREE:** Defendant's plea was neither voluntary nor knowingly entered.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

See attached Memorandum

_____

_____

_____

_____

_____

_____

_____

_____

(b) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☒ No ☐

(2) If you did not raise this issue in your direct appeal, explain why: Though the defendant now alleges the coercive actions were the result of prosecutorial misconduct.

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐ No ☒

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion, petition, or application?

    Yes ☐   No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

    Yes ☐   No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

    Yes ☐   No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or

raise this issue: _____

_____

_____

_____

_____

**GROUND FOUR:** Breach of plea agreement and Ineffectiveness of
Counsel by refusing to take advantage of evidentiary hearing
on substantial assistance.
(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

See attached Memorandum

_____

_____

_____

_____

_____

_____

_____

_____

(b) **Direct Appeal of Ground Four:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

        Yes ☐ No☒☒

    (2) If you did not raise this issue in your direct appeal, explain why: <u>At the time of filing</u>
    <u>the appeal the defendant did not know defense counsel had</u>
    <u>opportunity for hearing on substantial assistance claims.</u>

(c) **Post-Conviction Proceedings:**

    (1) Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ☐ No ☒☒

    (2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

    (3) Did you receive a hearing on your motion, petition, or application?

        Yes ☐   No ☐

    (4) Did you appeal from the denial of your motion, petition, or application?

        Yes ☐   No ☐

    (5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

        Yes ☐   No ☐

    (6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue: _____

_____

_____

_____

13. Is there any ground in this motion that you have <u>not</u> previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them: _____

_____

_____

_____

_____

_____

14. Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the judgment you are challenging?    Yes ☐  No ☒

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised. _____

_____

_____

_____

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: William Richard Gallagher, 114 East Eighth St. Cincinnati, OH 45202 _____

(b) At arraignment and plea: ____ same _____

(c) At trial: _____ same _____

(d) At sentencing: 1st sentencing, Gallagher alone at re-sentencing- W. Kelly Johnson, Federal Public Defender 36 E. 7th, 2000 URS Center, Cincinnati, OH 45202

(e) On appeal: _____ Pro Se _____

_____

(f) In any post-conviction proceeding: ___ Pro se _____

_____

(g) On appeal from any ruling against you in a post-conviction proceeding: _____

_____

_____

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?     Yes ☐ No ☒X

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?     Yes ☐ No ☒X

(a) If so, give name and location of court that imposed the other sentence you will serve in the future: _____

_____

(b) Give the date the other sentence was imposed: _____

(c) Give the length of the other sentence: _____

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?   Yes ☐  No ☐

*Note:  I was also represented by Kenneth L. Lawson; 1008 Race St., Suite# 2., Cincinnati, OH 45202

18. TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*  Filed within one year from the date of affirmation by U.S. Court of Appeals for the Sixth Circuit. (see attached memorandum)

---

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

A one-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of —

(1) the date on which the judgment of conviction became final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Page 14

Therefore, movant asks that the Court grant the following relief: to vacate conviction and order new trial; and/or vacate sentence and resentence with instructions consistent with the attached memorandum.

or any other relief to which movant may be entitled.

_____

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on ___23rd day of July___ (month, date, year).

Executed (signed) on July 23, 2007 (date).

_Steven M[illegible]_

Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion. _____

_____

_____

_____

* * * * *

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

| | |
|---|---|
| STEVEN M. RENNICK, SR., | ) |
| Movant/Defendant, | ) |
| vs. | ) Civil No:_____ |
| | ) Case No.CR-1-02-157-3-SD |
| UNITED STATES OF AMERICA, | ) Hon. Susan Dlott |
| Repondent/Plaintiff. | ) U.S. District Judge |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION
## TO VACATE, SET ASIDE, OR AMEND CONVICTION
## AND SENTENCE PURSUANT TO 28 USC § 2255

Comes now the defendant, Steven M. Rennick, Sr., pro se, and does hereby move this Court for an Order Vacating and Setting Aside Defendant's Conviction and/or Sentence due to the violation of certain constitutional rights of the Defendant. This motion is brought before this court subject to the provisions of Title 28 USC § 2255. Pursuant to said statute the petitioner seeks all just and proper relief; and in support thereof the petitioner states as follows:

As a preliminary matter, the defendant avers that he is not an attorney; has no legal or professional training pertaining to the preparation and filing of legal motions or memorandums. The defendant seeks notice of such limitations and prays this court to construe his pleadings liberally in light of the Supreme Court

-1-

holding in Haines v. Kerner, 404 U.S. 519, 30 L.ED.2d 652 (1972); Cruz v. Beto, 405 U.S. 319 (1972); Lawler v. Marshall, 898 F.2d 1196 (6th Cir. 1990); Hill v. U.S., 368 U.S. 424, 430 (1962). The allegations and averments in a pro se pleading must be taken as true and construed in favor of the defendant. See Malone v Colyer, 710 F.2d 258, 260 (6th Cir. 1983).

## JURISDICTION AND TIMELINESS

Inasmuch as the defendant was found guilty and sentenced before the herein named district court, and inasmuch as the provisions of Title 28 USC § 2255 require that such collateral action be brought before the court having jurisdiction over said criminal conviction and sentence, jurisdiction is proper before this court.

Inasmuch as this action is brought within one year following defendant's sentence and conviction becoming final, or within one year following the issue of any appellate mandate being issued, or within one year of the conclusion of any Supreme Court decision or denial of certiorari; this filing is timely in accordance with the Anti-Terrorism and Effective Death Penalty Act (AEDPA) of 1996.

## PURPOSE

This motion is filed by a person in custody of the United States under a judgement of a United States District Court who seeks a determination that:

(1) the judgement violates the constitution or laws of United States;

(2) the court lacked jurisdiction to enter the judgement;

-2-

(3)   the sentence exceeded the maximum allowed by law; or

(4)   the judgement or sentence is otherwise subject to col-
      lateral review.

The broad purpose of federal habeas corpus review is to en-
sure that individuals are not imprisoned in violation of the
United States Constitution.  See Herrera v. Collins, 506 U.S. 390
(1993); Barefoot v. Estelle, 463 U.S. 880 (1983).

## METHOD OF REFERENCE

Throughout the entire memorandum the defendant refers to
exhibits and documents by their Docket Entry No., [DE-1...] and
also by specific page numbers in a joint appendix submitted in
two volumes with this filing illustrated as [JA-1...].  This
appendix was orginally compiled for defendant's appeal but is now
modified for this pleading.

## STATEMENT OF THE CASE

## NATURE OF THE PROCEEDINGS

Defendant was arrested on October 16, 2002, on Ohio State
charges.  On November 6, 2002, defendant was named, along with
five others, in a five count indictment charging, inter alia,
Count One: Conspiracy to distribute in excess of 100 kilograms
of marijuana in violation of Title 21 USC §§ 841(a)(1) and (b)
(1)(B) and § 846;  Count Two: Distribution of approximately 50
pounds of marijuana in violation of Title 21 USC §§ 841(a)(1)
and (b)(1)(D) and Title 18 USC § 2. [JA1-6].

On March 5, 2003, defendant was named in an eight count superseding indictment charging essentially the same conduct, but adding a charge of engaging in monetary transaction in violation of Title, 18 USC §§ 1957 § 2. [JA7-18].

The Court issued an order on August 15, 2003, compelling defendant's son to testify at defendant's up coming trial. [JA21-22].

On August 18, 2003, defendant arrived for the commencement of his jury tiral. The defendant had no intentions of entering a plea when he arrived at Court. As shown, infra, the defendant was ultimately manipulated into entering into a plea agreement to Count One. [JA23-26]. On the same day all three defendants entered their pleas pursuant to their plea agreements. [JA35-71].

On December 2, 2003, defendant caused an eight page letter to be transmitted to the judge and government categorically denying any guilt in the matters charged. [JA224-231].

On January 26, 2004, defendant's counsel filed a Motion for Downward Departure based on substantial assistance to the government and medical issues. [JA72-78].

On January 28, 2004, defendants were sentenced. Rennick's Motion for Downward Departure was denied. [DE-188]. Rennick was sentenced on Count One to 63 months in prison; four years supervised release; a $10,000.00 fine and a $100.00 assessment. [DE-188,157].

On January 29, 2004, defendant retained Kenneth L. Lawson as new counsel. [JA-79].

-4-

On the same date Mr. Lawson filed a Motion for Reconsideration.
[JA80-81].

On February 10, 2004, Mr. Lawson filed a Motion to Withdraw
Plea of Guilty. [JA-90]. On March 1, 2004, the Court denied Motion
to Reconsider and Motion to Withdraw Plea. [JA105-107].

At sentencing Mr. Rennick requested the clerk to file a notice
of appeal. [JA-108]. Nearly a year later Mr. Rennick discovered
no notice of appeal was filed.

On January 26, 2005, Mr. Rennick filed a pro se Motion to
Vacate Pursuant to Title 28 USC § 2255 [JA178-254] [Civil Action
No. 1-05-CV-050]. On March 2, 2005, defendant filed a Motion to
Amend his § 2255 motion [DE-198], which was granted on March 9,
2005 [DE-199]. On April 5, 2004, the court docketed the United
States response [JA275-283], in which the government sought denial
of all grounds. However, concurred with Mr. Rennick that his sen-
tence should be vacated and reimposed to allow a direct appeal.

On January 23, 2006, the District Court reimposed the same
sentence to allow timely filing of the notice of appeal. This
appeal follows:

A direct appeal followed and the Circuit Court affirmed the
conviction on March 12, 2007.

## STATEMENT OF FACTS

On October 15, 2002, RENU agents executed warrants at the
residence of Eddie Moore in Norwood, Ohio. Agents recovered 30
pounds of marijuana and arrested Moore.

Moore claimed to be storing marijuana for Mattew Elliot, his close friend. Elliot paid Moore small amounts of marijuana for personal use. Agents learned that Kareem Cole and David Jones, a/k/a/ Phillip Davidson, obtained marijuana through a source in Arizona and brought it into Cincinnati for distribution. The marijuana was alleged to be typically stored in a rented portion of a warehouse owned by Phyllis Rennick, defendant's wife.

On October 16, 2002, surveillance was set up on the warehouse. Agents observed Steven Rennick, Jr. and Matthew Elliot arrive at the warehouse. Later the defendant also arrived. Shortly thereafter, the defendant and Elliot left in one vehicle and Steven Rennick, Jr. left in another. Agents stopped and detained all three at two different locations. None of the three had any contraband on them or in either vehicle.

A search of the warehouse revealed an alleged 450 pounds of marijuana inside a seperate locked area of the portion of the warehouse leased to a Kareem Cole.

The Rennick family owns the entire warehouse and real property. The warehouse is divided into seperate leasable areas. The defendant's son operates the family trucking business in part of the building and the family rents the remaining space. The area in which the alleged marijuana was found was in an area leased under a lawful lease agreement to Kareem Cole. The defendant had keys to all areas of the building, as would any landlord.

-6-

RENU agents were able to locate the residence of Cole and established surveillance. On October 16, 2002, Cole and Jones left the residence in a rented vehicle. Agents stopped the car and detained both men. Cole's apartment and a vehicle were searched. Agents recovered scales, balance sheets showing money owed, marijuana, and $50,000.00 cash in the apartment. The vehicle contained a box that had 25 pounds of marijuana in it. It was also found that Cole had a key to the located portion of the warehouse where the 450 pounds of marijuana was allegedly stored, and a key that fit the door lock at the warehouse.

On December 2, 2003, Rennick wrote an eight page letter to the judge denying any role in the offense whatsoever. [JA224-231].

As an inducement to plead guilty Rennick was originally told he would receive a sentence of 36 months and that he would be able to work with case agent John Mercado as a confidential informant and by doing so could thereby get this sentence as low as only probation.

The details of defendant's good faith attempts at providing cooperation were submitted to the Court below in a sworn affidavit [JA246-251], and are summarized as follows:

During the first meeting with Detective John Mercado, Rennick executed three documents pertaining to being a "Confidential Informant" (CI) and Rennick was finger printed. Rennick tape recoreded every phone conversation with Mercado and took a witness to every meeting.

