CRIMINAL NUMBER 1:02-CR-00157

CIVIL NUMBER_____

IN THE

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

STEVEN M. RENNICK, SR.

Defendant-Movant

VS

UNITED STATES OF AMERICA

Plaintiff-Respondent

MOTION TO VACATE, SET ASIDE

OR CORRECT A SENTENCE

BY A PERSON IN FEDERAL CUSTODY

PURSUANT TO 28 USC § 2255

APPENDIX

VOLUME TWO

SUBMITTED BY MOVANT

Steven M. Rennick, Sr.
Movant Pro Se
Reg. No.: 04050-032
Federal Medical Center
P.O. Box 14500
Lexington, Kentucky 40512-4500

APPENDIX FOR MOTION PURSUANT TO 28 USC § 2255

RENNICK vs. USA No.: CR 1-02-157

VOLUME TWO

TABLE OF CONTENTS

| DE-No. | DATE | DOCUMENT | JA Pg No. |
|---|---|---|---|
| 191 | 12-15-04 | Motion to Reinstate Direct Appeal | 166-172 |
| 192 | 01-10-05 | Order Denying Reinstatement of Appeal | 173-177 |
| 194 | 01-26-05 | Motion to Vacate 28 USC § 2255 | 178-223 |
| | | Ex1 Rennick Letter to Court | 224-231 |
| | | Ex2A VA Medical Record Medications | 232-235 |
| | | Ex2B VA Medical Record Mental Health | 236 |
| | | Ex2C VA Medical Record Mental Health | 237 |
| | | Ex3A Rennick Affidavit | 238-241 |
| | | Ex3B Ball Affidavit | 242-243 |
| | | Ex3C Benjamin Affidavit | 244-245 |
| | | Ex3D Rennick Affidavit | 246-251 |
| | | Ex3E Battle Affidavit | 252-254 |
| 200 | 04-05-05 | § 2255 Memorandum Addendum | 255-264 |
| 201 | 04-14-05 | Request for Judicial Notice | 265-274 |
| 202 | 04-25-05 | USA Resposne 28 USC § 2255 | 275-283 |
| 205 | 05-23-05 | Motion for Grand Jury Minutes | 284-303 |
| 210 | 10-13-05 | Order Granting & Denying § 2255 | 304-318 |
| 213 | 10-27-05 | Objections to Presentence Report (PSI) | 319-325 |
| 216 | 10-31-05 | Motion to Withdraw Plea | 326-327 |
| 220 | 12-14-05 | USA Motion to Strike | 328-330 |
| 227 | 01-13-06 | Order Striking PSI Objections | 331-336 |
| 229 | 01-23-06 | Rennick, Sr. Sentencing Judgment | 337-341 |
| 231 | 01-23-06 | Notice of Appeal | 342-343 |
| | | Transcript Rennick, Sr. Re-Sentencing | 344- |
| 234 | 03-08-06 | Transcript Rennick, Sr. Resentencing | 344-377 |
| | 10-16-02 | Original State Complaint | 378 |
| | 4-29-05 | Forfeiture Magistrate's Decision | 379-384 |

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

|  |  |  |
|---|---|---|
| STEVEN RENNICK, SR. | ) | |
| | ) | |
| Movant/Defendant | ) | Case No.: CR-1-02-00157 |
| | ) | |
| vs | ) | Hon. Judge Susan J. Dlott |
| | ) | |
| UNITED STATES OF AMERICA | ) | U.S. District Court Judge |
| | ) | |
| Respondent | ) | |
| | ) | |

## MOTION TO REINSTATE RIGHT TO DIRECT APPEAL
## PURSUANT TO RULE 4(b) FEDERAL RULES APPELLATE PROCEDURE

Comes the defendant, Steven Rennick, Sr., pro se, and moves this court for an order reinstating defendant's right to direct appeal beyond the statutory time peirod and in support defendant states as follows:

As a preliminary matter, the defendant avers that he is not an attorney; has no legal or professional training pertaining to the preparation and filing of legal motions or memorandums. The defendant seeks notice of such limitations and prays this court to construe his pleadings liberally in light of the Supreme Court holding in Haines v Kerner, 404 U.S. 519, 30 L.Ed.2d 652 (1972); Cruz v Beto, 405 U.S. 319, (1972); Lawler v Marshall, 898 F.2d 1196 (6th Cir 1990); Hill v U.S., 268 U.S. 424, 430 (1984. The

-1-

allegations and averments in a pro se pleading must be taken as true and construed in favor of the defendant.  See Malone v Colyer, 710 F.2d 258, 260 (6th Cir 1983).

## CASE HISTORY

On October 16, 2002, defendant was arrested on multiple counts charging various violations of 21 USC §§ 846 and 841(a)(1) and (b)(1)(B) all dealing with possession with intent to distribute marijuana.  On August 19, 2003, defendant entered a plea purusant to a written plea agreement to Count One with conspiracy to distribute in excess of 100 kilograms of marijuana in violation of 21 USC §§ 846 and 841(a)(1A) and (b)(1)(B).

On January 28, 2004, the defendant was sentenced by this court to a sentence of 63 months in the custody of the Bureau of Prisons.

### DEFENDANT'S RIGHT TO DIRECT APPEAL WAS
### FORECLOSED BY THE DISTRICT COURT
### CLERK'S FAILURE TO FILE NOTICE
### OF APPEAL

Defendant was represented at plea and sentencing by private counsel, William R. Gallagher.

At sentencing the court formally imposed the sentence snd then informed the defendant of his rights to appeal his sentence and conviction.  The court concluded the notice of appellate rights by stating:

-2-

[DE-191 P2 JA-167]

"If you request, Mr. Rennick, I'll order the Clerk
of the Court to file your notice of appeal immediately
after the judgement is filed, and, if not, Mr. Gallagher,
will you protect the rights of the defendant?"
[Exhibit One - Sentencing Transcript pg 20 ln 1-4].

Defendant's counsel responded that he had already discussed
with the defendant the potential outcomes of the sentencing hearing
and that defendant would like to appeal. After giving the court
the verbal notice of intent to appeal the following exchange took
place:

```
"THE COURT:    And are you going to be responsible for
               filing it, or do you want the Clerk?
GALLAGHER:     Judge, if the clerk would.  I don't know
               what the financial situation is going to
               be from this point forward ... But either
               new counsel is either going to be appointed
               or retained to pursue it.
THE COURT:     All right.  That's fine."  [ID ln 8-15].
```

Clearly defendant's counsel made clear the defendant wanted
to appeal; that the clerk was to file the notice of appeal; and
defendant's counsel would not be handling the appeal.

A review of the docket indicates no notice of appeal was ever
filed. This fact was only recently discovered by the defendant.

Immediately after the sentencing the defendant observed the
sentencing of his co-defendant who was represented by attorney
Kenneth L. Lawson II. Attorney Lawson actual addressed the court
regarding defendant's attempted cooperation and successfully ob-
tained a reduction udner USSG § 5K1.1 for his client on the basis
of a proposition that his client persuanded the defendant to try
and cooperate. The defendant was so impressed that he hired
attorney Lawson to handle his appeal. Attorney Lawson filed

-3-

appearance on 1/29/04 [Docket #148].

In the weeks and months following the sentencing, the defendant was preoccupied with serious medical problems and recovering from gunshot wounds he sustained while attempting to provide substantial assistance to the government. (The defendant only recently obtained evidence and a statement from an eyewitness identifying Detective John Mercado as one of the two men responsible for shooting him).

The defendant remained on bond pending self-surrender based in part on his medical and mental health problems. On 1/29/2004 defendant, through counsel, filed a Motion for Reconsideration [Docket #149] and on 2/10/2004 defendant filed a Motion to Withdraw Plea of Guilty [Docket #162]. During all this time the defendant was under the impression an appeal was being agressively pursued.

The defendant self-surrendered to the Federal Medical Center in Lexington, KY, on 5/28/2004. The defendant was told by his counsel that he was very busy and was also ill and would not file anything until September.

As the time grew near, the defendant began to grow impatient and his family made inquiry as to the status of the appeal and the possibility of a bond pending appeal. Attorney Lawson advised that there would be no appeal as no notice was ever filed. He advised he would file a 500+ page motion pursuant to 28 USC § 2255 to challenge the plea and sentence. He said it would take more time

-4-

as he was suffering from A.L.S., more commonly known as Lou Gehrig's Disease, a fatal motor neuron disease.

The defendant then sought to get new counsel to try to appeal his case. He retained John Paul Rion of Dayton, Ohio, who after review said an appeal was now time barred and a § 2255 motion would be the last resort. Counsel made this decision without benefit of review of the sentencing transcript.

On December 8, 2004, the defendant received, for the first time, a transcript of his sentencing hearing, which was just recently transcribed. The transcript, as indicated above, clearly establishes this court knew of defendant's desire to appeal and this court agreed to have the Clerk file the required notice, which was not filed as instructed.

The failure to file notice of appeal is not attributable to the defendant. The defendant prays this court to grant defendant's motion and allow him to take Direct Appeal of his sentence and conviction as there are genuine issues to appeal.

Respectfully submitted,

Steven Rennick, Sr.
#04050-032   HCU
Federal Medical Center
P.O. Box 14500
Lexington, KY 40512

## CERTIFICATE OF SERVICE

I, Steven Rennick, attest the foregoing was deposited, postage pre-paid, into the prison legal mail box, addressed as set forth below, on this ____ , day of December 2004.

Clerk of the Court
U.S. District Court
Southern District of Ohio
U.S. Courthouse
100 East Fifth Street
Cincinnati, OH 45202

Robert C. Brickler, AUSA
221 E. Fourth Street
Suite 400
Cincinnati, OH 45202

Steven Rennick, Sr.
#04050-032
Fmc —

1    If you request, Mr. Rennick, I'll order the clerk

2    of courts to file your notice of appeal immediately after

3    the judgment is filed, and, if not, Mr. Gallagher, will you

4    protect the rights of the defendant?

5    MR. GALLAGHER:  Judge, I will.  I have already

6    spoken to Mr. Rennick about the potential outcomes of the

7    sentencing hearing.  He would like to appeal.

8    THE COURT:  And are you going to be responsible

9    for filing it, or do you want the clerk?

10    MR. GALLAGHER:  Judge, if the clerk would.  I

11    don't know what the financial situation is going to be from

12    this point forward because of forfeiture proceedings that

13    are engaged in state court.  But either new counsel is

14    either going to be appointed or retained to pursue it.

15    THE COURT:  All right.  That's fine.

16    Mr. Brichler, what's the custodial status of the

17    defendant?

18    MR. BRICHLER:  Your Honor, Mr. Rennick is free on

19    bond that was posted when this case was initially brought.

20    I spoke with Pretrial Services, and he's complied with all

21    the requested Pretrial Services, and we would request the

22    Court consider allowing Mr. Rennick to self report.

23    THE COURT:  All right.  Who have we got from the

24    marshals here?  Did I see Joel somewhere?

25    Nobody here from the marshals.  Okay.  I'm not

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Steven Rennick, Sr., | : | |
| | : | Case No. CR-1-02-157 |
| Petitioner | : | |
| | : | District Judge Susan J. Dlott |
| v. | : | |
| | : | |
| United States of America, | : | ORDER |
| | : | |
| Respondent | : | |

This matter is before the Court on Petitioner's Motion to Reinstate Right to Direct

Appeal Pursuant to Rule 4(b) Federal Rules Appellate Procedure (doc. #191). Petitioner Steven

Rennick, Sr. asserts that a notice of appeal was not filed on his behalf within the statutory time

period due to the neglect of his legal counsel and/or oversight of the clerk of courts. For the

reasons that follow, the Court **DENIES** Petitioner's motion, but will permit Petitioner to file a

motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255 within 90 days of

the date of this Order.

## I.    BACKGROUND

On August 19, 2003, Petitioner pleaded guilty to conspiracy to distribute in excess of 100

kilograms of marijuana. (Doc. #103.) On January 28, 2004, this Court sentenced Petitioner to a

term of imprisonment of 63 months followed by four years of supervised release. (Doc. #188 at

14, 16.) Petitioner was represented by William R. Gallagher, Esq. at his sentencing hearing.

The following conversation took place between the Court and Mr. Gallagher at the hearing

concerning Petitioner's right to appeal his sentence:

> THE COURT: Let me tell you about your rights on appeal. Both parties
> are notified by the Court that you have a right to appeal this sentence. . . . You

1

[DE-192 P1 JA-173]    #192

are further advised that, in accordance with Rule 4(b) of the Rules of Appellate Procedure, you must file your notice of appeal with the clerk of the United States District Court, within ten days of the filing of the judgment. The Court does advise you that, if you request, the clerk of the Court will prepare and file immediately the notice of appeal on your behalf. . . . If you request, Mr. Rennick, I'll order the clerk of courts to file your notice of appeal immediately after the judgment is filed, and, if not, Mr. Gallagher, will you protect the rights of the defendant?

MR. GALLAGHER: Judge, I will. I have already spoken to Mr. Rennick about the potential outcomes of the sentencing hearing. He would like to appeal.

THE COURT: And are you going to be responsible for filing it, or do you want the clerk?

MR. GALLAGHER: Judge, if the clerk would. I don't know what the financial situation is going to be from this point forward because of the forfeiture proceedings that are engaged in the state court. But either new counsel is going to be appointed or retained to pursue it.

THE COURT: All right. That's fine.

(Doc. #188 at 19-20.) The clerk of courts, however, did not file the notice of appeal on

Petitioner's behalf. The statutory deadline for filing a notice of appeal passed on or about

February 9, 2004. See Fed. R. App. P. 4(b).

Petitioner retained Kenneth L. Lawson, II, Esq. to represent him after the sentencing

hearing on January 29, 2004. (Doc. #148.) Mr. Lawson filed multiple motions on Petitioner's

behalf, including motions for reconsideration, to withdraw the plea of guilty, and to stay

execution of his sentence (docs. ##149, 162, 166), but he did not file a notice of appeal.

Petitioner asserts in his *pro se* brief that he believed that an appeal was being pursued during this

time. Petitioner states that he first learned in September 2004 that an appeal had not been filed.

Thereafter, Petitioner was told by both Mr. Lawson, and then by John Hayes Rion, Esq., a new

attorney he retained, that his appeal rights had passed and that he would have to pursue relief by

2

filing a motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255.

The transcript from Petitioner's sentencing hearing was docketed on December 3, 2004. (Doc. #188.) After reviewing the sentencing transcript for the first time, Petitioner filed this *pro se* motion on December 14, 2004 seeking reinstatement of his appeal rights.

## II.    ANALYSIS

The Court is required by the Federal Rules of Criminal Procedure to advise a defendant who has pleaded guilty of his rights (1) to appeal his sentence, (2) to ask for permission to appeal *in forma pauperis*, and (3) "[i]f the defendant so requests, [to have the clerk] immediately prepare and file a notice of appeal on the defendant's behalf." Fed. R. Crim. P. 32(j).  The Supreme Court has instructed that "[t]rial judges must be meticulous and precise in following each of the requirements of Rule 32 in every case." Peguero v. United States, 526 U.S. 23, 27 (1999). A violation of Rule 32 is grounds for collateral relief if the defendant is prejudiced by the court's error. See id. at 27-30.

The Court has found only one other case in which a petitioner alleges that the district court clerk failed to file a notice of appeal upon request in violation of Rule 32(j)(2). See United States v. Hirsch, 207 F.3d 928 (7th Cir. 2000). As the Hirsch court explained, a district court does not have the authority under the Federal Rules of Criminal Procedure or Rule 4(b) of the Federal Rules of Appellate Procedure to extend the time period by which a notice of appeal may be filed by more than 30 days. See id. at 930 (explaining Fed. R. App. P. 4(b)(4)). Rather, an allegedly aggrieved petitioner, like Petitioner Rennick here, must pursue relief for the clerk's error by filing a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. See id. at 931. If Petitioner can establish that his constitutional rights were violated, then this

3

Court must vacate the judgment against Petitioner and reimpose his sentence so that Petitioner can file a timely appeal. See id. at 931.[1]

Accordingly, the Court will permit Petitioner to file a motion pursuant to 28 U.S.C. § 2255 within 90 days of the date of this Order. Petitioner should address specifically in his motion whether the motion has been timely filed, and if not, on what grounds the limitations period should be equitably tolled.[2] Petitioner also should address specifically all grounds for relief from the conviction or sentence he seeks to challenge.

Attached hereto as Exhibit A is a standard form for a motion under 28 U.S.C. § 2255. The Court directs Petitioner's attention to paragraph 6 of the instructions listed on the first page of the standard form wherein he is instructed as to how to request to proceed *in forma pauperis*

---

[1] Courts have afforded this same relief to petitioners pursuant to § 2255 motions when their defense counsel failed to file a timely appeal despite specific instructions to do so by the petitioners. See e.g., Rosinski v. United States, 459 F.2d 59, 59 (6th Cir. 1972) (vacating, then reinstating, petitioner's sentence so that he could file a timely appeal); United States v. Forsythe, 985 F. Supp. 1047, 1051 (D. Kan. 1997) (same).

[2] The one-year limitation period for § 2255 is not jurisdictional and it is subject to equitable tolling. See Dunlap v. United States, 250 F.3d 1001, 1004 (6th Cir. 2001). Courts examine the following five factors to decide whether to apply equitable tolling:

(1) the petitioner's lack of notice of the filing requirement; (2) the petitioner's lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the respondent; and (5) the petitioner's reasonableness in remaining ignorant of the legal requirement for filing his claim.

Id. at 1008-09. Generally, reliance on an attorney or on an attorney's mistaken advice is not grounds for equitable tolling. See Allen v. Yukins, 366 F.3d 396, 403-04 (6th Cir. 2004) cert. denied 125 S.Ct. 200 (2004); Jurado v. Burt, 337 F.3d 638, 643 (6th Cir. 2003). However, one district court equitably tolled the filing period when a petitioner's attorney did not inform him that his state appeal had been decided until after the deadline for filing his habeas petition. See Erwin v. Elo, 130 F. Supp. 2d 887-90 (E.D. Mich. 2001). The petitioner in Erwin learned his state appeal had been decided only after he inquired to the state court about the status of his appeal. See id.