-7-

Rennick first arranged to purchase 1500 pounds of marijuana from a Solje Anderson. At the last moment Mercado said his boss would not approve the deal because it was not in Ohio, and involved too much money.

Rennick then arranged the purchase of 500 pounds of marijuana from a Yamine Israel. Mercado had this deal set up at Rennick's son's trucking company. Israel spotted numerous police and SUV's behind the business and didn't show. He called Rennick and said; "You're a cop." This attempt also failed.

Later, Rennick received an unsuspected male caller who advised the 1500 pounds defendant ordered from Solje Anderson was now in Cincinnati.

Rennick notified Mercado at once. Mercado advised he needed time to organize the money, etc. Rennick told Mercado he was to receive a call at 2:00 p.m., Sunday. Mercado instructed Rennick to call him on a three-way call. Rennick was to say that the money man, "Joe Wilson," needed to speak with the seller (Joe Wilson was an alias for Mercado).

When the dealer called, Rennick attempted a three-way call to the number Mercado provided. A woman answered. She said there was no "Joe Wilson" at that number. After several attempts Rennick could not get Mercado on the phone. The dealer was very irate; he said, "YOU'RE DEAD RENNICK; WE'VE HAD A BEAD ON YOU FOR TWO DAYS, YOU'RE DEAD," and hung up.

Rennick was terrified and could not reach Mercado.

-8-

Finally, he reached someone with RENU who told him to "drive around and go home."

On Friday, November 7, 2003, at 9:30 p.m. Rennick was alone at work. He was washing up to leave when two men came from behind, out of the darkened garage. One person placed a gun at the back of Rennick's head and said, "Rennick, you're dead." Rennick shoved the gunmen backward. Shots were fired as Rennick headed out the front door. He was shot in the leg and the shoulder.

Another distinct voice yelled to the shooter, "Get him, get him." That voice was, without hesitation or doubt, the voice of RENU Agent John Mercado.

Rennick fell in the front parking lot. The owner of the Drive-Thru Store next door ran to Rennick and called 911.

Within 20 minutes of the shooting, Mercado arrived at the hospital. There is no explanation as to how he could have arrived so soon. He asked if Rennick knew who shot him. Rennick said he did not. Rennick did not tell Mercado he also recognized his (Mercado's) voice saying "Get Him" at the shouting.

Subsequent to the shooting an eyewitness came forward who was in his car in the Drive-Thru adjacent to the defendant's business. The witness saw one man throw an object into the woods behind the shop. The description of one of the suspects fits Mercado. The witness further described a vehicle the suspect entered and it matched the description of a vehicle driven by Mercado.

Acting on the information of the eyewitness, a search of the

-9-

woods behind the shop located a paper bag containing a firearm
possibly used in the shooting.  The weapon was turned over to the
Cincinnati Police Department.

Rennick requested the court and/or the government to inves-
tigate these matters in that they contain most serious allegations.
The Assistant U.S. Attorney provided the defendant's § 2255 motion
and supporting documents to the Cincinnati Police Department, who
in turn assigned the matter to Detective Robert Randolph (Randolph).
The Detective spent several hours in phone conversations with the
defendant's sister (these calls are recorded).  The thrust of
these conversations were that Rennick's family needed to persuade
Rennick to withdraw his § 2255 motion or AUSA Robert Brichler was
going to indict various members of Rennick's family (again on
tape).

## ORIGINAL SENTENCING FACTS

Defendant was sentenced in accordance with the United States
Sentencing Guidelines(USSG), November 1, 2002 edition. Defendant's
base offense level for a violation of Title 21 USC §§ 846 and 841
(a)(1) and (b)(1)(B) is located at U.S.S.G. § 2D1.1  The sentence
was predicated on the allegation that the crime involved 800
pounds of marijuana or an equivalent of 362.88 kilograms.   The
appropriate range for this quantity is found at U.S.S.G § 2D1.1.
(1)(3)(c)(7), the base offense level is 26.  Defendant further
received a three level redcution for acceptance of responsibility
pursuant to § 3E1.1(a) and (b).

-10-

This resulted in a Total Offense Level of 23.

Defendant had a total of three criminal history points and, therefore, is in Criminal History Category II. The guideline sentencing range is 51 to 63 months. However, pursuant to U.S.S.G. § 5G.1(c)(2) the range is 60-63 months as a result of the minimum mandatory. Defendant was sentenced to 63 months. [Sealed PSI page 20, JA-108-129, JA-82-86]. Defendant appeals the manner in which the drug quantity was determined in the fact of evidence showing only 20 kilograms.

## FIRST ISSUE

DEFENDANT'S 5th AND 6th AMENDMENT CONSTITUTIONAL RIGHTS
WERE VIOLATED WHEN DEFENDANT'S SENTENCE DID NOT FULLY COMPLY
WITH 18 USC § 3553(a) AND THE SUPREME COURT'S HOLDINGS
IN BLAKELY V. WASHINGTON AND U.S. V. BOOKER

### A.  The Sixth Amendment:

In the past few years the Supreme Court has completely altered the methods and procedures for sentencing federal defendants. These changes started with the holding in Apprendi  v. New Jersey, 530 U.S. 466 (2000) which was adopted verbatim in Blakely v. Washington, 542 U.S. 296 (2004) to wit:

> "Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty, or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt."

United States v. Booker, 126 S.CT. at 756, also adopted the same verbatim language when they applied the Blakely holding to the Sentencing Reform Act (SRA) and to the Federal Sentencing Guidelines.

-11-

The SRA and the Federal Guidelines are a part of a new trend in "the legislative regulation of sentencing," where legislatures identify facts relevant to sentencing and increase the range of possible sentences when such facts are present. This trend in sentencing has "forced the court to address the question of; How the right of jury trial could be preserved, in a meaningful way guaranteeing that the jury would still stand between the individual and the power of the government?" Booker, supra at 751.

The Booker Sixth Amendment majority held that the mandatory nature of the federal sentencing guidelines was problematic for the Sixth Amendment. Because judge found facts are essential to an enhanced sentence under the guidelines (i.e., absent those facts, the judge is required to sentence within a lower range); those facts must be found by a jury, beyond a reasonable doubt unless they are admitted to by the defendant.

B. The Booker Remedy:

The Supreme Court set forth the remedy in Booker which required that Title 18 USC § 3553(b)(1) and § 3742(e) can and must be severed from the remainder of the SRA and excised. Booker, supra at 756-57. This in the remedy majority's words, makes the sentencing guidelines "effectively advisory" in all cases. ID at 757.

The result is that district courts must now impose a sentence that is "sufficient but not greater than necessary" to achieve the purposes of sentencing set forth in Title 18 USC § 3553(a)(2) after considering:

-12-

(1)   the nature and circumstances of the offense and the
      history and characteristics of the defendant [§3553(a)
      (1)];

(2)   the kinds of sentences available [§3553(a)(3)];

(3)   the guidelines and policy statements issued by the
      Sentencing Commission, including the (now not man-
      datory) guidelines range [§3553(a)(4) and (a)(5)];

(4)   the need to avoid unwarranted sentencing disparity
      among defendants with similar records that have been
      found guilty of similar conduct [§3553(a)(6)];

(5)   the need to provide restitution to any victim of the
      offense [§3553(a)(7)].

In as much as the Supreme Court has stricken the SRA's pro-
vision governing the appellate standard of review for sentencing
decisions, the remedy majority implies a new standard into the
SRA's review for "reasonableness." Booker, supra at 766.

C.   The Fifth Amendment:

Under the Due Process Clause of the Fifth Amendment, the pro-
secutor is required to prove beyond a reasonable doubt every ele-
ment of the crime with which a defendant is charged. See In re
Winship, 397 U.S. 358, 364 (1970). See also Sullivan v. Louisiana,
508 U.S. 275, 278 (1993). The Winship reasonable doubt standard
protects three interests. Winship, supra, at 363. Second, it
protects the defendant from the stigma of conviction. Third, it
endangers community confidence in the criminal law by giving "con-
crete substance" to the presumption of innocence. ID at 363-64
In this regard, the court stated, "..it is critical that the moral
force of the criminal law not be diluted by a standard of proof
that leaves people in doubt whether innocent men are being con-
demned. Id at 364.

The Winship requirement applies to elements that distinguish a more serious crime from a less serious one, as well as to those elements that distinguish criminal from non-criminal conduct. Thus, a state may not distingush between similar offenses that have different maximum penalties without requiring the prosecution to prove beyond a reasonable doubt the facts upon which the distinction turns because the interest in due process is implied. See Apprendi v. New Jersey, supra at 988-92 (2000) (state must prove every element that distinguishes lesser versus greater crime).

Under this new post-Booker sentencing scheme the United States Sentencing Guidelines (USSG) are neither silent nor moot. In fact, the first requirement of the new discretionary sentencing scheme requires the court to consider the correct sentencing range recommended by the guideline, which must be fully supported by the jury's verdict or defendant's admission. In one sense the guidelines remain mandatory, at least to the extent that they must be considered (albeit they are to be considered as only advisory).

The bottom line now is the fact the guidelins, even though advisory, must be accurate. A Pre-Sentence Report (PSR) is still required. Both sides still retain the full right and obligation to object to and litigate the report for accuracy and it's advisory range must be made based on the court's findings from the report and evidence.

These findings <u>must be supported by the jury's verdict or findings</u> <u>or on the defendant's admission</u>. Certainly, after <u>Booker</u>, supra, there can be no findings in the PSR or in the judge's reasonable basis that aren't confirmed and supported by the jury's verdict, or a specific acknowledgement by the defendant.

Not only must the PSR recommendation be accurate and supported by the jury's verdict, the obligation of counsel to properly pre- serve all proper arguments and objections still applies. To fail to properly litigate the PSR or insure the sentence is supported by the jury's verdict or defendant's admissions, would remain an issue of ineffectiveness of counsel, just as it was before <u>Booker</u>, supra, was ruled on.

## D.  The Issue of Fairness:

If our jury system is to continue and be trusted as to it's ability, then unconfident prosecutors and zealous judges are going to have to allow juries to do their most important roles as the finders of such facts which (as in this case) make a difference of multiple years of confinement.

This is no trivial issue. The Supreme Court has finally started a slow march to total reform of a very broken system.  One of the cornerstone issues is fairness:

> Any evaluation of <u>Apprendi's</u> 'fairness' to
> criminal defendants must compare it with the regime
> it replaced, in which a defendant with no warning
> in either his indictment or plea, would routinely
> see his maximum potential sentence ballon from as
> little as five years to as much as life imprisonment,
> based on facts not proved to his peers beyond a
> reasonable doubt, but on facts extracted after a

> trial from a report compiled by a probation officer
> who the judge thinks more likely got it right than
> got it wrong." Blakely v. Washington, 124 S.Ct. at
> 2542 (2004)

It must be remembered that the first finding under Booker, supra, was to place or apply Blakely, in total, to federal defendant. While most could welcome the new discretion under Booker, they tend to ignore Blakely. This cannot be done. Blakely clearly guides us to an understanding that sentencing enhancements must be in purview of the jury. "[T]hese enhancements are nothing more or less than crimes and as such trigger the requirements of the 5th and 6th Amendments to the U.S. Constitution, requiring seperate indictment by a Grand Jury, criminal tial quality due process, the right of confrontation, trial by jury, and proof beyond a reasonable doubt." United States v. Haddad, 10 F.3d 1262.

E.  The sentence may not exceed the Blakely defined statutory maximum.

This case does not differ from the holdings in Blakely, supra; "[T]his requires the Court to apply the rule of Apprendi, supra at 490, that 'other than the fact of a prior conviction any fact that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury and proved beyond a reasonable doubt...'" This rule reflects two long standing tenets of common law jurisprudence: that the "truth of every accusation against a defendant should be confirmed by the unamimous suffrage of twelve of his equals and neighbors," 4 W. Blackkstone Commentaries of the Laws of England 343 (1769); and that "an accusation which lacks any particular fact which

the law makes essential to the punishment is [...] no accusation within the requirements of the common law, and it is no accusation in reason." 1 J. Bishop, Criminal Procedure 87, p.55 (2nd ED. 1872).