4

(as a poor person) so that an attorney may be appointed to him. Upon filing of Petitioner's

§ 2255 motion, the United States will be served with notice to answer or otherwise plead

pursuant to Rules 4(b) and 5 of the Rules Governing Section 2255 Proceedings.

## III.    CONCLUSION

For the foregoing reasons, Petitioner's motion for relief pursuant to Appellate Rule 4(b)

(doc. #191) is **DENIED.** Petitioner is permitted to file a motion pursuant to 28 U.S.C. § 2255 as

set forth above within 90 days of the date of this **ORDER.** Nothing herein shall be construed as

a finding as to the timeliness or merits of a § 2255 motion.

IT IS SO ORDERED.

s/Susan J. Dlott
Susan J. Dlott
United States District Judge

5

| UNITED STATES DISTRICT COURT | District Southern District of Ohio - Cincinnati | |
|---|---|---|
| Name of Movant STEVE RENNICK, SR. | Prisoner No. 04050-032 | Case No. 1:02-CR-00157 |
| Place of Confinement Federal Medical Center, P.O. Box 14500, Lexington, KY 40512-4500 | | |
| UNITED STATES OF AMERICA | V. STEVE RENNICK SR. | |
| | (name under which convicted) | |

## MOTION

1. Name and location of court which entered the judgment of conviction under attack United States District Court, Southern District of OHIO, WESTERN DIVISION Cincinnati

2. Date of judgment of conviction JANUARY 28, 2004

3. Length of sentence 63 months

4. Nature of offense involved (all counts) Count ONE: Conspiracy to distribute in excess of 100 kilograms of marijuana in violation of 21 U.S.C §§ 841(a)(1) and (b)(1)(B) and § 846. All remaining counts dismissed

5. What was your plea? (Check one)
(a) Not guilty ☐
(b) Guilty ☒
(c) Nolo contendere ☐
If you entered a guilty plea to one count or indictment, and not a guilty plea to another count or indictment, give details:
Pled to Count ONE by virtue of Plea Agreement UNDER which REMAINING counts were dismissed.

6. If you pleaded not guilty, what kind of trial did you have? (Check one)
(a) Jury ☐
(b) Judge only ☐   N/A

7. Did you testify at the trial?
Yes ☐   No ☒

**FILED**
JUN 2 6 2005
JAMES BONINI, Clerk
CINCINNATI, OHIO

8. Did you appeal from the judgment of conviction?
Yes ☐   No ☒   Clerk failed to file timely notice as ordered

194

(1)

[DE-194 P1 JA-178]

9. If you did appeal, answer the following·

   (a) Name of court   N/A

   (b) Result _____

   (c) Date of result _____

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, application motions with respect to this judgment in any federal court?
   Yes ☐     No ☒

11. If your answer to 10 was "yes," give the following information: N/A

   (a) (1) Name of court _____

       (2) Nature of proceeding _____

       _____

       (3) Grounds raised _____

       _____

       _____

       _____

       _____

       _____

       (4) Did you receive an evidentiary hearing on your petition, application or motion?

          Yes ☐     No ☐

       (5) Result _____

       (6) Date of result _____

   (b) As to any second petition, application or motion give the same information:

       (1) Name of court _____

       (2) Nature of proceeding _____

       _____

       (3) Grounds raised _____

       _____

       _____

       _____

       _____

[DE-194 P2 JA-179]

AO 243 (Rev. 2/95)

    (4) Did you receive an evidentiary hearing on your petition, application or motion?
       Yes ☐      No ☐

    (5) Result _____

    (6) Date of result _____

(c) Did you appeal, to an appellate federal court having jurisdiction, the result of action taken on any petition, applic
   or motion?
   (1) First petition, etc.          Yes ☐     No ☐
   (2) Second petition, etc.        Yes ☐     No ☐

(d) If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

12. State *concisely* every ground on which you claim that you are being held in violation of the constitution, laws or treaties of the United States. Summarize *briefly* the *facts* supporting each ground. If necessary, you may attach pages stating additional grounds and *facts* supporting the same.

   <u>Caution:</u>   <u>If you fail to set forth all grounds in this motion, you may be barred from presenting additional grounds at a later date.</u>

    For your information, the following is a list of the most frequently raised grounds for relief in these proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed. However, you should raise in this motion all available grounds (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

    Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The motion will be returned to you if you merely check (a) through (j) or any one of the grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily or with understanding of the nature of the charge and the consequences of the plea.

(b) Conviction obtained by use of coerced confession.

[DE-194 P3 JA-180]

AO 243 (Rev. 2/95)

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e) Conviction obtained by a violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence fav to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(i) Denial of effective assistance of counsel.

(h) Denial of right of appeal.

A.    Ground one: Plea Neither Knowing or voluntary but Acquired by Prosecutorial Misconduct, manipulation, + coercion.

Supporting FACTS (state *briefly* without citing cases or law)

SEE Memorandum

B.    Ground two: Ineffective Assistance of Counsel

Supporting FACTS (state *briefly* without citing cases or law)

SEE Memorandum

C.    Ground three: GOVERNMENT BREACHED PLEA AGREEMENT

Supporting FACTS (state *briefly* without citing cases or law)

SEE Memorandum

[DE-194 P4 JA-181]

AO 243 (Rev. 2/95)

D.  Ground four: DUE PROCESS by failing to grant down ward departure, motion for Reconsideration. motion to withdraw plea

Supporting FACTS (state *briefly* without citing cases or law)  SEE MEMORANDUM

E.  GROUND FIVE: Denied direct Appeal by court cleek's failure to file notice of Appeal.

                SEE MEMORANDUM

13.  If any of the grounds listed in 12A, B, C, and D were not previously presented, state *briefly* what grounds were not so presented and give your reasons for not presenting them: These matters were to be raised on appeal but the court failed to file timely notice

14.  Do you have any petition or appeal now pending in any court as to the judgment under attack?
     Yes ☐      No ☒

15.  Give the name and address, if known, of each attorney who represented you in the following stages of judgment attacked herein:

     (a)  At preliminary hearing  William Gallagher, Esq. 114 East Eighth St, Cincinnati Ohio 45202

     (b)  At arraignment and plea  SAME

     (c)  At trial  SAME

     (d)  At sentencing  SAME

~~ 243 (nov. 2/95)

(e) On appeal _Kenneth L. Lawson, Esq, The Kroger Building, Suite 1575,_ _Cincinnati, Ohio 45202_

(f) In any post–conviction proceeding _John Paul Rion, Rion, Rion Rion, LPA., clivc._ _P.O. Box 10126, Dayton, Ohio 45462_

(g) On appeal from any adverse ruling in a post–conviction proceeding _____

_____

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and approximately the same time?

   Yes ☐      No ☒

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?

   Yes ☐      No ☒

   (a) If so, give name and location of court which imposed sentence to be served in the future: _____

   _____

   _____

   (b) Give date and length of the above sentence: _____

   _____

   (c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?

   Yes ☐      No ☐

   Wherefore, movant prays that the Court grant petitioner relief to which he or she may be entitled in this proceeding.

   _____
                                    Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct. Executed on

_Jan. 20, 2005_
     (Date)

                              _Steve M Rennich Sr_
                              Signature of Movant

(6)                    [DE-194 P6 JA-183]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION CINCINNATI

STEVE RENNICK, SR.                )
                                  )
        Movant/Defendant          )   Case No.: 1:02-CR-00157
                                  )
            vs                    )   Hon. Susan J. Dlott
                                  )
UNITED STATES OF AMERICA          )   U.S. District Judge
                                  )
            Respondent            )
                                  )

## MEMORANDUM IN SUPPORT OF

## DEFENDANT'S MOTION TO VACATE, SET ASIDE OR AMEND

## SENTENCE PURSUANT TO 28 USC § 2255

Comes the defendant, Steve Rennick, Sr., pro se, and moves this court for an Order Vacating and Setting Aside defendant's plea, conviction, and sentence to the extent that defendant's plea was coerced, not voluntary or knowing, and the express result of ineffective assistance of counsel and violative of defendant's 5th & 6th Amendment rights as set forth herein; and defendant further seeks to be tried on the merits of his case and assured the full force and effect of his constitutional rights and in support thereof the defendant states as follows:

As a preliminary matter, the defendant avers that he is not an attorney; has no legal or professional training pertaining to the preparation and filing of legal motions or memorandums. The

-1-

defendant seeks notice of such limitations and prays this court
to construe his pleadings liberally in light of the Supreme Court
holding in Haines v Kernes, 404 U.S. 519, 30 L.Ed.2d 652 (1972);
Cruz v Beto, 405 U.S. 319, (1972); Lawler v Marshall, 898 F.2d
1196 (6th Cir. 1990); Hill v U.S., 268 U.S. 424, 430 (1984).  The
allegations and averments in a pro se pleading must be taken as
true and construed in favor of the defendant.  See Malone v Colyer,
710 F.2d 258, 260 (6th Cir. 1983).

     The defendant further advises the court that there are several
elements of style and format needing explanation:

     1.  The movant, Steve Rennick, Sr., is referred to through-
out as the defendant.

     2.  There are two types of exhibit referrals.  Items and
documents contained in the record of the court are referred to by
their "Docket Entry Number" and appear in text as [DE #].  Docu-
ments not part of the record are referred to as sequentially numb-
ered exhibits and are referred to as [Ex #].  In addition, there
are several composite exhibits referred to as [Comp Ex - # A.B.C..].

     3.  Docket Entry exhibits are not included in attachments as
they are readily available to all parties.  Other exhibits are sub-
mitted herewith.  All exhibits are made a part hereof by reference.

### STATEMENT OF THE CASE

     Defendant was originally arrested on October 28, 2002, pursu-
ant to a Complaint and Arrest Warrant [DE-1].  On november 6, 2002,

-2-

defendant was named, along with five other defendants in a five
count indictment charging, inter alia; Count One: Conspiracy to
distribute in excess of 100 kilograms of marijuana in violation
of 21 USC §§ 841(a)(1) and (b)(1)(B) and § 846; Count Two:  Dis-
tribution of approximately 50 pounds of marijuana in violation
of 21 USC §§ 841 (A)(1) and (b)(1)(D) and 18 USC § 2; Count Four:
Possession with intent to distribute 450 pounds of marijuana in
violation of 21 USC §§ 841(a)(1) and (b)(1)(B) and 18 USC § 2.
[DE - 8].

On March 5, 2003, defendant was named in an eight count su-
perceding indictment charging essentially the same conduct, but
adding a charge of engaging in monetary transactions in violation
of 18 USC §§ 1957 & 2 [DE - 59].

Defendant's son, Steve Rennick, Jr., was named in the initial
indictment, but was dismissed prior to the Superseding Indictment.
The government, in its attempt to persuade defendant to plea, gave
notice of its intent to force defendant's son to testify against
the defendant.  The court issued an order on August 15, 2003, com-
pelling defendant's son to testify at the upcoming trial [DE - 102].

On August 19, 2003, defendant arrived at court for the com-
mencement of his jury trial.  On arrival defendant was first con-
fronted by his counsel who advised him the government was claiming
they had evidence where the defendant had paid several witnesses
to give false testimony (Rule 404(b) evidence) [DE - 94].  The
defendant knew this accusation to be false and cotninued to

-3-

adamantly desire a jury trial.

Defendant was then approached by co-defendant Matthew Elliot who asked if he could get the defendant to consider entering a guilty plea. Elliot made several arguments including, inter alia, (i) that if everyone pled it would be good for everyone; (ii) that all defendants had to plead in order for everyone to get a good deal; (iii) that if the defendant would not plead it could "mess up" Elliot's future and "ruin his life"; (iv) that the defendant would be able to "cooperate" with the government and would never do much time and might get probation.

Defendant's counsel, William Gallagher, echoed much of what Elliot said and encouraged defendant to plead guilty. Defendant was moved by Elliot's expressed desire that he enter a plea and was further confused and threby moved by counsel's encouragement. The defendant agreed to entertain a discussion about a plea even though he knew he was innocent of any wrongdoing.

Defendant was ultimately manipulated into entering into a plea agreement to Count One [DE - 104]. Co-defendant Elliot entered into a similar agreement [DE - 106] and co-defendant Benjamin also entered into a similar agreement [DE - 111]. On the same day all three defendants entered their pleas pursuant to their plea agreements. [DE - 145].

On December 2, 2003, defendant caused an eight page letter to be transmitted to the judge and the government categorically denying any guilt in the matters charged. [Ex - 1].

-4-

On January 26, 2004, defendant's counsel filed a Motion for Downward Departure based on substantial assistance to the government and medical issues [DE - 147].

On January 28, 2004, defendant's sentencing was held. The defendant's motion for downward departure was denied. [DE - 188]. Defendant was sentenced on Count One to 63 months in prison; four years supervised release; a $10,000.00 fine and a $100.00 assessment. [DE - 188, 157]. Co-defendant Elliot was sentenced to 14 months in prison, followed by 2 years supervised release, a $1,000.00 fine and a $100.00 assessment [DE - 190]. Co-defendant Benjamin was sentenced to three years probation, a $1,000.00 fine and a $100.00 assessment. [DE - 189].

On January 29, 2004, defendant retained Kenneth L. Lawson, II, as new counsel [DE - 148]. On the same date counsel Lawson filed a Motion for Reconsideration [DE - 149].

On February 10, 2004, Counsel Lawson filed a Motion to Withdraw Plea of Guilty. [DE - 162]. On March 1, 2004, the court denied Motion to Reconsider and Motion to Withdraw Plea of Guilty. [DE - 168].

## STATEMENT OF FACTS

The PreSentence Investigation Report (PSR) set forth the following facts in the Offense Conduct section of the report.

The investigation with respect to this case involved agents of the Regional Enforcement Narcotics Unit (RENU) and officers from area police departments.

[DE-194 P11 JA-189]

On October 15, 2002, RENU agents, acting on a tip from a con-
fidential informant, executed a search warrant at the residence of
Eddie Moore in Norwood, Ohio.  Agents recovered 30 pounds of mari-
juana and arrested Moore.

Moore claimed to be storing marijuana for Matthew Elliot, his
close friend.  Elliot paid Moore small amounts of marijuana for
personal use.  Agents learned that Kareem Cole and David Jones
A/K/A Phillip Davidson obtained marijuana through a source in Ari-
zona and brought it into Cincinnati for distribution.  The mari-
juana was typically stored in a rented portion of a warehouse owned
by Phyllis Rennick, the defendant's wife.

Defendant ran a garage on North Bend Road for 30 years.  Ap-
proximately eight years ago the defendant leased a separate por-
tion of the warehouse building to Dennis Morrison.  After several
years of being a model tenant, Morrison had no further need for
the space and asked defendant if he would switch the lease to his
uncle, Kareem Cole, and Cole's friend Phillip Davidson, A/K/A
David Jones.  The defendant agreed.

On October 16, 2002, surveillance was set up on the ware-
house.  Agents observed Steve Rennick, Jr., defendant's son, and
Matthew Elliot arrive at the warehouse.  Later the defendant also
arrived.  Shortly thereafter the defendant and Elliot left in one
vehicle and Steve Rennick, Jr., left in another.  Agents stopped
and detained all three.

A search of the warehouse revealed 450 pounds of marijuana

-6-

inside a separate locked area of the rented warehouse. The de-
fendant was found to have a key to the locked area.

The defendant's family owns the entire warehouse and real
property. The warehouse is divided into separate leasable areas.
The defendant's son operates the family trucking business in part
of the building and the family rents the remaining space. The
area in which the marijuana was found was in an areas leased under
a lawful lease agreement to Kareem Cole. The defendant had keys
to all areas of the building, as would any landlord.

According to the government's version of the crime, the de-
fendant made three trips to Arizona to transport marijuana back to
Cincinnati. The first two trips were allegedly made in a motor
home and the third trip in a Freightliner Tractor. (Notably there
is never any assertion about a trailer being used with the semi-
tractor). The first trip allegedly involved 100 pounds, the sec-
ond, 150 pounds and the third, 550 pounds for a total of 800
pounds.

On July 23, 2002, the defendant purchased a Freightlienr
Semi-tractor in Arizona. The purchase price was $93,000.00. The
defendant paid $5,000.00 by business Visa, the balance was paid by
Provident Bank cashiers check for $88,000.00 ($46,000.00 was loan
proceeds).

RENU agents were able to locate the residence of Cole and
established surveillance. On October 16, 2002, Cole and Jones
left the residence in a rented vehicle. Agents stopped the car

-7-

and detained both men. Cole's apartment and a vehicle were
searched. Agents recovered scales, balance sheets showing money
owed, marijuana and $50,000.00 cash in the apartment. The ve-
hicle contained a box that had 25 pounds of marijuana in it. It
was also found that Cole had a key to the locked portion of the
warehouse where the 450 pounds of marijuana was stored, and a key
that fit the door lock at the warehouse.

From the period of June 24, 2002, through October 9, 2002,
the defendant deposited $74,000.00 into the Earth Management Ac-
count and $80,000.00 into the S&S Racing account. All of these
deposits were in cash. Both accounts were maintained at Provident
Bank.

On December 2, 2003, defendant wrote an eight page letter to
the judge denying any role in the offense whatsoever. Defendant
also met with the probation department and supplied the following
written statement:

> "I, Steve Rennick, involved myself with Kareem
> Cole and another man whom I now know to be David Jones.
> I drove the trips to Arizona as alleged in the indict-
> ment. I regret my involvement in this case, the harm
> it has caused my family, and the embarrassment that has
> resulted to me. I entered my plea before trial in this
> case and believe my plea prompted the pleas of the two
> remaining co-defendants in this case. I believe my plea
> resulted in there being no trial in this case."
> [DE - 107 pg 8].

This statement deliberately fails to mention anything about
the possession or sale of marijuana. It also admits no criminal
conduct. This was the only way the defendant would give a state-
ment because he was not guilty.

-8-

## SENTENCING FACTORS

Defendant was sentenced in accordance with the United States Sentencing Guidelines (USSG), November 1, 2002 edition.  Defendant's base offense level for a violation of 21 USC §§ 846 and 841 (a)(1) and (b)(1)(B) is located at U.S.S.G. § 201.1.  The sentence is based on the allegation that defendant's crime involved 800 pounds of marijuana or an equivalent of 362.88 kilograms.  The appropriate range for the quantity is found at U.S.S.G. § 2D1.1(a)(3)(c)(7), the base offense level is 26.  Defendant further received a three level reduction for acceptance of responsibility pursuant to §§ 3E1.1(a) and (b).  This resulted in a Total Offense Level of 23.