Many courts determined that Apprendi only applied if the sentence exceeded the maximum allowed by statute. These assumptions are incorrect. The Supreme Court clarified:

> "Our precedents make clear, however, that the Statutory maximum for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Ring v. Arizona, 536 U.S. 584 at 602.

While the holding in Ring is not ambiguous, the Supreme Court has now further emphasized; "In other words, the relevant 'Statutory Maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without and additional findings." Blakely, supra at 7 [emphasis added].

When a judge inflicts punishment that the jury's verdict only does not allow, the jury has not found all the facts which the law makes essential to the punishment, [then] the judge exceeds his authority and commits error.

F.  The Parsimony Provision:

The overriding principle and basic mandate of section 3553(a) requires District Courts to impose a sentence "sufficient, but not greater than necessary," to comply with the four purposes of sentencing set forth in section 3553(a)(2):

    (a)  retribution (to reflect seriousness of the offense,
         to promote respect for the law, and to provide "just
         punishment");

-17-

(b) deterence;

(c) incapacitation ("to protect the public from further crimes"); and

(d) rehabilitation ("to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner").

The sufficient-but-not-greater-than-necessary requirement is often referred to as the "parsimony provision." The Parismony Provision is not just another "factor" to be considered along with the others set forth in section 3553(a)(discussed supra) - it sets an independent limit on the sentence a court may impose. See United States v. Denardi, 892 F.2d 269, 276-77 (3rd Cir. 1989)., (since § 3553(a) requires sentence to be no greater than necessary to meet the four purposes of sentencing, imposition of sentence greater than necessary to meet those purposes is reversible, even if within a guideline range.

G. Burden of Proof Standard is Beyond A Reasonable Doubt:

The doctrine of avoidance of constitutional doubt requires that all sentencing findings must be made beyond a reasonable doubt. The Sentencing Commission (pre-Booker) stated in its commentary to U.S.S.G. § 6A1.3 that it believes "that the use of the preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns..." But as Justice Thomas points out in his dissent in Booker, "the Court's holding today corrects this mistaken belief. The Fifth Amendment requires proof beyond a reasonable doubt, not by a

-18-

preponderance of the evidence, of any fact that increases the sentence beyond what could have been imposed on the basis of facts found by the jury or admitted by the defendant." Booker, 125 S.CT. at 798 n.6 (Thomas, J. dissenting).

The preponderance standard has no statutory basis, and particularly where the government is attempting to raise the guideline range through acquitted or uncharged conduct, it can be argued that the potential Fifth Amendment concerns are best avoided by requiring proof beyond a reasonable doubt. Cf. Jones v. United States, 526 U.S. 227 (1999) (interpreting federal car jacking statute "in light of the rule that any interpretive uncertainty shold be resolved to avoid serious questions about that statute's constitutionality").

Several District Courts have ruled that since there is nothing in Booker to prohibit district courts from applying a higher standard of proof than the preponderance standard, they are free to require proof beyond a reasonable doubt. See, e.g., United states v. Pimental, No. 99-cr-10310 (D.C. Mass Apr. 15, 2005)(Gertner, J.) (due process requires that significant enhancement facts be proven beyond a reasonable doubt; Booker undermined United States v. Watts, 519 U.S. 148 (1997), which upheld enhancements based on acquitted conduct); United States v. West, 2005 WL 180930 (S.D.N.Y. Jan. 27, 2005) (Sweet, J.); United States v. Huerta-Rodriguez, 355 F.Supp.2d 1019, 1028 (D. Neb. Feb 1, 2005) (Bataillon, J.)

The bottom line is: Nothing in Booker, supra compels a

-19-

preponderance standard of proof for enhancement facts in the advisory guideline calculation, and it can well be argued that the beyond-a-reasonable-doubt-standard- is the appropriate level of certitude particularly for substantial enhancements of those based on uncharged or acquitted conduct.

## H.  Scope of Sentencing Arguements:

Booker, supra, returns sentencing the pre-guidelines days in which there were no limits on what could be considered (and could actually have an impact) at sentencing.  Effective representations now requires that counsel make any and all arguements that will humanize the defendant, mitigate guilt, and encourage the judge to impose the lowest possible sentence. The only difference between pre-guideline sentencing is that judges now have a longer list of factors (only one of which is the advisory guideline range) that they must "consider" before imposing a sentence that is sufficient but not greater than necessary" to achieve the purposes of sentencing set forth in 18 USC § 3553(a)(2).

Under 18 USC § 3582, imposition of a term of imprisonment is subject to the following limitation: in determining whether and to what extent imprisonment is appropriate based on the § 3553(a) factors, the judge is required to "recogniz[e] that imprisonment is not an appropriate means of promoting correction and rehabilitation". Thus, to the extent that the defense has a good argument that a defendant is in need of rehabilitation, whether educational, vocational or medical, this seperate statutory

-20-

provision provides a strong argument for a lower non-custodial sentence. Failure to raise rehabilitative arguments can construe ineffectiveness of counsel.

I. The instant Booker claim:

The Booker claim in this case deals exclusively with the quantity of marijuana the defendant should be held accountable for. Clearly, the indictment charges that Rennick was liable for more than 100 Kilograms. This amount is significant in that it triggers the mandatory minimum sentence of 60 months.

In this case, however, there is no judicial finding where the court even considered the drug amount. There was no evidence to confirm such amount. No drugs were brought before the court to be entered into evidence, nor was there any drug testing to determine if in fact the alleged substance was marijuana and whether it weighed more than 100 kilograms.

In fact amid the incredible lack of evidence we do have only one clue as to how much marijuana was located in the warehouse on North Bend Road. One of the arresting officers completed certain documents for the complaint in the Hamilton County Municipal Court Case No. 02-CR-35415 filed October 16, 2002; before this case was even a federal case.

This incident started as a state charge under the laws of the State of Ohio. Agent C.P. Connor's of the Regional Narcotics Unit (RENU) wrote that the defendant Steven M. Rennick, Sr., was being charged in a drug conspiracy involving 20,000 grams or more of marijuana. [JA-378].

-21-

The revelation of the 20,000 gram document was newly dis-
covered evidence found in Gallagher's client file after the plea,
sentencing and first §2255 motion. In fact it only was dis-
covered near the end of the drafting of the appellate brief. The
defendnat did raise this issue in his opening brief. [Appellate
Opening Brief pg. 49-55]. The same information was discovered
again in Appellants Reply Brief [pg. 9-13].

Despite the attention allocated to the discovery of the
sworn declaration of more than 20,000 grams and not more than
100 kilograms, the Appellate Court completely failed to address
the issue. Agent Connors statement or rather deposition is a
sworn, under oath document. It is to carry a strong degree of
reliability, and it very clearly states that the Rennick search
and investigation was based on the recovery of more than 20,000
grams.

There is an unwritten reality in law enforcement that
encourages all law enforcement officers to overstate the crimes
they are involved in prosecuting. Any estimate of things, like
victims or drugs amounts or street values are consistently high-
er than lower. Clearly, if law enforcement had found 500 pounds
or marijuana, as later claimed, it would never be written down as
more than 20,000 grams which is only 20 kilograms. This would
never happen. It did not happen in this case. Connors wrote
20,000 because that was all he thought could be proven, indeed
that is all there was.

Defendant begins examining the record of the defendant's re-sentencing hearing. At the start of the hearing the defendant was very, matter of fact, about desiring to represent himself but because of his desire to please everyone and his passive nature; the court was immediately able to manipulate defendant to accept the court appointed attorney, Mr. Kelly Johnson, Esquire. [JA345 -347].

Next the Court erroneously stated the purpose of the re-sentencing was "because of a decision by the U.S. Supreme Court, the guidelines, instead of being mandatory... becomes advisory." [JA-346]. The re-sentencing had nothing to do with the Booker decision even though it had to be applied at this sentencing. The purpose or reason for the re-sentencing was because this Court granted relief under defendant's Motion pursuant to 28 USC § 2255 to wit that the defendant had been denied his right of direct appeal.

Prior to the re-sentencing the defendant under the suggestion of attorney Mr. Johnson, prepared formal objections to the original Pre-Sentenct Report (PSR) [DE-213; JA319-325]. The government moved to have said objections stricken [DE-220; JA328-330]. On January 13, 2006, the Court entered an order, an 'Opinion' strick-ing "all but ¶13 of Petitioner's Objection(s)" [DE227; JA336].

For the record ¶13 of defendant's objections states:

"13. Defendant objects to the use of U.S.S.G. 2D1.1 (a)(3)(C)(7) in paragraph 53 [of the PSR] as such is based upon a quantity exceeding 100 kilograms of mari-juana which amount has neither been proven before this Court beyond a reasonable doubt; nor admitted to by the defendant. The defendant claims this objection, subject to the holdings of Blakely v. Washington, 124 S.CT. 2531

-23-

(2004) and United States v. Booker, 125 S.CT. 7,38 (2005).
Defendant contends in the absence of proof of any quantity
the correct advisory guideline would be level 6 pursuant
to U.S.S.G. §2D1.1(a)(3)(C)(17)." [DE-213; JA-323].

In reviewing the record of the re-sentencing, the Court
promises to get to the defendant's one lone objection (para-
graph 13 alone) [JA-350]. The Court and participant then get off
track (admittedly partially caused by defendant). The Court stays
off track for seven pages and returns to the quantity objection on
top of page 14 [JA-35]. Finally, this Court was ready to deal with
the Booker error concerning quantity. The Court first turns to
counsel for the defendant who opines:

   "...because the Court is now operating under an
   advisory issue which has been established by the Booker
   and Fan-Fan decisions, that standard of proof beyond
   a reasonable doubt as to the weight is not required."

Before going further, the defendant would direct the court
to § G presented supra, entitled, "Burden of Proof Standard is
Beyond a Reasonable Doubt." Despite the thoughts of attorney
Johnson and the Courts agreement with them, they are in conflict
with the law. The position of attorney Johnson, AUSA Brichler and
Judge Dlott are the very "mistaken beliefs" the Booker case
corrected. The Fifth Amendment requires proof beyond a reasonable
doubt. There is no legal or statutory basis for Kelly Johnson's
statements nor no explanation for the Court's concurrence with them.
It should now be readily apparent why the defendant didn't want
Mr. Johnson from the outset, but once again could not resist the
Court's pressure to keep Mr. Johnson.

Mr. Brichler's position is no more legal or correct.

-24-

The government has always held that the defendant's plea to dealing in marijuana also admits the quantity because the crime's name includes "100 kilograms or more". Under this logic, no Court has ever accepted a plea to a crime containing one amount in the crimes title and then later sentenced the defendant to a lesser quantity. No one charged with First Degree Pre-Meditated Murder could ever be found guilty of involuntary manslaughter. The reality is these types of cases happen often.

The point is simple, if the quantity included in a crime's title was dispositive of the quantity and type of drug; then no Court would ever have the burden of determining the type or amount of the drug. If a crack dealer was charged with "50 grams or more" then his sentence would also be pre-determined at level 30. This would make no logical sense and would preclude the Court from finding a sentence for say 1.5 kilograms of crack which would be level 38.

The government cannot have this issue both ways, if the Court is allowed to sentence based on the title of the crime which states a quantity; hence, it must not be allowed to sentence on a higher than amount contained in the crime's title.

At the time of the original sentencing there was no Blakely or Booker. At that time the government would often accept a plea on a drug case and then proceed to raise the sentence by huge quantities that were often supported by no more than a suggestion of multiple transactions or by something the U.S.S.G. created known as relevant conduct.

-25-

This is the very substance of what Blakely & Booker were all about. The government never had to prove the issues of drug type or quantity.

The primary defense to these issues in this case is the governments mantra that Rennick executed a plea agreement; and the plea agreement spells out the amount. Once again, there must be some discussion about the plea agreement which as discussed, infra, was executed unknowingly and involuntarily and was the product of coercion and prosecutorial misconduct, infra.