Defendant had a total of three criminal history points and, therefore, is in Category II.  The guideline sentencing range is 51 to 63 months.  However, pursuant to U.S.S.G. § 5G1.1(c)(2) the range is 60-63 months.  Defendant was sentenced to 63 months.  [DE - 107, pp 20, 188, 157].

## ISSUE I

## DEFENDANT'S PLEA WAS NEITHER KNOWING

## OR VOLUNTARY AS IT WAS ADDUCED

## BY PROSECUTORIAL MISCONDUCT,

## MANIPULATION AND COERCION.

## A.   DEFENDANT HAD NO DESIRE, MOTIVE OR NEED TO CONSIDER TAKING A PLEA.

The defendant never desired to enter a plea to the govern-
ment's allegations and remained at all times adamant about going
to trial, because the defendant was not and is not guilty of the
crime charged.

The substance of the government's allegations were simple
and circumstantial. Essentially the government alleged that RENU
agents, acting on a tip from a confidential informant, found 30
pounds of marijuana at the residence of one Eddie Moore. Moore
claimed to be storing marijuana for Matthew Elliot.

These facts led to a Kareem Cole and David Jones who, it was
found were importing large quantities of marijuana from Arizona
to Cincinnati and storing same in warehouse space leased from
Phyllis Rennick, the defendant's wife. Agents found 450 pounds
in this section of the warehouse.

The defendant had been hired by Cole to drive Cole and his
associates from Cincinnati to Arizona and back on three occasions.
The purpose of these trips  was to assist in the promotion of
three Reggae shows that Cole produced. The first two trips were
made in a motor home and the third in a Freightliner semi-tractor
(with no trailer).

The government also discovered the defendant had made
$154,000.00 in cash deposits to two business accounts. These
facts comprised all of the government's basis in charging the
defendant.

At the time of arrest, the defendant's son, Steve Rennick,
Jr., was also arrested and similarly charged. Defendant initially

-10-

hired Attorney Richard Goldberg to represent his son and Attorney
William Gallagher to represent himself.  The defendant and his son
were both freed on bond.

From the outset it was apparent that the government's case
against the defendant was weak and purely circumstantial.  The de-
fendant was not found to possess any drugs or drug pariphernalia.
The defendant was never observed in any drug transaction, nor was
he a party to any recorded conversations, controlled buys, or any
direct or physical evidence of any kind.  There were only two cir-
cumstantial links to the crime.  The defendant did have keys to
all parts of the warehouse which his family owns and he had made
three trips to Arizona with Cole and associates.

Defendant's defense team set out to assemble a substantial
defense including, inter alia: (i) evidence that the last and
largest  550 pound load was not transported in the Freightliner
semi-tractor driven by the defendant, verified by a physical in-
spection of the tractor to determine that no trailer, of any kind,
had ever been hooked to such tractor; (ii) a video taped deposi-
tion by a New Mexico Department of Transportation Officer indicat-
ing that he had been inside the new tractor on its return trip to
Cincinnati and it did not contain nor could it have held the 550
pounds of marijuana alleged.  (AUSA Brichler participated in this
deposition); (iii) the warehouse space where the marijuana was
found was leased by a valid lease agreement to Kareem Cole and
David Jones, who both had keys to said space; (iv) independent

-11-

forensic accounting records indicated that the source of all cash
deposits in the superseding indictment were documented and had
nothing to do with the purchase or sale of any narcotics, nor were
they from any illegal activity. There was significant evidence
to overcome all aspects of the government's allegations and there
was never a consideration of entering a plea to a crime the defen-
dant did not commit.

**B.   DEFENDANT'S PLEA WAS ADDUCED BY PROSECUTORIAL MISCONDUCT**

On the morning of August 19, 2003, the defendant's trial was
set to commence.  AUSA Robert Brichler met with co-defendant
Matthew Elliot, his counsel Kenneth Lawson, and defendant's coun-
sel William Gallagher.  This meeting was unknown to the defendant.
The purpose of the meeting was to devise a scheme to convince the
defendant to enter a plea of guilty and avoid a trial.

It was determined that as part of this scheme, co-defendant
Elliot would use his friendship and closeness to the defendant to
persuade him to plead.  Elliot was told to, and did, represent the
following to the defendant: (i) that a plea was the best thing for
all parties because each person would get a low sentence; (ii)
that each defendant could cooperate and get little time or maybe
probation; (iii) that defendants Elliot and Benjamin could get a
"plea deal" only if all three defendants pled; (iv) that if they
lost at trial it would ruin Elliot's and Benjamin's lives.

It was further a part of the plan that attorneys Gallagher
and Lawson would show the defendant a notice that the government

-12-

had evidence in the form of witnesses who would confirm that the defendant had paid witnesses to lie.  [DE - 94].

As consideration for his part in this scheme, co-defendant Elliot was promised a 5K1.1 downward departure of one third of his sentence for convincing the defendant to enter a guilty plea. This promise was made by AUSA Brichler.

In furtherance of this plan, defendant's counsel promised defendant would get no more than 36 motnhs and probably probation. AUSA Brichler represented the defendant could cooperate and "work off" his sentence; the government further agreed to not seek forfeiture on a motor home owned by the defendant.

At the time of this pressuring of the defendant, Elliot, Gallagher, and Brichler all knew the defendant suffered from PTSD, Post Traumatic Stress Disorder, and was on numerous medications. Defendant's medical records indicate the defendant was diagnosed with "severe and persistent mental illness including schizophrenia, bipolar disorder, major affective disorder and severe PTSD."  Records further indicate the defendant was taking Quetiapine Furomate, Sertraline HCL, Resperidone, Trazodone HCL, Lorazepam, and Oxycodone, all of which have mind altering effects.  Medical records further indicate the defendant's mental illness by the time of sentencing had become; "severe functional impairment [was] such that the Veteran is neither currently capable of successful and stable self-maintenance in a community living situation nor able to participate in necessary treatments without intensive  support."

-13-

[DE-194 P19 JA-196]

Clearly the defendant was in no condition to enter a plea, let alone a manipulated and emotionally coerced plea. [Comp Ex - 2 A, B, & C].

The scheme was successful and defendant eventually gave in and agreed to a plea to a crime he did not commit. Defendant's counsel stressed that he would be required to answer the court's questions as instructed or the deal would fall through. The defendant had no knowledge that Elliot was rewarded for his part of the scheme.

The three plea agreements [DE - 104, 106, 111] are essentially the same. None provide any factual basis and Elliot's does not mention the 5K1.1 reduction for manipulating the defendant and emotionally coercing the defendant's plea.

At the plea hearing the government was finally asked to provide the factual basis for the plea. The government's basis included, inter alia, that the defendant conspired with co-defendants Cole, Jones, and Elliot to distribute marijuana; that defendant traveled to Arizona to bring back 500 pounds of marijuana in defendant's Freightliner tractor; that the defendant stored the drugs in his warehouse; that co-defendant Elliot received 50 pounds of said marijuana; that the defendant gave one pound of marijuana to co-defendant Benjamin.

Upon hearing these facts the defendant was stunned. He knew he was pleading to something he did not do, but now he was being asked to further admit details that simply never happened. When

-14-

[DE-194 P20 JA-197]

the court inquired, "Mr. Rennick, we need something verbal," he
was speechless and at the nudging of counsel said, "No, ma'am."
There was simply no truth to the factual basis.  [DE - 145].

     As soon as the plea hearing was over the defendant gathered
with attorneys Gallagher, Richard Goldberg, Lawson, and Cohen,
the other co-defendants and several of defendant's friends and
family.  He was furious that he was forced to lie to the patently
untrue factual basis.  The lawyers attempted to calm him down by
stating over and over that it was only a "fictional plea" and it
would make no difference.  The defendant has submitted an affida-
vit including the fact of the fictional plea.  [Comp Ex - 3A, pg 5].

     In addition, defendant submits an affidavit from Demetrious
A. Ball [Ex 38] who is a friend of the defendant and was present
when these events occurred.  He observed the defendant moving his
head from side to side gesturing the factual basis was untrue, ID
pg 2 para 7.  He further observed other indications that the defen-
dant was not in agreement with the factual basis, ID paras 8-11.
Finally, he recounts the matters he heard relative to the "fic-
tional pleas."  ID paras 12 and 14.

     The defendant submits an affidavit from co-defendant Wayne
Benjamin, which directly supports the facts stated herein.  [Comp
Ex - 3C].

     The entering into a deal with a co-defendant to manipulate
an untruthful plea is an action in furtherance of deceiving the
court and undermining the judicial system and it is, per se, gross

-15-

misconduct on the part of the prosecution. The actions of AUSA
Brichler tainted the entire case and demand reversal.

An Appellate Court reviews a claim of prosecutorial miscon-
duct for harmless error. "[T]he touchstone of due process analy-
sis in cases of alleged prosecutorial misconduct is the fairness
of the trial, not the culpability of the prosecutor." Marshall v
Hendricks, 307 F.3d 36, 64 (3rd Cir. 2002). In this proceeding a
defendant with known mental problems was subjected to emotional
coercion by a younger co-defendant who enjoys a son-like closeness
to the defendant for the purposes of extracting a false confession.
This is misconduct of the type considered in Mason v Mitchell, 320
F.3d 604, 635 (6th Cir. 2003) "this misconduct must be so pronoun-
ced and persistent that it permeates the entire atmosphere of the
[proceeding] or so gross as probably to prejudice the defendant."

As shall be seen, this case is one where bad faith and conduct
begat more of the same. The coerced plea led to defective sen-
tence, which set up a botched cooperation, and ultimately the de-
fendant being shot and nearly killed by a rogue cop still on the
loose.

Normally, a claim such as this would be reviewed de novo.
United States v Wells, 211 F.3d 988, 995 (6th Cir. 2000). How-
ever, the defendant is only now raising the matter for the first
time. The government may well argue that by not filing a previous
objection the defendant is limited to only a plain error and an-
alysis, United States v Carr, 170 F.3d 572, 577 (6th Cir. 1999).

-16-

The defendant maintains he only recently learned of the deal
and the actions of the prosecutor when he obtained the transcripts
of the sentencings [DE-188, 189, 190]. There has been no oppor-
tunity to object and as will be discussed, neither of the attor-
neys retained post conviction brought the matter to the defendant's
attention.

While not consenting to a limitation of plain error, defen-
dant understands that a reversal would require a finding that (1)
there is an error; (2) it is plain; (3) which affected the defen-
dant's substantial rights; and (4) that seriously affected the
fairness, integrity or public reputation of the judicial proceed-
ing. United States v Carter, 236 F.3d 777, 783-784 (6th Cir.
2001).

The defendant the Court to the transcript of defendant
Elliot's sentencing, [DE-190] and for contextual consistency, re-
quests the Court to review the exchanges commencing at page 4
line 20 through and including page 12 line 15.

Co-defendant Elliot's counsel, Kenneth Lawson, described the
"deal in the following manner:

> "In order to end up into these plea bargains, it
> was presented to my client, since he was closest to
> Mr. Rennick, that if he was able to get Mr. Rennick
> to enter a plea, voluntarily enter a plea and also pro-
> vide sub -- and get Mr. Rennick provide substantial
> assistance, he would receive, he being Mr. Elliot,
> would receive a 5K1. So Mr. Elliot's plea bargain and
> 5K1 is based on what Mr. Rennick was to do ...
>   [O]ur understanding of his [Elliot's] responsibil-
> ity was to do, which was to get in discussions with his

-17-

friend to enter the plea and also provide sub-
stantial assistance." [DE-190, p 4-5] emphasis
added.

Clearly the government set on a deliberate course of action
bent on getting the defendant to enter a plea. Lawson made a
forceful argument that Elliot was entitled to his 5K1 because he
upheld his end of the bargain.

Lawson further argued that he had only just learned that
the defendant had tape recordings of his attempts to cooperate,
including phone calls from bonafide drug dealers, as well as con-
versations with RENU Agent John Mercado. Lawson critized defen-
dant's counsel for not having a hearing on the extent of the de-
fendant's cooperation and how serious he felt it was that defen-
dant's shooting was not being recognized as a form of cooperation.
[DE-190, p 6-7].

Lawson also confirmed that defendant's counsel, Gallagher,
had full knowledge of the deal with Elliot.

"And Mr. Gallagher knows, [...], that that was
the offer that was made to my client, because we had
to come back out and let my client [Elliot] speak to
Mr. Gallagher's client [the defendant]." [DE-190,
p 10].

Mr. Lawson made it very clear he wanted to look into the
tapes or other matters to determine what, if any, cooperation
the defendant may have done. AUSA Brichler went off the re-
cord and spoke with Lawson. After the discussion the govern-
ment suddenly withdrew its objection and reluctantly asked that
Elliot receive his one third 5K1 reduction. AUSA Brichler

-18-

apparently not wanting to risk further complications stated:

> "I want to make it clear that this motion for reduction is based upon what happened that day and it's not based upon any conduct that Mr. Rennick subsequently engaged in." [id. p 12].

The government rewarded Mr. Elliot for using his trust and influence to betray a friend. He received a one third reduction in his guideline sentence. The actions of the government were done in bad faith. While subverting the system by using Elliot to coerce a plea is reprehensible, the involving of defendant's counsel in the scheme is unexcusable and perverts the entire system.

At an evidentiary hearing the defendant will show, by examination of Attorneys Goldberg, Gallagher, Cohen, and Lawson, the extent of the betrayal by defendant's counsel for deliberately participating in this scheme.

> "A decision to enter into a plea agreement cannot be knowing and voluntary when the plea agreement itself is the result of advice outside "the range of competence demanded of attorneys in criminal cases." Deroo v United States, 223 F.3d 919 (8th Cir. 2000) citing Hill v Lockhart, 474 U.S. 52, 56 (1985).

When the government conceived a scheme to manipulate a defendant into entering a plea a line was crossed. This was not a case of rewarding a co-defendant for "truthful" testimony against another defendant, this was trickery, exploitation of the defendant's mental state and his trust. As bad as that is, when defendant's counsel became a willing partner in the scheme and kept the defendant in the dark, the entire adversarial process broke down.

All of this because AUSA wanted to "[m]ake the trial go away" [DE-190, p 11].

The defendant, Steve Rennick, Sr., served this country with honor in the Vietnam war. The honors of the war came home in the chronic replays caused by his Post Traumatic Stress Disorder. One of the common side effects for PTSD patients is their desire to accomodate or go along with persons close to them. In the defendant's case his medical records reflect he was in group treatment. The "purpose of this group is to increase assertiveness by recognizing certain situations in which it is difficult to say 'no'." [Comp Ex-20].

The reality here is that using Elliott and his "closeness" to the defendant and telling the defendant a plea was best for all; was coercion, it was a situation the defendant could not refuse. On August 19, 2003, AUSA Brichler adduced a plea from the defendant by coercion; coercion no less serious and no less effective than had he threatened the defendant with mortal harm. The defendant's plea in this matter should be withdrawn, the conviction reversed, and the defendant should be tried by a jury on the merits.

## ISSUE II

### DEFENDANT'S PLEA WAS UNKNOWING AND
### INVOLUNTARY AS DEFENDANT RECEIVED
### INEFFECTIVE ASSISTANCE OF COUNSEL

A criminal defendant's right to the assistance of counsel is

-20-

[DE-194 P26 JA-203]

a necessity, not a luxury, <u>Gideon v. Wainwright</u>, 372 U.S. 335, 344 (1963). The defendant's attorney is a crucial component to the process because he is the vehicle through which the accused's other rights are preserved and effectuated, and without whom those other rights are practically meaningless <u>ID</u>. As such this right to counsel has long been held to mean "the right to the <u>effective</u> assistance of counsel." [emphasis added]. <u>McMann v Richardson</u>, 397, U.S. 759, 771, n.14 (1970).

The attorney client relationship requires the relationship be shrouded in secrecy. How does a judge know if an attorney fully and completely explained an offense, its elements and all possible penalties? How can this court know how attorney Gallagher persuaded the defendant to lie by pleading guilty when he wasn't guilty? The court doesn't know, and, therefore, an evidentiary hearing is required, and at that hearing the defendant will show the court the full extent of the lack of effective representation and the deliberate breach of the relationship's trust.

If the defendant does not receive proper assistance facing the complexities inherent in the law, then the defendant's rights have been violated. <u>United States v Ash</u>, 413 U.S. 300, 309 (1973).

A.   <u>DEFENSE COUNSEL'S ASSISTANCE WAS INEFFECTIVE AND COMPROMISED</u>
     <u>WHEN HE PARTICIPATED IN GOVERNMENT'S SCHEME TO OBTAIN A</u>
     <u>GUILTY PLEA</u>

The record of the sentencing hearing of co-defendant Elliot

-21-

makes it very clear that at the time Elliot was manipulating the
defendant into entering a plea, defendant's counsel, William
Gallagher, then well knew that the government had "hired" Elliot
to manipulate the defendant. From the moment Gallagher became
aware of the Elliot scheme and payoff of a one-third sentence re-
duction, and allowed same to continue, he ceased to represent the
interests of the defendant.

The "benchmark for judging any claim of ineffectiveness must
be whether counsel's conduct so undermined the proper functioning
of the adversarial process that the trial cannot be relied on as
having produced a just result." Strickland v Washington, 466 U.S.
668 (1984) at 686.

The court announced a two-part inquiry for making the deter-
mination: first, "the defendant must show that counsel's perform-
ance fell below an objective standard of reasonableness" as com-
pared with "prevailing professional norms." ID 688. Second, the
defendant must show he was prejudiced by his attorney's deficient
conduct, by demonstrating that "there is a reasonable probability
that, but for counsel's unprofessional errors, the result of the
proceedings would have been different." ID, 694.

In guilty plea cases the Strickland test is refined:  the
defendant must show that his counsel's performance was deficient
and "there is a reasonable probability that, but for counsel's
errors, he would not have pleaded guilty and would have insisted
on going to trial." Hill v Lockhart, 474 U.S. 52, 59 (1985).

-22-

It is regretably evident that when attorney Gallagher became aware of the scheme to get co-defendant Elliot to use his "closeness" with the defendant, and thereby manipulate a plea of guilty; then, at that moment, attorney Gallagher ceased to represent the interests of the defendant.