The circumstances behind these pleas are somewhat odd. On August 18, 2003, the defendant arrived at Court to pick a jury and start trial. As discussed later, the prosecutor, three defense attorneys and two co-defendants (Elliot and Benjamin) all collaborated against defendant Rennick to attempt to persuade him to enter a plea. (The AUSA, Robert Brichler had made the defendants Elliot and Benjamin very favorable plea offers but made them contingent on the plea of Rennick. After much discussion Rennick was emotionally drained and agreed to enter a plea on the assurance he would be able to cooperate and then would probably get probation. In the worst case, Rennick would do no more than 36 months. There was never any hint of a 60 month mandatory minimum.

By the time Rennick agreed it was lunchtime and it was agreed the defendant would have lunch and Brichler would prepare the three plea agreements; when the defendants came back they could execute the plea agreements and go home until sentencing.

When the defendant's returned from lunch they were rushed to

-26-

execute the agreements. Rennick did not read his plea agreement, but relied on counsel to advise him what to do. Frankly, if Rennick had read the agreement he would not have understood it's meaning and implication, nor would he have realized it was not in line with the promises made.

While judges and prosecutors pretend to believe defendant's understand legal documents and Fed.R.Civ. P. Rule 11 colloque; the truth is defendant's don't understand. Defendant's have no clue as to the ramifications of the answers they give during what for many is the most stressful time of their lives. This Court may well insist on perpetuating their pretense, this Court may well hang their robe on the fact that Rennick should have known the legal consequences behind 100 kilograms (despite not knowing what a kilogram is). The Court may well convince itself that Rennick understood the meanings and sub-meanings to the Rule 11 colloque, but deep inside the Court knows the truth. This Court understands a defendant does and says, whatever, an attorney tells them to; and this Court, which on the record, vouched for the drug addict- ed Kenneth Lawson as a man who "would not lie" has lied repeatedly. This Court knows the deals made quid pro quo between prosecutors and the Lawson's and Gallagher's of the industry and the Court also knows there is littel hope of any change!

There is, however, a documented fact that is hard to sweep away and that fact is the sworn, under oath statement of RENU agent C.P. Conners, badge number 194, who on the 16th of October, 2002, the very day of the Rennick drug bust; swore that Steve Rennick, Sr.

-27-

"did knowingly possess a schedule I controlled substance to wit:
Marijuana in an amount weighing more than 20,000 grams, but less
than [left blank] grams as defined in 2925.01 of the Revised Code
of Ohio." [JA-388].

The government will doubtless say that agent Conners was just
using a conservative number, but this Court knows better, we all
know better, in fact given the typical law enforcement traits, this
number is still probably an overstatement.

Whether true or not it is evidence and it is new evidence
to the extent it was not discovered until mid-way through the
appeal drafting process and was found in documents obtained from
Kenneth Lawson who allegedly received same from attorney William
Gallagher. As new evidence it calls for this Courts careful review
and at a minimum should justify an evidentiary hearing on the
issue of drug quantity.

In a similiar vein the defendant has never received any type
of lab report or evaluation or analysis to determine the alleged
marijuana was in fact marijuana and not some other type of sub-
stance. The full record of this case fails to establish what
the substance in question is and how much there is or was in
question. From the inception of this matter, Rennick respectfully
requested his counsel to find out if the material was really
marijuana.

## SECOND ISSUE

### I.    THE PETITIONER WAS DENIED EFFECTIVE
### ASSISTANCE OF COUNSEL AT SEVERAL SEPERATE
### CRITICAL STAGES OF THE PROCEEDINGS: THE COMBINED
### EFFECT VIOLATING PETITIONER'S SIXTH AMENDMENT
### CONSTITUTIONAL RIGHTS

A.   Definitions:

The Sixth Amendment of the United States Constitution pro-
vides, in pertinent part:

> "In all criminal prosecutions; the accused shall
> enjoy the right to [...] Have the assistance of counsel
> for his defense." VI Amendment U.S. Constitution.

See McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970), "6th
Amendment right to counsel is right to effective assistance of
counsel.   The right to effective assistance of counsel applies
to both retained and appointed counsel." Id.

B.   Standard for determining ineffectiveness:

The "benchmark for judging any claim of counsel's effective-
ness must be whether counsel's conduct so undermined the proper
functioning of the adversarial process that the trial cannot be
relied on as having produced a just result." Strickland v. Wash-
ington, 466 U.S. 668,686 (1984).

Strickland announced a two-prong inquiry for an ineffective
assistance claim: (1) "The defendant must show that counsel's
performance was deficient" by showing "counsel's performance
fell below an objective standard of reasonableness" as compared
with, "prevailing professinal norms." Id. at 688;

-29-

(2) defendant must show that he was prejudiced by his attorney's conduct by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different." Id. at 694.

The client-attorney relationship is, by nature, shrouded in secrecy and absent a hearing a court can never tell from the record what really happened. A judge, free from the record, does not hear the representations a lawyer makes to his client, his client's family, or close associates. The Court does not hear the coaching of how a defendant is to answer the Court's questions, nor does the Court perceive the threats that are related from the government (or fabricated by counsel). For all these reasons, the defendant should be heard and no ill-conceived waiver of rights should ever foreclose the defendant's rights to correct an otherwise unconstitutional sentence.

The Court in Strickland stated that "the purpose of effective assistance guarantee of the Sixth Amendment is ... to ensure that criminal defendants receive a fair trial," supra at 689. Strickland states that a court must:

> [J]udge the reasonableness of counsel's challenged condcut on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the facts or omissions of counsel's conduct that are alleged not to have been the result of reasonable professional judgement. They must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the Court should keep in mind counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same

-30-

time, the Court should recognize that counsel is strongly
presumed to have rendered adequate assistance and made all
significant decisions in the exercise of reasonable pro-
fessional judgement." supra at 690.

In deciding whether a counsel's performance was ineffective
under Strickland, supra, a Court must consider the totality of
the circumstances. Id. at 690 (the Court must 'determine whether,
in light of all the circumstances, the identified acts or
omissions were outside the wide range of reasonable professional
judgement"). While clearly minor instances of behavior or
lapses of reasonable professional judgements may, upon accumula-
tion, rise to ineffectiveness of counsel... may in a particular
case be violated by even an isolated error of counsel if that
error is sufficiently egregious and prejudicial." Mason v.
Mitchell, 320 F.3d 604, 618 (6th Cir. 2003).

In interpreting the prejudice prong, the Supreme Court had
identified a narrow category of cases in which prejudice is pre-
sumed. Strickland, supra at 692; see also United States v. Cronic,
466 U.S.648, 658-61 (1984). There are three categories of cases
in which prejudice is presumed: (1) denial of counsel; (2) where
counsel is burdened by an actual conflict of interest; and (3)
various kinds of state interference; Smith v. Robbins, 528 U.S.
259, 287 (2000).

Any failure by counsel to file a direct appeal when in-
structed to do so by defendant is per se ineffective. "[P]re-
judice presumed where defendant demonstrates a reasonable pro-
bability that but for counsel's deficient failure to consult

-31-

defendant about an appeal, counsel would have timely appealed;"
Roe v. Flores Ortega, 528 U.S. 470, 483-84 (2000). Prejudice
is presumed when alleged ineffectiveness of counsel is based
on "unexcused failure to bring a direct appeal from a criminal
conviction upon a defendant's instruction to do so." United States
v. Hernandez, 202 F.3d 486, 489(2nd Cir. 2000).

If counsel 'entirely fails to subject the prosecution's case
to meaningful adversarial testing,' the adversarial process itself
becomes presumptively unreliable." Cronic, supra at 659. In a
similar manner, any counsel failure to file a brief or response
or jurisdictional statement and failure to respond to Court's
inquiry constituted denial of assistance of counsel because pre-
judice is presumed from abandonment.

Unlike the performance prong of the Strickland, test which
is analyzed at the time of trial, the prejudice prong of said test
is examined under the law at the time the ineffective assistance
claim is evaluated. Strickland, supra at 687. See Lockhart v.
Fretwell, 506 U.S. 364, 367-68 (1993).

The prejudice burden is generally met by showing that the
outcome of the proceeding would have been different but for
counsel's errors, Williams v. Taylor, 529 U.S. 362, 391-93 (2000).
To prove prejudice, the defendant must establish a 'reasonable
probability' that but for counsel's unprofessional errors, the
result of the proceeding would have been different. Strickland,
supra at 692. The Court has rejected the proposition that the
defendant must prove more likely than not that the outcome would

-32-

be altered. See also Woolford v. Visciotti, 537 U.S. 19, 22-23 (2002). However, in some cases the Court will inquire further to determine whether counsel's ineffective assistance "deprive[d] the defendant of a substantive or procedural right to which the law entitles him." Williams, supra at 391-93.

In Glover v. United States, 531 U.S. 198-99 2001; the Court explained that the outcome based prejudice inquiry set forth in Strickland should be applied in most cases. See Id. at 203. The Court reversed the Seventh Circuit's holding that a six month to 21 month increase in petitioner's sentence, allegedly caused by the ineffective performance of defendant's counsel, could not be considered prejudicial because the increase was not sufficiently significant to render the defendant's trial fundamentally unfair. Id. The Court stated: "Authority does not suggest that a minimal amount of additional time in prison cannot constitute prejudice. Quite to the contrary, our jurisprudence suggests that any amount of actual jail time has Sixth Amendment significance." Id.

Claims of ineffective assistance of counsel generally are limited to collateral review and ordinarily will not be considered on appeal. See United States v. Gambino, 788 F.2d 938, 950 (3rd Cir. 1986). Circuit courts have often declined to consider in-effective assistance claims on direct appeal because the record was not sufficiently developed. United States v. Galloway, 316 F.3d 624 (6th Cir. 2003). An "adequate record is imperative to properly evaluate ineffective assistance claims." Matheny v. Anderson, 253 F.3d 1025, 1040 (7th Cir. 2001). Failure to raise ineffective

-33-

assistance of counsel claim on direct appeal does not bar the claim from being brought in a later... proceeding..." United States v. Massaro, 538 U.S. 500, 509 (2003).

## C. Ineffective Assistance in plea cases:

A central role of counsel in cases resolved by a guilty plea is to provide the defendant with an accurate set of facts from which defendant will make one of the most serious decisions of a lifetime. This process obviously includes a real, true and re-liable prognosis of just what kind of punishment the defendant is facing if he enters the plea. As will be shown infra, defense counsel utterly failed in this area.

In guilty plea cases, the Strickland test is refined: the defendant must show that his counsel's performance was deficient and "there is a reasonable probability that but for counsel's errors, defendant would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985).

If remanded for an evidentiary hearing the defendant will demonstrate by evidence, not a part of the record, that credible challenges existed to some of the government's assumptions and enhancing factors. It will be shown that if defendant had fully understood the extent of his rights, the government's burden, and the requirement that all facts had to be proven beyond a reasonable doubt, the defendant would not have entered the plea at all.

This issue was addressed in Via v. Superintendent, Powhatan

-34-

Correctional Center, which held that:

> "A statement by the defendant that he would
> not have plead guilty, but for counsel's ineffective
> assistance is sufficient to show prejudice." Via,
> 643 F.2d 167, 174 (4th Cir. 1981).

Furthermore, counsel failed to explain the important rights

that could be waived in the plea agreement, including the right

to direct appeal and collateral attack. Here, again, just as

was the case with the plea itself, the defendant did not fully

understand the very rights he was allegedly waiving.

> "Any decision to enter into a plea agree-
> ment cannot be knowing and/or voluntary when
> the plea agreement itself is the result of advice
> outside 'the range of competence demanded of
> attorneys in criminal cases.'" DeRoo v. united States,
> 223 F.3d 923-24 (8th Cir. 2000);citing Hill v. Lock-
> hart, supra at 56. The present case at bar is on all
> points with Jones v. United States, 167 F.3d 1142
> (7th Cir. 1998):

> "Justice dictates that a claim of ineffective
> assistance of counsel in the connection with the
> negotiation of a plea agreement cannot be barred
> by the agreement itself-the very product of the
> alleged ineffectiveness-[t]o hold otherwise would
> deprive a defendant of an opportunity to assert his
> 6th Amendment right to counsel where he had accepted
> the waiver in reliance of delinquent representation."