There is no question that defendant's counsel witnessed and subsequently participated in the betrayal of his innocent client. In addition to going along with the "Brichler scheme;" Mr. Gallagher also participated proactively when he told his client that he would get a low sentence, maybe probation, when all along counsel knew the defendant faced a mandatory minimum of five years. He further sabotaged the defendant by ignoring the evidence of defendant's innocence and encouraged the plea.

> "The fact remains that [the defendant] was entitled to effective assistance of counsel when he entered his plea, and this he did not receive. Had he received it, the decision to plead guilty would have been his own depending upon his informed appraisal of the attractiveness of the government's offer." Tolliver v United States, 563 F.2d 117 (4th Cir. 1977).

Tolliver suggests that a defendant is automatically prejudiced whenever his plea agreement is the product of ineffective assistance of counsel, by virtue of the fact that such an agreement cannot be truly voluntary.

In the instant matter the ineffectiveness manifested in a single action, the agreement to participate in the scheme to get the defendant to plead. This is similar to the event in Murray v Carrier, 477 U.S. 478, 496 (1986):

-23-

"[T]he right to effective assistance of counsel
may in a particular case be violated by even an iso-
lated error of counsel if that error is sufficiently
egregious and prejudicial."

In interpreting the prejudice prong, the Supreme Court
has identified a narrow category of cases in which prejudice is
presumed. <u>Strickland</u> supra 692. The three categories of pre-
sumed prejudiced cases are: (1) denial of counsel; (2) State
interference, and; (3) where counsel is burdened by an actual
conflict of interest.

The defendant asserts the government interfered when it made
defendant's counsel a party to the plea scheme and by doing so
the defendant was denied counsel as he was compromised. Inasmuch
as counsel hid the deal from the defendant and thereby assisted
co-defendant Elliot it further appears to be a conflict of inter-
est.

As discussed previously the defendant had assembled a mean-
ingful defense with evidence and testimony and yet counsel scrap-
ped the defense at the last minute for an ill conceived plea. If
counsel "entirely fails to subject the prosecutions's case to
meaningful adversarial testing" the adversarial process itself
becomes presumptively unreliable. <u>United States v Cronic</u>, 466
U.S. 648, at 659 (1984). In this instance, counsel surpassed de-
ficient conduct; he instructed his client to perjure himself by
admitting crimes he did not commit. As the Affidavit in Composite
Exhibit 2 A, B, C shows, his attorney told him to enter a "fic-
tional plea" because he would supposedly receive a lesser

-24-

sentence.  This act fell below an objective standard of reason-
ableness and acted to subvert the normal functioning of the ad-
versarial process.  Had defendant not entered the plea, he would
not be in a federal prison today.

Finally, defendant expressed his desire to appeal his case
[DE-156A at 20].  Counsel failed to file a timely notice of appeal
or failed to determine whether the Clerk had so filed as requested.
Prejudice is presumed when alleged ineffective assistance of coun-
sel includes a basis of "unexcused failure to bring a direct ap-
peal from a criminal conviction upon the defendant's direction to
do so.  Hernandez v United States, 202 F.3d 486, 489 (2nd Cir.
2000).

B.    THE ACTIONS OF DEFENSE COUNSEL INDICATE A CONFLICT OF
      INTEREST

When defense counsel Gallagher willingly knew and participated
in government's scheme to use Elliot and further secreted same from
the defendant his actions served the interests of others apart from
the defendant.

Whenever defense counsel operates under a conflict of interest,
the defendant's right to effective assistance of counsel is impair-
ed because; "counsel breaches the duty of loyalty, perhaps the most
basic of counsel's duties."  Strickland, supra at 692.

In Cuyler v Sullivan, 446 U.S. 335, 350 (1980) the Supreme
Court ruled that a defendant can demonstrate a 6th Amendment

-25-

violation by showing that defense counsel was actively represent-
ing conflicting interests.

Defense counsel only represented the defendant.  The defen-
dant was clearly entitled to representation only concerned with
his outcome and not that of anyone else.  AUSA Brichler presented
his plan to use Elliot to Elliot and his counsel, Lawson, but the
deal required Gallagher to allow Elliot and Lawson access to the
defendant and to subsequently endorse the plan.  Indeed, when
Lawson was forced to reveal the plan in court he made specific
references to the court that Gallagher knew about the deal and
verified the events in the face of the government's momentary
"memory loss."

The record is clear, all parties knew of the scheme except
the defendant.  Gallagher's role in the scheme continued after the
pleas were entered when all defendants were upset over the factual
basis the government gave the court.  The representations that the
defendant sold or gave drugs to co-defendants Elliot and Benjamin
were patently false and troubling.  When all three co-defendants
angrily inquired of all counsels as to what just happened; attor-
neys Gallagher, Lawson, and Cohen all supported the claim that
they were "fictional pleas" and nothing would happen as long as
they "went along."

Obviously the pleas weren't fictional and neither were the
sentences.  When three lawyers join in harmony to lie and conceal
matters from their clients, the result is a conflict of interest.

-26-

There is a similarity to <u>United States v Hall</u>, 200 F.3d 962, 966 (6th Cir. 2000) in that a conflict of interest because counsel failed to forego a plea in client's best interest in order to protect a second defendant.

For reasons unknown, attorney Gallagher involved himself in a scheme of the government's design and interest and in doing so he became conflicted in his interests, and brought harm upon the defendant.

ISSUE III

<u>THE GOVERNMENT BREACHED THE SPECIFIC</u>

<u>TERMS OF DEFENDANT'S PLEA AGREEMENT</u>

As previously stated, defendant never desired a plea. The government, as part of defendant's inducement, was promised he could "work off" the sentence by cooperation. As inducement, the government and defendant's counsel placed great emphasis on the fact that the defendant could "cooperate" with the government and receive a substantial sentence reduction pursuant to U.S.S.G. § 5K1.1. The plea agreement provided:

> "5." The government <u>agrees to file</u>, upon the defendant's substantial assistance, a motion with the court for a downward departure from the guideline sentence, stating that the defendant <u>has made a good faith effort to provide substantial assistance in the investigation and prosecution of other persons who have committed offenses</u>. The filing of such motion shall be the sole discretion of the U.S. Attorney for the Southern District of Ohio. If such a motion is filed, the defendant understands that it is not binding on the Court. Such a motion is authorized by § 5K1.1 of the Sentencing

-27-

Guidelines and 18 USC § 3553(e).  If such a motion is
filed it will be in reliance on the defendant's continued
cooperation.  If the defendant should later refuse
to testify the government may, at the government's
option, petition the court to set aside the defendant's
sentence and sentence him without a downward departure
or seek to set aside the defendant's plea and reinstate
the Indictment."  [DE-104, p 5] [emphasis added].

"Plea agreements are contractual in nature.  In interpreting and enforcing them, we are to use traditional principles of contract law."  United States v Robinson, 924 F.2d 612, 613 (6th Cir. 1991); see also United States v Wells, 211 F.3d 988, 995 (6th Cir. 2000) (quoting same).  A court should hold the government to a greater degree of responsibility than the defendant for imprecisions or ambiguities in plea agreements ID at 995 (citing United States v Johnson, 979 F.2d 396, 399 (6th Cir. 1992)).

Although plea agreements are governed by contract principles, Due Process Clause requires these principles be supplemented with concerns that bargaining processes not violate defendant's right to fundamental fairness.  United States v Schilling, 142 F.3d 388, 394 (7th Cir. 1998).

In the instant matter the plea agreement states; "the government agrees to file a motion, upon the defendant's substantial assistance [ ] for a downward departure ...."  The defendant avers that terms "agrees to file" implies an obligation to file the motion which has, in fact, bargained away the government's reservation of "sole discretion."

In the plea agreement the government's language states it would file the downward departure stating the defendant "has made

-28-

documenting the defendant's shooting, including medical records.

The defendant raised the issue of the downward departure at sentencing including the shooting to which the government responded:

> "I became convinced that whatever happened to Mr. Rennick was basically caused by his inability to follow the requests and the guidance of the agents who were attempting to work with him." [DE-188, p 11].

The government went on to say it did not intend to make said motion. Defendant contends that the government bargained away its "sole discretion" when it decided to induce the defendant's plea by promising a substantial reduction in sentence with a § 5A1.1 departure. Defendant further contends that the government only refused to credit the defendant because doing so may have left the government with liability stemming from a registered confidential informant being shot while working with the government and its agent.

The plea agreement further argued that if the defendant subsequently refused to continue to cooperate by testifying, then the government could reverse the departure. This language further suggests the government's obligation to make the motion.

The plea agreement is very ambiguous. The inclusion of the "agrees to file;" "good faith effort to provide;" and "option to withdraw departure" clauses in this agreement distinguishes the instant agreement from the agreement in United States v Head, 927 F.2d 1361 (6th Cir.), cert denied, 502 U.S. 846, 112 S.Ct. 144, 116 L.Ed.2d 110 (1991), in which the court determined the

-30-

government retained its discretion.  In this case the inclusion of
such mandatory language is inconsistent with the statement that the
U.S. Attorney has the sole discretion.

The "sole discretion" language is not entirely clear.  It
would be clearer, for example, to state that the government retains
the exclusive right to determine whether the defendant has "made
a good faith effort to provide substantial assistance."  As it is
currently phrased, the "sole discretion" language may be read as a
restatement of the fact that § 5K1.1 motions must originate with
the government, whether or not the government waives its discretion
to deny such motions.  There is ambiguity in the agreement as to
whether the government retained its discretion or bargained it
away.

The rules of construction of plea agreements dictate that the
agreement be interpreted to impose a binding obligation on the
government.  Johnson supra at 399 (holding  that ambiguities in
plea agreements are construed against the government); see also
UNITED STATES v Houston, 40 Fed. Appx. 139 (6th Cir. 2002)(unpub-
lished) holding that the government did not reserve discretion to
make 5K1.1 motions based on the use of discretionary and nondis-
cretionary language in the plea agreement creating an ambiguity.

While the government offered to have the court examine the
case agent, the court ultimately made no inquiry as to whether
the defendant had made "a good faith effort to provide substantial
assistance."

-31-

This is a case outside the mainstream in many ways. The defendant is coerced and manipulated into pleading guilty to a crime he did not commit; as part of his inducement he is promised a downward 5K1.1 departure for nothing more than a good faith effort to provide substantial assistance; he establishes tape recorded conversations for drug purchases only to be thwarted by his case agent; he was shot twice while working for the same agent and then is denied the departure. All of this then is combined with evidence suggesting the case agent, John Mercado, was involved in the shooting and the government contracting with a co-defendant to talk the defendant into pleading guilty (as set forth herein) and it leaves no doubt that something is vastly wrong.

This court has recognized that "fundamental fairness" requires the court to enforce promises made in a plea agreement that induces the defendant to plead guilty. "Where a defendant fulfills his promise in entering a guilty plea, the prosecution is bound to fulfill any promise made in exchange." Robinson, supra 613.

The defendant first raised these issues at sentencing when the defendant argued for a Downward Departure [DE-147] they were further raised in defendant's Motion to Reconsider [DE-149] and again his Motion to Withdraw Plea of Guilty [DE-162]. The 10th Circuit has adopted a general rule that the defendant need not raise his claim of breach at trial. See United States v Peterson, 225 F.3d 1167, 1170 (10th Cir. 2000).

The defendant was at the very least entitled to an evidentiary

[DE-194 P38 JA-215]

hearing to determine the nature of the promises made and the extent
of the good faith effort to cooperate.  See <u>Pearcy v United States</u>,
31 F.3d 1341, 1345-46 (6th Cir. 1994); <u>United States v Watson</u>,
988 F.2d 544, 551-52 (5th Cir. 1993), see also <u>Blackledge v Allison</u>
431 U.S. 63, 76, 80-82 (1977) "allegation of breach entitles de-
fendant to an evidentiary hearing unless defendant's allegations
are "palpably incredible" or "patently frivolous or false."

The government at sentencing attempted to state the reason
they refused to move for the 5K1.1 reduction was because of fail-
ures on the defendant's part.  The government may now decide to
claim a breach by the defendant.  However, before the government
can decline to fulfill its own obligations under the plea agree-
ment, it must first prove by a preponderance of evidence that de-
fendant breached the agreement.  <u>United States v Lukse</u>, 286 F.3d
906, 913 (6th Cir. 2002).

In the instant matter the defendant entered into an agreement
to plead guilty.  He did this not because he was guilty, but be-
cause he was manipulated into the plea by the government.  A major
part of his decision to plead was the government's promise to sub-
stantially reduce any sentence in return for his good faith effort
to help the government.  The defendant put forth that good faith
effort, got shot and nearly killed and the government ignored its
obligation.  AUSA Brichler honored an illegal deal with co-defen-
dant Elliot and refused to honor a lawful obligation to the defen-
dant.

-33-

Inasmuch as the government breached its written plea agreement with the defendant, the defendant should be relieved of his obligation and be allowed to withdraw his plea and be tried by a jury on the merits of the case.

## ISSUE IV

## DEFENDANT WAS DENIED HIS SUBSTANTIAL RIGHTS OF DUE PROCESS WHEN THE COURT ERRED BY DENYING HIS MOTION FOR DOWNWARD DEPARTURE, MOTION FOR RECONSIDERATION, AND MOTION TO WITHDRAW PLEA WITHOUT AN EVIDENTIARY HEARING ON THE FACTS, CIRCUMSTANCES, AND POINTS OF LAW

A.    DEFENDANT MADE A GOOD FAITH EFFORT TO COOPERATE.

Attached hereto is the defendant's Sworn Declaration concerning his good faith effort to cooperate with the government. Defendant incorporates the statements in said Declaration as though they were set out herein. [Exhibit 3D    ]. See also AFFIDAVIT of Anthony Battle [Ex 3E]

It is clear from defendant's declaration that this instant matter is far removed from the heartland of cases considered by the U.S. Sentencing Commission or Congress' intent in creating downward departures for providing substantial assistance to law enforcement. In the case at bar, the defendant established verifiable contact with two separate drug dealers. In both cases the deals collapsed through no fault of the defendant. Most important are the tape recordings which fully support defendant's position

-34-

[DE-194 P40 JA-217]

and claims.  [Comp Ex-4] .

The use of confidential informants is the mainstay of today's law enforcement, and to some large degree is responsible for most successful prosecutions, but this one fell apart and in the end nearly killed the defendant. No one wants to address this issue and that is understandable since publicity that an informant got shot would impede many from agreeing to participate and when one adds the factor of the case agent being involved in the shooting it quickly becomes a prime candidate for cover-up.

The defendant agreed to cooperate and put forth much more effort than most. Agent Mercado failed. He didn't assist the defendant in the least, he pulled the plug each time a close was in sight, and an independent eye witness has now identified John Mercado as one of the two men leaving the rear of defendant's warehouse where the defendant laid shot and bleeding in the front parking lot.

The U.S. Sentencing Guidelines (USSG) list items to be considered when evaluating a 5K1.1 departure: "(4) any injury suffered, or any danger or risk of injuries to the defendant or his family resulting from his assistance." U.S.S.G. § 5K1.1(a)(5).

In re Sealed Case No. 97-3112, 181 F.3d 128, 142 (DC 1999) (en banc) "although court normally lacks the authority to depart from Sentencing Guidelines on the basis of defendant's cooperation absent prosecutorial motion, if cooperation was pursuant to plea agreement and government's refusal to file a motion is attributed

-35-

bad faith or other breach of the agreement the court may grant re-
lief. See <u>United States v Overstreet</u>, 51 Fed Appx 838, 841 (10th
Cir. 2002). When the defendant contends that the government's
failure violates the plea agreement the court <u>must</u> determine whe-
ther the government came to the decision to not file the motion in
good faith <u>ID</u> at 842 (citing <u>United States v Cerrato-Reyes</u>, 176
F.3d 1253, 1264 (10th Cir. 1999)).

    This circuit has stated where a condition of the plea agree-
ment is that the government will file for downward departure if
the defendant provides substantial assistance and the filing of
that motion is, therefore, not solely within the government's dis-
cretion, the defendant is not limited solely to arguing unconsti-
tutional motives to challenge the failure to file such a motion.
<u>United States v Williams</u>, 176 F.3d 301 (6th Cir. 1999). A defen-
dant is entitled to an evidentiary hearing on the issue of whether
the departure motion should have been filed and should be granted.
<u>United States v Wolf</u>, 270 F.3d 1188, 1190 (8th Cir. 2001)(citing
<u>Wade v United States</u>, 504 U.S. 181, 186 (1992)).

## ISSUE V

### DEFENDANT WAS DENIED HIS RIGHT TO DIRECT
### APPEAL WHEN THE COURT CLERK FAILED TO FILE
### DEFENDANT'S NOTICE OF APPEAL AS DIRECTED

    The record indicates the defendant expressed his desire to
appeal his sentence and his request that the court clerk file the

[DE-194 P42 JA-219]

notice of appeal [DE-188 at 19-20]. The clerk failed to file said notice and ultimately appellate counsel also failed to do same. The defendant filed a motion seeking reinstatement of direct appeal right [DE-191]. The court denied said request to the extent it lacked the authority subject to Fed Rules of Criminal Procedure or Rule 4(b) of the Federal Rules of Appellate Procedure.

The court suggests that if defendant can demonstrate "that his constitutional rights were violated, then this court must vacate the judgement against Petitioner and reimpose his sentence so that Petitioner can file a timely appeal." <u>United States v Hirsch</u> 207 F.3d 928 (7th Cir. 2000) at 931.

The defendant submits that in order to use this method he was nevertheless required to bring forth all issues for relief to avoid foreclosure of same in the future. The defendant acknowledges that all matters desired to be appealed are set forth herein. In the event the court should deny relief on the matters herein, the defendant requests his sentence to be vacated and reimposed so that he may then have a direct appeal.

## CONCLUSION

This case is far removed from the heartland of most cases. An innocent defendant with certain mental problems is manipulated to enter a guilty plea. He then is commissioned as a Confidential Informant to work with drug enforcement agents in the purchase of large quantities of drugs. Defendant is allowed to get himself

-37-

into a transaction for over a million dollars only to find agents
unwilling to complete the deal, leaving the defendant on a limb
with no net.