In the instant matter, defense counsel, as shown infra, fail-

ed to provide the defendant with minimal requisite of effective

representation. He failed to provide the best basic and honest

advice required for the defendant to make a knowing plea and

waiver decision and counsel provided misleading and coercive ad-

vise intended to manipulate the defendant into entering a plea,

thereby creating a circumstance under which no plea could have

ever been voluntary.

## D. DEFENSE COUNSEL'S ASSISTANCE WAS INEFFECTIVE AND COMPRISED WHEN HE PARTICIPATED IN GOVERNMENT'S SCHEME TO COERCE A GUILTY PLEA FROM THE DEFENDANT.

The record of the sentencing hearing of co-defendant Elliot makes it very clear that at the time Elliot was manipulating the defendant into entering a plea, defendant's counsel, William Gallagher, then well knew that the government had "hired" Elliot to manipulate the defendant. From the moment Gallagher became aware of the Elliot scheme and payoff of a one-third sentence reduction, and allowed same to continue, he ceased to represent the interests of the defendant, a conflict of interest and no loyalty.

The "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668 (1984) at 686. Clearly, this occurred in this matter.

It is regretably evident that when attorney Gallagher became aware of the scheme to get co-defendant Elliot to use his friendship and "closeness" with the defendant, and thereby manipulate a plea of guilty; then, at that moment, attorney Gallagher ceased to represent the interests of the defendant.

There is no question that defendant's counsel witnessed and subsequently participated in the betrayal of his innocent client. In addition to going along with the "Brichler scheme"; Mr. Gallagher also participated proactively when he told his client

-36-

that he would get a low sentence, maybe probation, when all along counsel knew or should have known, the defendant faced a mandatory minimum of five years. However, this was based on the crime charged in count one of the indictment. He further sabatoged the defendant by ignoring the evidence of defendant's innocence and encouraged the plea.

> "The fact remains that [the defendant] was entitled to effective assistance of counsel when he entered his plea, and this he did not receive. Had he received it, the decision to plead guilty would have been his own depending upon his inform-ed appraisal of the attractiveness of the govern-ment's offer." Tolliver v. United States, 563 F.2d 117 (4th Cir. 1977).

Tolliver suggests that a defendant is automatically pre-judiced whenever his plea agreement is the product of ineffective assistance of counsel, by virtue of the fact that such an agree-ment cannot be truly voluntary.

In the instant matter the ineffectiveness manifested in a single action, the agreement to participate in the scheme to get the defendant to plead. This is similar to the event in Murray v. Carrier, 477 U.S. 478, 496 (1986):

> "[T]he right to effective assistance of counsel may in a particular case be violated by even an isolated error of counsel if that error is sufficiently egregious and prejudicial."

In interpreting the prejudice prong, the Supreme Court has identified a narrow category of cases in which prejudice is pre-sumed. Strickland supra at 692. The three categories of pre-sumed prejudiced cases are: (1) denial of counsel; (2) state in-terference; and (3) where counsel is burdened by an actual conflict

-37-

of interest.

The defendant asserts the government interfered when it made defendant's counsel a party to the plea scheme and by doing so the defendant was denied counsel as he was compromised. Inasmuch, as counsel hid the deal from the defendant and thereby assisted co-defendant, Elliot it further appears to be a conflict of interest.

As discussed previously the defendant had assembled a meaningful defense with evidence and testimony and yet counsel scrapped the defense at the last minute for an ill conceived plea. If counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing" the adversarial process itself becomes presumptively unreliable. United States v. Cronic, 466 U.S. 648, at 659 (1984). In this instance, counsel surpassed deficient conduct; he instructed his client to perjure himself by admitting to crimes and actions he did not commit. As the affidavit shows, defendant's attorney told him to enter a "fictional plea" because he would supposedly receive a lesser sentence. See [JA-238 ¶5; JA-243 ¶12-14; and JA-245 ¶7] This act fell below an objective standard of reasonableness and acted to subvert the normal functioning of the adversarial process. Had defendant not entered the plea, he would not be in federal prison today.

E.   THE ACTIONS OF DEFENSE COUNSEL INDICATE A CONFLICT OF

INTEREST.

When defense counsel Gallagher willingly knew and participated in the government's scheme to use Elliot and failed to disclose

same to the defendant, his actions served the interests of others apart from the defendant.

Whenever defense counsel operates under a conflict of interest, the defendant's right to effective assistance of counsel is impaired because; "counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Strickland, supra at 692.

In Cuyler v. Sullivan , 446 U.S. 335, 350 (1980) the Supreme Court ruled that a defendant can demonstrate a 6th Amendment violation by showing that defense counsel was actively representing conflicting interests.

Defense counsel only represented the defendant. The defendant was clearly entitled to representation only concerned with his outcome and not that of everyone else. AUSA Brichler, presented his plan to use Elliot, to Elliot and his counsel, Lawson, but the deal required Gallagher to allow Elliot and Lawson access to the defendant and to subsequently endorse the plan. Indeed, when Lawson was forced to reveal the plan in court he made specific references to the court that Gallagher knew about the deal and verified the events in the face of the government's momentary "memory loss".

The record is clear, all parties knew of the scheme except the defendant. Gallagher's role in the scheme continued after the pleas were entered when all defendant's were upset over thh factual basis the government gave the Court. The representations that the defendant sold or gave drugs to co-defendants Elliot and

-39-

and Benjamin were patently false and troubling. When all three co-defendant angrily inquired of all counsels as to what just happened; attorneys Gallagher, Lawson and Cohen all supported the claim that they were "fictional pleas" and nothing would happen as long as they "went along."

Obviously, the pleas weren't fictional and neither were the sentences. When three lawyers join in harmony to lie and conceal matters from their clients, the result is a conflict of interest.

There is a similarity to United States v. Hall, 200 F.3d 962, 966 (6th Cir. 2000) in that a conflict of interest occurred because counsel failed to forego a plea in the client's best interest in order to protect a second defendant.

For reasons unknown, attorney Gallagher involved himself in a scheme of the government's design and interest and in doing so he became conflicted in his interests, and brought harm upon the defendant.

## F. COUNSEL NEVER ADVISED DEFENDANT OF ANY MANDATORY MINIMUM SENTENCE.

From the first receipt of the intial federal indictment the defendant was charged with a marijuana conspiracy involving an alleged 100 kilograms or more of marijuana; which pursuant to 21 USC §§ 841(a)(1) and (b)(1)(B) carried a mandatory minimum sentence of 60 months. (The original arresting charge was a State of Ohio charge pertaining to 20,000 grams which would not have any mandatory minimum sentence, but by some mystery the quantity became 5 times more in the hands of the federal prosecutor).

-40-

Mr. Rennick had never heard the term mandatory minimum and would not have grasped it's implication on his case (and actual sentence). Defense counsel Gallagher never explained this to the defendant. Oddly enough, this Court nearly forgot to explain it in the Rule 11 coloquy. In fact, it wasn't until almost the very end of the plea hearing that the Court realized and then advised Rennick of the mandatory minimum application in this case. The Court did properly give Rennick a final chance to change his mind but his counsel advised that his cooperation with the government would overrule the mandatory minimum sentence.

The problem is that Rennick made all his most important decisions based on erroneous information. Had his counsel properly explained what was at risk, the defendant would not have entered a plea and would have gone to trial. By the time he knew the truth Rennick was too confused, too upset, and too overloaded to have reacted properly. It was too late and sense Elliot and Benjamin's plea were supposedly this package deal and sense the other pleas were accepted, Rennick was made to think if he backed out now, it would really hurt Elliot and Benjamin.

Advising a defendant to the punishment he is facing is a standard responsibility any criminal attorney must do. Not doing so is absolutely irresponsible and contaminates the whole process. Clearly, this is outside any reasonable standard of conduct comprising effective representation of the client.

## THIRD ISSUE

### I. RENNICKS GUILTY PLEA WAS NEITHER KNOWINGLY NOR

### VOLUNTARILY ENTERED AND SHOULD BE VACATED AND WITHDRAWN

The U.S. Constitution requires that a defendant's plea of guilty be made knowingly and voluntarily. Brady v. United States, 397 U.S. 742, 25 L.ED.2d 747, 90 S.CT. 1463 (1970). ("State may not induce guilty plea by threatening defendant with physical harm or by mental coercion overbearing defendant's will"). (Emphasis added).

In the instant matter there are several completely unique and equally viable reasons why Rennick's plea was not entered knowingly or voluntarily; they include, inter alia, (i) Rennick was not mentally competent to knowingly or voluntarily enter a plea; (ii) Rennick's guilty plea was entirely, the result of coercion by the government, by third parties operating at the behest of the prosecutor, and by Rennick's own trusted counsel; and (iii) as discussed in the second clause, supra, Rennick's plea of guilt was the result of ineffective representation by counsel.

While it will be evident infra, that each of these bases are sufficient grounds for reversal indivdually, their existence in concert with one another leaves no other conclusion; except determination that Rennick's plea is neither knowingly nor voluntary and Rennick is entitled to a reversal, a withdrawal of his plea and a trial by a jury.

-42-

The fact that entering a guilty plea is a grave and solemn act to be accepted only with care and discrement has long been recognized. Central to the plea and the foundation for entering judgement against the defendant is the defendant's admission in open court that he committed the acts charged in the indictment. He thus stands as a witness against himself and he is shielded by the Fifth Amendment from being compelled to do so - hence the minimum requirement that his plea be the voluntary expression of his own choice.  See Machibroda v. United States, 368 U.S. 487, 493, 7 L.ED.2d 473, 477, 82 S.CT. 510 (1962); Brady, supra at 748.

Regrettably, in the instant matter, Rennick, for a number of reasons, was incapable of making a knowing decision and, therefore, could have never made a voluntary pleas.

A.  Rennick was not competent to render knowing and voluntary plea of guilty die to diminished capacity.

Steve Rennick has a serious and complex history of mental illness which was known by his counsel and, to some extent, was also known by the court below, and yet, as well documented as it is, there was never any inquiry made to determine if the defendant was mentally capable to even enter a plea of any kind, or for that matter whether Rennick was even able to stand trial or would such be impossible as a result of his diminished capacity.

The defendant's first known mental problems started to be documented at around the age of seventeen, when defendant enlisted in the United States Army.

-43-

As soon as young Rennick finished basic training he was deployed to the front lines in Vietnam. During one of the early battles his company was under heavy attack. Rennick and two buddies were in a bunker under seige when one friend was killed, the other hit by napalm. This friend was on fire and melting; he pleaded to be killed and Rennick drew his sidearm and fired. Two friends were dead and Rennick was sentenced to a lifetime mental disorder of Post Traumatic Stress Disorder (PTSD)

The defendant has chronically endured the suffering, the nightmares, the "visitings" from his fallen friends. If this incident were not horrific enough, many years later Rennick, while operating a small dump truck company was asked to teach a close friend to drive a dump truck. During what would be the last lesson, the defendant was forced to swerve to miss a head-on driver on notorious Cliff Road in Cleave, Ohio. Rennick's truck hurtled off the road and slid some five hundred feet down the mountain in the process a tree limb caught and decapitated his friend as Rennick would later proclaim; "I try not to make friends because they seem to die around me." Needless to say this event compounded the PTSD.

As if his friend dying was not bad enough, Rennick was charged with the death of his friend and was ultimately found not guilty. One of the lasting side effects of these problems has left Rennick with a subconscious need to make friends by doing things or giving things to others and, as will be discussed infra, has left Rennick with the inability to say no to anyone.

-44-

In the associated dreams the defendant experiences as a re-
sult of the PTSD, his Vietnam buddies and his friend from the
truck wreck "visit and talk" with him. They encourage him to
come join them. Rennick has made several unsuccessful attempts
at suicide over the years. Rennick has been under treatment for
these conditions and takes serious medications. He was under
such treatment and such narcotics at the time he was persuaded
to enter the plea in this matter which, as will be discussed infra,
was the result of mental pressure and coercion beyond Rennick's
will and mental ability to accept or handle.