If this were not enough the defendant is shot twice by some-
one connected to the deal. Defendant identifies the shooter's
voice as being the same voice on recorded threat calls, but there's
more; defendant recognizes the second voice at the shooting as De-
tective John Mercado. The very case agent on this case is seen by
a witness leaving the scene of the crime. More remarkably, this
same agent shows up at the emergency room less than twenty minutes
after the shooting with no explanation as to how he knew the defen-
dant was shot, let alone where he was taken.

The defendant contends his plea was neither willing nor know-
ing, and his sentence devoid of any mitigating consideration.
Steve Rennick is simply not guilty and never was. He had informed
the court prior to sentencing that he was not guilty and certainly
the court knew of his claims of innocence before the imposition of
the sentence and, perhaps, should have vacated the plea at that
time.

The defendant prays this court to vacate his sentence in this
matter and further to allow the defendant to withdraw his plea and
stand trial on the merits. Defendant Steve Rennick is an honored
veteran, businessman, father, and grandfather, who stands convic-
ted for matters he did not know about and did not do. The govern-
ment obtained this conviction by deceit and manipulation and the

-38-

defendant only seeks his right to be legally tried on these untrue allegations.

        Further defendant saith naught.


        Respectfully submitted,


        *Steve Rennick Sr.*  1/20/05
        Steve Rennick, Sr.
        #04050-032  HCU
        Federal Medical Center
        P.O. Box 14500
        Lexington, KY 40512

## CERTIFICATE OF SERVICE

I certify that the above true and correct Memorandum In Support of Motion to Vacate pursuant to 28 USC Section 2255 was provided to the Clerk of the Court at the address below. I further certify tht I sent one original with two true copies pursuant to 28 foll. 2255 Rule 3(A) and I understand the Clerk is to serve the United States pursuant to 28 USC Section 2255 Rule 3(B). All copies deposited, postage prepaid, into the prison mail service on this, the __20__ day of January 2005.

Clerk of the Court
U.S. District Court
Southern District of Ohio
100 East Fifth Street
Cincinnati, OH 45202


Steve Rennick, Sr.
#04050-032  HCU
Federal Medical Center
P.O. Box 14500
Lexington, KY 40512

[DE-194 P46 JA-223]

Steve Rennick
2 Peachtree Ct.
Fairfield, Ohio 45014
December 2, 2003

Judge Dlott
Federal Court

Dear Judge Dlott:

I have been told that I may write you a letter prior to my sentencing which is scheduled for December 9, 2003. I am writing this letter to make you aware of all the circumstances surrounding my case.

During the summer of 2002 I met two Jamaicans, Phillip Davidson and Kareem Cole. They were promotors of Reggae music and traveled throughout the United States setting up Reggae concerts. They approached me and asked if I would transport them to the various concerts. Phillip also showed an interest in sponsoring my racecar. We gave him a proposal and sent proposals to companies in Jamaica which he claimed to have connections with. I actually talked to people in Jamaica and so did our marketing director for the race car team.

I was so eager to get a sponsor for the race car I would have done anything and Phillip made sponsorship seem possible. Wayne Benjamin and I took Phillip and Kareem to Phoenix Arizona March 2002. Phillip had arrangements for us to stop at a camping spot in Goodyear Arizona. He was picked up by a group of Jamaicans in an SUV. We didn't see him again until Sunday night when they dropped him back off. Nobody asked any questions when they came back they had the same luggage they left with. I was paid $5000 for this trip and out of the $5000 I paid Wayne $1000 and it cost about $1200 for fuel out and back and $30 a day at the campsite.

We made a total of 3 trips with Phillip and Kareem. On the second trip Phillip flew out from his wife's house in New York. All the while he kept promising to sponsor the race car and I kept going along with him. On the last trip Phillip flew back because he had a Reggae show scheduled for Friday at Swifton Commons "The Ritz". I personally attended 2 of his shows at the Ritz and Wayne and I did go to a couple of them in Arizona. He was a legitimate band promotor.

1 of 8          REV 1 P1 IA-22/1          Exhibit 1

During this time Kareem rented the front shop for storage of equipment and also planned to start an auto service center.

On October 16, 2002 Eddie Moore was caught selling Marijuana to the RENU squad in Norwood. Marijuana was found at the property on North Bend Road in the front shop rented by Kareem Cole. I was in turn arrested. I knew nothing about the Marijuana at the shop. They arrested my son, Wayne and Matt Elliot. The charges were eventually dropped against my son.

After postponement after postponement we were advised to plead out. I decided to plead out mainly because I have a past record. From the time of our plea till the time we went in front of the judge the wording on the plea got entirely turned around. For instance they said I gave Wayne a pound of marijuana. I never gave Wayne and pound of marijuana and he will verify this. They also said I sold Matt Elliot marijuana and he will also deny this. Matt has said this to several people. I have never sold Marijuana to anyone.

Even though I have never sold drugs in my life since I had a past record I thought it would be better to plead to something so I could get a sentence reduction. I am accepting responsibility for taking the Jamaicans to Arizona. I am accepting responsibility for not really asking or caring what they were doing in the hopes I could get a race car sponsor.

At the pleading I spoke to Bill Gallagher, my lawyer, about the possibility of working with the RENU squad. I meant to show them where I dropped the Jamaicans off in Arizona and anything I thought might be helpful for them to bust the guys the Jamaicans were getting the Marijuana from. Bill Gallagher said he spoke to Mr. Brickler and he would be willing to work with me on my sentence reduction in exchange for working with them to find the people who were the Arizona connection. Mr. Goldberg who had been my son's attorney advised me this would be very dangerous and I should reconsider.

I was desperate. I haven't been in trouble in almost 10 years. I have a profitable trucking business and a family. I have never had anything to do with drugs and I just wanted all this to be over. I chose to work with the RENU squad. The next day I spoke to John Mercado of the RENU squad. He gave me a card and said to get with him so we could get working on a drug bust. I called Bill Gallagher immediately and asked him if he would go

with me to speak to John Mercado because I wanted my lawyer present. He said just go ahead and work with Mercado and do what he says.

This was the beginning of my worst nightmare. At my first meeting with John Mercado I signed three papers called C.I. papers and was fingerprinted. At this time I learned they didn't want any information related to Arizona.   Mr. Brickler wanted a drug bust in the Eastern District of Ohio.  I was told Phoenix was out of their jurisdiction and they didn't really care about out there.  Since the information related to Arizona was really all I knew, I knew I was in trouble.

This was a real problem for me because I have never sold or used drugs in my life and I don't know any drug dealers.  I soon found out contrary to what everybody says about drug dealers being on every corner they are not easy to find or approach.  Especially when you are trying to buy over 500 pounds, which I was told was the amount I needed to buy to get my sentence reduced.

One of my friends, Tony Battles, had recently gotten out of the Justice Center for Domestic Violence.  While he was there he met a Jamaican named Solje Anderson.  Solje told Tony any time he needed Marijuana just come to him and he'd get him as much as he needed.  Tony wanted to help me out so we called Mercado and told him about Solje Anderson.  Tony and I both went down to the Renu Center and met with John Mercado.  At this time John Mercado punched up Solje Anderson's rap sheet and got a picture of him which Tony identified.  At this time Mercado told Tony and I if this bust was over 500 pounds I would only get probation.  We were given a tape recorder by John Mercado and told to tape any phone conversations which we did.  I have copies of all the tapes.

The days went buy, Tony and I talked to Solje Anderson or his people on several occassions.  They didn't have that large of an amount of Marijuana in Cinti.  They told us they could make us a good deal if we wanted to go to Arizona and help them bring Marijuana back.  We talked to John Mercado about this and said yes, and to try to get the details worked out.

The way it was supposed to work was they were supposed to get us 1500 lbs. For $600 a lb.  We were also going to help them bring back 2000 pounds of their own Marijuana.  John Mercado said he would do this at first.

He later said his boss said we couldn't do it this way because it wasn't by the book and they could lose their money.

We cut communications with Solje Anderson and did not hear any more from him. We turned off our cell phones.

The next deal I tried to put together was also a disaster thanks to the RENU squad. A driver at the shop told me about a guy in Northside named Yamine Israel. This driver gave him my number and he called me. I told him I was looking to buy 500 lbs. of Marijuana. He gave me a number to call him back to discuss the deal. He told me he would only answer 541-3777 my shop number. He had a throw away phone and changed numbers every few days. I called John Mercado and told him about the deal. He said to make sure I tape record all the conversations. I called Yamine and set up a deal for 500 lbs. John Mercado insisted we do the deal at my son's trucking company which everybody including Kevin Coo thought was stupid and risky.

The first night the deal was set up John Mercado had about 20 agents at the garage. I was wired. Yamine's phone was not working so we couldn't get a hold of him. Yamine was supposed to have called us by 7:00PM. When he didn't call the RENU squad waited till about 9:00 then went home. The next day I got a hold of Yamine. (If you listen to the tape you can see how desperate I sound and how I know nothing about Marijuana) We set up another deal with Yamine a few nights later. The same scenario 20 cars parked out back, sheriffs running in and out with their flack jackets on. It was really obvious to anyone passing by what was going on. Again I was unable to reach Yamine. I called my friend who knew Yamine and was told that Yamine came by, pulled through the drive way and noted all the cars, and sheriffs coming in and out and stated "this guy is a cop, this is a set up". Since then I have not been able to contact Yamine.

Using my son's business location was a very big mistake. This not only jeopardized me but my family as well.

After these two attempted drug busts failed I was getting desperate. I had no other prospects. Then out of the blue a guy called on the garage phone 541-3777 saying the 1500 lbs. of marijuana I ordered from Solje Anderson was in. He said the price was now $800 lb. Since they brought it from Arizona. He said we would agree on a location and he would come

alone with a money counter (the machines like they use at the bank) and count the money. When he was certain it was all there he would make a phone call and the marijuana would be delivered to the agreed upon location.

I called John Mercado and told him what was going on. He said that he couldn't come up with any money. The guy was set up to call back on Sunday at 2:00PM and for me to 3 way John Mercado. John instructed me to call him Joe Wilson, the money man. John planned to tell the guy that he couldn't get the money out of the bank till Monday or Tuesday and they he could probably only get half and the drug guy would have to front him the other half of the Marijuana. This sounded crazy to me since this guy had never met either one of us, but what do I know.

At 2:00PM on Sunday the drug guy called as he said he would. I did a 3 way call and dialed John Mercado's cell phone number. A woman answered. I asked for Joe and she said I had the wrong number and hung up. I told the drug guy to hang on that I was going to dial the number again. This time I got John Mercado's answering machine. By this time the drug guy was really upset. His exact words were "You're dead Rennick, we've had a bead on you for two days, you're dead". Then he hung up the phone.

I tried John back a few more times. I finally got him and told him about the guy's threat on my life. John said if he calls back again try to get me back. I then called Bill Gallagher, my lawyer, because I was scared to death. Bill said to call the RENU squad and to talk to the person on duty. That there is always somebody on duty 24 hrs a day. I left a message and a guy named Brian called me back. I explained what had happened and about the death threat and he said don't worry, be careful and go home. Bill Gallagher also said he would call me back.    I waited at the shop with all the doors locked for several hours. Nobody called me back, I couldn't get a hold of anybody. Finally I went home. I went a different route making sure nobody was following me.

Monday came I didn't hear from anybody. I finally got a hold of Bill Gallagher and I asked what was going on, why hadn't he called me. He stated since he hadn't seen anything on the news or read about me in the paper I was all right.

During the next few days I talked to John Mercado and was told if the guy calls back see what I could work out. I knew nothing would ever be worked out and that I was a dead man.

On Friday night I was getting ready to leave the shop about 9:30PM. I had just finished working on the Autocar dump truck which was scheduled to go out the next morning. I was alone and had just finished washing my hands in the washroom. The lights were out in the other shop and only one light was on in the washroom. I came out of the washroom and turned to the left out to pick up my jacket when I felt someone come up behind me, placing a gun to the back of my head and saying "Rennick you're dead". I knew the front door was unlocked and I turned to push the gun away. I heard two shots go off and felt my whole body move like I was hit with a baseball bat. I started running and yelling out the front door toward the drive thru next door. I got halfway and fell to the ground. I was yelling and screaming for help. The people at the drive-thru heard me yelling and saw me laying in the parking lot between the garage and the drive-thru.

Wesley Hahn and his worker came running toward me to see what was wrong. I kept yelling "Don't let him kill me, don't let him kill me" They tried to call 911 from the phone booth a few feet away and were put on hold. Wesley then ran into the street (North Bend Rd.) and flagged down several cars looking for someone with a cell phone. A few people had cell phones and called 911. I was taken to University Hospital E.R.

At the E.R. John Mercado and Kevin Coo came in to see how I was doing. They looked at my x-ray and asked if I saw who shot me. I told them I hadn't seen the guy's face but the voice was the same one I heard a week ago on the phone when I was trying to set up a deal for 1500 lbs. I told John Mercado days before and even let him listen to the tape with the guy threatening me.

I spent two days in the hospital and was released on the third day because my wife is an RN and the doctors felt she would be able to manage my care at home. I was scared to death that going home would put my family at risk. I have only been out of my house twice since being released from the hospital. Both times it was to see the doctor. I have a Physical Therapist come to the house three times a week and work with me. I sleep in a hospital bed in my living room and have blinds drawn on all my

windows. My family makes sure I am never alone. There is always someone with me.

I know I made a serious mistake getting mixed up with Phillip Davidson and Kareem Cole. I take full responsibility for driving them out to Arizona in the hopes that they would sponsor my racecar. I am not a drug dealer. I have never dealt or even used drugs in my life. I was willing to do anything in the world to make this nightmare go away and not destroy my family, my business, and my life.

When I agreed to plead it was supposed to be to some kind of possession charge since the Marijuana was found on property I rented to Kareem Cole. I didn't go to court because I do have a past record (never any drug charges) and they were threatening to drag my family into this.

When I got to court everything had changed. All of a sudden they read Wayne Benjamin had received a pound of Marijuana from me and Matt Elliott had bought Marijuana from me. Both of these statements are totally false. My lawyer told me this was a fictional plea. With this fictional plea I was to get a reduction in my sentence for accepting responsibility. I have no problem accepting responsibility but I am NOT a drug dealer. I have never had any Marijuana on me to give or sell to anyone.

I agreed to be a C.I. and told Bill Gallagher I would take the D.E.A. to Arizona where I dropped off Phillip and Kareem and try to find them a connection for Marijuana there. I don't have any connections here. I tried everybody I could think of to help me and I feel I not only jeopardized my life but theirs too.

Now I have two bullets in me. I can barely walk. I have a steel rod down my left leg and can't lift any weight with my left arm for three months. I have received phone calls at my house that were hang ups. I never go outside or stay alone at home. My son can never go to the trucking company alone and my whole family looks over their shoulders everytime anyone goes to work or even outside. This is a painful awful life. I honestly feel this guy isn't finished. I think he's just waiting for another opportunity to finish me off.

I feel I've already been sentenced. I've got a death sentence. It doesn't seem anyone has much concern for my safety. Injuries aside I don't

feel I'd last long in prison. I'm sure if these people want me bad enough they'll find a way to get me even in jail.

Judge Dlott, I was made a deal by John Mercado. I was told that he worked for Bill Brickler and whatever they said they would stand by it. I was told if I got them a Marijuana deal over 500 lbs. I would get probation. I tried my best and almost got killed. As desperate as I was I did get together 2 separate deals that went bad due to the RENU squad not coming through.

I'm sorry for this whole thing. I wish to God I never met Phillip and Kareem. I'm really afraid for my safety if I am incarcerated. I can hardly walk and spend most days in excruciating pain.

I'm sorry this letter has gotten so long. I know you are a very busy person and I'd like to thank you for taking the time to read this letter.

Sincerely,


Steve Rennick

**Page 5**

# Medication

Jan 26, 2004

✓       QUETIAPINE FUMARATE 25MG TAB
           TAKE ONE TABLET BY MOUTH AT BEDTIME

               Status: ACTIVE
           Start date: JAN 21, 2004
           Stop date: JAN 21, 2005
    Refills remaining: 1
           Days supply: 30
             Quantity: 30

    Comments:

_____

✓       SERTRALINE HCL 100MG TAB
           TAKE ONE TABLET BY MOUTH EVERY MORNING FOR DEPRESSION/MOOD

               Status: ACTIVE
           Start date: JAN 21, 2004
           Stop date: JAN 21, 2005
    Refills remaining: 1
           Days supply: 30
             Quantity: 30

    Comments:

_____

        WARFARIN (COUMADIN) NA 5MG TAB (SP)
           TAKE ONE AND ONE-HALF TABLETS BY MOUTH EVERY DAY TO THIN BLOOD

               Status: DISCONTINUED (EDIT)
           Start date: JAN 21, 2004
           Stop date: JAN 21, 2005
    Refills remaining: 1
           Days supply: 30
             Quantity: 45

    Comments:

_____

        WARFARIN (COUMADIN) NA 5MG TAB (SP)
           TAKE ONE AND ONE-HALF TABLETS BY MOUTH EVERY DAY ON SUN,TUES,WED,FRI - , ALL O

               Status: ACTIVE
           Start date: JAN 21, 2004
           Stop date: JAN 21, 2005
    Refills remaining: 1
           Days supply: 30
             Quantity: 50

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available) | **VISTA Electronic Medical Documentation**

RENNICK, STEVEN
2 PEACHTREE COURT
FAIRFIELD, OHIO  45014          Printed at CINCINNATI
300463291                                    [EX-2A P1_JA-232]

# Medication

Comments:

RISPERIDONE 1MG TAB
    TAKE ONE TABLET BY MOUTH AT BEDTIME

        Status: DISCONTINUE
    Start date: JUN 16, 2003
     Stop date: JUN 16, 2004
Refills remaining: 1
    Days supply: 30
       Quantity: 30

Comments:

SERTRALINE HCL 100MG TAB
    TAKE ONE TABLET BY MOUTH EVERY MORNING FOR DEPRESSION/MOOD

        Status: DISCONTINUE
    Start date: JUN 16, 2003
     Stop date: JUN 16, 2004
Refills remaining: 1
    Days supply: 30
       Quantity: 30

Comments:

TRAZODONE HCL 100MG TAB
    TAKE TWO TABLETS BY MOUTH AT BEDTIME

        Status: ACTIVE
    Start date: JUN 16, 2003
     Stop date: JUN 16, 2004
Refills remaining: 1
    Days supply: 30
       Quantity: 60

Comments:

IBUPROFEN 800MG TAB
    TAKE ONE TABLET BY MOUTH THREE TIMES A DAY WITH FOOD

        Status: DISCONTINUED
    Start date: APR 17, 2003

| PATIENT NAME AND ADDRESS (Mechanical imprinting, if available) | VISTA Electronic Medical Documentation |
|---|---|
| RENNICK, STEVEN<br>2 PEACHTREE COURT<br>FAIRFIELD, OHIO  45014<br>300463291 | Printed at CINCINNATI |

[EX-2A P2 JA-233]



# Medication

Jan 26, 2004

Comments:
NOT TO EXCEED 4GM PER DAY   .