There is already recognition of PTSD within the federal
courts. In United States v. Cantu, 12 F.3d 1506 (9th Cir. 1993)
the court received a report by Dr. Paul Wert, a clinical Psychol-
ogist, who provided the following which would exactly apply to
defendant Rennick:

> "[the defendant's] combat experience left him with
> 'severe and ongoing' post-traumatic stress disorder,
> a recognized pyschiatric condition. See American
> Psychiatric Ass'n, Diagnostic and Statistical  Manual
> of Mental Disorders 247-51 (3d ed. rev. 1987).  See
> also; United States v. Johnson, 979 F.2d 396, 401
> (6th Cir. 1992)) (taking judicial notice of the
> manual). His symptoms include flashbacks to and
> 'frequent and vivid' nightmares about his combat ex-
> perience, chronic insomnia, 'considerable' anxiety,
> 'intrusive thoughts [and] images, depression, rage, and
> "marked []" paranoia." [internal quotes in original].
> Clearly, PTSD is a very real and debilitaing condition.

In Cantu, supra, the Ninth Circuit Court of Appeals held
that PTSD "is a type of mental disorder which can support down-
ward departure based on significantly reduced mental capacity."
Id at 1506.

-45-

In this instance however, the defendant's PTSD and related treatments suggested a reduced mental capacity rising to a diminished capacity that draws into question whether the defendant had the mental capacity to enter a knowing and voluntary plea of guilty. In everyday language, "reduced mental capacity" refers to a lack of full intellectual functioning. It connotes an impairment of the intellect, a failure to be able to quickly or fully grasp ordinary concepts. This becomes more relevant in that, as will be discussed infra, Rennick was totally unprepared to enter a plea. There had been no thought of pleading guilty until Rennick arrived at the courthouse to select the jury and commence the trial. It was at this point that a tremendous coercion came against Rennick, mentally bombarding him until he entered the guilty plea against his will.

At the time of the plea and sentencing, Rennick was represented by William Gallagher, a seasoned defense attorney who was fully aware of Rennick's diminished capacity. Gallagher not only knew of the serious problems, but also had to manage court dates and meetings to accomodate Rennick's treatment by the VA hospital, both in patient and out patient, and Gallagher had over four hundred pages of detailed VA medical records, and with this ammunition he never raised the issue of Rennick's diminished capacity.

While other instances of defense counsel's ineffectiveness are presented supra, there can be no question that counsel's failure to investigate an present this issue is a significant failure.

-46-

In some cases a defendant's competency or mental state is his only viable defense. The Fifth Circuit addressed this issue and has held that failure to investigate these types of issues "falls below the customary level of skill and knowledge required." Profitt v. Waldron, 831 F.2d 1245 (5th Cir. 1987). The Fifth Circuit also held that such a failure to investigate is not a discretionary tactical decision. Beavers v. Balkcom, 636 F.2d 114 (5th Cir. 1981). Under Bouchillon v. Collins, 907 F.2d 589 (5th Cir. 1990), "counsel who fails to investigate defendant's extent of diminished capacity may be guilty of an appalling lack of professionalism."

This issue was considered by the Eleventh Circuit in Agan v. Singletary, 12 F.3d 1012 (11th Cir. 1994) in upholding the grant of a habeas petition alleging ineffectiveness of counsel the Appellate Court opined that counsel has a duty to investigate a client's competency to stand trial or plead guilty. In that case the attorney failed to obtain Agan's prison medical files or military files which would have raised a "red flag" as to Agan's competence. Rennick provided attorney Gallagher with all the records and material sufficient to have challenged Rennick's mental capacity far more than merely raising a "red flag" and yet counsel and the court failed to investigate this situation.

Where a condition may not be visible to a layman, counsel cannot depend on his own evaluation of someone's sanity or mental capacity once he has reason to believe an investigation is warranted because, where such a condition exists, the defendant's attorney is the sole hope that it will be brought to the attention

-47-

of the court. This should be no less true where a diminished capacity defense is implicated. Bouchillon, supra.

In the instant matter, no one is suggesting that Rennick would or should have pled guilty by reason of insanity, this is clearly not the case as borne out by the fact Rennick maintains his innocence. The issue here is the fact that Rennick lacked the mental capacity to cope with the deliberate and improper co-ercion brought against him on the morning of August 18, 2003, when he was pressured and manipulated past the limits of his free will to enter an unknowing and involuntary plea.

There is no question that any appellate court is disadvantaged when a matter such as this comes up. The record itself is virtu-ally silent on this issue because defense counsel only brought up the mental problems in a somewhat non-persuasive motion for downward departure. This court does, however, have the ability, if deemed appropriate, to order an official psychiatric study by the Bureau of Prisons for the further developement of an ap-propriate record. While incarcerated, the BOP has been treating defendant's PTSD and the Veteran's Board has made a finding of disability due to PTSD. Additionally, the complete records of the Veterans Administration were subsequently entered into the record by appellate counsel Kenneth Lawson.

-48-

B.  Rennick's guilty plea was entirely the result of coercion
by the government; by third parties acting at the behest of the
government; and by defense counsel.

Before entering a discussion concerning the various means
of coercion, it is imperative to understand the factual occurrences
of the morning of August 18, 2003, which was to be the opening
of the trial of Rennick and his co-defendants, Elliot and Benjamin.

Rennick had spent several hours on the eve of the trial with
counsel Gallagher.  There was discussion of any kind concerning
a plea.  Rennick was advised as to the procedures and was looking
forward to picking a jury and geting this matter over with.
Rennick knew he was innocent and was further assured the govern-
ment had a very weak case.

When Rennick arrived at the courthouse, Gallagher began by
explaining to Rennick that AUSA Brichler was claiming to have
evidence that Rennick had paid two witnesses, Demetrius Ball,
and an unknown party to lie at the trial.  Brichler had copies
of two six thousand dollar checks from Rennick's son's business,
Earth Management, payable to Mr. Ball.

Rennick knew this was a complete fabrication; the checks
were not from Rennick, but from his son's business.  Second, the
checks were for payment for services Mr. Ball performed for Earth
Management, LLC, and were completely legitimate.  No one would
ever identify the second alleged person who was going to testify.
The record in this case does show the government filed a Notice

-49-

Intention to Use Rule 404(b) Evidence on August 5, 2003 [JA-19-
20]. Counsel Gallagher had failed to advise Rennick of this until
the morning of the trial. Gallagher suggested maybe Rennick should
consider a plea.

Rennick was not moved by the false threats of the 404(b)
evidence which was not persuasive because Rennick knew he had
not paid anyone for false testimony. This issue is revisited,
infra, as a portion of the claim of prosecutorial misconduct.

Next, Rennick was approached by co-defendant Elliot who made
a very emotional and manipulative plea to Rennick in an attempt
to persuade Rennick to enter a plea. Elliot represented: (i)
that Rennick would get a sentence of 36 months and Elliot and
Benjamin would each get probation; (ii) that Rennick could be
signed up as a confidential informant ("CI") and thereby be able
to "work off" the sentence; (iii) that Elliot would assist Rennick
in finding people "to bust"; (iv) that the only way anyone could
plead and get a good deal would be if everyone pleaded at the
same time.

Rennick was moved by the persuasion of Elliot, but still
wanted to go to trial. Rennick knew he wasn't guilty. He knew
he was no part of any marijuana conspiracy. His lawyer had re-
peatedly told him the government's case was very weak.

Now the prosecutor, the court, and defense counsel began
to rush the defendants to either decide to plead or proceed to
trial. The parties kept making an issue of the fact that the
potential jury pool was waiting and the parties needed to make

-50-

up their minds. Rennick's condition reacts adversely to being rushed or pressured and the burden of the waiting jury now pressed him greatly.

Co-defendant Elliot was sent back to Rennick and this time turned up the pressure. Rennick had no way to know that AUSA Hrichler, Elliot, and Elliot's counsel, Kenneth Lawson, had made a deal for Elliot's assistance to compromise Rennick's free will and choice.

Elliot approached Rennick and essentially cried an begged. He told Rennick that Rennick was his good friend and that if Rennick would not enter a plea then Elliot's life would be ruined and Rennick would be responsible for the destruction. This be- came a time of great confusion for Rennick who knew he was inno- cent, but began to feel powerless to the increasing pressure of the moment.

At this juncture co-defendant Benjamin began to get worried. He had negotiated a sentence of straight probation, but was told by Brichler it was only good if all three pleaded so he did not have to put on a trial. Co-defendant Benjamin now joined Eliot in pressuring Rennick, even defense counsels Lawson, Gallagher, and Greg Cohen were taking part in presurring a decision. During all this no one advised Rennick that his offense carried a manda- tory sentence of 60 months. All discussions emphasized that Rennick would receive a sentence of 36 months and could cooperate and "work off" the time.

One of the clinically documented manifestations of Rennick's

illness is his often inappropriate capitulation to those closest to him. Put another way, Rennick is easily manipulated and has difficulty saying no to those he is close to. See [JA__to__].

Rennick was very fond of Elliot and Benjamin. They were close in age and reminded him of his own son, Steve Jr. All of this, while perhaps insignificant to most people, was a very significant and decisive issue to Rennick as pertaining to his severe PTSD. The culmination was more than Rennick's own will and self interests could bear, and he reluctantly agreed to forgo his own interests and enter a plea of guilty to a crime he knew he didn't commit.

Once Rennick agreed to plead, the jury pool was released and Rennick and the co-defendants were dismissed to go to an early lunch. They were told the plea agreements would be ready when they returned, and they were. The formal change of plea hearing started at 11:45 a.m. on August 18, 2003.

1. Coercion by the Government.

As discussed supra, the government filed a notice on August 5, 2003, some thirteen days before trial, of its intention to use Rule 404(b) evidence against Rennick. In the notice the government stated it was going to present evidence that Rennick "approached various individuals after his arrest and solicited them to give false testimony at trial." [JA-19-20]. Rennick was never made aware of this until the morning of his trial when his attorney Gallagher told him of this new developement. As discussed previously, the only named "witness" was Demetrius Ball whose only

-52-

payments were legitimate.  In short, AUSA Brichler lied.  He deliberately stated he had credible evidence that did not exist.  Other instances of prosecutorial misconduct are presented infra.  This instant misrepresentation was solely intended to coerce Rennick into entering a plea to something he did not do. Clearly, the prosecutor has a duty in a criminal prosecution to seek justice. Therefore, the prosecutor should "prosecute with earnestness and vigor," but may not use "improper methods calculated to produce a wrongful conviction."  See Berger v. United States, 295 U.S. 78, 88 (1935).

     In this instance Brichler is faced with an even deeper misdeed than his outright lie.  In this case he advised counsel there were "several" witnesses solicited to give false evidence; the 404(b) notice claims Rennick approached "various individuals" (plural); the government provided only one name.  If there were in fact, additional witnesses the government would have been compelled to produce them.  In other words, either the government made a false statement or they failed to provide proper discovery. Inasmuch, as this was a part of the coercion of the defendant, it prejudiced the defendant by encouraging the guilty plea when he was actually innocent.

     2.  Coercion by third party Elliot at the Government's behest and urging.

     The next step on the path of coercion leading to a plea involved AUSA Brichler, counsel Gallagher, co-defendant Matt Elliot, and Elliot's counsel Kenneth Lawson, II.

These four individuals met together outside the presence of the defendant to develop a plan to get the defendant to enter a plea. It should be noted that in light of recent revelations, attorney Lawson will testify and confirm his role and AUSA Brichler's leadership.

The scheme was essentially very simple. All four partici-pants knew the defendant was very fond of his co-defendant Matthew Elliot, who not only worked with Rennick in his race car business, but had become his close friend. The first step of the plan was for Elliot to talk with the defendant. Elliot was to explain that he and co-defendant Benjamin could get off with very low sen-tences, probably probation, but only if all three plead guilty. Elliot, in fact, explained to the defendant that if the defendant did not plead it would ruin Elliot's and Benjamin's lives. He further explained that Rennick could assist the government and could himself receive a sentence of 36 months which could be work-ed down to just probation by sentencing time.

The next part of the plan was for Gallagher to verify and endorse the plan as being the right thing to do. Finally, Brichler would reassure the defendant as to his possibility of cooperating with the government and thereby getting very little time himself.