---

ANTACID/SIMETHICONE LIQUID   PO     Q4H PRN
   15ML

          Status: DISCONTINUED
       Start date: JAN 15, 2004@10:33
        Stop date: JAN 22, 2004@11:19:34
Comments:
indigestion

---

LORAZEPAM TAB   PO     TID7 PRN

          Status: DISCONTINUED
       Start date: JAN 15, 2004@10:54
        Stop date: JAN 22, 2004@11:19:34
Comments:

---

SERTRALINE TAB   PO     QD7
   100MG

          Status: DISCONTINUED
       Start date: JAN 15, 2004@10:33
        Stop date: JAN 22, 2004@11:19:34
Comments:

---

DOCUSATE SODIUM U.D. CAP,ORAL   PO     QD7
   100MG

          Status: DISCONTINUED
       Start date: JAN 15, 2004@14:12
        Stop date: JAN 22, 2004@11:19:34
Comments:

---

QUETIAPINE FUMARATE TAB   PO     QHS
   25MG

          Status: DISCONTINUED
       Start date: JAN 16, 2004@09:46
        Stop date: JAN 22, 2004@11:19:34
Comments:
WARFARIN TAB   PO     QD17

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)   VISTA Electronic Medical Documentation

RENNICK, STEVEN
2 PEACHTREE COURT
FAIRFIELD, OHIO  45014           Printed at CINCINNATI
300463291

[EX-2A P3 JA-234]

# Medication

**Page 11**

Jan 26, 2004

          7.5MG

              Status: DISCONTINUED
        Start date: JAN 18, 2004@12:04
         Stop date: JAN 22, 2004@11:19:34
    Comments:

✓
        OXYCODONE TAB   PO      QHS
            5MG

              Status: DISCONTINUED
        Start date: JAN 20, 2004@21:00
         Stop date: JAN 22, 2004@11:19:34
    Comments:

        OXYCODONE TAB   PO      QHS
            5MG

              Status: EXPIRED
        Start date: JAN 19, 2004@21:01
         Stop date: JAN 20, 2004@21:00
    Comments:

        OXYCODONE TAB   PO      QHS
            5MG

              Status: EXPIRED
        Start date: JAN 16, 2004@09:46
         Stop date: JAN 19, 2004@21:00
    Comments:

        WARFARIN TAB   PO     SU-TU-FR@1700

              Status: DISCONTINUED
        Start date: JAN 16, 2004@00:01
         Stop date: JAN 18, 2004@12:04:14
    Comments:

        WARFARIN TAB   PO     MO-WE-TH-SA@1700

              Status: DISCONTINUED
        Start date: JAN 15, 2004@14:28
         Stop date: JAN 18, 2004@12:04:13

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available) | **VISTA Electronic Medical Documentation**

RENNICK, STEVEN
2 PEACHTREE COURT
FAIRFIELD, OHIO   45014        | Printed at CINCINNATI
300463291

[EX-2A P4 JA-235]

# Progress Note

Ja

```
        TITLE: MHICM SCREENING INPATIENT (B/T)
DATE OF NOTE: JAN 23, 2004@10:09    ENTRY DATE: JAN 23, 2004@10:09:21
      AUTHOR: CARTER,AMY L          EXP COSIGNER:
     URGENCY:                            STATUS: COMPLETED
```

This patient has met the high-risk criteria for consideration as a
candidate for the mental health intensive case management (MHICM) team.
This includes an ICD-9 diagnosis of 295-298, and either 3 or more
admissions in the past 12 months or 30 days total of inpatient
psychiatric care in the past 12 months.

Is this patient's discharge plan to a nursing home, domiciliary or other
inpatient setting ?    No
If the answer is Yes, further assessment for MHICM is not warranted at
this time. If the answer is No, the following assessment is required.

This patient also meets the following clinical criteria:

1. Diagnosis of Severe and Persistent Mental Illness: Diagnosis of severe
and persistent mental illness includes, but is not limited to:
schizophrenia, bipolar disorder, major affective disorder, or severe
post-traumatic stress disorder.
   Patient meets criteria?    Yes
2. Severe Functional Impairment: Severe functional impairment is such
that theveteran is neither currently capable of successful and stable
self-maintenance in a community living situation nor able to participate
in necessary treatments without intensive support.
   Patient meets criteria?    Yes
3. Inadequately Served: This means inadequately served by conventional
clinic-based outpatient treatment or day treatment.
   Patient meets criteria?    Yes
4. High hospital use as evidenced by over 30 days of psychiatric hospital
care during the previous year or three or more episodes of psychiatric
hospitalization.
   Patient meets criteria?    Yes
5. Clinically Appropriate for MHICM Approach: Patients who are more
appropriately managed clinically as inpatients need to remain in the
inpatient setting; that is, the positive aspects of MHICM should not be
used to justify moving patients who would be better served by inpatient
care to this ambulatory care model.
   Patient meets criteria?    Yes

Does patient meet all five criteria for treatment by MHICM?    Yes
If patient meets all five criteria, he should be referred to the MHICM
team for follow-up care prior to discharge.
   Patient referred to MHICM?    Yes
If patient meets all five criteria, but is not being referred to MHICM,
please explain

---

PATIENT NAME AND ADDRESS (Mechanical imprinting, if available)   **VISTA Electronic Medical Documentation**

RENNICK, STEVEN
2 PEACHTREE COURT
FAIRFIELD, OHIO  45014
300463291

Printed at CINCINNATI

[EX-2B P1 JA-236]

# Progress Note

```
/es/ AMY L CARTER
MSW
Signed: 01/23/2004 10:09

Receipt Acknowledged By:
01/23/2004 16:13            /es/ CYNTHIA S MARTINELLI
                                  MSW,LSW
```

TITLE: PT ED - DIAGNOSIS/HEALTH STATUS (B)
DATE OF NOTE: JAN 22, 2004@10:49    ENTRY DATE: JAN 22, 2004@10:49:49
    AUTHOR: RONSHEIM,DONNA J    EXP COSIGNER:
    URGENCY:                         STATUS: COMPLETED

PATIENT EDUCATION:
Interdisciplinary Patient/Family Education for Diagnosis/Health Status
  Patient/Family received education at this encounter.
    Specific Topic Taught/Learned: Symptoms Management-Saying NO
    Knowledge of Disease/Problem: Group-no assessment
  The best method(s) for learning is group class.
  Patient has no barriers to learning.
  Patient was taught using verbal discussion method.
  Patient agrees to follow instruction.
Thirteen patients attended group co-led by D. Ronsheim, RN,C and S. Harper,
RN.  Purpose of the group is to increase assertiveness by recognizing certain
situations in which it is difficult to say "no".  Group discussed each of the
listed situations and assertive ways to handle these situations.  Gave group
guidelines to saying "NO":
Be honest, open and direct.
Don't make excuses.
By saying "NO" you're gaining self-respect.

```
/es/ DONNA J RONSHEIM
RNC
Signed: 01/22/2004 10:50
```

TITLE: PT ED - SAFE AND EFFECTIVE USE OF MEDICATION (B)
DATE OF NOTE: JAN 21, 2004@22:24    ENTRY DATE: JAN 21, 2004@18:55:02
    AUTHOR: ROWEKAMP,ALAN L    EXP COSIGNER:
    URGENCY:                         STATUS: COMPLETED

PATIENT EDUCATION:SAFE & EFFECTIVE USE OF MEDICATION
INTERDISCIPLINARY PATIENT/FAMILY EDUCATION DOCUMENTATION

Each health care professional documents both formal and informal

---

PATIENT NAME AND ADDRESS (Mechanical Imprinting, if available)

RENNICK, STEVEN
2 PEACHTREE COURT
FAIRFIELD, OHIO  45014
300463291

**VISTA Electronic Medical Documentation**

Printed at CINCINNATI

[EX-2C P1 JA-237]

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT CINCINNATI

UNITED STATES OF AMERICA              **CASE NO. 1:02-CR-00157**

     Plaintiff,                                          **JUDGE DLOTT**

vs.

**STEVEN M. RENNICK, SR.**              **AFFIDAVIT**

     Defendant.

---

STATE OF KENTUCKY
              ) SS.
COUNTY OF CLAY      )

    Now comes **STEVEN M. RENNICK, SR.,** who being first duly cautioned and sworn, deposes and state from his own personal knowledge as follows:

    1.    I am the Defendant in the above-captioned matter.

    2.    I entered a guilty plea to one count of conspiracy to distribute marijuana on August 19, 2003.

    3.    I entered into this plea to protect my friends and family and to ensure a lower sentence because of my criminal record.

    4.    The plea as read on the record was not truthful, and was not the way my lawyer, William Gallagher, told me it would be.

    5.    My lawyer told me I was entering a fictional plea to a possession charge since the drugs were found on my property and to go along with it so I would receive a sentence reduction for accepting responsibility.

LT

6.    After I entered my plea, I asked my lawyer if I could get a sentence reduction by working for the RENU squad. He spoke with the U.S. Attorney on the case who agreed to help reduce my sentence if I helped find the Arizona connection.

7.    The next day I spoke with John Mercado of the the RENU squad about teaming up. Mr. Gallagher said he did not need to be present and to just do what Mercado said.

8.    I signed CI papers, was fingerprinted, and discovered that the government was only interested in uncovering drug activity in Ohio, not in Arizona.

9.    My lawyer told me that since Mercado was working on a federal case, he was a federal agent having pull with the U.S. Attorney and that I should work with him. [This conversation is on tape.]

10.   A friend of mine had a marijuana connection in Cincinnati. My friend, Tony Battles, came with me to meet with Mercado, who told us if we could organize a bust over 500 pounds, I would be sentenced only to probation.

11.   Over the next few days, my friend and I worked on setting up a buy with Tony's marijuana connection, Solje Anderson. They said they couldn't get 1500 pounds of marijuana in Cincinnati, but could from Arizona in about a week and that it could be cheaper if we made the deal out in Arizona. [This conversation was on tape.]

12.   After this deal was in place and although he initially approved it, Mercado later said we could not do this deal. He said it was too big a financial and safety risk and his boss would not authorize it. [This conversation is on tape.]

13.   I cut off all communication with Solje and assumed he realized this meant the deal was off.

14.   I later found out about another Cincinnati dealer named Yamine Israel. I told him I needed 500 pounds of marijuana. He and I worked out how we would execute the deal. [This conversation is on tape.]

15.   I told Mercado about the set-up, I also asked him if I would receive credit if this worked out and he promised I would. [This conversation is on tape.]

16.   During this time, I received threats from the drug dealers that if this did not pan out, I would be in danger. [One such threat is on tape.]

LT

17.  The deal with Yamine did not materialize because the drug dealers found out it was a set-up.

18.  Soon after this, one of Solje's representatives called me on the same number Solje always used. He told me the 1500 pounds of marijuana I wanted had arrived and that Solje wanted his money. He also said the price had increased because they had brought it here from Arizona themselves. I now owed them 1.2 Million Dollars ($1,200,000.00) rather than Nine Hundred Thousand Dollars ($900,000.00).

19.  I called Mercado, who said he could not get me the money. He did say he would pretend to be a Joe Wilson, who handled the money, and that he would talk to Solje's people when I three-way conference him on Sunday, when they called me back.

20.  On Sunday, I tried to call Mercado as we had arranged. The first time, his wife answered and said I had the wrong number. The second time, we got his answering machine. The drug connection became angry, threatened my life and hung up. [These conversations are on tape].

21.  When I was finally able to reach Mercado, he told me to just let him know if the guy called me back. Then I called my lawyer, who simply instructed me to call RENU, and that he would call me back. He never did. When I left a message for the RENU squad, an agent named Brian returned my call and told me to be careful and go home. After sitting in my locked shop for a few more hours, that is what I did.

22.  The next day I was finally able to reach Mr. Gallagher who said he assumed nothing had happened since he did not hear about it on the news.

23.  Also during that week, Mercado told me just to see what I could work out if I heard back from Solje's people.

24.  That Friday, I was working late at the shop. Around 9:30 p.m., as I ws leaving, someone came up behind me and put a gun to my head and said, "Rennick, you're dead!" I tried to escape and wound up getting shot twice, though I managed to make it outside, one-half way to the Drive-Thru next door.

25.  Two people from the Drive-Thru came to help me. I was taken to University Hospital Emergency Room, where I later saw Mercado and Kevin Coo. I told them I didn't see the person who shot me, but recognized his voice as the person I spoke with when trying to setup the 1500 pound buy.

LT

26.  To this day, as recent as October 30, 2004, I and my family receive threats. This most recent one is on tape, the caller stating he will shoot me in the head because the bullets in my shoulder and thigh did not get the message across.

27.  The two bullets are still lodged in my body. I still walk with a cane and experience medical problems including a blood clotting disorder.

28.  Since my sentencing and surrender, many other facts surrounding my attempt to substantially assist the government have come to light. One is that a witness from my shooting has come forward and executed an affidavit as to what he saw that night. His observations lead me to believe Mercado was nearby when I was shot. My memory leads me to believe he was involved with the shooting.

29.  Even if Mercado was not directly involved, the person who shot me was the same person with whom I negotiated the 1500 pound drug deal. As such, my being shot was directly related to my working with the government.

30.  I have always maintained my actual innocence of the crimes charged in the original and superceding indictments.

31.  I believe my trial attorney was ineffective for promising me probation if I worked with Mercado, for convincing me to go along with this "fictional plea," and for letting me enter a plea while on medications affecting my judgment.

32.  I believe the government had no real case against me and that my lawyer never prepared for trial because he always expected me to enter a plea, despite my constantly maintaining my innocence.

33.  I believe my sentence must be vacated and my case remanded to comport with constitutional requirements.

34.  Affiant further sayeth naught.

_Steven M Rennick Sr_
**STEVEN M. RENNICK, SR.**

Sworn to before me, a notary public in and for state and county and subscribed in my presence this 14th day of _____, 2004.

_____
Notary Public

LT

[EX-3A P4 JA-241]

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION AT CINCINNATI

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
      v                        )    Case No. 1:02-CR-00157
                               )
STEVEN M. RENNICK, SR.,        )    Judge Susan J. Dlott
                               )
            Defendant,         )
                               )

### AFFIDAVIT

STATE OF OHIO          )
                       )
COUNTY OF HAMILTON     )   SS.
                       )

Now comes, Dimetrious A. Ball, whose address is: 1132 Intercircle Avenue, Cincinnati, Ohio 45240, who being first duly cautioned and sworn, does state from his personal knowledge as follows:

1.   I am not a defendant or party in the above-captioned matter.

2.   I have no vested interest in any manner in the outcome of the above-captioned matter.

3.   I am providing this sworn and truthful statement voluntarily. I have not received nor been promised anything in connection with this statement.

4.   I have been a personal friend with Steven Rennick, Sr. for over 15 years.

5.   I was present in the Courtroom on or about August 19, 2003, to provide support for Steve when he entered his

-1-

[EX-3B P1 JA-242]

plea on federal marijuana charges.

6.    I was shocked to hear the prosecutor state that Steve
      Rennick, Sr. sold marijuana to Matt Elliott and gave
      marijuana to Wayne Benjamine, both matters I was sure
      did not occur.

7.    I observed Steve Rennick, Sr. motion his head from side
      to side gesturing these statements were untrue.

8.    I listened as the judge made several inquiries of Steve
      as though she, too, had visually seen his surprise and
      denial.

9.    I observed Attorney Gallagher nudge Steve and whisper
      to him.

10.   Finally, Steve said those statements were true.

11.   After the hearing I was with Steve and the other parties
      and lawyers and Steve was very upset with Gallagher over
      those two lies he insisted Steve agree with.

12.   Attorney Gallagher kept telling Steve to calm down, he
      said it was a <u>fictional plea</u> to allow the court to give
      him acceptance of responsibility.

13.   Steve continued to get more upset; he kept saying that
      those statements gave the court the impression that
      Steve dealt in drugs, which he never did.

14.   All of the lawyers continued to tell the defendant's
      that they could not let probation know they made <u>fictional
      pleas</u> or the deals would be void.

15.   Affiant saith nothing further.

                                    _____
                                    Demetrious A. Ball

Sworn to before me, a notary public in and for the State and
County and subscribed in my presence this _____ day of November 2004.
                                              December 3 2004

                                    _____
                                    Notary Public

TAMI McCOY ERVIN
Notary Public, State of Ohio
My Commission Expires October 15, 2007

SEAL

                    -2-

                    [EX-3B P2 JA-243]

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION AT CINCINNATI

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| | ) |
| v | ) Case No. 1:02-CR-00157 |
| | ) |
| STEVEN M. RENNICK, SR., | ) Judge Susan J. Dlott |
| Defendant, | ) |
| | ) |

AFFIDAVIT

Now comes Wayne Keith Benjamine, whose address is:  4561
Buxton Avenue, Cincinnati, Ohio 45242, who being first duly
cautioned and sworn, deposes and states from his own personal
knowledge as follows:

   1.   I am a co-defendant in the above-captioned matter.

   2.   On or about August 19, 2003, I appeared in U.S. District
        Court for the Southern District of Ohio before the Hon-
        orable Judge Susan J. Dlott for the purpose of entering
        a plea in the above captioned matter.

   3.   At the plea I was represented by attorney Greg Cohen.

   4.   During the plea the prosecutor said that I went to Mr.
        Rennick's garage and he gave me a pound of marijuana
        for my personal use.

   5.   That statement was a lie.

   6.   Attorney Cohen told me to say it was true so I would
        get less time.

   7.   After the hearing I was upset over telling the lie.

-1-

[EX-3C P1 JA-244]

Attorney Cohen told me not to worry because it was a
<u>fictional plea</u>; he also said I wouldn't get probation
unless I said it was true.