The real linchpin to the plan was the fact that all four schemers knew Rennick had extensive mental problems. They knew he suffered from Post Traumatic Stress Disorder, supra. They knew Rennick was insecure and felt an intense need to be accepted and the need to please those with whom he wanted to be friends.

-54-

This combination of mental maladies left the defendant an ideal candidate for this form of coercion.

As difficult as it might be to believe that an Assistant United States Attorney would tolerate such a dishonest manipulation of a defendant, in this case the government acutally promised to reward co-defendant Elliot with a downward departure pursuant to U.S.S.G. § 5K1.1 for Elliot's substantial assistance to the government by manipulating the defendant to plead guilty. To make matters even more stunning, the proof is actually on the record.

In preparing for his collateral attack, Rennick decided to transcribe the sentencing hearing for his co-defendant, Matthew Elliot. In said transcript, co-defendant Elliot's counsel, Kenneth L. Lawson, described the deal to manipulate Steve Rennick, Sr., as follows: (The defendant has included this lengthy passage as it is part of his co-defendant's record).

> "MR. LAWSON: Judge, [ ] if you recall when he entered the pleas, it was a date the morning of the trial on a case that had been ongoing for some time and where my client and especially Mr. Gallagher's client were adamant about going to trial. In order to end up into these plea bargins, it was presented to my client, since he was closet to Mr. Rennick, that if he was able to get Mr. Rennick to enter a plea, voluntarily enter a plea and also provide sub -- and get Mr. Rennick to provide substantial assistance, he would receive, he being Mr. Elliot, would receive a 5K1. So Mr. Elliot's plea bargain and 5K1 is based on what Mr. Rennick was to do.
>
> Mr. Elliot did that. [ ] when Mr. Rennick was shot, I sent Mr. Brichler a letter on November 10th because my client had been concerned that he was next and, in fact, had also expressed concerns a week before that people were threatening his life-- reminding him of what this was about and asking if there was anything that they knew or could so to pro--

tect him along with Mr. Rennick.

>     That was sent down November 10th.  But it re-
> iterates what our understanding of his responsibility
> was to do, which was to get in discussions with his
> friend to enter the plea and to also provide substan-
> tial assistance."  [DE-156-C Transcript of Matthew
> Elliot Sentencing Hearing; page 4 line 20 - 5 line
> 18; JA 146-147]

The entire plan is laid out in the record.  Attorney Lawson

represented Matthew Elliot and, therefore, had specific duty to

make sure Mr. Elliot got the full benefit of his client's role

in this plan to coerce Rennick.

Mr. Elliot, who was named in the same conspiracy count with

Rennick, was allowed to plead to a lesser charge of possession

with intent ot distribute marijuana and was then given a one-third

reduction in sentence, all solely based on Elliot's ability to

con and coerce Rennick into pleading to a crime he never committed.

There may be some confusion as to whether the deal was for a plea

to a lesser count or a 5K1.1 reduction, but the record will ad-

dress this further:

>     "MR. LAWSON:  When I spoke to Mr. Brichler earlier
> this morning, I believe his understanding is that we
> were given the opportunity to enter a plea to the
> count that we plead to if we were able to get Mr.
> Rennick to plead.  But I don't believe that either
> one are disputing that the issue also came up that,
> if he was able to get Mr. Rennick to provide substan-
> tial assistance, I believe the government's position
> is that Mr. Rennick has not provided substantial as-
> sistance.
>
>     Now, when I came in this morning, I hear that
> there are tapes, et cetera.  I know that Mr. Gallagher
> denied to have a hearing on whether or not this con-
> stitutes -- Rennick's actions constitute substantial
> assistance, but, on behalf of my client, I would like
> to have that hearing, because my understanding of co-

-57-

operation, the ultimate goal is to see if we can get
an individual who's out committing crimes charged with
a good crime and also to see if that individual, after
he's charged, can lead to higher-ups. <u>I don't know
of any charge more serious, other than murder and at-
tempted murder. And if Mr. Rennick was shot at by the
target who attempted to kill him,</u> then, although the
crime wasn't a drug-related crime, <u>it's a lot more
serious than a drug -related crime and because he was
doing it at the direction of the government.</u> And they
now know who did this. And this guy was a target, and
he shoots Mr. Rennick.

I would thing that, sooner or later when he's ar-
rested and charged with attempted murder, <u>especially
if he knew or believed Mr. Rennick was somehow, formally
or informally, a government agent, even more charges can
be brought against him that would lead to the same type
of cooperation</u> that they normally get if the person had
sold drugs, got charged and then was given the oppor-
tunity to cooperate to lead to a higher up. [Id page 5
line 19 - page 7 line 2; [JA 147-149]

At times it seems Attorney Lawson was representing Rennick

instead of Elliot. Lawson was reminding the court on a very

important and chilling reality. Steve Rennick was shot while

assisting the government as a confidential informant; something

very rare and disconcerting. To make the matter even worse, the

defendant has credible evidence to suggest that Detective John

Mercado, the case agent on this matter, was present and directly

involved in Rennick's shooting, infra. Attorney Lawson con-

tinued with his discussion on Rennick's assistance to the govern-

ment:

I dispute the fact that -- not only that, but I
also heard Mr. Rennick saying some things about pro-
mises that was made to him, er cetera. I don't re-
present Mr. Rennick, but I do represent Mr. Elliot.
<u>I sense his plea bargain was so closely related to
what Mr. Renncik did,</u> I cannot pass on the opportun-
ity to -- at least Mr. Gallagher has offered me the
ability to come down and listen to the tapes at his
office.

But my understanding, Judge, is that Mr. Rennick
was out there doing what he said he was doing, at
least that's what he said this morning. And he said
also that he had taped these conversations. But, more
importantly, Judge, I know that, if an officer got
shot in the line of duty, not only would they receive
a commendation for the work that they were doing at
the time, they would receive high accolades. This man
gets shot and can't get a 5K1.1  I did not know that
he was not going to receive a 5K1.1 until I walked in
here this morning, nor did I know there were any tapes
that would lead to a justification for it.

So I don't mean to cause the Court any problems,
but I have to represent Mr. Elliot to the best of my
ability, Your Honor, and I would like it to run smooth-
ly. But I just can't as his counsel, sit here and say
that I have to explore that area, but I don't know
what's on the tapes, and I don't know exactly -- if Mr.
Gallagher would give me permission to talk to his client
to see -- I would like to have a hearing on that in the
very near future to determine if there was substantial
assistance given that my client should get credit for.
Because, but for his efforts, none of this would have
went on, and I think the government knows this.  And
that was the basis of his entering th plea."  [Id page
7 line 3 - page 8 line 9; JA-149-150].

It would be difficult to be muchmore precise in describing

the fact that the government made a deal predicated on Elliot

being able to manipulate Rennick into entering a plea of guilty

when he never intended to do so. After being confronted on the

record in open court, counsel for the government at first attempt-

ed a denial, but lead to an admission of sorts:

MR. BRICHLER:  I have read the letter. I have
read it previously.  And, first of all, I'm not privy
to whether or not Mr. Elliot was the one that con-
vinced Mr. Rennick to enter a plea.  I'm not rpivy to
the fact that it's alleged that MR. Elliot talked Mr.
Rennick into cooperation.  I have no way of knowing
that.

As far as the concern about Mr. Elliot's safety,
when I received the letter, I had spoken to Mr.
Mercado, and it was my understanding that Mr. Elliot

had nothing to do with any of the things that were
going on and wasn't involved and wasn't in any danger.
So I was a little bit -- when I received the letter,
I kind of -- I wondered where it was coming from,
because of the fact that Mr. Elliot didn't have any-
thing to do with this, and I didn't know Mr. Lawson
felt that he was in danger.

        MR. LAWSON: Judge, if I may, every defense at-
torney that was present for trial that morning, every-
body was here ready to go to trial. And Mr. Gallagher
knows, and I don't know if Mr. Cohen remembers it or
not, that that was the offer that was made to my client,
because we had to come back out and let my client
[Elliot] speak to Mr. Gallagher's client [Rennick].

        THE COURT: All right. Here's what --

        MR. BRICHLER: May I have a moment , Your Honor,
with Mr. Lawson?

        THE COURT: Sure.

        Off-the-record discussion between Mr. Brichler
and Mr. Lawson.

        MR. LAWSON: Judge --

        MR. BRICHLER: Your Honor, I just had a discussion
with Mr. Lawson, and he related to me that, on the morn-
ing of the pleas, that I had a conversation with him con-
cerning his client's ability to basically make the case
go away.

        THE COURT: You mean make the trial go away?

        MR. BRICHLER: Make the trial go away. If he was
cooperative and if he was able to convince the other
defendants that this is what they should  do.

        MR. LAWSON: Actually, it was Mr. Rennick, not
the other defendants.

        MR. BRICHLER: Okay. And Mr. Lawson indicated
that I told him that, if that happened, that I would
consider Mr. Elliot's conduct to be substantial
assistance.

        Now, I don't have any recollection of that.  On
the other hand, I have practiced law for many years
with Mr. Lawson, and I know that Mr. Lawson would

-60-

not say something about me if it hadn't occurred.
So I'm prepared at this time, based upon Mr. Lawson's
representations, to request the Court to consider a
downward departure on the basis of his assistance in
that case.

I know it's obviously out of time --

THE COURT:  No, no.  That's all right.

MR. BRICHLER:  And his range was 21 to 27 months.

THE COURT:  Right.  He's a category II.

MR. BRICHLER:  Gategory II, level 15.

THE COURT:  Right.

MR. BRICHLER:  A one-third reduction would be
14 months; 7 from 21 would be 14 months. I would
request the Court consider a senence, therefore,
within the range of offense level 12, which would
be 12-18 months where 14 months would be.

MR. LAWSON:  I have discussed that with my
client, Your Honor, and there is no objection.  I
discussed that with him already.  And I appreciate
what Mr. Brichler jsut stated, but Mr. Gallagher
is also in the room.  We talked briefly before we
came up here, and I just want Mr. Brichler to know
that is our recollections about what happened that
day.

MR. BRICHLER:  And I want to make it clear
that this motion for reduction is based upon what
happpened that day and it's not based upon any con-
duct that Mr. Rennick subsequently engaged in.  [JA151-154].

It is now completely evident, the government made a deal with
co-defendant Elliot to manipulate or emotionally coerce defendant
Rennick into entering a plea despite his innocence.  The govern-
ment proposed the deal, oversay its operation and rewarded Mr.
Elliot with a one-third reduction in his sentence just for abusing
his friendship and trust with Rennick.

It is also somewhat ironic that AUSA Brichler was so intent on not allowing anything to appear to assist Rennick, that he wanted it clear that Elliot's reduction was solely for what Elliot did that morning, [manipulate Rennick], and not for any recognition of what Rennick had done to cooperate. (It will be shown, infra, that defendant Rennick was shot twice while assisting the government and there is some indication of a member of law enforcement being a party to said shooting).

Coercion by private actors such as Elliot usually does not invalidate a guilty plea unless, as in this case, such private conduct is attributable to the prosecution. See e.g., United States v. Gwiazdzinski, 141 F.3d 784, 788 (7th Cir. 1998) (where plea was held voluntary despite wife's threat to forbid defendant from seeing children unless he pled guilty, but was done without the government's knowledge or consent. In Sanchez v. United States, 50 F.3d 1448, 1454-55 (9th Cir. 1995) the defendant's plea was only deemed not coerced by government's informant's promises to secure defendant's release because informants were not representing the government at the time of the promises.

The cornerstone for viewing this type of coercion almost always focuses on the extent of knowledge if any, that the government had in causing the coercion. In United States v. Abbott, 241 F.3d 29, 34-35 (1st Cir. 2001) a plea linked to a favorable plea agreement for defendant's mother was deemed invalid when government failed to bring linked pleas to the judge's attention and the judge could not adequately ascertain whether defendant

-62-

pled guilty voluntarily or to save his mother.

Steve Rennick pled guilty to "save" Elliot and Benjamin. Arugably, there might not have been any wrongdoing if Elliot's appeal to Rennick was done on his own accord; but such is not the case. The testimony, supra, makes clear that Brichler knew what was going on, approved a deal with Elliot and failed to appraise the court, all to save a weak and faltering case.