8. My Attorney, Greg Cohen, told me not to tell the PSI
people that it was a lie or I would not get probation.

9. I never received any marijuana from Mr. Rennick, Sr.

10. At my sentencing I got probation.

11. I do not have more to say.

_Wayne Benjamine_
Wayne Benjamine

Sworn to before me, a Notary Public in and for the state and
county and subscribed in my presence this _4_ day of _December_
2004.

_Laura Neiheisel_
Notary Public

**LAURA R. NEIHEISEL**
Notary Public, State of Ohio
My Commission Expires May 22, 2009

SEAL

-2-

[EX-3C P2 JA-245]
Comp Ex 3C  2of2

## SWORN DECLARATION

State of Kentucky    )
                   )
                   )
County of Fayette    )

I, Steve Rennick, Sr., being first duly sworn and cautioned do swear, attest, and affirm under oath and penalty of perjury the following are the truth, the whole truth and nothing but the truth so help me God:

On August 19, 2003, I appeared before the above captioned court and entered a plea of guilty, pursuant to an executed plea agreement to one count of "conspiracy to distribute marijuana in violation of 21 USC §§ 846 and 841(a)(1) and (b)(1)(B)."

Immediately following the plea hearing my counsel, William R. Gallagher, contacted Assistant United States Attorney Robert C. Brickler, who agreed I could benefit myself by "cooperating" or providing "substantial assistance" to the government. I was told to work with RENU Agent John Mercado, (on information and belief John Mercado is a Cincinnati police employee who at all relevant times was assigned to the Regional Narcotics Unit Task Force and was working in conjunction with the United States Attorney's Office).

[EX-3D P1 JA-246]

During my first meeting with Detective John Mercado (Mercado)
had me execute three documents pertaining to being a "Confidential
Informant" and I was fingerprinted.

I tape recorded every phone conversation with Mercado and I
took a witness to every meeting.

I first arranged to purchase 1500 pounds of marijuana from
a Solje Anderson.  This transactions was to occur out of state.
Mercado was fully aware of the details all along.  At the last
moment Mercado said his boss would not approve the deal because
it was not in Ohio, and involved too much money.  All conversa-
tions are again recorded.

I then arranged the purchase of 500 pounds of marijuana from
a Yomiune Israel.  All conversations are recorded.  Mercado in-
sisted I set this deal up at my son's trucking company.  Israel
spotted numerous police and SUV's behind the business and didn't
show.  He called me and said; "You're a cop."  This attempt also
failed.  Mercado's boss, Kevin Coo, later told me the trucking
company was a "dumb" location.  I had no more possible suspects.

A little later I received a surprise male caller who advised
me the 1500 pounds I ordered from Solje Anderson was now in Cin-
cinnati and the price was now higher.

I notified Mercado at once.  Mercado advised he needed time
to organize the money, etc.  I told Mercado I was to receive a

call at 2:00 p.m. Sunday. Mercado instructed I was to call him on a three-way call. I was to say that the money man "Joe Wilson" needed to speak with the seller (Joe Wilson was an alias for Mercado). Mercado was to buy time.

The dealer called on time. I attempted a three-way call to the number Mercado provided. A woman answered. She said there was no "Joe Wilson" at that nubmer. After several attempts I could not get Mercado on the phone. The dealer was very irate, he said, "YOU'RE DEAD RENNICK; WE'VE HAD A BEAD ON YOU FOR TWO DAYS, YOU'RE DEAD," and hung up.

I was terrified, could not reach Mercado. Finally, reached someone with RENU who merely told me to drive around and go home. After several hours I went home.

On Friday, November 7, 2003, at 9:30 p.m. I was alone at work. I was washing up to leave when two men came from behind, out of the darkened garage. One person placed a gun at the back of my head and said, "Rennick, you're dead." I shoved the gunmen backward. Shots were fired as I headed out the door. I was shot in the leg and shoulder.

Another distinct voice yelled to the shooter, "Get him." That voice was, without hesitation or doubt, the <u>voice of Cincin-nati Police Detective and RENU Agent John Mercado</u>.

I fell in the front parking lot. Wesley Hahn and one of his

co-workers from the Drive Thru Store next door ran to me and
called 911.  I was taken to University Hospital.

Within 20 minutes of the shooting, Mercado arrived at the
hospital.  There was no explanation as to how or why he would
have arrived so soon.  He asked if I knew who shot  me.  I said I
did not, but that the shooter's voice was the same as the caller
who threatened me after the botched 1500 pound deal.  I did not
tell him I also recognized his voice saying "Get Him" at the
shooting.

Subsequent to the shooting an eyewitness has come forward
who was in his car in the Drive Thru adjacent to my son's business.
The witness saw one man throw an object into the woods behind the
shop.  The description of one of the suspects fits Mercado.  The
witness further described a vehicle the suspect entered and it
matched the description of a vehicle driven by Mercado.

Acting on the information of the eyewitness a search of the
woods behind the shop located a paper bag containing a firearm
possibly used in the shooting. The weapon was turned over to the
Cincinnati Police Department

The bullets that hit me remain in my shoulder and leg.  I am
most willing to have them removed in order for any needed forensic
testing.

At my arrest the RENU agents seized a 2001 Freight-Liner/
Classic Semi Tractor.  This seizure was predicated on a theory

[EX-3D P4 JA-249]

COMP EX 3D 486

that this tractor was used to haul large quantities of marijuana. This tractor has been verified to the extent that it has never pulled a trailer before its purchase or since and, therefore, could never have been used for said purpose.

While on bond pending sentencing and after being shot. Mercado, in concert with a security representative from Provident Bank, obtained an "Emergency Arrest Warrant" for myself and stopped me on the highway and charged me with bank fraud concerning the financing on the truck.

Mercado appeared in court and asked a State Court Judge to hold me without bond or a $500,000.00 cash bond. The Hamilton County Superior Court Judge was irritated over Mercado's request since he had gotten an Emergency Warrant over a several years old transaction. I was released without bond and the case was ultimately dismissed.

Mercado has further followed and harrassed several of my family members and has made his presence known at various work sites of my son's business and continues to intimidate my family.

On information and belief I understand Mercado has been accused in at least one other shooting and may have been suspended for some period of time.

I am praying this court will refer this information to the proper agencies for investigation. I live in fear for myself and

[EX-3D P5 JA-250]

my family.

Further Affiant Saith Naught.

Date: January 12, 2005

Steve Rennick, Sr.
Defendant, Pro Se
#04050-032   HCU
Federal Medical Center
P.O. Box 14500
Lexington, KY 40512

Sworn to before me, a notary public in and for the State and County set forth above; Steven Rennick, Sr., who provided photo identification, did subscribe hereto in my presence on the 12th day of January 2005.

Notary Public
n/p. 6/28/06
Fayette Co Ky

−8−

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION AT CINCINNATI

UNITED STATES OF AMERICA,                )
                                          )
                Plaintiff,                )
                                          )
        v                                 )   Case No. 1:02-CR-00157
                                          )
STEVEN M. RENNICK, SR.,                   )   Judge Susan J. Dlott
                                          )
                Defendant,                )
                                          )

AFFIDAVIT

STATE OF OHIO                  )
                               )
COUNTY OF HAMILTON             )   SS.
                               )

        Now comes, Anthony Battle, Sr., whose address is 8819 Grenada

Avenue, Cincinnati, Ohio 45231, who being first duly cautioned and

sworn, deposes and states from his own personal knowledge as

follows:

    1.  I am not a defendant or party in the above-captioned
        matter.

    2.  I have no vested interest in any manner in the outcome of
        the above-captioned matter.

    3.  I am providing this sworn and truthful statement volun-
        tarily.  I have not received nor been promised anything
        in connection with this statement.

    4.  I have known and been friends with Steven Rennick, Sr.,
        for over twenty five years.

    5.  On or about November 1, 2002, I became aware that Steve

                            -1-    [EX-3E P1 JA-252]

Rennick, Sr. had been arrested of some type of federal drug offense.

6.  I was present when Steve Rennick entered a plea to the federal charge on August 19, 2003.

7.  Shortly after the plea, Steve advised me that the case agent on the Federal Case, John Mercado, had told him he could get a lesser sentence by becoming a Confidential Informant and assisting the government in developing other drug cases.

8.  Steve asked me if I could help him because he didn't know any people to set up.

9.  I advised Steve that I had met someone in the Justice Center where I was locked up for a period of time for domestic violence.  Steve asked if I would go with him to meet with Mercado.

10.  I was present with Steve Rennick at his first meeting with Detective John Mercado.

11.  I observed Steve get fingerprinted and sign several documents relative to him becoming a registered Confidential Informant.

12.  At the meeting I personally heard Detective John Mercado promise that if Steve could set up a 500 lb marijuana bust that Steve would receive a sentence of straight probation.

13.  I informed Mercado that my contact, Solje Anderson, could supply that quantity.

14.  Mercado presented Steve and I with a photo of Solje Anderson and I identified the photo as the man I came to know at the justice center.

15.  I listened in and recorded the telephone communications between Steve Rennick and Agent Mercado.  Agent Mercado clearly promised that Rennick would get probation if he assisted the government with this proposed deal.

16.  I also listened to and recorded a conversation between Steve Rennick and his attorney, Gallagher, during which Steve asked Gallagher if Mercado had the power to promise a sentence of probation.  Attorney Gallagher told Steve that Mercado was working with the Assistant U.S. Attorney and, therefore, had the power to recommend such a sentence.

-2-    [EX-3E P2 JA-253]

Common Ex 3 E  dof 3

17. Even though I was not the Confidential Informant, Mercado issued me a tape recorder and told me to get all calls involving the drug transaction on tape.

18. I am completely knowledgable about all tape conversations, and tapes exist to confirm statements herein.

19. Steve and I had four more personal meetings with Mercado concerning the drug bust.

20. We originally set up a deal with Soje Anderson to purchase 1500 pounds from his connection in Arizona.

21. After setting up the 1500 pound drug buy, Mercado advised Steve and I the deal could no longer take place in Arizona, but would now have to occur in Cincinnati.

22. When the 1500 pound deal fell through, I further helped Steve by getting another buyer for a 500 pound buy in Cincinnati.

23. Mercado told Steve and I that the 500 pound deal would also end up getting Steve a sentence of no more than probation.

24. During this entire period of time I electronically recorded conversations with drug dealers, and I also recorded conversations with Mercado. There are about 15 taped conversations in all.

25. Further Affiant saith naught.

Anthony D. Battle Sr.
_____
Anthony Battle, Sr.

Sworn to before me, a notary public in an for the State and County and subscribed in my presence this  2nd  day of  December  2004.

JANIE HENRY
NOTARY PUBLIC, STATE OF OHIO
MY COMMISSION EXPIRES
March 29, 2009

_____
Notary Public

SEAL



UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

STEVE RENNICK, SR.

      Movant/Defendant

     vs

UNITED STATES OF AMERICA

      Respondent

)
)
)
)
)
)
)
)
)

C-1-05-00050

CR-1-02-157-3

Hon. Susan J. Dlott

U.S. District Judge

## MEMORANDUM ADDENDUM TO
## DEFENDANT'S MOTION PURSUANT
## 28 USC § 2255

  Comes the defendant, Steve Rennick, Sr., pro se, and does

Supplement by Addendum his Motion to Vacate, Set Aside, or Amend

his sentence pursuant to 28 USC § 2255 and does state as follows:

### FIRST ADDENDUM ISSUE

### DEFENDANT'S DUE PROCESS AND APPELLATE RIGHTS
### WERE DENIED BY THE COURT"S FAILURE TO
### FILE NOTICE OF APPEAL AND BY DEFENSE
### COUNSEL'S INEFFECTIVE ASSISTANCE IN NOT
### PROTECTING DEFENDANT'AS SUBSTANTIVE RIGHTS

-1-

[DE-200 P1 JA-255]

#200

On December 14, 2004, defendant filed a motion seeking to restore his right to take a direct appeal based on defendant's new discovery that his appellate rights were denied him by (1) the Court Clerk's failure to file defendant's notice of appeal as requested by the defendant at sentencing; and (2) defendant's post conviction attorney's failure to file said notice or at least determine whether or not such notice was filed.

The court responded by order and openly acknowledged "The Clerk of Courts, however, did not file the notice of appeal on Petitioner's behalf." (Court Order, undated at pg 2).

In this instant matter the court properly advised the defendant of his right to appeal and his right to proceed in forma pauperis, and further advised defendant that the clerk would be directed to file the notice of appeal all pursuant to Fed R. Crim P. 32(j) (see DE 188 at 19-20). The defendant, through counsel, requested the court to order the clerk to so file said notice and the court affirmatively responded. While the court fulfilled its responsibility on the one hand; the court readily concedes that the clerk's failure is a violation of Rule 32(j)(2).

The court is also correct in its determination that the court's ability to extend time to correct this matter is limited to thirty days pursuant to Fed. R. Crim. P.32 and Fed. R. App. P. 4(b)(4) and, therefore, the defendant is required to seek alternative manners of relief.

The court directed the defendant to <u>United States v. Hirsh</u>,

-2-

[DE-200 P2 JA-256]

207 F.3d 928 (7th Cir. 2000). In <u>Hirsh</u> the clerk also failed to file the notice of appeal and <u>Hirsh's</u> counsel failed to verify the filing of said notice. The court in <u>Hirsh</u> allowed the appeal to be filed under a theory that "what should have been done will be treated as done."

Unfortunately for <u>Hirsh</u> the U.S. Court of Appeals for the Seventh Circuit disagreed with the court's remedy and was reluctantly forced to dismiss the appeal. While the appeal was dismissed, <u>Hirsh</u> was given a new avenue for remedy, the Appellate Court found: "He may now file a motion under 28 USC § 2255, contending that Forsyth's failure to ensure that the clerk followed through deprived Hirsh of the assistance of counsel guaranteed by the 6th Amendment. [ ] If the district court finds that Forsyth was asleep on the job, then the court must vacate the judgment and reimpose the sentence to permit an appeal." <u>Id</u> at 931.

On the very day of sentencing, after the defendant requested the clerk file the notice of appeal, the defendant was approached by Attorney Kenneth L. Lawson, II, who represented co-defendant Matthew Elliot. Attorney Lawson regaled the defendant with the poor performance his present attorney, William Gallagher, had done. He told the defendant that he would like to handle defendant's appeal and needed to start right away. The defendant was easily manipulated and engaged Lawson before leaving the courthouse. The defendant paid a large retainer and merely relaxed in the assurance that his appeal was underway.

-3-

[DE-200 P3 JA-257]

Months passed and with the exception of several more requests for additional monies by Attorney Lawson, nothing was ever shown the defendant concerning his appeal. As the time neared for the defendant to enter prison the defendant begain to press Lawson on the appeal and was always put off with various excuses. Finally, in disgust the defendant hired new counsel in September 2004 who informed him no record of an appeal could be located.

The defendant then started to gather information on his own in order to be involved with his own destiny. In December 2004 the defendant discovered that the transcripts of his sentencing and the sentencings of his co-defendants had never been transcribed, indicating his newest attorneys also failed to even review the key elements pertaining to post conviction relief. The defendant now represents himself with only the assistance of "jail house lawyers."

Defense counsel Lawson had a specific duty and obligation to file or confirm filing of a timely notice of appeal. While it is true that Lawson was in the courtroom when the defendant instructed the clerk to file the notice; Lawson was not representing the defendant at that time. Inasmuch as Lawson was hired solely for the direct appeal, he surely bore the burden of making sure defendant's appellate rights were preserved.

There is only limited authority on this subject with best instruction found in <u>Roe v. Flores-Orgega</u>, 528 U.S. 470, 145 L.Ed. 2d 985, 120 S.Ct. 1029 (2000) in which the Supreme Court held the

-4-

[DE200 P4 JA-258]

two prong test in for effective assistance of counsel as held in Strickland v. Washington, 466 U.S. 668, 80 L.Ed.2d 674, 104 S.Ct. 2052 (1984) was the proper form of inquiry.

In the Roe court the basic decision dealt with a situation where the defendant's instructions were not specifically known. This is not the case here where the defendant and his trial counsel announced the defendant's desire for an appeal and for the clerk to file the notice on the record at sentencing. It has long been held that a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable. See Rodrigues v. United States, 395 U.S. 327, 23 L.Ed.2d 340, 89 S.Ct. 1715 (1969) cf. Peguero v. United States, 526 U.S. 23, 28, 143 L.Ed.2d 18, 119 S.Ct. 961 91999)("[w]hen counsel fails to file a requested appeal, a defendant is entitled to [a new] appeal without showing that his appeal would likely have had merit.").

In Roe supra 995, it was further held that counsel's failure to file the notice of appeal cannot be considered a strategic decision. The filing is a purely ministerial task and the failure to file reflects inattention to the defendant's wishes.

In the case at bar the defendant informed the court of his desire to appeal. The court inquired as to whether his counsel, William Gallagher, would "protect the rights of the defendant?" He assured the court he would and then asked the court to have the clerk file the notice of appeal. There is no question that

-5-

Attorney Gallagher retained the obligation to follow up and verify
that the notice was filed.

There can also be no question that the hiring of Attorney
Lawson to litigate defendant's appeal obligated him to file the
notice of appeal or verify the clerk's filing.

The performance by ~~both attorneys~~ Counsel in failing to follow the
defendant's explicit instructions is professionally unreasonable
and without question satisfies the first prong of the <u>Strickland</u>
test. The defendant is left only with the need to demonstrate
prejudice.

In this case the defendant's constitutional right to direct
appeal was denied by counsel's substandard, ineffective assistance.
The failure to preserve the direct appeal was nothing more than a
blatant failure to represent the defendant. "The complete denial
of counsel during a critical stage of a judicial proceeding, how-
ever, mandates a presumption of prejudice because 'the adversary
process itself' has been rendered 'presumptively unreliable.'"
<u>United States v. Cronic</u>, 466 U.S. 648, 649, 80 L.Ed.2d 657 104
S.Ct. 2039.

By counsel's failure to preserve direct appeal the defendant
is limited to collateral attack, which forecloses certain issues
and requires the burden of plain error on others. A good example
is found in that had the defendant been on direct he would have
automatic consideration of issues raised in <u>United States v. Booker</u>,
543 U.S. _____ (2005)(No. 04-105) and <u>Blakely v Washington</u>, 124

-6-

S. Ct. 2531 (2004); both of these cases impact the defendant to the extent that his sentence was enhanced by matters not supported by his plea.  Clearly this example alone demonstrates prejudice resulting from counsels' ineffectiveness in their assistance.