In LaConte v. Dugger, 847 F.2d 745, 753 (11th Cir. 1988) the plea was deemed voluntary despite pressure from friends to plead guilty because the prosecution neither knew of nor sanctioned the behavior. The same rationale is found in case after case with the touchstone always being whether the government knew or sanc- tioned the coercion. The matter in this instant case is crystal clear, the AUSA knew about, created, promoted, endorsed and re- warded Elliot for his role in the coercion of Rennick and that is what make this ill-gotten plea involuntary and, therefore, un- knowing.

The government will doubtless counter that Rennick failed to raise the coercion during plea colloquy. This is true. The de- fendant acknowledges that a defendant's testimoney at a plea colloquy that his or her plea is voluntary creates a presumption against later claims of coercion by private parties. See; Blackledge v. Allison, 431 U.S. 63, 74 (1977) ("Solemn declara- tions in open court carry a strong presumption of verity")

The defendant completed his plea colloquy without claim of coercion, but this is not a case of Rennick's word against that

-63-

of AUSA Robert Brichler, in fact this issue is proven not on Rennick's word at all. This issue is completely borne out in the record below and is summed up by Mr. Brichler:

> "I want to make it clear that this motion for re-
> duction is based upon what happened that day [day
> of the plea] and it's not based upon any conduct
> that Mr. Rennick subsequently engaged in."

Mr. Lawson and Mr. Brichler created the record in open court and, therefore, to somehow now claim this coercion should be allowed because of Rennick's colloquy is pure sophistry. Mr. Rennick gave the answers to the Court that his attorney told him he had to give. While judges often seek refuge behind a defendant's answers to the court, the real truth is that more often than not the defendant has been warned, cautioned, and threatened that any deviation from the attorney's instructions would result in dire consequences for the defendant. There were times when Rennick was shaking his head from side to side signaling disagreement, yet when the judge scolded him for not answering out loud, he would give an affirmative answer.

Bram v. United States, 168 U.S. 532, 42 L.ED. 568, 18 S.CT. 183 (1897), held that "the admissibility of a confession [or plea] depended upon whether it was compelled within the meaning of the Fifth Amendment. To be admissible, a confession must be 'free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.'" Id at 542-43.

In the case at bar the government enlisted a co-defendant and Rennick's defense counsel to place a form of psychological manipulation on Rennick to persuade him to plea. This was improper influence beyond that which Rennick could withstand.

It is very important to repeat Mr. Lawson's statement to the District Court:

"[I]t was presented to my client, since he was closet to Mr. Rennick, that if he was able to get Mr. Renncick to enter a plea.. he would receive... a 5K1." [JA146].

AUSA Robert Brichler presented this plan to use Elliot to manipulate Rennick. This is not proper conduct. It was planned and deliberately carried out. This is not a case where Elliot's actions can be swept away because the government didn't know about it. Here, the government created the plan, enlisted a third party co-defendant and then rewarded Elliot for an illegal act of coercion done well. This is unacceptable and warrants reversal.

Most of the arguement concerning the involuntariness of defendant's plea was the fault or the result of prosecutorial misconduct on the part of Robert Brichler. The presentation of this issue is very similar to the wording used in the plea; the difference being the claim that such occured only by the virtue of the governments actions, scheme and misconduct. While the appeal focuses nearly all attention on the coercion of the defendant, it becomes a different claim when developed under a theory of misconduct by the government.

-65-

## FOURTH ISSUE

## DID THE GOVERNMENT BREACH THE PLEA AGREEMENT AND WAS

## DEFENSE COUNSEL INEFFECTIVE BY REFUSING EVIDENTIARY HEARING

## ON WHETHER DEFENDANT COOPERATED OR NOT

A.  Did the Government Breach the Specific Terms of the Plea

Agreement, and was defense counsel ineffective when counsel, at

sentencing refusal to pursue an evidentiary hearing, concerning

defendant's substantial assistance.

As previously stated, the government went to great effort to

manipulate Rennick into pleading guilty. One of the strongest in-

ducements was that Rennick could cooperate and essentially work

off his sentence pursuant to USSG § 5K1.1 and 18 USC § 3553(e).

The plea agreement [JA23-26] addresses this in paragraph 5, which

in pertinent part says:

> 5.  "The government agrees to file, upon the defen-
> dant's substantial assistance, a motion with the Court
> for a downward departure [...], stating that the de-
> fendant has made a good faith effort to provide sub-
> stantial assistance in the investigation  and prosecu-
> tion of other persons who have committed offenses."
> [JA-24] (emphasis added).

Plea agreements are contractual in nature. In interpreting

and enforcing them, we are to use traditional principles of con-

tract law." United States v. Robinson, 924 F.2d 612, 613 (6th

Cir. 1991); see also United States v. Wells, 211 F.3d 988, 995

(6th Cir. 2000) (quoting). A court should hold the government

to a greater degree of responsibility than the defendant for

imprecisions or ambiguities in plea agreements. Id at 995 (citing

United States v. Johnson, 979 F.2d 396, 399 (6th Cir. 1992).

Although plea agreements are governed by contract principles, Due Process Clause requires these principles be supplemented with concerns that bargaining processes not violate defendant's right to fundamental fairness. United States v. Schilling, 142 F.3d 388, 394 (7th Cir. 1998).

In the instant agreement it states, "government agrees to file, upon [...] defendant's substantial assistance, a motion [...] for a downward departure [...], stating that the defendant has made a good faith effort to provide substantial assistance..." (emphasis added). In this matter there is no sincere dispute about whether the defendant made a good faith effort to cooperate.

The defendant set up several deals, all of which are recorded on tape and on two occasions the police exposed their positions and thereby ruined deals. On a third occasion the police did nothing and allowed the defendant to be shot in the leg and shoulder. (There is strong evidence to suggest that case agent John Mercado was directly involved in this shooting).

Rennick avers that the term "agrees to file" implies an obligation to file the motion if the condition, "good faith to provide" assistance has been completed. It is Rennick's contention that the government has, in fact, bargained away their reservation of "sole discretion." It is well settled that there is no legal requirement of a successful arrest or conviction. The government's own wording defines defendant's burden of performance as being, "a good faith effort to provide assistance" and nothing more.

-67-

This court has recognized that, "in order to induce a defendant to enter the plea agreement, the government may bargain away its discretion and simply promise to make the substantial assistance motion. United States v. Benjamin, 138 F.3d 1069, 1074 (6th Cir. 1993). In such cases as this, the government is obligated to make the § 5K1.1. motion, unless it can be shown by a preponderance of the evidence that the defendant breached this agreement by not making the "good faith effort." Id.

In this matter defendant's counsel argued at sentencing that the defendant had attempted to cooperate and that as a consequence of so doing Rennick was shot. [JA-115]. In addition, the court was further provided with a detailed account from the defendant as to several "deals" Rennick set up, but the government failed to perform properly. In the sentencing of co-defendant Elliot, attorney Lawson argued that Rennick was entitled to the reduction [JA143-165]. The cooperation is further detailed in several affidavits before the court. See [JA238-41], [JA224-31], [JA246-51], and [JA252-54].

The rules of construction of plea agreements dictate that the agreement be interpreted to impose a binding obligation on the government. Johnson, supra, at 399 (holding that ambiguities in plea agreements are construed against the government); see also United States v. Houston, 40 Fed. Appx 139 (6th Cir. 2002) (unpublished) holding that the government did not reserve discretion to make § 5K1.1. motions based on the use of discretionary and non-discretionary language in the plea agreement creating an ambiguity.

-68-

The court made no inquiry as to whether the defendant had made "a good faith effort" to provide assistance.

The defendant first raised this issue at sentencing when he argued for a Downward Departure [JA72-78]; it was further raised in his Motion to Reconsider [JA80-81]; and again in his Motion to Withdraw Plea of Guilty [JA90-95]. The 10th Circuit has adopted a general rule that the defendant need not raise his claim of breach at trial. United States v. Peterson, 225 F.3d 1167, 1170 (10th Cir. 2000).

The defendant, at the very least, was entitled to an evidentiary hearing to determine the nature of the promises made and the extent of the good faith effort to cooperate. See Pearcy v. United States, 31 F.3d 1341, 1345-55 (6th Cir, 1994); United States v. Watson, 988 F.2d 544, 551-52 (5th Cir. 1993); see also Blackledge v. Allison, 431 U.S. 63, 76, 80-82 (1977) "allegation of breach entitles defendant to an evidentiary hearing unless defendant's allegations are "palpably incredible" or "patently frivilous or false."

The record excerpts presented in Ground Three, supra, clearly show that there were taped recording concerning defendant's informing efforts with the Cincinnati Police Department. These tapes would have proven or disproven the defendant's worthiness for a sentence reduction. The record plainly set forth the fact that Gallagher did have the crucial tapes to demonstrate that he followed the rules and made a good-faith effort attempt to assist.

-69-

Co-defendant Elliot counsel, Kenneth Lawson, already had this court agreeing to have an evidentiary hearing on the matter and thereby be would find out just what the defendant did or didn't do. When the AUSA realized the court was offering a hearing; AUSA Brichler had a private discussion with Kenneth Lawson and as a result Brichler agreed to give a Rule 35 to defendant Elliot and Lawson would agree to have no hearing on the matter.

## THE RECORD

The defendant has submitted two volumns which contain most of the pleadings, all transcripts, and certain affidavits. These volumns contain defendant's initial § 2255 motion which ultimately resulted in the vacating of his sentence and a re-sentencing to allow for a direct appeal. Presented with said § 2255 motion were a number of separate affidavits which were submitted as evidence. These same affidavits are also included by reference as evidence to support the instant motion.

Finally, the defendant has submitted a new affidavit with this filing which is intended to more or less explain the defendant's mental states, history and the things that have brought the defendant to this point and place of time.

## ISSUES REQUIRE EVIDENTIARY DEVELOPEMENT

Much of this motion deals with issues which do not appear on the surface of the record. Much of this motion deals with the ineffectiveness of counsel and the defendant possesses considerable evidence. The defendant has tape recordings, witnesses and evidence to support most of these issues.

In light of such evidence the defendant feels an evidentiary hearing would be beneficial to the court and will reveal certain important matters that will assist the court in reaching a just result.  Should the court determine an evidentiary hearing would be beneficial then the court will need to appoint counsel.

The defendant is before this court seeking to vacate his existing sentence because, amongst other things, the U.S. Supreme Court has said the manner in which the defendant was sentenced violated certain important rights of the defendant; namely, the defendant's right to have all factors that could deny or further deny his liberty to be included in his charging instrument, admitted to specifically, or presented to a jury and proven beyond a reasonable doubt; as well as his rights to effective represent-ation by counsel, and other valuable constitutional rights.

The defendant respectfully moves this Court to correct his sentence in a manner protective of his constitutional rights and further seeks any and all relief to which he is entitled.

Further Defendant saith naught.

I declare(or certify, verify, or state) under penalty of perjury that the foregoing is true and correct to the best of my ability and that this Motion under 28 USC Section 2255 was placed in the prison legal mail system on the $\underline{2 4}$ day of $\underline{July}$ 2007.

Respectfully Submitted,

Steven M Rennick

Steven M. Rennick, Sr.
Reg# 04050-032
Federal Medical Center
P.O. Box 14500 HCU
Lexington, KY 40512-4500
Pro se

-71-

## CERTIFICATE OF SERVICE

I certify that the above true and correct Memorandum in Support of Motion to Vacate pursuant to 28 USC Section 2255 was-provided to the Clerk of the Court at the address below.  I further certify that I sent one original with two true copies pursuant to 28 foll.2255 Rule3(A) and I understand the clerk is to serve the United States pursuant to 28 USC Section 2255 Rule 3(B).  All copies deposited, postage prepaid, into the prison mail service on this, the $2\frac{4}{}$ day of July 2007.


Clerk, U.S. District Court
100 East 5th St.
Cincinnati, OH 45202

Steven M. Renncik
Reg# 04050-032
Federal Medical Center
P.O. Box 14500 HCU
Lexington, KY 40512