The defendant was entitled to a direct appeal, he ~~informed~~ the court of his desire and intention on the record.  The defendant was represented by ~~two prominent private~~ Counsel attorneys who ~~both~~ failed to provide the acceptable and reasonable level of effective assistance by ~~their~~ The failure to file ~~and/or verify~~ the clerk's ~~filing of~~ a notice of appeal. (Ent )

For all the reasons set forth above, the defendant prays this court to vacate the defendant's judgment and reimpose defendant's sentence, thereby providing the defendant a right to file a direct appeal.

## SECOND ADDENDUM ISSUE

### DEFENDANT'S 5th AMENDMENT IS CONTINUING TO BE DENIED AS THE RESULT OF THE COERCIVE THREATS MADE BY THE PROSECUTOR ARISING TO LEVEL OF MISCONDUCT AND OBSTRUCTION

Subsequent to the filing of the defendant's motion, pursuant to 28 USC § 2255, the defendant, by and with the assistance of friends and family, presented information to Cincinnati Police Chief Stricker.  This information included the defendant's statement accusing Detective John Mercado of being present when the

-7-

[DE-200 P7 JA-261]

defendant was shot.

Detective Bob Randolph was assigned to investigate the matter for the Cincinnati Police Department.  He talked with several family members and friends and constantly referred to his copy of the § 2255 motion.

Detective Randolph became indignant and informed family members that he felt there was no real case.  He never met with the defendant to get information from the source.  He finally threatened family members by stating; "AUSA Brickler told me to tell you, [a family member], that if Steve does not withdraw his § 2255 then he [Brickler] will indict the entire family."  [Transcripts of phone calls currently in preparation].

It is readily apparent that defendant's "fictional plea" and defendant's shooting while operating as a confidentail informant are matters the government does not want to discuss, but it should be known that this defendant intends to pursue justice in this matter.

## SUMMARY

The rules governing a § 2255 motion require a defendant to raise every issue.  This means that in order to file this motion to obtain a direct appeal, the defendant must raise all issues and defendant has done so.  The defendant prefers a direct appeal and  is entitled to such.  The defendant filed his § 2255 to comply with the time limitations and did so prior to knowing he could

-8-

obtain same. The court, therefore, should vacate and reimpose
sentence which would allow the defendant to proceed on direct ap-
peal. If the court does so; then all other issues should be dis-
missed without prejudice pending the results of the direct appeal
at which time defendant could raise the issues if needed.

Respectfully submitted,

Steve Rennick, Sr.
Defendant, Pro Se
#04050-032   HCU
Federal Medical Center
P.O. Box 14500
Lexington, KY 40512

-9-

[DE-200 P9 JA-263]

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served this 22nd day of February 2005, by regular mail, on Robert C. Brickler, AUSA, 221 East 4th Street, Suite 400, Cincinnati, OH 45202.

February 22, 2005

*Steve M Rennick Sr.*
Steve Rennick, Sr.
#-04050-032   HCU
Federal Medical Center
P.O. Box 14500
Lexington, KY 40512

[DE-200 P10 JA-264]

**FILED**

APR 1 4 2005

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

JAMES BONINI, Clerk
CINCINNATI, OHIO

|                              |     |                              |
| ---------------------------- | --- | ---------------------------- |
| STEVEN RENNICK, SR.,         | )   |                              |
|                              | )   |                              |
| Movant/Defendant,            | )   | Case No.: CV-1-05-00050      |
|                              | )   |                              |
| vs                           | )   | CR-1-02-157-3                |
|                              | )   |                              |
| UNITED STATES OF AMERICA,    | )   | Hon. Susan J. Dlott          |
|                              | )   |                              |
| Respondent.                  | )   | U.S. District Judge          |
|                              | )   |                              |

## REQUEST FOR JUDICIAL NOTICE

Comes the defendant, Steven Rennick, Sr., pro se, and does pray this court to Notice and Supplement the Record with the contents herein which are offered under oath and under penalty of perjury, and defendant does state as follows:

On January 26, 2005, defendant filed his timely petition pursuant to 28 USC Section 2255. On February 22, 2005, the defendant filed a "Motion to Supplement by Addendum" said Section 2255 motion which this court granted leave to file. (The addendum was filed simultaneous with said motion).

On February 17, 2005, Assistant United States Attorney (AUSA) Robert Brickler filed a request for 30 additional days to respond citing the need to investigate newly raised allegations which defendant raised in his Section 2255 motion. (The defendant has never received advice as to whether said continuance was issued).

-1-

[DE-201 P1 JA-265]

The respondent's response, assuming the extension was granted, was due on March 17, 2005, which date has passed without response.

Among the allegations included in defendant's pleading are facts and allegations suggesting that defendant's Case Agent, John Mercado, may have been involved in the shooting of the defendant <u>while the defendant was registered with the government as a Confidential Informant.</u> This matter is currently under investigation by the Cincinnati Police Department.

During the course of this investigation the police have had numerous hours of conversations with people associated with or related to the defendant. Many of these telephone conversations were recorded, (defendant's family having previously disclosed the fact that all such calls are being recorded, which is the result of continuing threats by phone which they have received).

Transcripts of these conversations indicate that the police are being partially directed by AUSA Brickler and to the extent that police have discussed the defendant's motion pursuant to 28 USC Section 2255, it seems that their investigation is now related to the matters presently before the court. Since it appears this investigation may be the one alluded to in respondent's Motion for Extension of time; and because there is a fair amount of misstatements of fact, the defendant does provide the following sworn and attested statement under penalty of perjury:

STATE OF KENTUCKY      )
                         )
COUNTY OF FAYETTE     )
                         )

<u>SWORN AFFIDAVIT</u>

I, Steven Rennick, Sr., the pro se defendant in the above captioned matter, do swear, attest, and affirm, under oath and penalty of perjury as to each of the following:

1. It has been stated that I have said that John Mercado shot me. I did <u>not</u> make that statement. I do not know the identity of my would-be assassin.

2. I have always, from the very night of my shooting, said I heard two voices. The first voice directly behind me said, "Rennick you're dead." At that moment I swung backwards and a shot fired, hitting my left shoulder; a second voice yelled "Get Him" as I moved toward the door and the second shot hit my left leg. I have always maintained that the first voice was that of the same man who threatened me days earlier because he was determined I was setting him up on a drug deal. I have always maintained the second voice was that of John Mercado, and I earnestly so maintain again herein.

3. Transcripts record a conversation between my sister, Joanne Childers (J) and Cincinnati Detective Bob Randolph (R) as follows:

   (R)  "Hold on a minute. Here is the problem that I have, okay. He got shot in November of 2003. In December, after the trauma of getting shot is beginning to wear off and he is healing, and he is getting a little better, he doesn't say that. In January of '04 he doesn't say the voice and Mercado. In February of '04 he doesn't say the voice of Mercado. In March of '04 he doesn't say the voice of Mercado. Do you see the point? April, May, June, July, August, September, October, November, December. In Janaury of 2005"-
   (J)  "When he was in prison."
   (R)  "Fifteen months later, he says there was another voice. I recognize that voice as Agent John Mercado. The voice said 'get him.'" [Tape 2, pg 4].

4. Detective Randolph made multiple statements through many conversations intimating that I never implicated John Mercado until January 2005.

5. Detective Randolph has never interviewed me on these matters despite the fact that I recently was housed in the Justice center where an interview would have been more convenient for him.

[DE-201 P3 JA-267]

6.   When my sister told me the problem Detective Randolph was
     having over his belief that I never mentioned hearing
     Mercado's voice until 15 months later, I gave my sister
     some of the names I told right after the shooting and asked
     her to relate those to Randolph so he could resolve the
     matter.  The following conversation took place:

7.   (J)  "He said if you would talk to Dave Munis (sp) at OMI
          [Office of Municipal Investigations] he knew that had
          all come up before that.  Ken Lawson knew.  Todd Morris
          knew, who is the probation officer, do you know him?"
     (R)  No, I don't.
     (J)  "He is in the Federal Building, I think.  I can give
          you their phone number.  He said, I told him, he is
          real anxious to talk to you."
     (R)  "I don't even know we are going to at this point.  It
          is up to my supervisors.  We will wait and see when
          Steve gets here next week.  I don't know.  I have to
          review what we have come up with at this point with my
          bosses.  They need to make a decision <u>along with
          Brickler.</u>  Which way they want to go with this."
     (J)  "What is Mr. Brickler saying?"
     (R)  "I need to review it all with him.  I have had dis-
          cussions up to this point.  I told you what he said
          about considering opening up a conspiracy investigation,
          that is on him.  If that is what he chooses to do?  At
          this point I need to sit down with my supervisors, which
          I have to do here and there as things have developed.
          Now we need to sit down and go over everything.  And let
          them decide if they even want me to go talk with Steve
          when he comes here."  [Tape 3, pp 17-18].

8.   It is my understanding from these conversations that even
     though there are numerous witnesses who know I have made the
     same statements from the very night of the shooting until the
     present, the police have now determined they have no need to
     interview me or verify my position with any of the witnesses.

9.   For the record; I was shot on Friday, November 7, 2003.  I
     recall telling a doctor in the emergency room words to the
     effect of, "a cop was involved in my shooting."  I have no
     knowledge of who I told.  I also remember an emergency room
     doctor talking to me about removing the bullets and comment-
     ing to me, if a cop was involved you should probably leave
     them in so the police don't lose them.

10.  On Sunday, November 9, 2003, I was visited by my wife Phyllis
     and two daughters, Melissa and Becky.  I was also seen by
     probation officer Todd Morris.  I told all four of them about

                              -4-
                    [DE201 P4 JA-268]

hearing Mercado's voice.  This was within 48 hours of the shooting.

11.  I also advised my lawyer, William Gallagher, as well as my co-defendants and their attorneys, Kenneth Lawson and Gregory Cohen about my suspicions.

12.  On advice of counsel, I met with Mr. Dave Munis (sp) with the Office of Municipal Investigation (OMI).  He seemed interested in the matter and promised he would look into it.  I specifically reported to him that I heard Mercado's voice during the shooting.

13.  I was subsequently informed that the matter was transferred to an Agent Green, with the FBI and OMI was no longer involved; I have no first hand knowledge if that is true.

14.  After I was sent home to recover, I was never left at home alone.  My family started getting threatening phone calls and cars would slow and sometimes stop at the house.  Within the first two weeks I called the Fairfield Police who came to the house.  I advised them I had been shot, that I was afraid, and that I had heard a Cincinnati detective's voice during my shooting.  The police started routinely checking by my home.

15.  I also told my orthopedic doctor, Dr. Mctidge, all about my shooting and my hearing of Mercado's voice at the shooting.

16.  At this same time period I was having treatment and therapy for my condition of Post Traumatic Stress Syndrome.  All details of the shooting, including Mercado's role, was discussed and recorded in my Veteran's Classified Mental Health Record.

17.  These are only some of the people told of Mercado's voice being at the shooting, and were told contemporaneously to the time of the shooting.

18.  The detective's assertion that I waited until January 2005 is not supported by the verifiable evidence in this matter. I have told the same facts to everyone involved all along.

19.  As stated in other documents, John Mercado arrived at the University of Cincinnati Hospital very soon after I was brought in.  I recall that even a doctor made the comment, "You must have been on scene."  When Mercado came in where I was, I was very afraid and, understandably, I did not say that I heard him say "Get Him" while bullets tore into my flesh.

-5-

20. Mercado asked; "Didn't Tony Battles leave the shop about 20 minutes before this happened?"

21. I said, "I don't know." That was not true. I did know, and Tony Battles had left almost exactly 20 minutes before the shooting. The fact that Mercado was correct confirmed in my mind that I heard his voice because there was no way to know when Battles left unless you were there or you were watching from somewhere near by and, if you were watching, you would have seen the shooter(s) leave the building.

22. Detective Randolph also advised my sister that the statement I received from a witness was a scam. He advised that there was no such person and the entire document was false. He specifically said many parts were fraudulent, including, inter alia; (1) There is no person named Antonio Louis employed by CG&E nor has there ever been; (2) The phone number listed in the witnesses statement is disconnected and never belonged to an Antonio Louis, (many people use phones not in their own name); (3) The notary is a "90 year old black man" who claims his notary stamp and impression seal were stolen 18 months before this signing, so the notary signature is forged; (4) there is no date on the document.

23. In the month of May 2004, I received a message to call my friend Demetrius Ball (hereinaftger referred to as "Duke"). When I called him he informed me that the owner of the Drive Thru next to the shop where I was shot had spoken with a customer of his, and this customer, Antonio Louis, had observed two men exiting the rear of the shope while I was lying on the front parking lot, bleeding and awaiting help.

24. I have never met or spoken with the witness and all communications with this witness have occurred through Duke Ball or an investigator, infra.

25. The witness gave Duke a description of one of the men  and the vehicle the man got in.  The man and the vehicle description fit John Mercado, and the witness believes he could pick the man he saw out of a line-up.

26. The witness claimed to see one of the two men throw something like a bag into the woods behind the shop.

27. Relying on this information, I hired Jay Etter, with Stealth Investigations out of Dayton, Ohio (A referral from the law firm of Rion, Rion, and Rion) to search the woods for a possible weapon.  The initial search was fruitless.

-6-

[DE-201 P6 JA-270]

28. There were subsequent searches and, finally, a weapon was found, retrieved, and now is in police possession. The advising of Police Chief Striker of the finding of the gun was the reason the current investigation was started.

29. There would never have been a search or a gun found had the witness not come forward.

30. On September 28, 2004, Investigator Jay Etter met in person with Duke Ball and the witness and received the witness statement from the witness. I am told it was already notarized.

31. Detective Randolph has been very adamant that this witness is a fake and does not exist. (There are pages of transcripts in which the detective seeks to convince the defendant's sister that the witness is a fake.).

32. Duke Ball maintains that not only is the witness real, but that he is in contact with him.

33. Duke Ball now claims the witness has been threatened to not cooperate in this matter. However, the witness has agreed to an in-camera private inquiry with the court at a non-disclosed time. (If the court consents, the witness will contact the court for the court's scheduling).

34. I have never had contact with the witness nor has any member of my family. All the material and statements concerning the witness are the results of Demetrius Ball.

35. On February 25, 2005, I was in the Court of Common Pleas for Hamilton County, to testify in a state forfeiture hearing. One of my federal co-defendants in this matter, Mr. Wayne Benjamine, testified for me under subpoena. Officer Mercado testified for the state.

36. Several days after the testimony, Mr. Benjamin, who presently lives with his elderly grandmother at 4651 Buxton Avenue, Cincinnati, Ohio 45242, was the subject of a breakin van-dalism of his grandmother's garage. Mr. Benjamine's truck and his grandmother's vehicles were severely damaged. A note was found at the scene that said; "Testify again and bad things happen to good people." Other than his testifying for me, Mr. Benjamine has not testified for anyone.

37. I am not accusing anyone of being a part of Mr. Benjamine's misfortune, I merely raise the coincidence to the court's attention.

-7-

[DE-201 P7 JA-271]

38.  Throughout Detective Randolph's conversations he has made
     many references to my 2255 motion and to AUSA Brickler:

     A.  (R)  "I have your brother's motion that he has recently
              filed."
         (J)  "The 2255."
         (R)  "Yes, with signed affidavits from Anthony Battle,
              Demetrius Ball, Wayne Benjamine, and your brother,
              Steven."  [Tape 2 at 34-35].

     B.  (R)  "Well, listen to this.  You know Mr. Brickler?"
         (J)  "Yes, ... I know who he is?"
         (R)  "Okay, he is the Assistant U.S. Attorney.  I have
              had conversations with him about this.  At this
              point, depending on how this all shakes out, he is
              preparing to open up a conspiracy to commit fraud
              case on everybody involved in this.  It is all
              bogus" ...

     C.  (J)  "Are you saying the judge are (sic) not going to
              even look at this?"
         (R)  "No, no, no, no."
         (J)  "That 2255?"
         (R)  "No, no, no.  I never said that.  I never said
              that.  I am just telling you that Mr. Brickler in-
              formed me that with the information I have presented
              to him so far there is serious consideration.  De-
              pending on how it all evolves, okay.  They may open
              up a conspiracy to commit fraud investigation.
              This thing is just kind of blowing up here.  [Tape
              3 at 3-4].

39.  As a result of Detective Randolph's comments concerning AUSA
     Brickler, my family members are extremely frightened that they
     are going to be charged with the crime of conspiracy for at-
     tempting to help me.

40.  For the record, I was shot twice on November 7, 2003, inside
     my son's place of business.  I did not see who shot me, but
     I heard the voices I say I heard.  Detective Randolph told
     my sister that Mr. Brickler has a statement and evidence that
     I had myself shot - that is not true, and is patently absurd.

41.  I believe Detective John Mercado was present when I was shot.
     I ascribe no motive for his actions, but I believe it is the
     truth.  Whether he was part of my shooting or not is irrele-
     vant to my sentence, or my crime, and is separate from the
     other legal issues.

42.  I have provided this lengthy material simply to make it a

-8-

[DE-201 P8 JA-272]

part of the public record. All tapes and transcripts are available on request.

Further affiant saith naught.

*Steven M. Rennick*
Steven M. Rennick, Sr.
Defendant, Pro Se

The foregoing was subscribed to before me by Steven M. Rennick, Sr., Inmate No: 04050-032, who provided photo identification, this ___ day of April 2005.

S E A L

Notary, State at Large, KY

[DE-201 P9 JA-273]

## CERTIFICATE OF SERVICE

I, Steven M. Rennick, Sr., do hereby certify that the original of this document was filed with the Court Clerk identified below and a true and correct copy was further sent to the other party or parties identified below by depositing same into the prison legal mail box, postage prepaid, on the 12Th day of April 2005.

Steven M. Rennick, Sr.
#04050-032

Clerk of the Court
U.S. District Court
Southern District of OH
100 East Fifth Street
Cincinnati, OH 45202

Robert C. Brickler
AUSA
221 E. 4th Street
Suite 400
Cincinnati, OH 45202

[DE-201 P10 JA-274]