```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  SOUTHERN DISTRICT OF OHIO

 3                      WESTERN DIVISION

 4     ------------------------------------------------

 5   UNITED STATES OF AMERICA

 6          Plaintiff          :

 7   -vs-                      : 1:02-CR-157

 8   STEVEN RENNICK, SR.       :

 9          Defendant          :

10     ------------------------------------------------

11                  Hearing before the Honorable

12   Magistrate Michael Merz at the United States

13   District Courthouse, Federal Building, Fifth Floor,

14   Dayton, Ohio at 9:30 a.m. on Thursday, March 20,

15   2008, before Paula A. Blosser, a Registered

16   Professional Reporter and Notary Public within and

17   for the State of Ohio.

18                 *    *    *    *    *    *

19

     ON BEHALF OF DEFENDANT:
20
            Mr. Lawrence Greger
21          Attorney at Law

22   ON BEHALF OF PLAINTIFF:

23          Mr. Benjamin Glassman
            Attorney at Law
24

25
```

QUICK REFERENCE INDEX

|  | DX | CX | RDX | RCX |
|---|---|---|---|---|
| GREGORY COHEN | 6 | 44 | 54 | |
| MATTHEW ELLIOTT | 62 | 120 | | |
| DEMETRIUS BALL | 121 | 130 | | |
| STEVEN RENNICK | 132 | 196 | | |
| WILLIAM GALLAGHER | 208 | 277 | 288 | 291 |

EXHIBITS

IDENTIFIED

| EXHIBIT 1: | 23 |
| EXHIBIT 2: | 30 |
| EXHIBIT 3: | 37 |
| EXHIBIT 4: | 38 |
| EXHIBIT 5: | 87 |
| EXHIBIT 6: | 100 |
| EXHIBIT 7: | 128 |
| EXHIBIT 8: | 127 |
| EXHIBIT 9: | 188 |
| EXHIBIT 10: | 189 |
| EXHIBIT 11: | 192 |
| EXHIBIT 12: | 193 |
| EXHIBIT 13: | 194 |
| EXHIBIT 14: | 263 |

\*   \*   \*   \*   \*

1                JUDGE MERZ:  This is Case No.

2    1:02-CR-157 also numbered 1:07-CV-594, United

3    States of America against Steven Rennick, Senior

4    set for hearing this morning to hear evidence on

5    the Defendant's motion to vacate judgment pursuant

6    to 28 U.S.C. Section 2255.

7                Good morning, Mr. Greger, good

8    morning, Mr. Glassman and Mr. Rennick.  Is the

9    Defendant ready to proceed?

10               MR. GREGER:  We are, your Honor.

11               MR. GLASSMAN:  We want to raise

12    two preliminary points real fast.  One is it is

13    possible that Mr. Brichler could end up being a

14    witness in this matter so I wanted to raise the

15    issue of his presence here at counsel table.

16               JUDGE MERZ:  Mr. Brichler, first

17    of all, I apologize for not acknowledging you this

18    morning.

19               MR. BRICHLER:  Good morning.

20               MR. GREGER:  I'm going to move for

21    a separation of witnesses.  My witnesses are in the

22    hall, your Honor.

23               JUDGE MERZ:  If he's likely to be

24    a witness he needs to be separated.  Mr. Greger,

25    anything else preliminarily?

 1                    MR. GREGER:  I thought there were

 2     two things.

 3                    JUDGE MERZ:  I'm sorry, Mr.

 4     Glassman, do you have additional --

 5                    MR. GLASSMAN:  The additional

 6     point, your Honor, personal point that I came down

 7     with some kind of illness yesterday.  If it was

 8     anything other than an evidentiary hearing with a

 9     lot of witnesses called I would have called in

10     sick.  If it becomes a problem I ask the Court's

11     indulgence that I could sit at counsel table if

12     something like that, it becomes a problem.

13                    JUDGE MERZ:  Thank you.

14                    MR. GREGER:  I have no objection.

15                    JUDGE MERZ:  An opening statement?

16                    MR. GREGER: I want to thank you,

17     the Court, for giving an opportunity to represent

18     Mr. Rennick.  It's both a personal and professional

19     pleasure to have done so. Your Honor, previously

20     this is a man who is in the twilight of his service

21     of a 63-month sentence.  His out date is 2008.

22                    I believe based on the experience

23     of BOP, I think he should qualify for a half way in

24     June of '08.  We are here on March 20th, '08.  Two

25     things are fundamentally clear.  One, either Mr.

1    Rennick is absolutely innocent or, two, he's

2    absolutely crazy to persist in this motion in the

3    twilight of his 63-month sentence knowing that this

4    Court could vacate, remanned, and he faces the

5    gauntlet again with no guarantees that he would get

6    credit for the time served on the sentence that

7    this Court, I pray, will absolutely vacate and

8    order a new trial.

9                        After my interaction now for the

10   past several weeks now going on months, I am

11   convinced that Mr. Rennick is not absolutely crazy.

12   He must therefore be absolutely innocent and with

13   that I'll proceed to present the evidence in

14   support of that contention.  Government want to

15   give an opening?

16                        JUDGE MERZ:  If that's the extent

17   of your opening, that's fine.  Mr. Glassman, any

18   opening at this point in time?

19                        MR. GLASSMAN:  Thank you, your

20   Honor.  On behalf of the United States we

21   anticipate that the testimony will reflect that Mr.

22   Rennick received effective assistance of counsel

23   and that he pled guilty voluntarily.  Thank you.

24                        JUDGE MERZ:  Thank you.  Mr.

25   Greger, you may call your first witness.

Case 3:07-cv-00353-SJD-SLW Document 9 (Court only) Filed 01/15/2008 Page 6 of 295

1          MR. GREGER:  We call Greg Cohen to

2     the stand.

3     WHEREUPON:

4                    GREGORY COHEN,

5     of lawful age, a witness herein, being first duly

6     sworn testified as follows:

7                    JUDGE MERZ:  State your full name

8     and spell your last name for the record.

9                    THE WITNESS:  Gregory A. Cohen,

10    C-O-H-E-N.

11                   JUDGE MERZ:  Before you proceed,

12    Mr. Greger, we have a problem with realtime.

13                   (Recess).

14                   DIRECT EXAMINATION

15    BY MR. GREGER:

16         Q.  Mr. Cohen, are you an attorney licensed

17    to practice law in the state of Ohio?

18         A.  I am.

19         Q.  How long have you been so licensed?

20         A.  Approximately fourteen and a half

21    years.

22         Q.  Mr. Cohen, did you represent Wayne

23    Benjamin in United States versus Steven M. Rennick,

24    Senior?

25         A.  Yes, I did.

1          Q.   Was that venued in the federal district

2     court in Cincinnati, Ohio?

3          A.   That's correct.

4          Q.   Was that case assigned to Judge Dlott?

5          A.   It was.

6          Q.   Based on your investigation of the

7     case, how strong of a case did you have in the

8     defense of Mr. Benjamin to the allegations that the

9     government made in the indictment that your client

10    had entered into a drug conspiracy with Matthew

11    Elliott and Steven Rennick, Senior?

12         A.   In my humble opinion I believe that was

13    probably the strongest case of all of the

14    defendants charged.

15         Q.   Were you, in fact, prepared to start

16    trial on August 18, 2003?

17         A.   Sitting at the defense table when the

18    jury was called in, we were ready to go.

19         Q.   Mr. Cohen, have you ever in speaking

20    with me used the term locked and loaded to describe

21    how prepared you were on the day of trial?

22         A.   That is an expression that I use fairly

23    frequently when I'm ready for trail.

24         Q.   Did you describe that in how prepared

25    you were in the defense of Mr. Benjamin to the

1    government's accusations?

2         **A.**  Yes.

3         **Q.**  Did the government ever tender to you

4    prior to the day trial was to begin a proposed plea

5    agreement with a proposed statement of facts?

6         **A.**  No.

7         **Q.**  Did trial actually begin in this case?

8         **A.**  No.

9         **Q.**  Who called, in your expression, a time

10    out to discuss resolution of the case by way of

11    plea?

12         **A.**  United States government.

13         **Q.**  And the United States government was

14    represented by the person of Robert Brichler?

15         **A.**  That is correct.

16         **Q.**  And was there anyone else assigned to

17    the government's case?

18         **A.**  I'm trying to remember who else might

19    have been seated at the table.  I can't honestly

20    recall.

21         **Q.**  Was it then your recollection that Mr.

22    Brichler himself took the time out to discuss the

23    resolution of the case by way of plea?

24         **A.**  It was.

25         **Q.**  Was Judge Dlott ready to bring the jury

1    in at the time that Mr. Brichler asked for a halt

2    in the proceedings?

3          A.  She was on the bench.

4          Q.  Prior to the morning of trial, had

5    there been any plea discussions between the

6    government and your client?

7          A.  No, we had always discussed the fact

8    that we were going to trial essentially no matter

9    what.  There was discussion regarding sentencing

10   guidelines based on the indictment.  Obviously my

11   client knew what was at risk.

12         Q.  On the morning of trial -- strike that.

13   Did you then at some point have a discussion with

14   Mr. Brichler about resolving your client's case --

15         A.  I did.

16         Q.  -- by way of a plea?

17         A.  That's correct.

18         Q.  It was a package deal and by that I

19   mean, did all three defendants have to plead or was

20   your client permitted to enter into a plea

21   agreement without the other two defendants?

22         A.  It was not contingent on the other two

23   defendants entering pleas.  It was offered

24   specifically to me.  Mr. Brichler turned and

25   addressed me individually as Mr. Benjamin's

1    attorney.

2          Q.   Based on your knowledge in preparing

3    the defense of the case, was there a strong

4    personal relationship between Mr. Benjamin and Mr.

5    Rennick?

6          A.   Yes, there was.

7          Q.   Did it surround the car racing

8    business?

9          A.   It did.

10         Q.   Let me ask you, what tractor did the

11   government allege was supposedly used to transport

12   marijuana from Arizona to the Southern District of

13   Ohio?

14         A.   I'm not prepared to give you the

15   vehicle identification number but it would be the

16   tractor that was in the Hamilton County Sheriff's

17   Department impound lot.  I think it may actually be

18   there as we speak today.

19         Q.   If I said, Mr. Cohen, to refresh your

20   recollection it's a Freightliner, would that

21   refresh your recollection in that regard?

22         A.   It would.

23         Q.   And, Mr. Cohen, was there ever anything

24   but the tractor, that being the motor pulling part,

25   there was never a trailer attached to that tractor,

1    was there?

2                        JUDGE MERZ:  Is your question

3    never?

4                        MR. GREGER:  Never.

5                        THE WITNESS:  I am not an expert

6    but I have more than a layman's knowledge having

7    loaded and unloaded trucks for seven years in my

8    youth.

9    BY MR. GREGER:

10           Q.   Yes, sir.

11           A.   There is a strike plate where the

12   trailer attaches to the tractor.

13           Q.   Can we call it a fifth wheel?

14           A.   We could.  And as it was in photographs

15   and we were prepared to introduce at trial, it was

16   clean.

17           Q.   Pristine condition?

18           A.   Absolutely.  There was nothing on

19   there.  There would have had to have been some

20   scoring if you had dropped a trailer into place on

21   that tractor.

22           Q.   Any trailer would at least leave some

23   mark on the fifth wheel?

24           A.   I have no idea how it could not.  It

25   just, again, based on my limited experience with

1    trucks but more than a layman's knowledge.

2        Q.  And you had pictures that you were
3    prepared to put forward in front of the jury that
4    indeed indicated that based upon the pristine
5    condition of the fifth wheel, a logical conclusion
6    or at least a very strong inference could be there
7    was never a trailer hooked up to the tractor; is
8    that true?

9        A.  That's correct.  The pictures were
10   taken by me.

11       Q.  Was it the government's contention
12   that, in fact, 500 pounds of marijuana had been
13   transported to the Southern District of Ohio from
14   Arizona by using the tractor portion?

15       A.  I think, again, my recollection there
16   were alternative theories.  Either there was a
17   trailer used or that it was contained within the
18   living compartment of that tractor.  It was a
19   pretty impressive tractor, actually.

20       Q.  And so the alternative theories, one of
21   which you were able or prepared to defeat almost
22   immediately would be that it was hauled in a
23   trailer attached to the tractor, true?

24       A.  That is true.  It got better than that
25   because regional narcotics unit used their drug

1    dog.

2         Q.   Let me get to that.

3         A.   Okay.

4         Q.   I'll phrase that in form of a question

5    that comes a little bit later.  Was it the

6    government's contention that your client and Mr.

7    Rennick brought the marijuana back to the Southern

8    District of Ohio from Arizona in that Freightliner

9    tractor?

10        A.   Yes, it was.

11        Q.   Was there ever a canine search

12   conducted on the tractor portion?

13        A.   It was my understanding that, yes, that

14   did take place.

15        Q.   Did it take place three times?

16        A.   At least twice based on the information

17   provided to us.

18        Q.   Was there ever a positive hit by the

19   canine in those two or more searches on the

20   Freightliner tractor?

21        A.   Not to my knowledge.  We did not get,

22   one of the witnesses who was at a weighing station

23   that they were going to call, I believe, in Mr.

24   Rennick's case.  It had nothing to do in my case,

25   also to testify that the vehicle had been searched

1    or tested.

2         Q.   Did the government have the paperwork

3    prepared for the pleas or was there a break taken

4    so that the government could, in fact, go out and

5    prepare the necessary paperwork?

6         A.   A break was called.

7         Q.   To your knowledge did Mr. Benjamin ever

8    speak privately with Mr. Rennick on the morning of

9    trial surrounding the changing of pleas?

10        A.   I'm trying to sort out between before

11   we were ready to start for trial and after we took

12   a break.  There was a lot of back and forth amongst

13   the lawyers.  There were, individuals that were

14   charged spoke to each other without us on occasion.

15   I honestly can't answer that question.  I'm not

16   sure if Mr. Benjamin actually had a private

17   conversation with Mr. Rennick.

18        Q.   Were you present in a group that

19   included Mr. Gallagher, Matthew Elliott, Ken

20   Lawson, and Steven Rennick, Senior where resolution

21   of the case was discussed?

22        A.   Yes.

23        Q.   Mr. Cohen, your client's case was

24   resolved by a superseding bill of information, was

25   it not?

1          A.    That's correct.

2          Q.    Was it your belief based on the

3    strength of your case that you could have caused

4    serious damage to the government's contention that

5    all three of the defendants, Elliott, Benjamin, and

6    Rennick had entered into a drug conspiracy?

7          A.    Yes.

8          Q.    Do you believe that one of the reasons

9    that Mr. Brichler, the federal prosecutor, entered

10   into plea negotiations because of the strength of

11   your case as against the allegations contained in

12   the indictment?

13         A.    I can't speak for the government's

14   position.  I suspect having done enough federal

15   work to make it to trial and have a prosecutor even

16   in a state case offer me a deal right before the

17   jury, typically that does mean there is a question

18   of the strength of their case.  I guess one would

19   safely assume they were worried about Mr.

20   Benjamin's case which may have an impact on the

21   remaining defendants.

22         Q.    Did your investigation in the defense

23   of Mr. Benjamin demonstrate to you that the two

24   Jamaicans that the government was going to present

25   in their case in chief were liars?

1          A.   Absolutely.

2          Q.   Were the two Jamaicans, Kareem Cole and

3    David Jones, who also had two other aliases --

4          A.   Yes.

5          Q.   -- do you know whether or not Mr. Cole

6    was testifying on the hope that he would secure a

7    5K substantial assistance motion from the

8    government?

9          A.   Well, government doesn't tell us who

10   the witnesses are until they provide the required

11   notice the day before prior to the testimony, but

12   we were all pretty clear that's who they were going

13   to bring to the show were the other two individuals

14   that entered into agreements with the government.

15         Q.   Mr. Cohen, let me ask you whether you

16   have ever used the term legal fiction to describe

17   what occurred in the courtroom on the day that your

18   client Wayne Benjamin changed his plea?

19         A.   I have.

20         Q.   Tell the Court what you mean or meant

21   by the use of that term, legal fiction, to describe

22   what occurred in the courtroom on the day that your

23   client Wayne Benjamin changed his plea.

24         A.   Harkening back to law school it's an

25   old common law description of a situation where

1      Court for convenience ends of justice,

2      clarification will allow a fact which may or may

3      not be true in order to resolve an issue.  In this

4      instance the legal fiction would be in the absence

5      of any hard evidence Mr. Benjamin was agreeing to a

6      set of facts that would allow him to plead to

7      essentially the lowest charge in the federal

8      sentencing guidelines.

9            Q.   So can we, Mr. Cohen, then use legal

10     fiction to describe a means to an end?

11           A.   That would be correct.

12           Q.   And so -- thank you.  Your client had

13     to agree with a statement of facts that was read

14     into the record by the government at the time of

15     change of his plea; is that correct?

16           A.   That's correct.

17           Q.   The statement of facts that Mr.

18     Benjamin agreed to included the fact that he had

19     received marijuana from Steven Rennick, Senior, the

20     quantity being one pound, correct?

21           A.   That is also correct, yes.

22           Q.   Did your investigation of this case

23     ever disclose to you that Mr. Rennick had delivered

24     or that Benjamin had received the quantity of

25     marijuana that was in the government's statement of

1    facts?

2         A.    No.

3         Q.    Do you know the source of the

4    information that was used to substantiate that one

5    pound of marijuana had been given to your client

6    allegedly by Steven Rennick, Senior?

7         A.    No.

8         Q.    Mr. Cohen, how many federal cases are

9    you aware where the drug quantities were one pound

10   of marijuana?

11        A.    None.

12        Q.    Let me --

13              JUDGE MERZ:   You are always

14   welcome to come and try cases in this Court.   We've

15   tried them a tenth of the gram.   But that to the

16   aside.

17   BY MR. GREGER:

18        Q.    Let me ask whether there were

19   discussions with Mr. Brichler to you and your

20   client concerning the sentence that your client

21   would receive?

22        A.    I don't know that we needed

23   discussions.   When the plea was offered based on

24   the quantity we knew it was in the zero to six

25   range and knew that our client had a criminal

Case 3:07-cv-00353-WHR-MRM Document 8 (Court only) Filed 04/13/2009 Page 1 of 295

1   history of one.  Essentially his worse exposure was

2   six months.

3           Q.   Did Mr. Brichler talk to you about

4   straight probation?

5           A.   Not in the context of a plea.  What he

6   basically said, your client based on his records is

7   going to get probation in this matter.

8           Q.   That's what Mr. Brichler said?

9           A.   He did, but it was not in the form, if

10  you plead you get probation.

11          Q.   Understanding that he didn't make you a

12  promise, my question is, did he discuss in the

13  presence of your client that he was going to get

14  straight probation based on the federal sentencing

15  guidelines?

16          A.   I think, he, yeah, that was some of

17  the, part of the conversation we had because the

18  conversation was right behind the defense table in

19  the courtroom.

20          Q.   Mr. Cohen, would it have been

21  malpractice to you for you to have proceeded to

22  trial even knowing that you had a strong case in

23  your opinion when you had a guarantee of probation?

24          A.   Malpractice?

25          Q.   Yes.  I'll strike that question and go

Case 3:07-cv-02053-D-BH Document 8 (Court only) Filed 04/13/2009 Page 26 of 295

1    back and phrase it a different way.

2                Did you, when you and I spoke

3    indicate that it would be malpractice for you to

4    have proceeded putting everything at risk when you

5    had a guarantee of straight probation in this case?

6        A.  Yes, but not, in terms of when a client

7    is offered the opportunity to walk out of the door

8    but you can't tell your client to go to trial just

9    because you, as an attorney, think your case is

10    strong because it's the 12 people sitting in the

11    jury box, those are the ones that decide who is

12    guilty and who is not.

13        Q.  And, in fact, had Mr. Benjamin decided

14    to go forward and defend against the accusations of

15    the government, he was looking at a five-year

16    minimum mandatory, was he not?

17        A.  That is correct, based on the

18    indictment.

19        Q.  Mr. Cohen, did your client, in fact,

20    get probation?

21        A.  He did.

22        Q.  Has he since passed away?

23        A.  Yes, he has.

24        Q.  Did you travel to the federal medical

25    center at Lexington, Kentucky to meet with Mr.

1    Rennick?

2              **A.**   I did.

3              **Q.**   What was the purpose of that meeting?

4              **A.**   To discuss the resolution of his claim

5    to recover the tractor from the Hamilton County

6    Sheriff's Department.

7              **Q.**   Were you attempting to make

8    arrangements between each other to represent him in

9    the forfeiture side of the case?

10             **A.**   Yes.

11             **Q.**   Did you actually represent him in the

12   forfeiture side of the case?

13             **A.**   For about ten minutes.

14             **Q.**   Let me ask you, you learned the term

15   legal fiction and referred to the common law.  Let

16   me ask whether or not there were other defense

17   counsel, that would be Mr. Lawson or Gallagher or

18   Mr. Goldberg, that used the term fictional plea to

19   describe what occurred that morning?

20             **A.**   No, I don't recall that.  I mean

21   fictional plea doesn't make sense to me because

22   when you plea, that's your plea.  You are pleading

23   guilty to an offense.  There is nothing fictional

24   about that for the defendant.

25             **Q.**   It's what they are pleading to that can

Case 3:07-cv-00253-WHR-MRM Document 6 (Court only) Filed 04/13/2010 Page 22 of 295

1   be fictional?

2          A.   Essentially the legal fiction.  Again,

3   legal fiction can't be used to harm another party,

4   a third party.  There was no agreement by Mr.

5   Benjamin to testify against Mr. Rennick or anybody

6   else.

7          Q.   That was not part of the plea

8   agreement?

9          A.   It was not.

10         Q.   Do you know whether or not that's

11  because it had to be a package deal, the government

12  was not going to cut Mr. Benjamin loose and then go

13  to the same length of trial to prove the conspiracy

14  with only two defendants, were they?

15         A.   Earlier on prior to sitting down for

16  trial, it was, it was pitched to defense counsel

17  this was a package deal.  All three of you plead or

18  all three of you go to trial, which I was looking

19  forward to the trial personally.

20         Q.   Is the truck forfeited?

21         A.   The truck was forfeited.

22         Q.   Was the truck forfeited because the

23  court found, in fact, the tractor had transported

24  marijuana from Arizona to the Southern District of

25  Ohio or that proceeds from a racing business might

1    have been used to purchase the tractor?

2         A.   Part of the problem was on the title to

3    the vehicle and essentially my role in it was

4    excluded pretty quickly by the magistrate because

5    we couldn't show standing at that time, at the time

6    of the hearing to challenge the state's forfeiture

7    action although it was a federal case.  The

8    forfeiture was filed in state court and basically I

9    was excused from the proceedings.

10        Q.   Mr. Cohen, let me ask you whether or

11   not, in fact, this case started out in the state

12   system as an arrest of Mr. Rennick and others for

13   possession with intent to distribute 20,000 grams

14   of marijuana?

15        A.   It did.

16        Q.   And did the Hamilton County Grand Jury

17   return a no true bill on that accusation?

18        A.   Mr. Benjamin wasn't charged originally

19   in the state action so I'm not, that does sound

20   right.  I can't confirm it but it does seem to ring

21   a bell.  We've had a couple of cases since this

22   one.

23        Q.   Did you mention or discuss with Mr.

24   Rennick the legal fiction that you have described

25   to the Court here today when you went down to the

Case 3:07-cv-00253-SMR-MRM Document 9 (Court only) Filed 04/23/2007 Page 24 of 295

1    federal medical center?

2         A.   I did.

3         Q.   Mr. Cohen, I'm handing you what's been

4    marked for identification as Rennick Exhibit 1 for

5    purposes of the 2255 hearing and I'll ask if you

6    can identify that for the record?

7         A.   This is the superseding information

8    that was filed with respect to Mr. Wayne Benjamin.

9         Q.   That information was filed with the

10   Court on August 20, 2003?

11        A.   That is correct.

12        Q.   Did you have that information before

13   you at the time Mr. Benjamin entered his plea?

14        A.   We would have done that on the day,

15   probably the day we entered the plea.  It would

16   have been proffered to me.  I had the plea bargain

17   before I had this to review so it would have been

18   contemporaneous.

19        Q.   Do you know if you had this on the

20   morning of August 18, 2003 at the time that you

21   pled?

22        A.   Without looking at my file I can't

23   answer that.

24        Q.   Do you have any reason to explain why

25   it was filed two days after the plea was accepted

1   and not at or about the time or before the pleas

2   were accepted?

3           A.   I'm not certain.  I'd have to see the

4   plea form to see when that was filed, if they were

5   all filed contemporaneously.

6           Q.   We can agree that the file stamped date

7   on the information is two days after the plea by

8   Mr. Benjamin was made, can't we?

9           A.   Yes, we can.

10          Q.   Does the defendant have the right to

11  have that document for 24 hours in his possession

12  before he acts?

13          A.   The defendant being Mr. Benjamin?

14          Q.   Yes.

15          A.   Yes.  Sure, he does.

16          Q.   That period can be waived, can it not?

17          A.   It can.

18          Q.   Did you even know the exact language of

19  the information and by that I mean what your client

20  was actually pleading to in terms of the statutory

21  citations and the date that he allegedly did the

22  act in question when you pled?

23          A.   I did.

24          Q.   Did your client get two points for

25  acceptance of responsibility toward his sentencing

Case 3:07-cv-00253-JD-SLC Document 3(Page 1 only) Filed 04/45/2005/2007 Page 26 of 295

1    guidelines?

2           A.   He did.

3           Q.   Are you sure of that?

4           A.   I don't know if it made a difference.

5    I presume he did.  I don't have his plea form in

6    front of me.  Any person who enters a plea

7    typically gets that.  I'm not sure if on this level

8    he qualifies.  Anything under 15 he would have

9    gotten a third point.

10          Q.   The offense level would have equated to

11   an offense level eight; is that true?

12          A.   Eight or six, but I think eight is

13   correct.

14          Q.   Acceptance of responsibility would have

15   taken it to six and you still would have fallen

16   into a zone which is a straight probation?

17          A.   That's correct.

18          Q.   Regardless of whether he had acceptance

19   of responsibility or not?

20          A.   Correct.  It made no difference.

21               MR. GREGER: Your Honor, I'm going

22   to ask for the Court to conduct an in-camera

23   inspection of the pre-sentence report for the

24   purpose of determining whether Mr. Benjamin got the

25   two points for accepting responsibility and the

1     reason that he didn't get those points, I think, is

2     relevant to this proceeding.

3                           JUDGE MERZ:  Any objection, Mr.

4     Glassman?

5                           MR. GLASSMAN:  No, your Honor.

6                           JUDGE MERZ:  The motion is

7     granted.  The Court notes that at least with

8     respect to the pre-sentence investigation report

9     that Mr. Benjamin did not get an adjustment for

10    acceptance of responsibility and the stated reason

11    was that he asserted during the pre-sentence

12    investigation that he did not distribute a pound of

13    marijuana on July 18, 2002 as charged in the

14    superseding information.

15                          The Court understands this is

16    merely a recommendation of the probation officer to

17    Judge Dlott and I do not have in front of me

18    documents reflecting Judge Dlott's action on the

19    recommendation but that is recommendation.

20                          MR. GREGER:  You will, your Honor,

21    at the conclusion of that have that answer and

22    document before you.  Thank you.

23    BY MR. GREGER:

24         Q.  Do you recall your client persisting in

25    his innocence when he went down to the probation

Case Case 3:07-cv-00595-0635 D-SLR-MR Document 3 (Court only) Filed 04/43/26OD/2007Page 28 of 295 of 295

1    officer to have the officer then take his side of

2    the story?

3              A.   I do.

4              Q.   That would then necessarily equate, if

5    he's denying he did anything wrong, that would then

6    pretty much eliminate his right to the two points

7    of acceptance of responsibility --

8              A.   It would.

9              Q.   -- in your experience?  I have tendered

10   to you, Mr. Cohen, a portion of the proceedings and

11   particularly the sentencing of your client, Wayne

12   Benjamin, and I'll ask if you could just review the

13   several pages, first.  Second, third to, in fact,

14   state that's a true representation?

15             A.    It appears to be a true and accurate

16   representation of the proceedings.

17             Q.   Let me ask you to turn to page four of

18   that exhibit and I will ask you, what did you mean

19   by the quote, confusing nature of how this process

20   took place, end quote, as you stated that in open

21   court and as it is recorded on page four of

22   Exhibit 2?

23                  JUDGE MERZ:  At line seven.

24                  MR. GREGER:  If we get into the

25   context it starts with line five.  Mr. Benjamin was

1    not given and then it goes on to conclude that

2    sentence on line ten.

3    BY MR. GREGER:

4           Q.  What did you mean by the confusing

5    nature of how this process took place?

6           A.  Well, essentially going back to the

7    legal fiction which resulted Mr. Benjamin's

8    criminal situation, his benefit, we are talking

9    about a date that we picked for a transaction that

10    we manufactured to create the legal fiction that

11    allowed the resolution of Mr. Benjamin's case.

12           Q.  Well, can we agree that you also

13    created a legal fiction as it relates to what he

14    pled to as he persisted in denying that he had done

15    that to the probation officer?

16           A.  Mr. Benjamin was given the opportunity

17    after he entered a plea to withdraw his plea and go

18    to trial.  He didn't want to do that so, again,

19    this is as it relates to Mr. Benjamin, not Mr.

20    Rennick.

21           Q.  Understood.  Let me ask you what you

22    meant by your words, that your client entered a

23    plea to a fictitious date?

24           A.  As I stated, we picked a date and a

25    quantity to satisfy his need and not take a risk of

Case 3:07-cv-00253-WHR-MRM Document 8 (Court only) Filed 04/17/2009 Page 30 of 295

1    going to prison.

2              Q.   Who picked a date?

3              A.   Best recollection is Mr. Brichler and I

4    discussed a date.

5              Q.   Who picked the quantity?

6              A.   Government.

7              Q.   Your client neither picked the date nor

8    the quantity, is that your testimony?

9              A.   That is my testimony.

10             Q.   What did you mean by the words, as we

11   do in the law sometimes to facilitate a plea?

12                  JUDGE MERZ:  This is line ten,

13   same page.

14                  MR. GREGER:  Thank you.  Same

15   page, line ten.  Thank you, your Honor.

16   BY MR. GREGER:

17             Q.   My question is, what did you mean by,

18   as we do in the law sometimes to facilitate a plea?

19             A.   We create a legal fiction which

20   satisfies the needs of justice, that binds only the

21   two parties to dispute essentially.  One of the

22   best examples, earlier in my career ready for trial

23   in a case where my client was charged with rape,

24   very serious charge.  Been locked up for 89 days.

25   Speedy trial was running, prosecution had a problem

1    with its case.  My client was allowed to plead to

2    an assault with credit for time served to resolve

3    his need to get out and avoid going to prison,

4    satisfy state's need for a conviction.  The matter

5    was resolved.  So I look at this the same way.

6            It does happen occasionally.  It

7    is not, Chinese have an expression, chew show,

8    which means eat vinegar.  It leaves a bitter taste

9    in your mouth if you are a litigator and a client

10    decides his or her reasons they want to avoid the

11    risk of prison.

12    **Q.**  Do you mean that you permit them to

13    plead to events that have fictitious dates

14    certainly to arrive at a plea?

15    **A.**  This is what I talked about, confusing

16    and difficult nature of this.  Do I allow him?

17    It's not for me to allow or disallow.  My interest,

18    as long as I'm not committing fraud on a Court, my

19    client is entitled to plead to anything that he or

20    she wants to if that's in their best interest.  I

21    cannot interfere with that process, I guess, the

22    answer with a qualified yes, I do.

23    **Q.**  Mr. Cohen, does Exhibit 2 demonstrate

24    that the court accepted the recommendation of the

25    probation officer to deny two points for acceptance

32

1    of responsibility to your client, Mr. Benjamin?

2                    JUDGE MERZ:  I direct your

3    attention, sir, to page six line 17 through 23.

4                    THE WITNESS:  It does appear that

5    the Court adopted the probation department's

6    recommendation.

7    BY MR. GREGER:

8        Q.  Let me ask you whether you understood

9    that the date stated by the government as to when

10   Mr. Elliott received 50 pounds of marijuana from

11   Mr. Rennick was likewise a fictitious date?

12       A.  I was not involved in that

13   conversation.

14       Q.  You do not know whether the date that

15   Mr. Elliott pled to was likewise fictitious?

16       A.  I was not his attorney, I was not

17   involved in any plea discussions with him.

18       Q.  Is it true that your client could not

19   explain to the probation officer what occurred on

20   the date contained in the information to which he

21   pled because he didn't do anything and particularly

22   didn't do anything on that date?

23       A.  I believe that was correct.  I was

24   sitting next to him when he made that explanation

25   to the probation officer.

1    Q. What was the actual date then from your

2    investigation where the one pound of marijuana was

3    actually transferred from Mr. Rennick to Mr.

4    Benjamin?

5    A. There was no evidence that there was

6    ever a transaction of that nature, at least in the

7    possession of the government to be transferred to

8    the defense counsel.

9         JUDGE MERZ: Could I have the last

10   question again, please.

11        (WHEREUPON, the requested portion

12   of the record was read.)

13   BY MR. GREGER:

14   Q. What was the source of the information

15   that provided the government with the date of

16   July 18, 2002?

17   A. I have no idea.

18   Q. Regardless of the date, did you have

19   evidence that Mr. Benjamin received one pound of

20   marijuana from Mr. Rennick in your investigation of

21   this matter?

22   A. No, there was no evidence, that's why I

23   was going to trial.

24   Q. Am I correct that the government stated

25   to the court that the one pound of marijuana was

1     the readily provable amount the government had as

2     it related to your client?

3          A.   That was their statement.

4          Q.   And so if there was, in fact, no

5     evidence that Mr. Benjamin ever received marijuana

6     from Mr. Rennick, one pound of marijuana from Mr.

7     Rennick, regardless of the date, the government

8     stood up in front of a court of law and said;

9     however, that was a readily provable amount for

10    purposes of the plea; is that correct?

11         A.   For purposes of the plea, that is

12    correct.

13         Q.   To your knowledge the government didn't

14    have any readily provable amount of marijuana

15    transferred from Mr. Rennick to your client, Mr.

16    Benjamin, regardless of the date; is that true?

17         A.   As far as discovery provided I cannot

18    tell you who was going to be testifying.  We don't

19    know that until we are at trial.  They may or may

20    not have had information, but based on my

21    preparation for trial, I don't believe there was

22    ever any credible evidence that Mr. Rennick

23    transferred marijuana to Mr. Benjamin.

24         Q.   And, in fact, Mr. Benjamin persisted in

25    denying the substance of the information even to

1      the probation department, in fact, harming himself

2      from getting the two points of acceptance of

3      responsibility; is that true?

4          A.   That is true.

5          Q.   Do you know then how the government was

6      going to prove, based on your investigation of this

7      matter, that your client and others conspired to

8      distribute in excess of a hundred kilograms of

9      marijuana when the readily provable amount at the

10     time of the plea was one pound?  And I'll add on to

11     that, other than through the lying Jamaicans?

12         A.   To the extent that you would consider

13     it readily provable, I think it was still all in

14     the context of the plea rather than trial.  You

15     have U.S. government by way of an assistant U.S.

16     attorney making allegations which are accepted by

17     my client for the purpose of insuring that he

18     doesn't go to prison causing no harm to anyone else

19     because there was no agreement to testify.

20              Mr. Brichler's statements are not

21     evidence.  I do not know, I do not believe they

22     could have proven even a pound, personally.

23         Q.   Mr. Cohen, isn't the very system that

24     you are sworn to uphold harmed by the actions that

25     occurred on the morning of August 18, 2003?

1     **A.** Is the system harmed?  You are asking

2 me to answer something that gets into a

3 philosophical debate.  I mean the system is the

4 federal system which operates in my mind very

5 similar to the Soviet system when I was behind the

6 iron curtain many years ago where prosecutors are

7 telling defendants, this is what is going to happen

8 to you, the defense attorney merely is seated there

9 to explain to his or her client what the government

10 is about to do to him or her.

11     The judge goes along with it

12 because we have sentencing guidelines.  Past couple

13 of years things have gotten a little better.  We

14 have returned judges to their primary role of

15 letting them decide what is correct and not correct

16 to sentence within certain constrictions, but what

17 occurred that day does not bring down the system.

18     What occurred that day was what

19 was in the best interest of my client.  Again,

20 legal fiction cannot cause harm to others and as

21 there was no agreement to testify against Mr.

22 Rennick or any other defendant in that matter, it

23 was an expediency that I don't think any lawyer can

24 deny his or her client so I don't think it harmed

25 the system.

Case 3:07-cv-00539-SSB-MRM Doc #: 3-14 Filed: 04/13/2009 Page: 37 of 295

1          Q.   Mr. Cohen, did your client plead guilty

2     of a charge of possession with intent to distribute

3     marijuana?

4          A.   He did.

5          Q.   Was the basis for that plea that your

6     client received one pound?

7               JUDGE MERZ:  I'm sorry?

8               MR. GREGER:  I apologize.

9               THE WITNESS:  That's not exactly

10    correct.

11    BY MR. GREGER:

12         Q.   I withdraw that question.  Did your

13    client plead to knowingly, willfully, intentionally

14    and unlawfully distributing approximately one pound

15    of marijuana?

16         A.   That is what he pled to, yes.

17         Q.   So it was not that he received

18    marijuana from Mr. Rennick, but that Mr. Benjamin

19    had knowingly, willfully, intentionally and

20    unlawfully distributed a pound of marijuana.  Is

21    that the basis for the bill of information?

22         A.   Yes.

23         Q.   Let me ask you then, turn to the bill

24    of information that has been marked as Exhibit 1.

25    If I can ask you did your client distribute

1    marijuana to somebody based upon your investigation

2    of this matter?

3            A.   No.

4            Q.   Is that then likewise fictional?

5            A.   Well, if you're pleading to an

6    information based on a legal fiction, I guess it

7    would be within the statute it implies possession

8    with intent to distribute.  So I don't know but it

9    is part of the legal fiction which got us to a

10   criminal history of one with an offense level of

11   eight for a five-year mandatory minimum.

12           Q.   Mr. Cohen, let me hand to you what is

13   marked for identification as Exhibit 3 for the

14   Rennick 2255 hearing and I'll ask if you can

15   identify that for the record?

16           A.   Copy of the indictment filed against my

17   client and others ultimately.

18           Q.   Mr. Cohen --

19           A.   My client was added to this, I'm sorry.

20   This was, I guess, the initial indictment which

21   brought Mr. Rennick before the Court.

22           Q.   Can we agree that your client, Wayne

23   Benjamin, is not named as a defendant in this

24   indictment?

25           A.   We can.

1          Q.  Was it your understanding that Wayne

2    Benjamin was one of the, quote, and others, end

3    quote, mentioned on the first page of this

4    indictment?

5          A.  I have no clue.

6          Q.  Did you learn that Wayne Benjamin had

7    spoken with the government whether by proffer or

8    otherwise, refused to agree with what the

9    government said the evidence would show and was

10    then told by Mr. Brichler that he would be indicted

11    because, in fact, he didn't conform to what the

12    government said the evidence would show?

13          A.  We are starting to get into areas of

14    confidential communication between attorney and

15    client so I don't know.

16          Q.  Let me ask you, Mr. Cohen, did your

17    client meet with Mr. Brichler?

18          A.  He did, prior to my representation.

19          Q.  And did he meet with Mr. Brichler

20    before the superseding indictment was filed that

21    named your client as a co-conspirator?

22          A.  He did.

23          Q.  Mr. Cohen, I'll hand to you what is

24    marked for identification as Exhibit 4 and I'll ask

25    if you can identify that for the record?

1    **A.** This is the indictment that brought my

2 client into this matter.

3    **Q.** This is a superseding indictment that

4 adds your client; is that true?

5    **A.** That is correct, yes, sir.

6    **Q.** And your client has been delineated in

7 parenthesis on the face of the document as

8 defendant seven; is that correct?

9    **A.** That's correct.

10    **Q.** And he would then be the seventh

11 defendant that would be in the Kareem Cole, Steven

12 Rennick, Senior, Steven Rennick, Junior line up of

13 defendants; is that true?

14    **A.** That is true.

15    **Q.** Where in this indictment, Exhibit No.

16 4, is it mentioned that your client distributed any

17 quantity of marijuana regardless of the date as an

18 overt act in furtherance of the alleged conspiracy?

19    **A.** Other than the language of count one

20 where it indicates that he was part of the

21 transportation of marijuana from Arizona to Ohio,

22 there is really no other overt act alleged.

23    **Q.** Where in that indictment, Exhibit 4, is

24 your client mentioned as having possessed any

25 quantity of marijuana regardless of the date as an

Case 3:07-cv-00358-WHR-MRM Document 8 (Court only) Filed 04/13/2009 Page 41 of 295

1    overt act in furtherance of the conspiracy?

2              A.   There is nothing there.

3              Q.   Where in the indictment, Exhibit No. 4,

4    is the date of July 18, 2002 mentioned as the date

5    any overt act in furtherance of the conspiracy

6    allegedly occurred?

7              A.   It is not there.

8              Q.   How then was the fictitious date of

9    July 18, 2002 agreed upon for the purpose of

10   superseding information?

11             A.   It was chosen as a date no different

12   than any other date that served the purposes of

13   both Mr. Benjamin and the U.S. government.

14             Q.   So really, based upon the actions that

15   occurred on the morning of trial, any date between

16   January of 2002 and October 16, 2002 would have

17   been perfectly acceptable?

18             A.   Yes.

19             Q.   Even if nothing actually occurred that

20   was a crime on any date that was randomly selected

21   within that range?

22             A.   That's correct.

23             Q.   Exhibit 4 alleges that Steven Rennick,

24   Senior purchased a Freightliner in Arizona on or

25   about July 23, 2002.  Do you see that?

1          A.   Number five?

2          Q.   That's part of the overt act in

3     furtherance of the conspiracy?

4          A.   Correct.

5          Q.   Do you even know if Steven Rennick,

6     Senior was in the state of Ohio on the date that

7     your client stated under oath at his plea that he

8     received a pound of marijuana from Mr. Rennick?

9          A.   I have no clue.

10         Q.   Is that important to know?

11         A.   No.

12         Q.   Why is it that your client didn't have

13    to plead to any of the currency violations that are

14    alleged that he committed in the superseding

15    indictment?

16         A.   I'm not privy to the decision that was

17    made regarding Mr. Benjamin.  I was only advised

18    that this is what their offer was.

19         Q.   Well, can we agree if he pled to any of

20    the 1957 violations that he would not have

21    qualified for probation?

22         A.   Short of substantial assistance, I

23    think that's correct.

24         Q.   Am I correct then a fictional plea was

25    entered into a fictional crime that got your client

1   probation?

2         **A.**  Not necessarily agreeing with your

3   semantics or your choice of words, yes.  The plea

4   was very real to my client.  He pled to a felony

5   charge.

6         **Q.**  Based on everything that you knew,

7   based on the investigation of the matter and being

8   locked and loaded and ready to try this case, a

9   fictitious crime was created for purposes of a

10  superseding information that then would enable your

11  client to get the probation that you and Mr.

12  Brichler spoke about; is that true?

13        **A.**  That is true.

14        **Q.**  Did you from your investigation of this

15  matter have evidence that the deposits of currency

16  that allegedly occurred by your client were not, in

17  fact, related to any marijuana conspiracy?

18        **A.**  The deposits were probably one of the

19  weaker things in my case, but there was no --

20  government had no evidence or provided no evidence

21  those deposits indeed came from any type of illicit

22  activity.

23            MR. GREGER:  If I may have a

24  moment, your Honor?

25            JUDGE MERZ:  Yes, sir.

1          MR. GREGER:  Thank you, Mr. Cohen,

2     I have no further questions.

3          JUDGE MERZ:  Cross?

4          CROSS EXAMINATION

5     BY MR. GLASSMAN:

6          Q.  Okay, you represented Defendant Wayne

7     Benjamin, correct?

8          A.  That's correct.

9          Q.  And Benjamin was charged, you showed up

10    at trial and he was charged with what charging

11    instrument?

12         A.  The superseding indictment.

13         Q.  Right.  And if someone is charged by

14    indictment, what does that mean with respect to the

15    Grand Jury?

16         A.  That there had been evidence presented

17    such that a Grand Jury can make a probable cause

18    finding whether or not a crime was committed and

19    that individual charged within the indictment might

20    be involved with the offense.

21         Q.  Okay.  Now, you have discussed your

22    preparation for trial and how you thought you had

23    relatively strong case, yes?

24         A.  Yes.

25         Q.  Now, I want to separate between what

1     your personal beliefs were versus all possible

2     facts.  Were you aware of any potential evidence

3     against your client, Mr. Benjamin?

4           A.   Circumstantial evidence, yes.

5           Q.   Possibly testimony?

6           A.   I was not worried by any particular

7     testimony.

8           Q.   Could there have been witnesses that

9     could have testified against Benjamin?  I'm not

10    asking whether you knew of them, I'm asking whether

11    you knew for certain that they were not?

12          A.   No, my assumption was Kareem Cole would

13    come in and say whatever he needed to seal his

14    deal.

15          Q.   Do you know for a fact whether the

16    government was going to call Kareem Cole as a

17    witness?

18          A.   Obviously I didn't get to that point.

19    They were advising he was coming through the

20    deposits.

21          Q.   Why did you say the deposits were one

22    of the weaker parts of your case?

23          A.   Cash deposits, they don't come with any

24    identifiable product.  It's not like depositing a

25    check, there may be some need to rebut the

1  assertion that these were the fruits of criminal

2  proceeds, but Mr. Rennick was in a business where

3  cash was used, long history of making cash deposits

4  to that account made me feel somewhat secure, you

5  know, it was not unreasonable for Wayne who just,

6  Mr. Benjamin hung out around the garage.

7  He really wanted to get into

8  racing.  Mr. Rennick was trying to build his racing

9  team.  He was basically a gopher and mechanic.  He

10 loved cars and ran errands for Steve.  The danger

11 is when you are seated at a table with others that

12 you get splashed with whatever hits one of the

13 others.  Jury just says they are a bunch of crooks,

14 we'll just convict them all.  So in terms of

15 weakness it was, you know, my concern that given

16 the nature and the amount of cash that jurors could

17 infer that somehow they were the fruit of a

18 criminal enterprise rather than legitimate deposits

19 or legitimately gained proceeds.

20 Q.  What were the nature and circumstances

21 of the cash that you just mentioned?

22 A.  I think there were two or three cash

23 deposits all of them under $10,000.  I don't

24 remember off the top of my head the exact amount

25 other than what is contained in the indictment.

1     Q.  Okay.  Is it correct that your client

2  Benjamin did admit that he did possess marijuana

3  with intent to distribute it?

4     A.  For purposes of the plea, yes.

5     Q.  Did he admit that was true?

6     A.  Standing in open court, yes, he did.

7          JUDGE MERZ:  Was he under oath at

8  the time?

9          THE WITNESS:  He would have been

10  placed under oath which is typical.

11  BY MR. GLASSMAN:

12     Q.  Now, let me go back and cover a few

13  points.  You were representing Mr. Benjamin at the

14  time?

15     A.  Yes.

16     Q.  You were not representing Mr. Rennick?

17     A.  I was not.

18     Q.  There is discussion of the term legal

19  fiction or fictional plea.  Did you tell Mr.

20  Rennick prior to the entry of him pleading guilty

21  that he was entering a fictional plea?

22          JUDGE MERZ:  Rennick or Benjamin?

23          MR. GLASSMAN:  Rennick.

24          THE WITNESS:  I don't recall.  I

25  know Mr. Rennick was concerned.  He had a lot of

Case 3:07-cv-00535-MRB-MRM Document 8 (Court only) Filed 04/13/2010 Page 4 of 255

1      questions, you know, about what we were doing, why

2      we were doing this, but I don't recall talking

3      about a fictional plea.  That doesn't sound like an

4      expression that I use.  Legal fiction, definitely.

5      BY MR. GLASSMAN:

6            Q.  At some point you discussed the concept

7      of a legal fiction with Mr. Rennick?

8            A.  Yes, I did.

9            Q.  When was that?

10           A.  Definitely when I went to see him

11     probably a good year after the case was over.  I

12     would have discussed it with him at that time.  In

13     the hall we may have all discussed prior to

14     entering the pleas the concept of the legal

15     fiction.

16           Q.  So your recollection is that you

17     discussed the concept of a legal fiction with

18     Rennick approximately a year after the case was

19     over?

20                    MR. GREGER:  Objection, your

21     Honor.

22                    JUDGE MERZ:  Grounds?

23                    MR. GREGER:  He said it may have

24     occurred out in the hallway.

25                    JUDGE MERZ:  I don't think that

1     Mr. Glassman's question implies exclusively.

2     Overruled.

3               THE WITNESS:  My recollection and

4     again we are going back a number of years, I do, I

5     mean I recall going down to the Lexington, I'm

6     thinking it was somewhere in the neighborhood of a

7     year after the actual plea took place, the case was

8     over, my client wasn't involved anymore.

9     BY MR. GLASSMAN:

10         Q.  With respect to plea negotiations on

11     the day of the entry of the guilty pleas in this

12     case, you said that the plea agreement that was

13     offered to Mr. Benjamin was not conditional on

14     anyone else's plea, is that your testimony?

15         A.  That's my recollection.  It was prior

16     to trial.  It was, you know, plea as three or we go

17     to trial as three and Mr. Benjamin said I'm going

18     to trial.  So at that point, yes, that's correct.

19         Q.  You said that you thought that

20     Benjamin's case was the strongest?

21               JUDGE MERZ:  From a defense

22     perspective?

23               MR. GLASSMAN:  Yes.

24               THE WITNESS:  Yes, that's my

25     opinion as his attorney.  People may have

Case 3:07-cv-00535-WHR-SLO Document 8 (Court only) Filed 11/13/2009 Page 56 of 295

1    disagreed.  Yeah, I felt, tried enough cases where

2    looking at the facts on that case, I mean was

3    excited by going to trial.  We don't get a lot of

4    trials in federal court because evidence usually is

5    so overwhelming you just don't take that chance.

6    BY MR. GLASSMAN:

7         Q.  Why did you think that Benjamin's

8    defense case was stronger than say Rennick's or his

9    other co-defendants?

10        A.  Total lack of evidence in terms of his

11   involvement other than being close to what was

12   going on, but we had an alternative reason for

13   being where a lot of this stuff was going on.

14        Q.  What was going on, what are you

15   referring to?

16        A.  Well, he was in the garage where

17   allegedly Kareem Cole stored drugs which is part of

18   the garage owned by Mr. Rennick.  Mr. Benjamin went

19   to Arizona as an additional driver to bring the

20   truck back.  He was in places where people might

21   infer something but there was no hard evidence.

22   Certainly none of the people that were with him

23   would have been saying, Wayne Benjamin was with us

24   when we picked up drugs, when we delivered drugs.

25   There was none of that there.

1       I mean, he had, Wayne Benjamin had

2 very little to do with Kareem Cole or Eddie Moore

3 so there was not, we were not frightened of their

4 testimony in particular.

5    Q. You are aware there was several hundred

6 pounds, correct me if my characterization is wrong,

7 several hundred pounds of marijuana discovered in a

8 garage that was either owned or operated by Mr.

9 Rennick?

10    A. In a locked portion of the garage, yes.

11    Q. Was there, on the morning of trial, you

12 advised Mr. Benjamin; is that right?

13    A. That's correct.

14    Q. And did you advise the other

15 defendants?

16    A. I did not.

17    Q. Who advised the other defendants?

18    A. Their attorneys.

19    Q. Okay.  At any point did the assistant

20 United States attorney enlist you in any sort of

21 plan or plot to make Mr. Rennick plead guilty?

22    A. No, the other two defendants were not

23 part of the consideration of my client's plea.

24    Q. So to your knowledge was there any plan

25 or plot to force Rennick to plead guilty against

Case 3:07-cv-00053-SSB-MRM Document 8 (Court only) Filed 04/13/2009 Page 52 of 295

1    his will?

2        A.  No.

3        Q.  In fact, at some point did you separate

4    Benjamin out away from his co-defendant so he would

5    not, in fact, be involved in discussing the matter

6    with them?

7        A.  I did.

8        Q.  When the pleas were actually entered,

9    did you have any reason to believe that Rennick was

10    pleading guilty in anything other than a voluntary

11    fashion?

12        A.  Mr. Rennick was clearly not happy to be

13    pleading to anything.  He was fidgeting at the

14    podium.  All six of us are standing up there.  I

15    was not, to be honest with you, paying attention to

16    Mr. Rennick, but I do know earlier on outside in

17    the hallway prior to trial that Mr. Rennick showed

18    a great amount of concern to both Mr. Elliott and

19    Mr. Benjamin that he felt responsible because they

20    were caught up in all of this.

21               I think he was probably pretty

22    loyal to his friends is how he looked at the

23    situation, but I think he clearly, clearly was

24    agitated, but, again, he was not the focus of my

25    attention at that time.

1         Q.  You've done a number of pleas in

2  federal court?

3         A.  Yes.

4         Q.  About how many?

5         A.  I'd say no less than three or four a

6  year.  Number of trials as well.

7         Q.  Are defendants typically happy pleading

8  guilty and subjecting themselves to a prison

9  sentence?

10         A.  Some are happier than others depending

11  on the quality of the plea.

12         Q.  And in this case, was there something

13  to indicate that, was there anything to indicate

14  that Rennick, from your perspective, that Rennick's

15  will had been overborne by the prosecutor or anyone

16  else?

17         A.  I wasn't involved in his plea so I

18  can't, other than being standing there when it was

19  taking place for our plea discussions, I was not

20  involved in any of that so I don't know.

21         Q.  If after entering the guilty plea, if

22  Rennick or Elliott would have withdrawn their plea

23  sometime down the road, was it your understanding

24  that your client Benjamin's plea would be affected

25  at all?

1          A.  I'd not been lead to believe that, no.

2          Q.  And there is nothing in the plea

3    agreement to indicate that?

4          A.  No, this was not a package deal.  This

5    was clearly as to Mr. Benjamin.  I think Mr.

6    Elliott may have had some different problems but

7    certainly as to Mr. Benjamin, we were done.

8                    MR. GLASSMAN:  No further

9    questions.

10                   JUDGE MERZ:  Thank you, sir.

11   Redirect?

12                   MR. GREGER:  Thank you, your

13   Honor.

14                   REDIRECT EXAMINATION.

15   BY MR. GREGER:

16         Q.  Mr. Cohen, was there any evidence put

17   before a Grand Jury that your client distributed

18   marijuana?

19                   JUDGE MERZ:  How does he know?

20                   MR. GREGER: Mr. Glassman got into

21   what does the meaning of an indictment show.

22                   JUDGE MERZ:  How does he know what

23   was put before the Grand Jury?  Foundation.

24   BY MR. GREGER:

25         Q.  Based upon your investigation of this

1  case, could there have been evidence presented to a

2  Grand Jury upon which an indictment for

3  distributing a pound of marijuana would have

4  occurred?

5          JUDGE MERZ:  Distributing by

6  Mr. --

7          MR. GREGER:  Benjamin.

8          THE WITNESS:  I would have

9  expected to find that in the overt acts but having

10  practiced in both Michigan and Kentucky, their

11  federal district court idea of overt is referring

12  to the language of the federal statute.  They don't

13  give us anything.  In this district they are very

14  good about laying out overt acts.

15          Again, I'm not present in the

16  Grand Jury so I can't answer that affirmatively as

17  personal knowledge.  My belief is had that occurred

18  it would have appeared in the overt acts.

19  BY MR. GREGER:

20      Q.  One of the circumstantial evidence that

21  might have connected your client to the conspiracy

22  is the two or three currency transactions that

23  occurred; is that true?

24      A.  That was my belief in terms of what my

25  weak spots were in this case.

1           Q.  And, Mr. Cohen, you could not and would

2    not have denied that your client made the deposits,

3    would you?

4           A.  No.

5           Q.  Because, in fact, he had?

6           A.  Yeah, he readily admitted that he had.

7           Q.  And he denied that those deposits were

8    the result of marijuana transactions, didn't he?

9           A.  That's why we were going to trial.

10          Q.  Mr. Rennick could not have stopped your

11   client's plea, could he?

12          A.  No.

13          Q.  So if Mr. Rennick was fidgeting, was

14   nervous, was agitated because he was hearing facts

15   that were fictional that he allegedly did, could

16   that explain his nervousness, fidgetiness,

17   agitation?

18          A.  It could.

19          Q.  Mr. Rennick couldn't have stood up in

20   open court and said, wait a minute, your Honor,

21   Benjamin can't plead to that because that's not

22   true, could he?

23          A.  Well, no, but he certainly could have

24   said that's a lie when it was his turn to speak,

25   when it was his plea.

1        **Q.** Have you read his 2255 petition?

2        **A.** I have not.

3        **Q.** The portion that Mr. Glassman talked

4  about where the marijuana was located was in a

5  locked portion of a warehouse that Mr. Rennick's

6  family owned; is that true?

7        **A.** That's true.

8        **Q.** And that locked portion of that

9  warehouse was under lease, was it not?

10       **A.** It was.

11       **Q.** Who was it leased to?

12       **A.** Kareem Cole, essentially the other

13  individuals in the initial indictment.

14       **Q.** Who, I'll phrase it differently --

15  strike that.

16              Did your investigation show that

17  Mr. Cole and Mr., I think it's Davidson, regardless

18  of the other aliases, had a legitimate reggae

19  concert business?

20       **A.** Yes, we actually had bills, not,

21  whatever you call them, notices of concerts.

22       **Q.** Fliers?

23       **A.** Fliers showing that they were

24  promoters.

25       **Q.** And did your investigation of this case

1    show that, in fact, Mr. Benjamin and Mr. Rennick

2    actually attended one or more of the reggae

3    concerts put on by Mr. Cole or Mr. Davidson?

4          A.  Yes.

5          Q.  Was there a joint defense agreement --

6    strike that.  What is a joint defense agreement?

7          A.  Essentially where defendants don't hurt

8    each other, put on a unified defense.

9          Q.  And by a waiver executed in writing,

10   the clients allow the defense counsel to speak

11   freely amongst each other protecting the umbrella

12   of privilege but not necessarily the individual

13   client's confidence; is that true?

14         A.  Correct, yes, sir.

15         Q.  Was there a joint defense agreement

16   executed in this case?

17         A.  I don't specifically recall.  I would

18   think not.

19         Q.  How then did you know how Mr. Gallagher

20   was going to defend the accusations against Mr.

21   Rennick as Mr. Glassman asked you about?

22         A.  How did I know?

23         Q.  How did you know the witnesses that

24   were going to be called to defend Mr. Rennick?

25         A.  I don't know who's being called to

1    defend Mr. Rennick.

2           Q.   Did you know what evidence Mr.

3    Rennick's counsel was going to put on to defend him

4    against the allegations put forth by the

5    government?

6           A.   It was the same in mine in terms of

7    investigation.  Two of us went out to the sheriff's

8    impound lot at the same time.

9           Q.   Did you know they hired a forensic CPA

10   or accountant as part of their defense?

11          A.   That they had?

12          Q.   That they had.

13          A.   I believe, I had no reports.  I know

14   there was discussion of doing that.  Again, much

15   different defenses were involved in this case.

16          Q.   Mr. Cohen, how then are you able to

17   discern that your case was the strongest defense

18   case when you didn't know what the components of

19   the defense cases were for Mr. Rennick and Mr.

20   Elliott?

21          A.   Because the government gave me that

22   kind gift of laying out overt acts which didn't

23   contain my client's activities and based on history

24   of handling cases where the fringe runners get

25   drawn in hoping they'll plead and then testify

1    against the primaries.  And I just think they made

2    a mistake by indicting Mr. Benjamin on facts that I

3    didn't think they could support.  The allegations

4    against Mr. Rennick, to a lesser extent Mr.

5    Elliott, seemed a little more substantial.  Again,

6    based on overt acts which presumably come out of

7    the testimony provided to Grand Jury.

8         Q.  Assuming that the testimony provided at

9    the Grand Jury was truthful?

10        A.  Correct.  Which I don't obviously

11   believe.  Obviously, that's why I try cases.

12        Q.  For the record, who presents the

13   government's cases at their Grand Jury's?

14        A.  The government.

15        Q.  For the record, are defense counsel

16   permitted to cross-examine the government's

17   witnesses presented at Grand Jury?

18        A.  No.

19        Q.  For the record does the government have

20   a duty to present exculpatory evidence to a Grand

21   Jury?

22        A.  Yes.

23        Q.  They do?

24        A.  They cannot intentionally hide evidence

25   from an investigating Grand Jury.

1    **Q.** You indicated to Mr. Glassman's

2 questions that Mr. Rennick had questions and

3 concerns about what was happening and why it was

4 happening.  Did I state that or paraphrase that

5 pretty correctly?

6    **A.** Pretty close.

7    **Q.** Was that on the morning of trial that

8 Rennick had questions and concerns about what was

9 happening and why it was happening?

10    **A.** At the time of the plea, yes.

11    **Q.** Was Mr. Rennick having questions and

12 concerns about what was happening and why it was

13 happening as it related to Mr. Benjamin saying that

14 he had received a pound of marijuana from Mr.

15 Rennick?

16    **A.** He voiced concern in the hallway why is

17 Wayne pleading to anything because he wasn't

18 involved.

19       MR. GREGER:  That's all.

20       MR. GLASSMAN: Nothing further.

21       JUDGE MERZ:  May the witness be

22 excused, Mr. Greger?

23       MR. GREGER:  Yes, sir.

24       THE WITNESS:  Thank you, your

25 Honor.

1          MR. GREGER:  Mr. Cohen, thank you

2    very much.  Matthew Elliott.

3    WHEREUPON:

4                    MATTHEW ELLIOTT,

5    of lawful age, a witness herein, being first duly

6    sworn testified as follows:

7                    JUDGE MERZ:  State your full name

8    and spell your last name for the record, please.

9                    THE WITNESS:  Matthew Alton

10   Elliott, E-L-L-I-O-T-T.

11                   DIRECT EXAMINATION

12   BY MR. GREGER:

13        Q.  Mr. Elliott, do you reside in

14   Cincinnati, Ohio area?

15        A.  Yes, sir.

16        Q.  Mr. Elliott, were you a co-defendant in

17   the case captioned United States of America versus

18   Steven Rennick, Senior, Wayne Benjamin, and Matthew

19   Elliott?

20        A.  Yes, sir.

21        Q.  Are you a co-defendant in that case?

22        A.  Yes, sir.

23        Q.  Tell the Court what you understood you

24   were being charged with in that case.

25        A.  Trafficking in marijuana.

1    Q. Did you enter a not guilty plea

2 initially to the charges brought against you?

3    A. Yes, sir.

4    Q. Were you scheduled for trial and was

5 that trial scheduled to begin on August 18, 2003?

6    A. I'm not sure of the date, but yeah, we

7 were scheduled to go to trial.

8    Q. Had the indictment that was originally

9 filed in the action been changed to delete some of

10 the defendants?

11    A. Could you repeat that?

12    Q. Sure.  Had the indictment that was

13 originally filed been changed to delete some of the

14 defendants?

15    A. I don't know.

16    Q. Did you receive an initial indictment

17 that had five or six defendants' names on it?

18    A. Yes, sir.

19    Q. And did you then receive another

20 indictment that only had three names on it?  Would

21 it help your recollection to look at the

22 indictment?

23    A. I don't know if I received it or my

24 attorney received it.  Would my attorney have

25 received it?

1          Q.  I'll just show it to you and identify

2     it.

3                    JUDGE MERZ:  Hand the witness

4     Petitioner Exhibits 3 and 4, please.  The original

5     is marked 3 and the second one is marked 4 at the

6     bottom.

7                    MR. GREGER:  Thank you, your

8     Honor.

9     BY MR. GREGER:

10         Q.  3, are you named a defendant in a

11    multiple defendant case?

12         A.  Yes.

13         Q.  And is there then a second or a

14    superseding indictment that is Exhibit 4 where only

15    three names appear?

16         A.  Yes, sir.

17         Q.  And is it your name both in No. 3 and

18    No. 4?

19         A.  Yes, sir.

20         Q.  Steven Rennick, Junior was a named

21    defendant in the first indictment filed; is that

22    true?

23         A.  Yes, sir.

24         Q.  Did you know Wayne Benjamin?

25         A.  I knew who he was, but personally I

1    didn't really know him.

2           Q.   Did you have any interaction with Mr.

3    Benjamin other than he hung around the shop and you

4    knew what his name was?

5           A.   No.

6           Q.   Tell me, for the record, how did you

7    know Wayne Benjamin?

8           A.   I had an old car in Steve's garage that

9    I was working on and Wayne did bodywork and he was

10   going to do some work on my car.  That's how I

11   originally met Wayne.

12          Q.   What information, if we could stay with

13   No. 3 in front of you, okay?

14          A.   Okay.

15          Q.   What information did you have that

16   Steve Rennick, Junior had conspired with at least

17   you and others to possess with intent to distribute

18   marijuana?

19          A.   I don't understand.

20          Q.   What evidence did you have that Steven

21   Rennick, Junior conspired with you and others to

22   possess with intent to distribute marijuana?

23          A.   Nothing.

24          Q.   What information did you have that

25   Wayne Benjamin conspired with you and others to

1    possess with intent to distribute marijuana?

2          A.   None.

3          Q.   What information did you have that

4    Steven Rennick, Senior had conspired with you and

5    others to possess with intent to distribute

6    marijuana?

7          A.   Could you be a little clearer?

8               JUDGE MERZ:  What evidence, what

9    information was known to you, known at some point

10   in time, Mr. Greger?

11              MR. GREGER:  But at least the

12   return of the first indictment that is marked as

13   Rennick Exhibit 3 which would have been in 2002.

14              JUDGE MERZ:  November 2nd,

15   November 8, 2002 as of that time, November 8, 2002,

16   thereabouts, what information did you have that you

17   had agreed with Mr. Rennick, Senior to traffic in

18   marijuana?

19              THE WITNESS:  What information did

20   I have?

21              JUDGE MERZ:  Yeah.

22              THE WITNESS:  I still don't

23   understand what you are asking me, what did I know

24   about Steve?

25   BY MR. GREGER:

1     Q.   What information did you have by early

2     November of 2002 that you and Mr. Rennick, Senior

3     had agreed, confederated, and conspired to

4     distribute marijuana?  You and Mr. Rennick, Senior.

5          A.   What information did I have?

6          Q.   What information that you two formed a

7     conspiracy to distribute marijuana?

8          A.   I don't know.

9          Q.   Were you represented at trial that was

10    to start on August 18, 2003 by Kenneth Lawson?

11         A.   Yes, sir.

12         Q.   I do not want to know what you and your

13    attorney talked about, but I do want to know

14    whether you discussed with your attorney the facts

15    that the government possessed and would present at

16    trial proving you conspired with Wayne Benjamin,

17    Steven Rennick, Senior, to possess with intent to

18    distribute marijuana.  Not what you discussed,

19    simply, whether you discussed it?

20              JUDGE MERZ:  Okay, here's where

21    Mr. Greger is going.  You don't have to tell us

22    what you said to Ken Lawson or what Ken Lawson said

23    to you.  That's protected by attorney/client

24    privilege.  Mr. Greger wants to know and his

25    question asks if you talked with Mr. Lawson about

1    the evidence that was going to be presented to show

2    you, Rennick, Senior, and Benjamin agreed to

3    distribute marijuana.

4                    THE WITNESS:  Did he show me the

5    evidence against us in this case, is that what the

6    question is?

7                    JUDGE MERZ:  Yes.

8                    THE WITNESS:  I don't think he

9    ever showed me anything.  I think we probably

10   discussed it.

11                   JUDGE MERZ:  Okay.

12   BY MR. GREGER:

13        Q.  Did you review with your attorney the

14   discovery, scant that it might be, that was

15   provided by the government to prove your guilt of

16   the accusations that they brought?

17        A.  Meaning did he suppress the evidence

18   and show it to me, is that what you are asking?

19                   JUDGE MERZ:  Discovery is a term

20   that relates to the obligation of parties in

21   lawsuits to show the other side what evidence

22   they've got.  The question is whether you, whether

23   Mr. Lawson ever showed you what the government, I'm

24   sorry, Mr. Greger I may be screwing it up, whether

25   Mr. Lawson ever showed you what the government had

1    given him in the case to show what their evidence

2    was?  Indicating no?

3              THE WITNESS:  Not that I recall.

4    BY MR. GREGER:

5         Q.  Mr. Elliott, you have spoken to me on

6    two separate occasions, have you not?

7         A.  Yes.

8         Q.  You are, did you express concern about

9    truthfully testifying here today and what

10    implications might arise, what harm might come to

11    you if you truthfully testified today?

12         A.  I don't think that's exactly how I put

13    it.  I think --

14              JUDGE MERZ:  How did you put it?

15              THE WITNESS:  My concern was that

16    if my lawyer had signed or said or done something

17    without my knowledge, that I didn't want to come

18    here and not know that and somebody say, I did this

19    or I signed this or my lawyer said this.  I've not

20    been able to get ahold of my attorney which she's

21    not an attorney anymore so that was my concern.

22              JUDGE MERZ:  All right.

23    BY MR. GREGER:

24         Q.  Mr. Elliott, did you, in fact, seek

25    counsel as it relates to your testimony here today?

1           A.   I spoke to an attorney, yes.

2           Q.   You talked to Mr. Monday?

3           A.   Correct.

4           Q.   Mr. Monday called me?

5           A.   Correct.

6           Q.   Is Mr. Monday here today with you?

7           A.   No, he's not.

8           Q.   So you had an opportunity to discuss

9  with counsel what might occur at this hearing?

10          A.   Yeah, he to the best of his knowledge

11  he told me --

12          Q.   Okay.  Based upon your discussions with

13  Mr. Lawson and your knowledge of what you yourself

14  -- strike that.

15                 Who's in the best position to know

16  what you did as it relates to a drug conspiracy?

17          A.   Me.

18          Q.   You'd know what you did and didn't do,

19  right?

20          A.   Correct.

21          Q.   You'd know if the allegations were true

22  or false that the government was making about you,

23  wouldn't you?

24          A.   Yes.

25          Q.   Did you form an opinion about the

Case 3:07-cv-00053-SSB-MRM Document 3 (Court only) Filed 04/13/2009 Page 71 of 295

```
 1    strength of the government's case against you as a

 2    result of both your personal knowledge about what

 3    you actually did and the discovery that was given

 4    to you by the government to show what they knew you

 5    did?

 6         A.   Could you repeat it?

 7              JUDGE MERZ:  Did you form --

 8    BY MR. GREGER:

 9         Q.   How strong of a case did the government

10    have against you on the accusations they made in

11    the two indictments?

12         A.   Truthfully I'm not sure.  My lawyer

13    never showed me.

14         Q.   Based upon your own knowledge --

15         A.   Okay.

16         Q.   -- regardless of what you talked about

17    with your attorney, how strong of a case did they

18    have against you that you conspired with Rennick

19    and Benjamin to distribute marijuana?

20         A.   I pleaded to it.

21         Q.   I understood that.  We are going to get

22    to that.  You were going to go to trial, weren't

23    you?

24         A.   No.

25         Q.   You were not adamant about going to
```

Case Case 1:07-cv-00535-SJD-MRM Document 3 (Court only) Filed 04/17/2003 Page 72 of 295

1    trial on August 18, 2003?

2            A.   Was I adamant?  No.

3            Q.   Well, when did you start to discuss

4    resolution of your case then by a plea with the

5    government if you weren't adamant about going to

6    trial?

7            A.   When did I discuss pleading?

8            Q.   When did you say to the government you

9    got me, let's start resolving this case by a plea,

10   I'm not going to try this case.  When did you start

11   that process?

12           A.   The day, I guess the day they were

13   picking the jury.

14           Q.   Were you prepared to go to trial on

15   August 18, 2003?

16           A.   Was I prepared?  I guess the best that

17   I could be.

18           Q.   Did you go to trial on August 18, 2003?

19           A.   No, sir.

20           Q.   They offered you a plea agreement,

21   didn't they?

22           A.   Yes, sir.

23           Q.   Did you on the morning of your plea

24   speak in a group with your attorney Ken Lawson,

25   Steven Rennick's attorney William Gallagher, and

1    Robert Brichler from the United States attorney's

2    office?

3         A.   Did I speak?

4         Q.   Were you in that group of people?

5         A.   Yeah, I think so.

6         Q.   Tell me what was said in that group of

7    people.

8         A.   I guess they was discussing what each

9    one of us was going to plead to.

10        Q.   Did you at some point speak privately

11   with Steven Rennick, Senior about plea bargaining?

12        A.   Not that I recall.

13        Q.   Did you tell Steven Rennick, Senior,

14   that you had young children and that you could not

15   go to prison for a lot of time?

16        A.   Not that I recall.

17        Q.   Did you ever cry on the morning that

18   you were set to go to trial when you were speaking

19   with Steven Rennick, Senior?

20        A.   Not that I recall.

21        Q.   Did you, in fact, have young children

22   in 2003?

23        A.   Yes.

24        Q.   Did you want to spend a lot of time in

25   prison?

1          A.   Does anyone?  No.

2          Q.   Tell me how the plea discussions

3  started.

4          A.   I guess it started with our attorneys.

5          Q.   Who do you recall starting the plea

6  discussions?  How did that process begin?

7          A.   I'm not sure how it began.

8          Q.   Did you instruct your attorney to go to

9  the United States attorney and find out if you

10  could plead to something to avoid going to trial?

11          A.   No.

12          Q.   Mr. Elliott, are you afraid that the

13  government will indict you for perjury if you come

14  in here today and tell this Court that, in fact,

15  what you agreed to was fictional?

16          A.   Am I worried that the government -- I

17  have concerns.

18          Q.   That the government could, in fact,

19  seek an indictment against you if you testify

20  truthfully before this Court that the facts

21  surrounding your plea are not true, that's what

22  your fear is, isn't it?

23          A.   I have a whole lot of fears.

24          Q.   That's one of them, isn't it?

25          A.   That I'm not sure if I sign, that my

Case 3:07-cv-00050-SD-MRM Document 9 (Ga209 only) Filed 04/43/2009 Page 75 of 295

1    lawyer had me sign something that now it could come

2    back on me?

3         Q.  Right.

4         A.  Yeah, I guess.

5         Q.  I mean, Mr. Elliott, you told me in our

6    telephone conversations, you've done this time,

7    this is behind you and you don't want to have

8    anything to upset your present life by having the

9    government now take action against you for

10    something that happened in 2003.  That's what you

11    expressed to me, didn't you?

12         A.  I think it was more that I was scared

13    of what my lawyer had done, not what I had done.

14         Q.  Did your lawyer tell you -- strike

15    that.  Did the offer from the government that

16    morning as to you change at any time?

17         A.  Yes.

18         Q.  Okay.  What did it start out?  What was

19    the first offer that the government made to you to

20    get you to plead?

21         A.  Probation.

22         Q.  Was that the first or second?

23         A.  I think --

24         Q.  Let me help you, okay?  Were you facing

25    a five-year minimum mandatory if you were

1    convicted?

2         A.   Yes.

3         Q.   Minimum that you could go to prison is

4    five years up to 40 if you were convicted; is that

5    true?

6         A.   Correct.

7         Q.   Did the government first offer to give

8    you 36 months if you changed your plea?

9         A.   Not that I recall.

10        Q.   Did it ultimately result in an offer

11   from the government that you would get probation if

12   you plead?

13        A.   Yes.

14        Q.   Who told you that you would get

15   probation if you plead?

16        A.   My attorney.

17        Q.   Was that based upon discussions that

18   you saw him have with Mr. Brichler, the United

19   States attorney?

20        A.   I just went by what my attorney told

21   me.  It didn't have anything to do with what.  Who

22   he talked to.  I hired him.  I suppose he was to --

23        Q.   Represent you?  How many times did the

24   offer from the government to you change that

25   morning, just twice?

Case 3:07-cv-00535-SRU-WIG Document 8 (Court only) Filed 04/13/2009 Page 77 of 295

1      **A.**   When I left, when we pleaded it was for

2    probation.

3      **Q.**   That's what you understood you were

4    going to get as a result of your plea?

5      **A.**   Correct.

6      **Q.**   That's one of the reasons you pled,

7    wasn't it?

8      **A.**   Sure.

9      **Q.**   Were you under oath in front of Judge

10   Dlott when she asked you a series of questions

11   before you accepted your plea?

12     **A.**   Yes.

13     **Q.**   Was one of the questions that she asked

14   you whether or not there had been any promises,

15   representations to you about what the ultimate

16   sentence in your case would be?

17     **A.**   Yes, she did ask me.

18     **Q.**   And did you tell her, yes, Judge, I

19   have an expectation that I'm going to get probation

20   because that's what my attorney told me?

21     **A.**   No.

22     **Q.**   No?

23     **A.**   Huh-uh.

24     **Q.**   Even though you knew at the time she

25   asked you that question that representation had

1     been made to you by your attorney; is that true?

2          A.   Yes.

3          Q.   It was a means to an end, wasn't it?

4     The plea was simply, regardless of what the

5     government wanted so long as you could get the

6     probation, you were willing to do what the

7     government asked you to do, is that a fair

8     representation?  It was just a means to an end?

9          A.   What do you mean to an end, to an end

10    of my case, that case was over then?

11         Q.   That, one, it was over and, two, it was

12    that you were going to get probation.

13         A.   It was a means --

14              JUDGE MERZ:  Hang on.  Would the

15    reporter read back the question.

16              (WHEREUPON, the requested portion

17    of the record was read.)

18              THE WITNESS:  Yeah, and I was

19    accepting responsibility for what I did.

20    BY MR. GREGER:

21         Q.   It was your understanding that all

22    three defendants had to plead for you to get the

23    deal that the government offered to you?  It was a

24    package deal, everybody pled?

25         A.   I don't know if that's what it had to

Case 3:07-cv-00535D-SLR-MPT Document 6(Radio only) Filed 04/05/2007 Page 76 of 295

1    be but that's what it seemed like it was.

2         Q.   And did you ever tell Mr. Rennick that

3    I want to go ahead and plead, Wayne Benjamin wants

4    to go ahead and plead, we need you to come along

5    with us, the package deal?

6         A.   Not that I recall.

7         Q.   Who gave you the impression that to get

8    your deal everybody had to plead?

9              JUDGE MERZ:  I don't think he said

10   that, but it assumes facts not in evidence.

11             MR. GREGER:  I'm sorry, let me go

12   back then.

13   BY MR. GREGER:

14        Q.   Did you get the impression that it had

15   to be everybody pleading so you could get your

16   deal?  Is that the impression that you got?

17        A.   My impression was if I pleaded then I

18   got probation.

19        Q.   Well, did you have to do anything to

20   get a substantial assistance motion filed on your

21   behalf?

22        A.   Did I have to do anything other than

23   plea?

24        Q.   Yes.

25        A.   (Witness shakes head.)

Case 3:07-cv-00533-SJD-MRM Document 3 (Case only) Filed 04/13/2009 Page 1 of 295

1               JUDGE MERZ:  Indicating no.

2    BY MR. GREGER:

3          Q.   You didn't have to get Mr. Rennick to

4    plead to get your substantial assistance motion?

5          A.   Nobody ever told me that, no.

6          Q.   Were you at your sentencing?

7          A.   Sure.

8          Q.   Do you remember the discussions that

9    occurred in open court between Mr. Lawson and

10   Brichler before whether or not you were going to

11   get substantial assistance?

12         A.   Was I in court?

13         Q.   Yeah.

14         A.   Yeah, I was in court.

15         Q.   Did you hear the discussion between Mr.

16   Lawson and Brichler about why you are not getting

17   your substantial assistance motion?

18         A.   Huh-uh.

19         Q.   You didn't hear that?

20         A.   No.

21         Q.   Were you always in open court at the

22   time of your sentencing, did you ever leave?

23         A.   No.

24         Q.   Had you --

25         A.   Not that I remember.  I don't remember

1    them ever saying anything out loud or to me.

2         Q.   Okay.  Had you known prior to

3    August 18, 2003 Steven Rennick, Senior, to have

4    distributed marijuana to anyone?

5         A.   No.

6         Q.   Had you ever seen Wayne Benjamin in

7    possession of any marijuana prior to August 18,

8    2003?

9         A.   No.

10        Q.   Was the jury that was to hear your case

11   actually present and ready to go the morning the

12   plea discussions occurred?

13        A.   That's what my attorney told me.

14        Q.   I may have asked this and I apologize,

15   had you prior to August 18, 2003 had any plea

16   discussions with the government in an effort to

17   resolve your case short of trial?

18        A.   Did I meet with the government before

19   that day?

20        Q.   Or did you authorize your attorney to

21   meet with the government for purposes of

22   determining, Ken, go get a plea, try to resolve

23   this, I don't want to go to trial?

24        A.   (Witness shakes head.)

25        Q.   No?

1          A.   Not that I recall, no.

2          Q.   Is that because you weren't guilty of

3     the accusations that the government made against

4     you?

5          A.   No.

6          Q.   You understood that you were facing a

7     five-year minimum mandatory sentence if you were

8     convicted of the crime charged in the indictment,

9     did you not?

10         A.   Did I know it carried five years?

11         Q.   A minimum, mandatory?

12         A.   No, not really.  I didn't know what the

13    minimum was.  I knew it carried up to like

14    40 years, I knew that.

15         Q.   Did your, were you ever aware prior to

16    Judge Dlott doing the plea colloquy with you if you

17    were convicted, you had to go to prison for a

18    minimum mandatory five years?

19         A.   When Judge Dlott did the what?

20         Q.   Started to take your plea, started to

21    ask you questions.  Everybody was in court, you

22    were all lined up and she went left to right, Mr.

23    Rennick, Mr. Elliott, Mr. Benjamin, do you remember

24    that?

25         A.   Was that the last day we went to the

1    court?

2         Q.   No, that was the date she took your

3    plea of guilty from you.

4         A.   Yeah, Steve went first and then I went.

5         Q.   Exactly, right.  You were all together,

6    right?  She went down the line, Mr. Rennick, you

7    didn't do separate pleas, she did them all

8    together, didn't she?

9         A.   I know we were all in the courtroom.

10   This is what I remember.  We were in the courtroom.

11   Steve went first and Steve got sentenced, I went

12   second and I got sentenced.  Now whatever, and

13   Wayne went after.  It wasn't like she said, Steve,

14   then Matt and then Wayne.  It was right after each

15   other --

16        Q.   I appreciate that.  I'm not talking

17   about the sentencing where she imposed your

18   14 months.  I'm talking about when you admitted you

19   did something wrong the morning of trial.

20        A.   I don't remember.

21        Q.   What, if anything, did you understand

22   you could do to get under a five-year minimum

23   mandatory sentence?

24        A.   What I could do to get under?

25        Q.   Yeah, what could you do to get under

1    the five-year minimum mandatory?

2         A.   I don't know.

3         Q.   Did you understand that the government

4    could file a motion asking the court to get you

5    under the five-year minimum mandatory if you

6    provided substantial assistance to the government?

7         A.   Did I know this?

8         Q.   Did you know that?

9         A.   No.

10        Q.   Did you ever learn that from the date

11   you entered your plea until the date that you were

12   sentenced?

13        A.   Not that I recall.

14        Q.   Well, then, how could you expect

15   probation if you didn't know how you could get

16   under the five-year minimum mandatory sentence?

17        A.   That's what my lawyer told me.

18             JUDGE MERZ:  Just for clarity

19   sake, Mr. Greger, I don't think you asked Mr.

20   Elliott what he pled to.

21   BY MR. GREGER:

22        Q.   I'm going to get there.

23             JUDGE MERZ:  All right, sir.

24   BY MR. GREGER:

25        Q.   Mr. Elliott, did you want to go to

1    prison for five years for something that you did

2    not do?

3         A.   I don't think anybody wants to go to

4    prison for what they didn't do.  Am I saying I

5    didn't do this?  No.

6         Q.   What was the date that you conspired

7    with Mr. Benjamin and Mr. Rennick to distribute

8    marijuana?

9         A.   On what day did I conspire?

10        Q.   On what date did you and another, in

11   this case, government says it's Mr. Benjamin and/or

12   Mr. Rennick, what was the date that you agreed with

13   Mr. Rennick or you agreed with Mr. Benjamin or you

14   all three agreed to distribute marijuana, if ever?

15        A.   None that I can remember.

16        Q.   Did you ever agree with Steven Rennick,

17   Senior, to distribute marijuana?

18        A.   Yep.

19        Q.   What was the date?

20        A.   I have no idea.

21        Q.   What was the year?

22        A.   It's the same year our case was, was it

23   2002?

24        Q.   What season?

25        A.   I don't remember.

1          **Q.**  Where did the discussion occur at?

2   Where did the agreement, where was it formed?

3          **A.**  I don't recall.

4          **Q.**  Who was present?

5          **A.**  Probably nobody but us.

6          **Q.**  So Wayne Benjamin wasn't there?

7          **A.**  No.

8          **Q.**  So you never agreed with Mr. Benjamin

9   to distribute marijuana?

10         **A.**  No.

11         **Q.**  Let's talk about the motion for

12  substantial assistance.  Have you ever heard that

13  term before, substantial assistance?

14         **A.**  Have I heard it?  I've heard it.  Do I

15  understand what it means?  No.

16         **Q.**  Did you tell me in a telephone

17  conversation that if the government did not give

18  you a reduced sentence at your sentencing hearing

19  that you authorized your attorney to seek to

20  withdraw your guilty plea?

21         **A.**  Yes.

22         **Q.**  Did you understand that the filing of

23  the motion for substantial assistance by the

24  government was the only way to get a sentence of

25  less than five years?

1         **A.**  No.

2         **Q.**  Let me turn to the day of your

3   sentencing.  Had the government filed by that date

4   the motion for substantial assistance so that you

5   could get a sentence under five years?

6         **A.**  I don't understand.

7         **Q.**  Had the government, by the time that

8   you showed up for sentencing, filed a motion asking

9   the court to give you credit for the substantial

10   assistance that you provided to the government?

11         **A.**  I have no idea.

12             MR. GREGER: Your Honor, I'm going

13   to ask that you take judicial notice that a motion

14   had not been filed by an inspection of the docket.

15             JUDGE MERZ:  Presumably the docket

16   shows that.  Mr. Glassman, any objection?

17             MR. GLASSMAN:  No.

18             JUDGE MERZ:  Judicial notice taken

19   thereof.

20   BY MR. GREGER:

21         **Q.**  What occurred at your sentencing that

22   related to the moving for substantial assistance?

23         **A.**  I don't know.

24             JUDGE MERZ:  Record will reflect

25   that the witness has been handed what has been

1    marked as Defendant or Petitioner Exhibit 5.

2    BY MR. GREGER:

3    Q.  I'm going to represent to you, Mr.

4    Elliott, that this is a true and accurate

5    transcription of the sentencing hearing in your

6    case.  Would you like to take a look through there.

7    Make sure that what I'm representing to you, in

8    fact, is true.

9    You'll see on the top of the

10   second page it says, the next case is United States

11   of America versus Matthew Elliott, defendant five.

12   Will defendant and counsel please step to the

13   podium.  Did I read that accurately?

14   A.  Yeah.

15   Q.  If you would, please, go to page four,

16   lines eight through ten.  Do you know what your

17   attorney was talking about, that there were a

18   couple of issues, judge, that came to light this

19   morning that may, with respect to the plea

20   agreement, may be in dispute.  Do you know what Mr.

21   Lawson was talking about there?

22   A.  This is on the morning that we got

23   sentenced, right?

24   Q.  Yes, sir.

25   A.  Do I remember this, is that what you

1  are asking me?

2  Q.  I'm asking you, do you recall what the

3  couple of issues were, judge, that came to light

4  this morning that may with respect to the plea

5  agreement be in dispute.

6  A.  Do I remember?  No.

7  Q.  Do you know what issues Mr. Lawson was

8  talking about there that came up that morning with

9  respect to your plea agreement?  Might it have been

10  the fact that you weren't going to get probation?

11  A.  Could have been.

12  Q.  Let's look at lines 22 through 25.  Are

13  you telling me that Mr. Lawson represented,

14  misrepresented to the court where it states that my

15  client and especially Mr. Gallagher's clients were

16  adamant about going to trial.  Are you saying Mr.

17  Lawson misrepresented you in that regard?

18  A.  Could have been.

19  Q.  He could have misrepresented you?

20  A.  I guess.

21  Q.  Did he misrepresent you when he said to

22  the court that you were adamant about going to

23  trial?

24  A.  I don't ever remember him saying that

25  he was adamant about going to trial.

1    **Q.** Do you want to go to the next page.

2 Did Mr. Lawson misrepresent to the court that you

3 were closest to Mr. Rennick as between you and Mr.

4 Benjamin?

5    **A.** He said that in court?

6    **Q.** It's at the top of page five, bottom of

7 four.  In order to end up into these plea bargains

8 it was presented to my client, this is Mr. Lawson

9 speaking, you are his client, since you were

10 closest to Mr. Rennick that if he was able to get

11 Mr. Rennick to enter a plea, voluntarily enter a

12 plea and also provide, and get Mr. Rennick to

13 provide substantial assistance, he would receive,

14 he being Mr. Elliott, would receive a 5K.1.1.  Do

15 you remember that?

16      JUDGE MERZ:  I don't mean to

17 quibble with you, Mr. Greger.  It says 5K1, not.1.

18      MR. GREGER: I apologize.  5K1.

19      JUDGE MERZ:  I don't know if the

20 difference is material or not.  I just wanted to be

21 clear.

22 BY MR. GREGER:

23    **Q.** Do you remember that?

24    **A.** Do I remember that?  No.

25    **Q.** Does reading this transcript now help

1    refresh your recollection about what happened on
2    the day that you were sentenced?
3            A.   I mean I remember most of what
4    happened.
5            Q.   Right.  This is true, isn't it?
6            A.   I don't remember, I don't remember any
7    of this being said.
8            Q.   Don't remember any of that being said.
9    So Mr. Elliott's plea bargain and a 5K1 is based on
10   what Mr. Rennick was to do.  Did Mr. Lawson
11   misrepresent the truth of that statement to the
12   court that morning?
13           A.   What does that statement mean?
14           Q.   That you, as part of your plea
15   agreement, if you got Mr. Rennick to plead, would
16   get a substantial assistance motion filed by the
17   government to reduce your sentence.
18           A.   Did my lawyer tell me that?
19           Q.   Yeah.
20           A.   No.
21           Q.   So he misrepresented that to the court
22   in this transcript?
23           A.   I'm telling you, he didn't tell me
24   that.
25           Q.   Well, was that part of your plea

1    agreement that you'd get a 5K motion filed if you

2    got Mr. Rennick to plead?

3         A.  That was never nothing that he

4    discussed with me, no.

5         Q.  Did you know that, I don't know if it

6    came from Ken Lawson or not?

7         A.  Did I know that?

8         Q.  Did you know to get a sentence under

9    five years you needed to get Mr. Rennick to plead?

10         A.  No, I didn't know that.

11         Q.  Didn't know that, okay.  Lines 16

12    through 18, our understanding of, I'm sorry, on

13    page five, our understanding of, his responsibility

14    was to do which was to get into discussions with

15    his friend to enter the plea and to also provide

16    substantial assistance.  Do you remember that?

17         A.  No.

18         Q.  Page six, did you hear Mr. Lawson say

19    that he'd like the opportunity to have a hearing so

20    that, in fact, what the plea was and the terms of

21    that plea would be put on the record?  Lines seven

22    through nine.

23         A.  I don't remember.

24         Q.  Mr. Elliott, this sentencing didn't go

25    smoothly, did it, your sentencing was confusing and

1    confrontational and had multiple problems with it,

2    correct?

3         A.   I guess.

4         Q.   To the point where you said, if the

5    government doesn't reduce my sentence, you, Lawson,

6    are going to move to withdraw my plea, right?

7         A.   Yes.

8         Q.   Page eight.  Mr. Lawson is asking,

9    lines three through nine, Mr. Lawson is asking for

10   a hearing in the very near future to determine if

11   there was substantial assistance given that you

12   should get credit for.  Do you remember that?

13        A.   No.

14        Q.   Mr. Lawson said, but for your actions,

15   none of this would have went on and he, Mr. Lawson,

16   thought the government knew that.  Let me ask you.

17   What efforts did you do but for none of this would

18   have occurred?

19        A.   What efforts did I do?

20        Q.   What efforts did you make because but

21   for your efforts, none of this would have went on?

22        A.   None of what would have went on?

23        Q.   That's going to be my next question.

24   First of all I want to know what efforts you did

25   and then I'm going to ask you what it meant that

Case 3:07-cv-00505-WHR Document 8 (Court only) Filed 04/13/2009 Page 3 of 295

1    absent those efforts this wouldn't have went on.

2    Know what Mr. Lawson is talking about there?

3            A.   No, idea.

4            Q.   Would you agree with me that one of the

5    efforts that you made was to get Steve Rennick to

6    plead guilty on the morning of August 18, 2003?

7            A.   That I got Steve to plead guilty?

8            Q.   That you went to Mr. Rennick, you told

9    him that you had young children, you told him that

10   you didn't want to go to prison for a long time.

11   It was a package deal and Steve without you, I

12   can't get that benefit.  Did you tell him that?

13           A.   Did I say that?  No.

14           Q.   Did you use words like that?

15           A.   Not that I recall, no.

16           Q.   But you don't recall a lot?

17           A.   This wasn't about my kids.  It was

18   Steve's kid.  He didn't want his kid drug in into

19   court.  I lost my kid.

20           Q.   Let's talk about Mr. Rennick's kid

21   then.  Is that Rennick, Junior?

22           A.   Yes.

23           Q.   Did you understand that Mr. Rennick who

24   had been dismissed from the first indictment was

25   going to be compelled to testify against you and

1   his father?

2           A.   Yeah.

3           Q.   He was going to be forced to testify,

4   right?

5           A.   I don't know about forced but I know

6   his name was his this list.

7           Q.   He was on the first list but not on the

8   second list, was he?

9           A.   No, his case was dismissed.

10          Q.   Because he didn't do anything wrong,

11  right?

12          A.   Right.

13          Q.   They wrongly indicted Rennick Junior in

14  the first indictment based on what Rennick, Junior

15  did, correct?

16          A.   Correct.

17          Q.   And did you know that the government

18  had compelled and sought a grant of statutory

19  immunity to force Steven Rennick, Junior, to

20  testify?  Did you know that?

21          A.   They gave him immunity to testify?

22          Q.   Did you know that?

23          A.   Huh-uh.

24          Q.   Go to page ten lines 8 through 14.  Is

25  it a true statement that every defense attorney

1    that was present for trial that morning was ready

2    to go to trial?

3          A.  I can't speak for lawyers.

4          Q.  Did you have to seek permission to

5    speak with Mr. Rennick, Senior that morning

6    privately?  Did you have to go to his attorney or

7    your attorney have to go to his attorney to make

8    sure that you two could talk privately?

9          A.  Not that I recall.

10         Q.  Government wasn't going to reduce your

11    sentence that morning, were they, Mr. Elliott, that

12    morning be the date of sentencing.

13         A.  That's what my attorney told me, no,

14    they wasn't.

15         Q.  And you were not happy about that, were

16    you?

17         A.  No.

18         Q.  And the reason, at least one reason you

19    weren't happy about that because that's what the

20    deal was that you would get a reduced sentence,

21    that's why you plead, right?

22         A.  That I would get a reduced sentence is

23    why I plead?

24         Q.  Yeah.

25         A.  I plead because that was the best deal

1    I could get for what I did.

2            Q.   If I understand that and part of the

3    best deal was, is what the sentence would be

4    probation, right?

5            A.   That's what my lawyer told me.

6            Q.   Okay, page 11.  Let's start with the

7    bottom of 10 and top of 11.  Mr. Brichler says to

8    the court, I just had a discussion with Mr. Lawson

9    and he related to me that, on the morning of the

10   pleas, that I had a conversation with him, meaning

11   Lawson, concerning your ability to basically make

12   the case go away.  Did you have those discussions

13   on the morning of your plea?

14           A.   No.

15           Q.   Judge says, you mean make the trial go

16   away?  And Mr. Brichler says make the trial go

17   away.  Mr. Brichler said, if you were cooperative

18   and if you were able to convince the other

19   defendants that this is what they should do, is Mr.

20   Brichler misrepresenting what occurred on the

21   morning of the plea?

22                JUDGE MERZ:  Mr. Brichler is not

23   representing what happened on the morning of trial.

24   He's representing what Mr. Lawson told him --

25                MR. GREGER:  I apologize.

```
 1                    JUDGE MERZ:  -- on the morning of
 2      sentencing.  That happened on the morning of trial.
 3                    MR. GREGER:  I apologize, your
 4      Honor.  You're absolutely correct.  Let me withdraw
 5      the question.
 6      BY MR. GREGER:
 7           Q.  On the day that you entered your plea,
 8      were you told that you had to cooperate with the
 9      government?
10           A.  What do you mean cooperate?
11           Q.  In any fashion, were you required to
12      cooperate with the government as part of your plea
13      agreement?
14           A.  Only thing I was told to do was sign
15      the plea agreement.
16           Q.  Did you read it before you signed it?
17           A.  No, I didn't.
18           Q.  So you didn't even know what the plea
19      agreement called for at the time you scratched your
20      name on it; is that true?
21           A.  My lawyer told me to sign it, I signed
22      it.
23           Q.  That's not my question.  The question
24      is you didn't even know what the terms of the plea
25      agreement was at the time that you signed it?
```

1          A.   I just know what my lawyer told me.

2          Q.   And you didn't verify that by reading

3    the plea agreement yourself, right?

4          A.   No.

5          Q.   As a result of the discussions between

6    Mr. Lawson and Mr. Brichler on the day of your

7    sentencing, the government actually moved the court

8    for a downward departure so that you could get a

9    lesser sentence, true?

10         A.   I don't know.

11         Q.   Well, if you'd like to look at page 11,

12   lines 14 through 17, do you see where Mr. Brichler

13   says he's prepared at this time based on Mr.

14   Lawson's representation to request the court to

15   consider a downward departure on the basis of your

16   assistance in that case?

17         A.   I don't even know what a downward

18   departure is, truthfully.

19         Q.   Lesser sentence.  Judge, I'm asking you

20   to impose a lesser sentence on Mr. Elliott, me, the

21   government is asking that because of his

22   cooperation and assistance to the government.  Does

23   that help you now understand what a downward

24   departure is?

25         A.   Uh-huh.

CaseCase37-cv0205034835D-GLEMMRDocuBenc6e(Page199-only)Filed Bit#457208D20PageePage4o20361295

1          Q.  Mr. Brichler actually moved for that in

2     front of the court and as a result, you then didn't

3     seek to withdraw your guilty plea, right?

4          A.  I didn't withdraw my plea, yes.

5          Q.  Right.  Because in fact, he moved for

6     the downward departure, asking the court to give

7     you leniency in your sentence so that you got a

8     sentence of 14 months instead of what you were

9     actually looking at, right?

10         A.  I guess.

11         Q.  Page 12, lines 11 through 14.  Did you

12    hear Mr. Brichler tell the court that he wanted to

13    make it clear that the motion for reduction was

14    based upon what happened that day and is not based

15    upon any conduct that Mr. Rennick subsequently

16    engaged in?  Did you hear Mr. Brichler say that in

17    open court while you were there for your

18    sentencing?

19         A.  I don't know.

20              JUDGE MERZ:  Before proceeding to

21    another exhibit, we'll take our lunch and recess.

22    We'll be into recess now.  I'll ask the marshall,

23    is an hour and fifteen minutes good time for Mr.

24    Rennick to be fed?

25              MARSHALL: That's fine.

Case 3:07-cv-00355-WHR-SLO Document 3 (Court only) Filed 04/21/2009 Page 101 of 295

1                JUDGE MERZ:  Anybody have a

2    problem with an hour and fifteen minute recess?

3                MR. GREGER:  No, your Honor.

4                JUDGE MERZ:  We'll be in recess

5    until 1:15.

6                MR. GREGER:  Your Honor, do you

7    want to let the witnesses know about a separation

8    of witnesses.

9                JUDGE MERZ:  Yes, the witnesses

10   cannot discuss their testimony among each other.

11               (WHEREUPON, a lunch recess was

12   taken.)

13              JUDGE MERZ:  Mr. Greger, you may

14   resume your examination.

15              MR. GREGER:  Thank you, your

16   Honor.

17   BY MR. GREGER:

18       Q.  Mr. Elliott, you've been handed

19   Rennick's Exhibit 6 for the purposes of the 2255

20   hearing.  Do you recognize that document for the

21   record?

22       A.  Do I recognize it?

23       Q.  Yeah, you can take a look at the last

24   page.

25       A.  I guess this is what I signed as my

Case 3:07-cv-00053-WHR-MRM Document 36 (Court only) Filed 05/13/2003 Page 102 of 295

1    plea agreement.

2            Q.   Is this the plea agreement that you

3    signed without reading it?

4            A.   To the best of my knowledge.

5            Q.   Is that your signature on the last

6    page?

7            A.   Yes, it is.

8            Q.   Did you write in the date, date

9    8/18/03?

10           A.   I don't think so.

11           Q.   Those aren't your numerals but that is

12   your signature?

13           A.   It looks like it, yeah.

14           Q.   Okay.  Let's go to the first page of

15   Exhibit 6 which you identified as the plea

16   agreement that contains your signature.  Paragraph

17   two, originally the plea agreement called for you

18   to chart to, sorry.

19                   Initially the plea agreement has a

20   one in the paragraph two, defendant understands the

21   punishment prescribed by law for the offense

22   charged in count one of the indictment is zero to

23   five years in prison.  Fine up to 250,000, a

24   three-year term supervised release and special

25   assessment, did I read that correctly?

Case Case 3:07-cv-00053-WHR Document 3e (Page 103 only) Filed Filed 45/20/05 2005 Page Page 103 of 295 of 295

1       A.   Uh-huh.

2       Q.   Do you know why the one was changed to

3   a seven?

4       A.   No.

5       Q.   Are your initials in that section of

6   paragraph two on Rennick's Exhibit 6?  Is there

7    an --

8       A.   Right where the one was.

9       Q.   M-E?

10       A.   Yeah.

11       Q.   Are those your initials?

12       A.   Those are my initial.

13       Q.   Why did you initial that change?

14       A.   I don't know.

15       Q.   Were you initially agreeing to plead to

16   the conspiracy which was count one?

17       A.   Was I going to plead to conspiracy?

18       Q.   Right, count one.  Did you understand,

19   you said the deal changed twice.  Was the first

20   deal that you were going to plead to the

21   conspiracy, count one?

22       A.   I don't ever know about the first deal.

23       Q.   Okay.  And so you plead to count seven,

24   do you remember what count seven of that indictment

25   was?

CaseCase3:07-cv-02005300035D-SdEMMRDocumeDocumesc(t9-320on-lyFiledFiled04/52005/200PageP1e4of2951 295

1          A.   No, sir.

2          Q.   You don't recall as you sit here under

3     oath what you plead to?

4          A.   I plead to trafficking in marijuana is

5     what I plead to, I thought.  I didn't see this.  I

6     was in front of a judge, standing getting

7     sentenced.  My lawyer said sign this.  I signed it

8     and handed it back.

9          Q.   Are you saying that you executed the

10    plea agreement the date of your sentencing and not

11    the date of your plea?

12         A.   I signed a paper when I was in court.

13    When it was, I have no idea.

14         Q.   Mr. Elliott from start to finish, how

15    much time elapsed between the time plea discussions

16    began and when you actually entered your plea?

17         A.   I don't know, maybe an hour.

18         Q.   Was there a break taken so that

19    paperwork could be prepared by the government to

20    consummate or complete the pleas?

21         A.   I think we did, I think there was a

22    break in there sometime.

23         Q.   Did you have, and the defendants all go

24    to lunch.  Did you and the other defendants go to

25    lunch during that break?

1          A.   I don't think I went to lunch, I think

2     I went outside and smoked.

3          Q.   When you then came back in, was the

4     paperwork ready?

5          A.   I don't remember.

6          Q.   Were you immediately taken to the

7     podium next to your attorney and told to sign the

8     plea agreement that is Rennick's Exhibit 6?

9          A.   You mean after Steve was sentenced?

10         Q.   No. At the time you entered your pleas?

11         A.   Before we were sentenced the first time

12    you are talking about?

13         Q.   August 18, 2003, the day you were going

14    to go to trial?

15         A.   Okay.

16         Q.   You entered into a plea bargain with

17    the government that day, right?

18         A.   Right.

19         Q.   Deal changed, first it was, one, you

20    don't recall what the first deal was.  The second

21    deal was probation?

22         A.   Right.

23         Q.   Correct?

24         A.   Correct.

25         Q.   Were you taken immediately upon

Case: 1:07-cv-00035-SSB-MRM Doc #: 8 (Court only) Filed: 05/22/2013 Page: 106 of 295

1     re-entering the courtroom, taken to a podium and

2     the judge then started to go into the pleas that

3     you were going to enter?

4             A.   I don't remember.

5             Q.   You were told to sign a piece of paper

6     by your attorney and you didn't read that piece of

7     paper; is that true?

8             A.   The paper that I didn't read that I

9     signed was on the final day when we got sentenced.

10            Q.   So you did read your plea agreement

11    then if your signature is appended to it because

12    that must be the second thing that you signed.

13            A.   I don't recall.

14            Q.   Was there a written statement of facts

15    that went along with the plea agreement?

16            A.   I don't recall.

17            Q.   Did you have to agree to a statement of

18    facts in open court under oath in front of Judge

19    Dlott?

20            A.   I don't recall.

21            Q.   Did you know what the statement of

22    facts was going to be before Mr. Brichler read them

23    into the record?

24            A.   I don't think so.

25            Q.   So you did not know what the factual

1    basis for your plea was before you heard it come

2    out Mr. Brichler's mouth, true?

3          A.  I didn't know what the plea was going

4    to be, is that what you are asking me?

5          Q.  Didn't know what the factual basis for

6    your plea was, what the facts were behind your

7    plea?

8          A.  Meaning --

9          Q.  That Mr. Brichler --

10          A.  -- did I know what I was pleading to?

11                 JUDGE MERZ:  That's the question.

12    Did you know what facts you were pleading to.

13                 THE WITNESS:  Yeah.

14    BY MR. GREGER:

15          Q.  What facts, not the charge but the

16    facts that you said were true?

17          A.  Did my lawyer ever show me evidence or

18    any facts or anything that the prosecutor had

19    against me or anybody else?

20          Q.  Yes.

21                 JUDGE MERZ:  No, no. Hang on a

22    second, Mr. Greger.  Before a judge can find you

23    guilty of something there has to be a statement of

24    facts read into the records, what the facts are

25    that underlie the defense, that underlie the guilty

1    plea Mr. Greger is asking.  Do you remember either

2    seeing it in writing or hearing Mr. Lawson tell you

3    what it was going to be or anytime before Mr.

4    Brichler read it into the record did you know what

5    the facts were?

6                    THE WITNESS:  Not that I recall.

7    BY MR. GREGER:

8            Q.   Let's go back to the question raised by

9    your comments.  Did Mr. Lawson go over with you

10   that the government had the evidence against you

11   that was going to go over your trial?

12           A.   No.

13           Q.   No?

14           A.   No.

15           Q.   Were you able then to determine the

16   strength of the government's case against you prior

17   to entering your plea of guilty?

18           A.   I went by what my attorney told me.

19           Q.   Am I correct that all three of the

20   defendants either stood at a podium or sat at

21   tables and the court went one to the other in

22   accepting the pleas?

23           A.   I think so.

24           Q.   Did you hear the government read into

25   the record the facts that supported your plea or

1      were behind your plea, the facts to which you were

2      pleading?

3           A.   I don't recall.

4           Q.   I will represent to you, Mr. Elliott,

5      that this is a true and accurate transcription of

6      the pleas that were taken before Judge Dlott

7      starting at 11:45 a.m. on August 18, 2003.  I will

8      ask you if, you would, please, turn to page 31,

9      lines 17 through 24.  Later that day on October 15,

10      2002 Mr. Elliott responded to that garage where he

11      and Eddie Moore, another co-defendant in this case,

12      obtained approximately 50 pounds of marijuana,

13      transported that marijuana to be broken down and

14      distributed, some of it distributed almost

15      immediately to customers and the rest of the

16      marijuana was stored at Mr. Moore's residence where

17      it was later seized by the police.  Did I read that

18      accurately?

19           A.   Yes.

20           Q.   Did you go to the College Hill garage

21      on October 15, 2002?

22           A.   Yes.

23           Q.   Are you sure of the date?

24           A.   No.

25           Q.   How do you know it was October 15,

CaseCase37-cv02p5040335B-GHBMRBoeDneument3e(RagenlyFiledFiled/1372067209PagePdgeof1295f 295

1    2002?

2            A.   Because this is the same one that was

3    brought out as evidence that the day before Eddie

4    Moore got caught and that's the day that I was

5    there.

6            Q.   Who was at the garage on October 15,

7    2002?

8            A.   I don't know.

9            Q.   Where in the garage did you obtain the

10   50 pounds from?

11           A.   I didn't.

12           Q.   You didn't?

13           A.   Huh-uh.

14           Q.   You distributed some of the marijuana

15   that you got on October 15, 2002 almost

16   immediately; is that true?

17           A.   Yes.

18           Q.   Who were your customers?

19           A.   I'll take the Fifth on that.

20                JUDGE MERZ:  Can't hear you.

21                THE WITNESS:  I'd like to exercise

22   my Fifth Amendment right.

23                JUDGE MERZ:  To do what?

24                THE WITNESS:  Not to answer.  That

25   might incriminate me.

CaseCase3:7-cv-00250300055D-GWSMMRMDoctumeBocun3c(Quai22)only filedFiled5/5/2608/200fagePbageof2bbf 295

1          JUDGE MERZ:  You've already pled

2     guilty to this.  You've got a right to maintain

3     your Fifth Amendment and immunity.  You don't give

4     that up by pleading guilty.  I don't understand how

5     an answer to that question is going to incriminate

6     you.  It incriminates other folks.

7               MR. GLASSMAN:  At this point, I'll

8     just raise an objection on the basis of relevance.

9               JUDGE MERZ:  Sustained.

10    BY MR. GREGER:

11         Q.   How did Eddie Moore get the 30 pounds

12    that was seized from his house?

13         A.   He picked it up from the garage.

14         Q.   Picked it up from the garage?

15         A.   Yeah.

16         Q.   So was there 80 pounds that was

17    obtained at the garage that day or 50?

18         A.   50.

19         Q.   50.  So Mr. Moore was with you?

20         A.   He was at the garage, he picked it up,

21    I was there but I didn't pick it up or receive it

22    or anything, I just was there.

23         Q.   Who did Mr. Moore get it from?

24         A.   I'm not sure.

25         Q.   Who did Mr. Moore tell you he got it

Case Case: 37-cv-00550-03835-SUEMR Document 36 (2 288 only) Filed File 05/2005 2005 Page Page 142 of 2951 295

1    from?

2            A.   I don't think I ever asked.

3            Q.   Who did you see at the garage other

4    than you and Mr. Moore?

5            A.   There was a bunch of people at the

6    garage.

7            Q.   Who?

8            A.   Workers, Steve, Phillip.

9            Q.   Phillip who?

10                   JUDGE MERZ:  Phyllis?

11                   THE WITNESS:  Phillip.

12   BY MR. GREGER:

13           Q.   Phillip, one of the co-defendants.  Mr.

14   Davidson?

15           A.   I guess that's his name.

16           Q.   What did you know him by?

17           A.   Phillip.

18           Q.   When you say we knew him by Phillip,

19   who is the we?

20           A.   I didn't know I said we.

21           Q.   Mr. Elliott, did Mr. Rennick call you

22   and tell you to come and pick up the marijuana?

23           A.   Not that I recall.

24           Q.   Did Mr. Elliott, did you do anything

25   else as part of the at-length conspiracy other than

Case 3:07-cv-00535-WHR Document 30 (Court only) filed 05/13/2008 Page 113 of 295

1    obtain 50 pounds of marijuana from a warehouse in

2    College Hill, distribute it to customers and store

3    it at Eddie Moore's house and later where it was

4    seized?

5              A.   I don't understand.

6              Q.   Did you do anything else as part of the

7    alleged conspiracy other than pick up 50 pounds of

8    marijuana from a warehouse on College Hill,

9    distribute it to some customers, and store the

10   remainder at Eddie Moore's house where the

11   marijuana was later seized?

12             A.   Not that I recall.

13             Q.   Who was part of this conspiracy?

14   Without looking at the indictment, who did you

15   agree with?

16             A.   Agree with for what?

17             Q.   Agree with to violate criminal laws.

18                  MR. GLASSMAN:  Your Honor,

19   actually, I object on the basis of asked and

20   answered before lunch.

21                  JUDGE MERZ:  Overruled.

22                  THE WITNESS:  Who did I --

23   BY MR. GREGER:

24             Q.   Agree with to violate a criminal law,

25   who did you form a conspiracy with?

CaseCase3:07-cv-020559340655D-SdEMRECDocuDDocumesnt9c(3-2330 only)FileEdFiloe4/57/240CB/200PagerPagie4of 2051 295

```
 1                    JUDGE MERZ:  With respect to this

 2      case?

 3                    MR. GREGER:  Right, with respect

 4      to this case only.

 5                    THE WITNESS:  I don't know.  Can I

 6      ask a question?

 7                    JUDGE MERZ:  Go ahead.

 8                    THE WITNESS:  Was I charged with

 9      conspiracy?  Is that what I pleaded to was a

10      conspiracy?

11                    JUDGE MERZ:  You were charged in

12      at least count one of the original indictment with

13      conspiracy.

14                    THE WITNESS:  I was charged or I

15      was sentenced to a conspiracy?

16                    JUDGE MERZ:  Your question was,

17      was I charged with conspiracy and the answer is,

18      yes, in the initial indictment and I haven't looked

19      at the subsequent superseding indictment.  Yes, you

20      were charged with conspiracy in the superseding

21      indictment as well.

22                    THE WITNESS:  But did I plead to

23      conspiracy?

24                    JUDGE MERZ:  I don't know that.

25      BY MR. GREGER:
```

CaseCase3:07-cv-002250935B-SSEMMRDocumeDucument3o(R-200 only)iledFile4/572005200PageP4geof 2951 295

1              Q.  Mr. Elliott, if you would, please, take

2    a look at Rennick Exhibit 4 which I believe is the

3    superseding indictment?

4              A.   Okay.

5              Q.   Do you have No. 4?

6              A.   Uh-huh.

7              Q.   Can you look at page nine.  What did

8    you understand you were charged with in count five

9    of the superseding indictment?

10             A.   I guess this was a later charge that

11   was added, right?  I guess it was money laundering,

12   I think that's what it was.

13             Q.   Is that what you understood you were

14   charged with?

15             A.   I think that's what my lawyer said.

16             Q.   Were you guilty of that?

17             A.   Yeah.

18             Q.   Tell me about that.  What did you do?

19                  MR. GLASSMAN:  Objection.

20   Relevance.

21                  JUDGE MERZ:  Relevance, Mr.

22   Greger?

23                  MR. GREGER:  His credibility is

24   clearly in question.

25                  JUDGE MERZ:  And you are

1     attempting to impeach him by getting him to admit a

2     felon.

3                 MR. GREGER:  I'm trying to get him

4     to admit whether the underlying facts as alleged in

5     count five are true or not.

6                 JUDGE MERZ:  Overruled.

7                 THE WITNESS:  Your Honor, I think

8     I need to seek counsel.

9                 MR. GREGER: Isn't it, I'm sorry.

10     I think it's cured by the plea bargain so long as

11     he engages in the plea bargain.  The government

12     agrees to the no file charges against him and

13     dismiss the count of the indictment that he didn't

14     plea to.

15                 JUDGE MERZ:  They have been

16     dismissed with prejudice, have they not?

17                 MR. GREGER:  I believe they have

18     been.

19                 JUDGE MERZ:  If your reason for

20     wanting to seek counsel is because you fear you may

21     incriminate yourself by admitting the facts

22     underlying count five, that can't happen because

23     the government has dismissed that charge with

24     prejudice which means it can never be brought up

25     again as part of a plea bargain.  Does that satisfy

1    your need to talk to counsel?

2                    THE WITNESS:  Truthfully, I don't

3    understand much of this.  I don't want to say

4    anything that's --

5                    JUDGE MERZ:  You've talked to a

6    lawyer about this proceeding?

7                    THE WITNESS:  Right.

8                    JUDGE MERZ:  Did you retain a

9    lawyer with respect to this proceeding?

10                   THE WITNESS:  I've talked to a

11   lawyer.  He said that he could not be here on this

12   date but if anything came up that I needed, felt

13   that I need to seek counsel ask for an attorney and

14   that he would.

15                   JUDGE MERZ:  That was gracious of

16   him to suggest to you that you'd be able to stop

17   this trial.

18                   THE WITNESS:  I'm not trying to

19   stop it, your Honor.

20                   JUDGE MERZ:  You are the witness,

21   you are on the stand and you are not willing to

22   answer questions without talking to a lawyer.

23   You've essentially brought at least your part of

24   the trial to a halt.

25                   MR. GREGER:  Your Honor, I'm going

1     to withdraw the question.

2                      JUDGE MERZ:  All right.

3     BY MR. GREGER:

4           Q.  Mr. Elliott, what was your relationship

5     with Mr. Rennick before August 18, 2003?

6           A.  I guess we were friends.

7           Q.  Close friends?

8           A.  Pretty close.

9           Q.  How long had you known Mr. Rennick

10    before August 18, 2003?

11          A.  I don't know, maybe a year and a half.

12          Q.  Did you have any common interests?

13          A.  Cars, old cars.  I restored them, Steve

14    worked on cars.

15                      MR. GREGER:  May I have a moment,

16    your Honor?

17                      JUDGE MERZ:  You may.

18    BY MR. GREGER:

19          Q.  Mr. Elliott, have you had any contact

20    with the government since you were listed as a

21    witness for Mr. Rennick?

22          A.  Any contact with the government?

23                      JUDGE MERZ:  Any lawyer on behalf

24    of the United States.

25    BY MR. GREGER:

CaseCase3:07-cv-00052024635D-SMMRDocDorcument3e(R200 only)FiledFiled0457206D205PageP4ge4f295f 295

1          Q.   Did you talk to Mr. Glassman or Mr.

2    Brichler?

3          A.   He said hi coming down the hall.

4          Q.   Just this morning?

5          A.   Yeah.

6          Q.   That's the only contact you've had?

7          A.   Yeah, as far as I know.

8          Q.   Mr. Glassman didn't call you to ask you

9    what you might be called upon to testify in court?

10         A.   Did he call me, Mr. Glassman?

11              JUDGE MERZ:  That's the question.

12   Did Mr. Glassman call you and talk to you about

13   what you might testify to in this case?

14              THE WITNESS:  No, I've talked to

15   attorney, other than you and the attorney that I

16   talked to, no.

17   BY MR. GREGER:

18         Q.   That's Mr. Monday?

19         A.   The one that called you, Mr. Monday.

20         Q.   That's the attorney that you are

21   talking to?

22         A.   Right.  Whether he put a call in or

23   not, I don't know.

24              MR. GREGER:  Thank you, Mr.

25   Elliott, I don't have any further questions.

Case Case 3:07-cv-00535-MRB-SLO Document 36 Document 6 (Claim only) Filed Filed 05/13/2005 Page Page 120 of 295 of 295

1          JUDGE MERZ:  Cross?

2          CROSS EXAMINATION

3    BY MR. GLASSMAN:

4          Q.  Just to clear up one point.  I've never

5    talked to you before today, have I?

6          A.  No.

7          Q.  Did you force Steve Rennick to plead

8    guilty?

9          A.  No.

10         Q.  Did you try to force him to plead

11   guilty?

12         A.  No.

13         Q.  So far as you are aware whose choice

14   was it for him to plead guilty?

15         A.  It was his.

16         Q.  You plead guilty to marijuana

17   trafficking?

18         A.  Correct.

19         Q.  And you were guilty of marijuana

20   trafficking?

21         A.  Correct.

22         Q.  And Steve Rennick was also involved in

23   marijuana trafficking?

24         A.  Correct.

25              MR. GLASSMAN:  I have no further

Case Case 3:07-cv-00035-WHR-SLO Document 94 (Court only) Filed 05/15/2008 Page 1 of 2951 295

```
 1    questions.

 2                     JUDGE MERZ:  Thank you.

 3                     MR. GREGER:  I don't have anything

 4    further, Mr. Elliott.

 5                     JUDGE MERZ:  You may step down,

 6    sir.

 7                     MR. GREGER:  Demetrius Ball.

 8    WHEREUPON:

 9                     DEMETRIUS BALL,

10    of lawful age, a witness herein, being first duly

11    sworn testified as follows:

12                     JUDGE MERZ:  Sir, state your full

13    name and spell it for the record, please.

14                     THE WITNESS:  Demetrius Ball,

15    D-E-M-E-T-R-I-U-S.

16                     MR. GREGER: Thank you, your Honor.

17                     DIRECT EXAMINATION

18    BY MR. GREGER:

19         Q.  Mr. Ball, do you know Steve Rennick,

20    Senior?

21         A.  Yes, I do.

22         Q.  How long have you known him?

23         A.  Approximately little more than

24    20 years.

25         Q.  Were you present in the courtroom on
```

1     August 18, 2003 when Mr. Rennick entered his guilty

2     plea?

3          A.   I'm not sure of the date that it was

4     but I was in the courtroom when he entered the

5     guilty plea.

6          Q.   Did you hear the judge ask Mr. Rennick

7     questions?

8          A.   Yes.

9          Q.   Did you ever see Steve Rennick move his

10    head in response to the judge's questions instead

11    of making a verbal response?

12         A.   Yes.

13         Q.   Tell the court --

14              JUDGE MERZ:  I'm not sure, Mr.

15    Greger, that I'm going to allow a lay witness to

16    impeach the record.

17              MR. GREGER:  Your Honor, the

18    record is clear and I'll point out exactly where

19    the judge then says, Mr. Rennick, you have to make

20    a verbal response.

21              JUDGE MERZ:  Very good, sir.

22              MR. GREGER:  I'll get to that.  I

23    should have known.  I apologize for thinking that

24    you would.

25    BY MR. GREGER:

Case: 1:07-cv-00355-SSB-MRM Doc #: 6-8 Filed: 05/12/2008 Page: 123 of 295

1        Q.  Tell the Court what you saw as the

2    judge was asking questions, what you saw Mr.

3    Rennick do.

4        A.  I saw Steve shaking his head no.

5        Q.  How many times to questions asked by

6    the judge did you see Steve Rennick shake his head

7    no?

8        A.  He shook his head no constantly.

9        Q.  Did you then see anything happen

10   between Mr. Rennick, Senior and his attorney while

11   they stood before the judge?

12       A.  Yes.

13       Q.  What did you see?

14       A.  I saw Steve whisper in his ear.  I

15   couldn't tell what they were saying and afterwards

16   he pled guilty.

17       Q.  Was the speaking or the whispering from

18   the attorney to Steve or from Steve to the

19   attorney?

20       A.  From the attorney to Steve.

21       Q.  You were not close enough to know what

22   was said?

23       A.  No, sir.

24       Q.  Did this nudging and whispering or

25   speaking from the attorney to Steve Rennick happen

Case 3:07-cv-00035-WHR-SLO Document 30-1 Filed 05/13/2008 Page 1 of 295

1    at the podium in the middle of the judge taking Mr.

2    Rennick's plea?

3        A.   Yes.

4        Q.   After this whispering or speaking and

5    nudging, did Mr. Rennick answer yes to the same

6    questions that he had been shaking his head no to?

7        A.   Yes.

8        Q.   You indicated in an affidavit that was

9    filed with this Court that you listened to the

10   judge ask Steve several questions during his plea

11   and then it appeared to you that she, too, saw Mr.

12   Rennick's surprise and denials.  Let me ask you,

13   what is the basis for you to say that's the

14   impression you got from what you saw?

15       A.   Well, Steve and I, we talked all of the

16   time and Steve told me that he wasn't guilty and he

17   was going to plead not guilty.  It was surprising

18   to me that he got up there and pled guilty after

19   what I saw go on in the courtroom.

20       Q.   What was Mr. Rennick's emotional state

21   after the plea hearing, Mr. Ball?

22       A.   He was very, very upset.

23       Q.   What happened?

24       A.   Well, he come out, as we left the

25   courtroom he was, I mean, he was enraged.  He said,

Case Case 3:07-cv-00350-MRB-MRM Document 3(Court Only) Filed 04/15/2015 Page Page 125 of 295

1     why?  What do you mean?  Why?  What do you mean

2     fictional plea?  What the hell -- sorry.

3                   JUDGE MERZ:  Quotation is great.

4     BY MR. GREGER:

5           Q.  Exactly what did you hear?

6           A.  What the hell is a fictional plea and I

7     asked the same, what happened there, Greg, Bill?

8     And they went off and talked to Steve and Steve, he

9     was in a rampage and I said, calm down, Steve, let

10     them do their job and get out of here.

11           Q.  Did you hear Mr. Gallagher in the

12     hallway after the pleas use the term fictional

13     plea?

14           A.  After the sentencing?

15           Q.  After the plea was taken and Mr.

16     Rennick was enraged, did you hear Mr. Gallagher use

17     the term fictional plea?

18           A.  I'm not sure if it was Mr. Gallagher or

19     I'm not sure which one.  I heard fictional plea, I

20     heard that for sure.

21           Q.  And did you hear it in a group of

22     lawyers as they were responding to Mr. Rennick and

23     the other two defendants?

24           A.  Yes.

25           Q.  You said you asked what the heck is a

Case: 3:07-cv-00353-SSB-MRM Doc #: 3 Filed: 05/14/08 Page: 126 of 295

1    fictional plea?

2              A.   Yes, sir.

3              Q.   Did anybody answer your question?

4              A.   No, sir.  Then I turned around and

5    asked, also asked Mr., this was after the fact, I

6    asked Mr. Goldberg what was a fictional plea and he

7    said, there is no fictional plea.

8              Q.   Is that a term that you made up,

9    fictional plea?

10             A.   I had never heard the term.

11             Q.   And you heard it from a group of

12   attorneys addressing the defendant Benjamin,

13   Rennick, and Elliott in the hallway after the pleas

14   had been taken by Judge Dlott?

15             A.   Yes, sir.

16             Q.   Mr. Gallagher tell Steve to calm down?

17             A.   Yes.

18             Q.   Did Mr. Gallagher tell Steve that he

19   had to go through that plea so that the court could

20   give him acceptance of responsibility?

21             A.   It's been a long time.  I can't

22   remember all of that, but I remember telling him to

23   calm down, Steve.

24             Q.   Did Steve calm down?

25             A.   Not really.

CaseClase37-tv0205030355B-SHEMMRLocuDeuntfe6G8000onlyjiledFile4530D200TagePlageof2295f 295

1          Q.  Did Steve Rennick, in your presence,

2     tell Gallagher that the facts made him sound like a

3     drug dealer and that was not true?

4          A.  Yes, I remember that, yes.

5          Q.  Did you hear Mr. Gallagher advise Steve

6     about what Steve should say to the probation

7     officer?

8          A.  I didn't hear everything.  I didn't

9     really hear everything.

10         Q.  I understand.  What do you recall

11     hearing in that regard?

12         A.  I don't recall, I don't remember.  I

13     don't remember exactly.

14         Q.  Mr. Ball, did you accompany Steve to

15     the courthouse on the morning the trial was

16     supposed to start where all of this commotion

17     ultimately happened?

18         A.  I don't remember, the first time Steve

19     went down by himself then I just happen, I went

20     down there myself.  He was already down there, and

21     then I went down.

22         Q.  Did you ever pick Mr. Rennick up from

23     the VA?

24         A.  Yes, sir.

25         Q.  Why was Mr. Rennick at the VA in your

CaseClase 1:cv02503063D-SHBM RBoca Buent 9c(R 2809 only jled Hile d 528/06/206 agePageol 298 of 295

1      understanding?

2              A.   He was having some problems, some

3      mental problems.

4              Q.   Psychological problems?

5              A.   Yes.

6              Q.   Mr. Ball, I've handed you what is

7      marked for identification as Rennick's Exhibit 8

8      for this hearing and I'll ask you to review that,

9      please.

10             A.   (Witness complies with request.)

11             Q.   Have you had an opportunity to read

12     Exhibit 8?

13             A.   Yes.

14             Q.   Is there any portion of the Exhibit 8

15     that is not true?

16             A.   I'm not sure fictional plea came out.

17     I know where it came from, it was in the group of

18     lawyers.  I didn't actually see or look at Mr.

19     Gallagher and say this is a fictional plea.  I

20     heard it with a group of attorneys standing there.

21             Q.   Was Mr. Gallagher part of that group of

22     attorneys?

23             A.   He was standing there with them, yes,

24     sir.

25             Q.   Do you, except for that change,

1    reaffirm the testimony that you've given by

2    affidavit in Rennick's Exhibit 8?  Do you reaffirm

3    the truthfulness of that affidavit?

4         A.  Yes.

5              MR. GREGER:  I have nothing

6    further of the witness.  To clarify the record on

7    the point of contention that the Court had on page

8    22 of Plaintiff's Exhibit 7 at line 21, 22, and 23

9    the Court says, Mr. Rennick, we need something

10   verbal.  The court reporter has to take it down.

11             JUDGE MERZ:  Right.  I have that

12   but that's the point at which Mr. Ball says Mr.

13   Rennick is shaking his head no; is that correct?

14             MR. GREGER:  There are multiple

15   places where Mr. Ball says that Mr. Rennick was

16   shaking his head no. He was then whispered and/or

17   nudged to by the attorney and proceeded to answer

18   all of the judge's questions yes.

19             JUDGE MERZ:  That's not reflected

20   at lines 19 through 23 of Exhibit 7.  Lines 19

21   through 23 of Exhibit 7, the other two defendants,

22   Mr. Elliott and Mr. Benjamin, answer no, ma'am.

23   Mr. Rennick, the Judge Dlott says, Mr. Rennick, we

24   need something verbal.  The court reporter has to

25   take it down and the witness says no, ma'am which

Case: 1:07-cv-00035-SJD-SMR Document 200 only Filed: 04/24/2008 Page: 100 of 295

1    is consistent with shaking his head no.

2                        MR. GREGER:  Understanding that.

3                        JUDGE MERZ:  Why else?

4                        MR. GREGER:  That's the only place

5    for the record.  As we know records are taken down

6    where she asks for a verbal response.  That does

7    not mean that Mr. Rennick was not, in fact, shaking

8    his head at the podium.  That simply would never

9    have been taken down by the court reporter.

10                       JUDGE MERZ:  Understood.

11                       MR. GREGER:  I have nothing

12   further of Mr. Ball.

13                       JUDGE MERZ:  Cross?

14                       CROSS EXAMINATION

15   BY MR. GLASSMAN:

16           Q.  Mr. Ball, you've known Mr. Rennick for

17   a long time?

18           A.  Yes, sir.

19           Q.  About how long?

20           A.  20 plus.

21           Q.  And you ever had any sort of financial

22   or business relationship with him?

23           A.  Yes, sir.

24           Q.  What was that?

25           A.  We were in trucking together.

CaseCase7-tv-00250533D-SHEMMRBocuDerent9c(R280-onlyjiledFDé4d/5/20/20dAdeePsageof2951295

1      Q.  Did he work for you or did you work for

2  him?

3      A.  We worked together.

4      Q.  Did you ever have occasion to take a

5  loan from him or anything like that?

6      A.  Yes.

7      Q.  You said in the affidavit that there

8  were certain factual matters -- actually, let me

9  get it.

10             MR. GLASSMAN:  With the Court's

11  indulgence.

12             JUDGE MERZ:  Of course, sir.

13  BY MR. GLASSMAN:

14      Q.  You said in the affidavit I was shocked

15  to hear the prosecutor state that Steve Rennick,

16  Senior sold marijuana to Matt and gave marijuana to

17  Benjamin.  Both matters I'm sure did not occur.

18      A.  Both matters what?

19      Q.  You said both matters I was sure did

20  not occur.  You are positive that never happened?

21      A.  I'm not sure if that happened or not.

22  I wouldn't, I've never known Steve to sell

23  marijuana.  I know Steve.  I've never known him to

24  sell marijuana.

25             MR. GLASSMAN:  No further

1    questions.

2                        THE WITNESS:  To anyone.

3                        JUDGE MERZ:  Any redirect, Mr.

4    Greger?

5                        MR. GREGER:  No, your Honor.

6                        JUDGE MERZ:  Mr. Ball, thank you

7    for your time.  You are excused, sir.

8                        MR. GREGER:  Steven Rennick,

9    Senior, your Honor.

10   WHEREUPON:

11                        STEVEN RENNICK, SR.

12   of lawful age, the Petitioner herein, being first

13   duly sworn testified as follows:

14                        JUDGE MERZ:  Please state your

15   full name for the record.

16                        THE WITNESS:  Steven M. Rennick.

17                        DIRECT EXAMINATION

18   BY MR. GREGER:

19        Q.  Mr. Rennick, are you currently in the

20   federal medical center at Lexington, Kentucky?

21        A.  Yes.

22        Q.  Except for the Butler County Jail for

23   the purposes of this hearing, true?

24        A.  Yes.

25        Q.  Are you serving a 63-month sentence?

1      A.   Yes.

2      Q.   Was that the sentence imposed by Dlott

3    in the criminal case?

4      A.   Yes.

5      Q.   Did Mr. Gallagher represent you in that

6    case?

7      A.   Yes.

8      Q.   Did you pay Mr. Gallagher?

9      A.   Yes.

10     Q.   Did you pay him in check and in cash?

11     A.   Both.

12     Q.   How much approximately did you pay Mr.

13   Gallagher in total?

14     A.   Probably about a hundred thousand

15   dollars.

16     Q.   Did you ever pay Mr. Gallagher cash in

17   a sum exceeding $10,000?

18     A.   Yes.

19     Q.   Did Mr. Gallagher request that you pay

20   him in cash?

21     A.   Yes.

22     Q.   What did he say?

23     A.   He said he was going on a skiing trip

24   with his family and they needed $25,000 cash.

25     Q.   And did you pay him $25,000 cash?

1          A.   Yes.

2          Q.   Did you pay him extra because you were

3    going to go to trial?

4          A.   Yes.

5          Q.   How much?

6          A.   10,000.

7          Q.   Did you ever get a receipt from Mr.

8    Gallagher for the cash payments?

9          A.   No.

10         Q.   Did you ever get a receipt from Mr.

11   Gallagher for the payments you made by check?

12         A.   No.

13         Q.   Did you get the canceled or returned

14   check as a receipt?

15         A.   Yes.

16         Q.   Did you understand that a portion of

17   your payments were to pay for investigators that

18   were being used by Mr. Gallagher?

19         A.   Yes.

20         Q.   Did Mr. Gallagher ever report to you

21   what the investigators had found as it related to

22   your criminal case?

23         A.   Yes.

24         Q.   What did he tell you?

25         A.   He told me, I think, he had taken tape

Case 3:07-cv-00535-WHR-MRM Document 6 (Court only) Filed 04/15/2013 Page 135 of 295

1    recorded statements from the witnesses up in the

2    shop.  There was no involvement in drugs

3    whatsoever.

4            Q.  How many witnesses did the

5    investigators tape record?

6            A.  I'd say ten.

7            Q.  Let me take you back to August of 2003

8    when you were set to go to trial.  Are you with me?

9            A.  Yes, sir.

10           Q.  Was your case set to proceed to a trial

11   on August 18, 2003?

12           A.  Yes, sir.

13           Q.  Had you and Mr. Gallagher discussed

14   resolving your case by a plea prior to the morning

15   of trial?

16           A.  No, no, sir.

17           Q.  Were you prepared to go to trial on

18   that day?

19           A.  Yes, sir.

20           Q.  Was a jury actually present to be

21   selected to hear your case?

22           A.  Yes.

23           Q.  To the best of your knowledge was Mr.

24   Gallagher likewise prepared to start trial on

25   August 18, 2003?

1          A.   Yes.

2          Q.   Why had you not discussed with Mr.

3     Gallagher resolving your case by way of plea prior

4     to the day of trial?

5          A.   Because with the detective that worked

6     on it with Mr. Gallagher talking to all of the

7     witnesses, I was not guilty.

8          Q.   Had you prior to the morning of trial

9     been shown any plea agreement?

10         A.   No.

11         Q.   Had you prior to the morning of the

12     trial been shown any statement of facts that would

13     support a plea of guilty to one or more charges?

14         A.   No.

15         Q.   Had anyone discussed with you the

16     federal sentencing guidelines prior to the day of

17     trial?

18         A.   No.

19         Q.   Had anyone discussed with you what the

20     meaning of a mandatory minimum sentence meant?

21         A.   No.

22         Q.   Had anyone discussed with you how you

23     might be able to get a sentence of something other

24     than a minimum mandatory five years?

25         A.   Yes.

1         **Q.** Who?

2         **A.** Mr. Gallagher.

3         **Q.** When?

4         **A.** After the plea bargain went. We were

5 out in the hallway and I was yelling and screaming.

6         **Q.** Okay, let's stop.

7         **A.** I'm sorry.

8         **Q.** After the pleas?

9         **A.** Yes.

10         **Q.** Is that the first time that anyone ever

11 spoke to you about how you could get a sentence

12 other than the minimum mandatory five years?

13         **A.** Yes.

14         **Q.** Tell this judge what happened on the

15 morning of your trial.

16         **A.** Well, Duke and Tony picked me up at VA

17 hospital and we went up to the courthouse.

18         **Q.** Let me stop you. Who is Duke?

19         **A.** Duke is Demetrius Ball.

20         **Q.** Is that the man that just testified

21 here?

22         **A.** Yes.

23         **Q.** You know him and call him Duke?

24         **A.** Yes.

25         **Q.** Go ahead.

Case 3:07-cv-00532-WHR-MRM Document 36 (Court only) Filed 04/03/2013 Page 100 of 295

1          **A.**   And we went up to the courthouse to

2     pick out the jury and we got up there and Mr.

3     Gallagher told me that Mr. Brichler had told him

4     that he had two people that I was going to pay to

5     lie and he said one of them was Duke Ball.

6               So Duke went up and talked to Mr.

7     Brichler and Mr. Brichler showed him two checks for

8     $6,000 each written on the same day from Earth

9     Management Trucking.  So Duke had explained to Mr.

10    Brichler those were for a job that they done and

11    those were nothing to do with paying somebody to

12    lie and we never, he never did say who the second

13    person was.  So then we got, Matt asked me to go

14    out in the hallway.

15               JUDGE MERZ:  Matt?

16               THE WITNESS:  Matt Elliott, I'm

17    sorry.  And he started to cry and tell me if we

18    don't, if we get found guilty that he could do up

19    to 40 years and he'd lose his kids and not be able

20    to see them; and I told him, Wayne came out at the

21    same time and I said, you guys go ahead and plead

22    and I'll just go to court by myself and Matt said,

23    they wouldn't do that.  It had to be all or none.

24    So I said, I can't plead so then they come back and

25    we met again out in the hall and he said the

1    prosecutor promised him probation, Wayne probation,

2    that I would get 36 months if we pleaded.  I mean

3    he was pushing me so hard.

4                      JUDGE MERZ:  Who is this, Elliott?

5                      THE WITNESS:  Matt Elliott.  He

6    was crying and just pressuring me so I finally said

7    yes.  So the lawyers came out and they said, go get

8    lunch and come back in an hour.  We came back in an

9    hour and everybody was already at the podium.  The

10   judge was there and everybody was ready to do

11   whatever and Gallagher had something in front of me

12   and said, sign this, and I said, what is it?  It's

13   a plea.  I'd like to read it.  Don't worry, it's

14   just what we talked about.

15                      So then it went on and when he

16   started reading, when Mr. Brichler started reading

17   the papers it was just not true.  So I kept shaking

18   my head no and Bill finally came over and

19   whispered, don't worry, it's a fictional plea.  I

20   didn't understand what a fictional plea was, but I

21   figured he was my lawyer, I paid him and he had my

22   best interest at hand.  So we went ahead and went

23   through everything and I lied to Judge Dlott and

24   I'm sorry I did that but so after all of that was

25   done we went out in the hallway and I lost it with

1    Bill.

2              I told him, even what he read

3    about Matt and Wayne, it was not true.  There was

4    no, and I told him, Bill, it makes me sound like a

5    drug dealer and he said, don't worry about it, it's

6    just a fictional plea, it doesn't mean anything.

7    To hell if it don't.  I don't think I'm a drug

8    dealer.  We talked and I got calmed down.

9              We need to go down and talk to the

10   probation officer, but he said before we do, Mr.

11   Brichler wants to know if you would work with John

12   Mercado and see if you can get anybody, be a CI and

13   you would get a sentence reduction.  Well, I'm

14   thinking I've got 36 months.  I knew the judge, I

15   did hear her say something about a mandatory

16   minimum.  I'm thinking it was a fictional plea.

17   I've already been told I'm getting 36 months.

18              JUDGE MERZ:  Who told you that,

19   Gallagher?

20              THE WITNESS:  Gallagher and Mr.

21   Lawson.  They came out in the hall and said the

22   plea agreement would be done in an hour and, you

23   know, Matt and Wayne would get probation and I'd

24   get 36 months.  Well, when Mr. Gallagher started on

25   the CI thing, Mr. Goldberg said, Steve, you

Case Case 3:07-cv-00053-WHR-MRM Document 3:07-cv-00053-WHR Document 302 (Court only) Filed 06/15/2005 Page Page 141 of 295

1    couldn't get involved in that, you can get hurt.

2    Mercado is a guy you couldn't trust anyway.

3                    So I love my family.  I wanted to

4    be with them.  I'm going to be, I didn't know any

5    drug dealers.  I didn't know what I was going to

6    do.  So I said, yeah, I'll try, see what I can do

7    for you.  I didn't know anybody.  What I told John

8    Mercado, I could take him to Arizona where I drop

9    off the Jamaicans.  That's all I knew.  It just

10   went on and on and I got the thing set, but the day

11   I was going to talk, the very next day John

12   Mercado, I was downtown with a driver in the

13   courtroom on a driving ticket and John was there.

14                   He gave me a card to call him and

15   come over to his office and talk to him about doing

16   the thing to Arizona.

17   BY MR. GREGER:

18         Q.   Tell the Court who John Mercado is.

19         A.   He's a Reno, RENU agent that was

20   involved on this case.

21         Q.   R-E-N-U, regional enforcement narcotic

22   unit?

23         A.   It was a Cincinnati drug task force.

24                   JUDGE MERZ:  Okay.

25                   THE WITNESS:  So he met me down

1    there and told me to call, I went home immediately

2    and I called Mr. Gallagher.  I said Bill, John

3    Mercado wants to come down and talk on the CI.  I

4    begged him, I need you to go with me.  I want to

5    know what he says is going to be, he's going to

6    stand by it.  He said, don't worry, go down and

7    talk to him.  Whatever he says you'll get it.  I

8    made an appointment to go down and see John and I

9    took Tony Battles with me.

10                   JUDGE MERZ:  Same Tony that picked

11   you up on the morning of trial?

12                   THE WITNESS:  Yes, sir.  I took

13   him with me.  John Mercado gives me, he

14   fingerprints me, gives us a tape recorder to tape

15   record phone calls and has me sign these papers

16   saying I was a CI, that I couldn't write tickets,

17   that I could get tickets still and when I signed

18   it, I said John can I have a copy of that?

19                   No, you have to get a judge to get

20   you a copy of that.  This is sounding crazy.  John

21   sat there and told us, he knew we didn't pick up

22   drugs.  He knew I didn't sell any drugs and he

23   said, if I get a deal for over 1,500 pounds that I

24   would get probation so, you know, we were arranging

25   to go to Arizona and Tony Battles had a guy he met,

Case Case 3:07-cv-00355-WHR-SLO-MRM Document 30-4 Filed 05/15/2013 Page 143 of 295

1           a Jamaican in jail, Sose Anderson.  He could get

2           1,500 pounds if he went to Arizona to pick it up.

3                          Mercado got his mug sheet,

4           Anderson.  Showed it to him and it was a done deal.

5           We were going to Arizona.  Tony Battles was working

6           with this guy.  So he gets this deal all lined up.

7           Anderson needed us to get the money.  As soon as we

8           called John and told him it was set, his boss says

9           we can't go to Arizona, it's too dangerous.  He

10          said we could get rolled.

11                         I said, wait a minute, John, I

12          didn't think it was just me and you.  I thought we

13          had the whole Army with us, FBI, everything.  He

14          said, no, his boss said we can't do that.  We can't

15          get the money together.  I said wholly molley.  I

16          have this guy thinking I'm going to Arizona to pick

17          up drugs.  So we went, it went on and on.  Calling

18          me saying we are ready.  We don't have the money.

19          Finally, I just didn't talk to him no more.  I

20          didn't answer the phone.

21                         Well, it went on for a couple of

22          months and I was trying to work with another Duke

23          who had a guy that he knew that I was trying to buy

24          500 pounds of marijuana from.  So I got the deal

25          set up and John Mercado, I said John where are we

1      going to do this deal at?  Do it at your son's

2      garage.  That is not a real good idea.

3                     He said, it's inside, you know, so

4      I said okay.  Kevin Kue which is John Mercado's

5      boss said it wasn't a good idea.  We had the guy

6      come in. He called and said he was on his way.  The

7      RENU cops set up the shop.  They put up a camera

8      and wired me.  They were standing out back smoking

9      and laughing.  The guy came around the drive

10     through and seen the cops.

11                    He went up and called me and said,

12     he said, you are a cop. I'm not coming in there.

13     So it just, every time I tried to do something it

14     got shot down.  Then the guy who was going to get

15     the 1,500 pounds in Arizona called me and said that

16     the marijuana was in Cincinnati.  Now I've got a

17     problem.  He wants to see the money.  It was like a

18     million two or whatever.

19                    I call John and told him the guy

20     called me.  He wants to see the money.  He said,

21     well, make an appointment so he could call like on

22     a Sunday and John will be a middleman.  He'll tell

23     them we don't have the money right now, blah, blah,

24     blah.  Sunday, this Sose Anderson called me and

25     said, do you have the money.  I said, wait a

Case 3:07-cv-00353-SSB-MRM Document 36 (Court only) Filed 04/27/2009 Page 145 of 295

1    minute.  You have to call, talk to the guy who has

2    the money.  I call John's phone.  He said ask for

3    Joe Wilson.  He didn't want the guy to know John.

4    Lady answers, I ask for Joe Wilson.

5              She says, there is no Joe Wilson.

6    I had it on speed dial and I called it again.  The

7    guy said, are you jacking me around?  I dialed

8    again on speed dial.  This is John, leave a

9    message.  So the guy got pissed off and said,

10   Rennick, you are dead.  I said, wait a minute,

11   I'll, he didn't.  He said, he's had a beat on me

12   for two days.

13              He started calling us Friday night

14   and it was Sunday.  I kept jerking him around

15   because there was no money, and John Mercado wanted

16   to tell him to wait to Monday to get the money out

17   of the bank.  He wanted me to talk him into giving

18   us half and pay for half.  Bottom line John said it

19   was the weekend and not enough officers to do a

20   drug bust like that.  You know, the guy just never

21   called back.

22              The following Friday someone was

23   in my garage and shot me twice and tried to kill me

24   and said, Rennick, you are dead.  It was the same

25   voice as the telephone.  So I didn't get probation,

1    I got almost killed and even after I got shot there

2    were several phone calls saying it was not

3    finished.  They would finish the job up so that's

4    probably my luck.  I'll do my 63 months and come

5    out and get killed anyway.

6                      It was just a bad deal and like I

7    said, I called Mr. Gallagher during this whole

8    thing and explained what John Mercado told me I

9    could get probation.  He said no problem.  John is

10   a Cincinnati cop. Can he give me that kind of a

11   deal.  He said he's working with Mr. Brichler,

12   whatever he says will go and I tape recorded all of

13   that because, you know, John Mercado gave us the

14   tape recorder.

15                      I'll put it to good use.  I tape

16   recorded Bill Gallagher.  He'll do what he says.

17   You can get probation he said.  So it was just a

18   stupid big deal.  1,500 pounds, you know, almost it

19   was unbelievable but the guy knew Tony Battles,

20   Sose Anderson and that's who basically dealt with

21   it.  I rambled on, I know.

22   BY MR. GREGER:

23        Q.   Mr. Rennick, did anyone explain to you

24   whether the sentencing guidelines called for a

25   sentence close to the 36 months that had been

1    discussed with you on the day of your pleas?

2          A.   No.

3          Q.   Did anyone explain to you how you could

4    get a sentence of 36 months when the indictment

5    contained a five-year minimum mandatory?

6          A.   No.

7          Q.   Were you able to explain to Matt that

8    it was impossible for any of them to get a sentence

9    below the five-year minimum mandatory if they plead

10   to the conspiracy count?

11         A.   No.

12         Q.   How many times did Matt Elliott come

13   back to you with changes in the deal?

14         A.   Two, he come two times.

15         Q.   Do you recall what the first deal was?

16         A.   First deal the way I understand Wayne

17   was going to get 36 months, Matt was going to get,

18   I think, 30 some months and I was going to get 48

19   or something like that.  And I just told them, I

20   can't plead to something that is not true.

21         Q.   How long did you have to review the

22   plea agreement in this case?

23         A.   I never seen a plea agreement.

24         Q.   Did you review the plea agreement

25   before you signed it?

1         A.  No, sir.

2         Q.  Why not?

3         A.  They were at the podium and said sign

4 it, it's what we said and Matt was very adamant.

5 He wanted to read his bad and Kenny Lawson said,

6 don't worry, it's just what we said.

7         Q.  Were you placed under oath at the time

8 that the court took your plea?

9         A.  Yes, sir.

10         Q.  Did you tell the court that, did the

11 court tell you that you could be prosecuted for

12 perjury or false swearing if the answers to the

13 court's questions proved to be false?

14         A.  Yes, sir.

15         Q.  Do you understand now that by

16 testifying under oath before this Court that you

17 lied to Judge Dlott and could subject you to

18 perjury or false swearing charges because you are,

19 in fact, telling this Court that you lied to Judge

20 Dlott at the time she accepted your plea?

21         A.  Yes, I've tried to explain to Judge

22 Dlott two times, three times in my resentencing

23 that I lied to you and sorry. I wrote her an eight

24 page letter before getting sentenced telling her

25 that I was guilty and I was sorry that I lied and I

| | |
|---|---|
| 1 | was told to do the letter by Todd Ellis, my |
| 2 | probation officer, at that time and he did, I asked |
| 3 | him, how would I get it to Judge Dlott?  I wasn't |
| 4 | talking to Mr. Gallagher at this time.  You get the |
| 5 | letter written and I'll get it to her so he did. |
| 6 | Q.  Did I explain to you prior to the |
| 7 | evidentiary hearing that you risked being charged |
| 8 | with perjury or false swearing if you testified |
| 9 | here under oath? |
| 10 | A.  Yes. |
| 11 | Q.  That you had lied to Judge Dlott? |
| 12 | A.  Yes. |
| 13 | Q.  Did you persist in going forward with |
| 14 | this motion? |
| 15 | A.  Yes. |
| 16 | Q.  Are you on any medications presently |
| 17 | that affect your ability to understand what's |
| 18 | occurring this afternoon? |
| 19 | A.  No. |
| 20 | Q.  Let me take you back to the morning of |
| 21 | your trial.  Was there a statement of facts that |
| 22 | was either read into the record or that you agreed |
| 23 | to that was attached to the plea agreement? |
| 24 | A.  It was read to the court. |
| 25 | Q.  Was that statement of facts true? |

CaseCase37-cv02t5303635D-SGEMMRE Document3c(2 293 only)ilecFHe/457/20/5207PageP5ge-1595f 295

1          A.   No.

2          Q.   What did you do as the court asked you

3     whether the statement of facts was true?

4          A.   As Judge Dlott was asking me I was

5     shaking my head no and I didn't want to lie to her

6     but so I just, I was going to say no and Bill

7     Gallagher leaned over and said you have to say yes,

8     it's a fictional plea.  That's the first time I've

9     heard fictional plea, so I said yes.

10         Q.   Did you then persist in answering the

11    judge's questions consistent with your accepting

12    your plea?

13         A.   No, I didn't, it was always a head

14    shake.

15         Q.   Was Mr. Gallagher at your side during

16    the plea process?

17         A.   Yes, sir.

18         Q.   Did Mr. Gallagher tell you just to

19    answer the judge's questions yes so the deal could

20    go through?

21         A.   Yes, sir.

22         Q.   Did he use at the podium the term

23    fictional plea?

24         A.   Yes, sir.

25         Q.   Did he use the term fictional plea out

Case 1:07-cv-00053-SJD-SKB Document 300 (Court only) Filed 04/13/2020 Page 151 of 295

1    in the hall afterwards where Mr. Ball was?

2         A.   Yes, sir.

3         Q.   Was your plea taken individually or

4    were your co-defendants Elliott and Benjamin also

5    standing at the podium for the taking of their

6    pleas?

7         A.   We were all at the podium together.

8         Q.   Were you present when the statement of

9    facts were read for Mr. Elliott?

10        A.   Yes.

11        Q.   Was the statement of facts that Elliott

12   pled to true?

13        A.   No.

14        Q.   Mr. Rennick, if the implication was

15   that the 50 pounds that Matt Elliott received from

16   the warehouse in College Hill was part of the

17   500 pounds that you allegedly brought back from

18   Arizona, would the statement of facts that Matt

19   Elliott pled to be correct?

20        A.   No.

21        Q.   Why not?

22        A.   I never brought any marijuana back from

23   anywhere, never had any.

24        Q.   Were you able to physically look at

25   both Mr. Elliott and Mr. Benjamin when the

CaseCase: 3:07-cv-00053-WHR-SLRR Doc Documento(221on) Filed File: 05/12/08/20Page Page 152 of 295

1   statements of facts were read for Mr. Elliott and

2   Mr. Benjamin?

3           A.  Yes.

4           Q.  What was Mr. Elliott's reaction to the

5   reading of his statement of facts?

6           A.  He shook his head, no, like he said it

7   wasn't true to me.

8                   MR. GLASSMAN:  Objection, your

9   Honor.  Only --

10                  JUDGE MERZ:  Hearsay, sustained.

11  BY MR. GREGER:

12          Q.  What did you see Mr. Elliott do, not

13  what did Mr. Elliott say.

14          A.  He looked at me and went, shook his

15  head.  (Indicating.)

16          Q.  Did you continue with the plea?

17          A.  Yes.

18          Q.  Why?

19          A.  Because the lawyer said it was a

20  fictional plea.

21          Q.  After the plea process was complete did

22  you have conversations with your lawyer?

23          A.  Yes.

24          Q.  Tell the court about that conversation.

25          A.  When we got out in the hallway, I told

1    Mr. Gallagher what they were reading was not true

2    and it made me sound like a drug dealer, and he

3    explained to us, he said, do not worry, it's just a

4    fictional plea.  It doesn't matter at all.  So I

5    said okay.  Then we were supposed to go down to the

6    probation officer and he said when we get down to

7    the probation officer, don't tell him it was a

8    fictional plea.  If you do, he won't accept your

9    plea.

10          Q.  Did you get acceptance of

11   responsibility points for continuing the lie in

12   front of the probation officer?

13          A.  I don't think I did.

14          Q.  Do you know, do you recall?

15          A.  I don't know.

16               MR. GREGER:  Your Honor, I'll

17   proffer into the record the pre-sentence

18   investigation report, in fact, gives Mr. Rennick

19   three points for acceptance of responsibility, two

20   being, one point being for timely notification of

21   the plea, two being for acceptance of

22   responsibility.  I also want the court to take

23   judicial notice of the application of 3E1.1 in that

24   rarely, if ever, is timely notification of a plea

25   applicable when the jury is ready to be seated and

Case 3:07-cv-00553-KBM-MRZ Document 30 (Court only) Filed 05/15/08 Page 154 of 295

1   hear the case.

2                   JUDGE MERZ:  Is there a sentencing

3   commission?

4                   MR. GREGER:  Commentary note and

5   application notes to the back of 3E1.1 where it

6   gives examples.  It says you can get acceptance of

7   responsibility even if you go to trial so long as

8   you are protecting constitutional rights.

9                   JUDGE MERZ:  Any objection to the

10  judicial notice request?

11                  MR. GLASSMAN:  Only that this

12  seems like legal argument and we can all look at

13  the guidelines.

14                  JUDGE MERZ:  I'll take judicial

15  notice as requested.

16                  MR. GREGER:  Thank you, your

17  Honor.

18  BY MR. GREGER:

19       Q.  Mr. Rennick, was your son originally

20  indicted in the same drug conspiracy?

21       A.  Yes, sir.

22       Q.  What occurred to your son's case?

23       A.  They dropped it there after a month or

24  so.

25       Q.  Was Kareem Cole likewise indicted in

1       your original case?

2               A.    Yes.

3               Q.    Do you know if Kareem Cole pled?

4               A.    I heard he did plead.

5               Q.    David Jones, he was likewise indicted

6       in your original case?

7               A.    I didn't know anybody named David Jones

8       but knew him as Phillip Davidson.

9               Q.    Did you know if Mr. Davidson aka Mr.

10      Jones pled?

11              A.    Yes.

12              Q.    Was there a superseding indictment

13      filed in your case?

14              A.    Yes.

15              Q.    Mr. Cole was not mentioned, Mr. Jones

16      was not mentioned, your son was out, Moore was out

17      but Wayne Benjamin was added into the new

18      indictment; is that true?

19              A.    Yes.

20              Q.    Was your son supposed to testify at

21      your trial?

22              A.    Yes.

23              Q.    Did he refuse to do so?

24              A.    Yes.

25              Q.    Did you have an understanding of why

1    your son refused to testify?

2          A.  Because they wanted him to lie about

3    what he was going to say.

4          Q.  What occurred with your son?

5          A.  I think on the day of the jury, they

6    were picking the jury, Mr. Goldberg came down and

7    they made some kind of a deal for him to testify

8    but he wasn't going to testify to what they wanted.

9                 MR. GLASSMAN:  Objection, your

10   Honor.

11                JUDGE MERZ:  Sustained.

12                MR. GREGER:  I'll ask the Court to

13   take judicial notice.  Judicial immunity sought

14   pursuant to the statute and, in fact, on the

15   morning of trial, Judge Dlott granted the statutory

16   immunity to Steven Rennick, Junior, thereby freeing

17   him from his Fifth Amendment right not to testify

18   and thereby compelling his testimony if it was

19   needed at Mr. Rennick, Senior's testimony.

20                JUDGE MERZ:  Is that, where is

21   that in the record?

22                MR. GREGER:  Your Honor, I do not

23   know other than through the government's file that

24   that exists.  So I can't tell you that it was ever

25   made of record.

1    JUDGE MERZ:  Then how can I take

2    judicial notice of it?

3    MR. GREGER:  Because I don't know

4    what's in your record.  I don't know if the Court

5    has privy to portions of records that the public

6    would never see thereby being an application for

7    statutory immunity pursuant to 6002 or 6001.

8    JUDGE MERZ:  I am not aware of

9    whether any such application was made.

10   MR. GREGER:  Mr. Brichler is here,

11   perhaps we can ask him.

12   JUDGE MERZ:  All right.

13   BY MR. GREGER:

14   Q.  Do you know why Mr. Benjamin pled to a

15   bill of information and not one of the counts in

16   the superseding indictment?

17   A.  No. Can you ask me that again?

18   JUDGE MERZ:  Do you know why Mr.

19   Benjamin pled to a bill of information and not to

20   one of the counts in the superseding indictment?

21   THE WITNESS:  I don't know.

22   BY MR. GREGER:

23   Q.  Mr. Rennick, did you terminate the

24   services of Mr. Gallagher at some point?

25   A.  Yes.

```
 1              Q.   Why?

 2              A.   Because he made me lie, and he lied to

 3   me.

 4              Q.   Did anyone tell you that Ken Lawson was

 5   inside of the courtroom actually defending you and

 6   telling the court what a raw deal you got when you

 7   were actually, when he was actually representing

 8   Mr. Elliott?

 9              A.   Yes, Tony Battles came out in the

10   hallway.  I was out there with Mr. Gallagher, my

11   sister, and couple of --

12              Q.   What did you do as a result of Mr.

13   Battles coming out and telling you that Mr. Lawson

14   was arguing about your raw deal in the defense of

15   Elliott?

16              A.   We went right back in the courtroom.

17              Q.   What happened next?

18              A.   When we got in there, Mr. Lawson was

19   telling the judge how I got shot and how policemen,

20   they get shot, they get a medal.  I got shot and I

21   didn't get anything and he wanted to put Mr. John

22   Mercado on the stand because they were saying that

23   I didn't do things by the book on being a CI.

24              Q.   Let me ask you, Mr. Rennick, if this

25   was in the portion of the record that we've already
```

1    talked about in this hearing where they were

2    arguing over whether Mr. Elliott was to get

3    substantial assistance or not?

4            A.   Yes.

5            Q.   There was a discussion, did you hear a

6    discussion in open court that's been reflected in

7    the record that we've already gone over between Mr.

8    Lawson and Mr. Brichler about whether or not Mr.

9    Elliott should get substantial assistance?

10           A.   When Mr. Lawson wanted John Mercado to

11   put him on the stand to have a hearing, Mr.

12   Brichler asked for it to be off the record and him

13   and Mr. Lawson talked, they talked right up, you

14   couldn't hear what they were saying.  As soon as

15   they broke up, Mr. Brichler said to go back on the

16   record and that him and Kenny Lawson had talked and

17   Kenny Lawson has never lied to him and that he was

18   going to give Matt a 5K1 so there was going to be

19   putting no John Mercado on the stand.

20           Q.   Did you ultimately hire Ken Lawson?

21           A.   He kind of hired himself to me out in

22   the hallway.

23           Q.   Tell the judge about that.

24           A.   After the spiel with me getting shot

25   and everything, we were out in the hallway and he

1    gave me his card and said, come to my office, call

2    and make an appointment and come to my office

3    tomorrow, I'll get all of this dropped.  I knew you

4    weren't getting, I'll get all of this dismissed.

5    So I said okay.

6                    So I called.  He wanted $15,000.

7    I took $15,000 check down and he said he would get

8    the truck back and get everything dismissed.  So

9    that was the start of every week or couple of days

10   he'd call and want another $15,000.  He said he was

11   going to go over to Judge Dlott's house, you know,

12   he was just blowing smoke.  So I kept giving him

13   money.

14                    JUDGE MERZ:  How much did you give

15   him?

16                    THE WITNESS:  $80,000.  And it

17   gets worse.  I mean, he tells me when I go to

18   prison, he said you won't be there anymore than

19   30 days or so. He talked to Judge Dlott and was

20   going to get everything taken back and I don't hear

21   from him in like 60 days, 90 days.  My daughter

22   calls him and he said, would you tell your F dad if

23   he don't quit F'ing this or that, he's going to

24   wind up doing all of his time.

25                    So my sister called Mr. Lawson and

1    tried to get this straightened out about cussing at

2    my daughter and that he got into it with her and he

3    said, I'm off Steve's case.  My wife called and

4    apologized for my sister.  He said bring $30,000

5    down.  It was unbelievable.  They didn't have

6    $30,000 so they just, I told them do not go down

7    there, he's just playing you.

8                    So you know, but she thought it

9    was a chance that, you know, this guy said bring

10   30,000.  We'll get it all taken care of.  And I

11   told them just don't do it.

12   BY MR. GREGER:

13        Q.  Mr. Rennick, did anything happen at the

14   sentencing between yourself and your attorney?

15        A.  Yes, we got out in the hallway and Bill

16   after we went through with the judge about we

17   wanted to do an appeal --

18        Q.  No, inside of the courtroom at the time

19   she started to impose sentence, does anything

20   happen between you and Mr. Gallagher?

21        A.  Yes, the night before.

22        Q.  Go ahead.

23        A.  We went down to Mr. Gallagher's office

24   and he said he talked to Mr. Brichler and that he

25   was going to give me a sentence reduction.  He had

Case Case: 37-cv-00359035D-SAEMMR Document 36 (3-290-only) Filed File: 0/57/00/20 Page Page 462 of 2951 295

1    to do a motion.  So he said he was going to do that

2    motion.  He was going to get it all straightened

3    out, and I would get a sentence reduction.

4          Q.  Who was going to do the motion?

5          A.  Bill Gallagher.

6          Q.  Bill Gallagher was going to do a motion

7    to get a sentence reduction?

8          A.  Yes.

9          Q.  What happened?

10          A.  We got to court.

11          Q.  Did you go to Gallagher's office the

12    night before?

13          A.  Yes.

14          Q.  How many drafts of the motion did you

15    review?

16          A.  None.

17          Q.  Go ahead.

18          A.  So when we got to the sentencing and

19    she started reading everything off and Mr.

20    Gallagher has just agreed and agreed and said he

21    didn't blame nobody for anything.  I said shit,

22    this is, something is not working like Mr.

23    Gallagher said it was.  I don't hear the sentence

24    reduction in there and it just, you know, the gavel

25    is ready to fall, something is not right and Mr.

Case 3:07-cv-00355-WHR-MRM Document 36 Filed 04/17/2012 Page 1 of 295

1    Gallagher leaned over to me and said, shh, don't

2    say no more.  So I didn't.

3         Q.  Did you use the term oh, shit in open

4    court?

5         A.  Yes, sir.

6         Q.  What did Mr. Gallagher tell you to do

7    after you used those terms in open court?

8         A.  He told me to shh, don't say no more.

9              MR. GREGER:  Can I have a moment,

10   your Honor?

11             JUDGE MERZ:  Yes, sir.

12             MR. GREGER:  Your Honor, I

13   apologize, I thought I had this marked and I'm sure

14   I do but I'm going to refer to the Joint Appendix,

15   JA page 121 that was in appendix one filed in

16   support of Mr. Rennick's 2255 and those are

17   consecutively numbered, and if I may approach the

18   witness, your Honor?  I'm sorry, let me give the

19   court -- may I approach, your Honor?

20             JUDGE MERZ:  Yes.

21   BY MR. GREGER:

22         Q.  Mr. Rennick --

23             JUDGE MERZ:  This is part of the

24   Joint Appendix in the court of appeals?

25             MR. GREGER:  Yes, your Honor.  It

Case: 87-cv-00053-WHR Doc #: 200 Filed: 04/24/2013 Page: 164 of 295

1    would have been but it's now been appended to his

2    2255.

3                JUDGE MERZ:  Right.

4    BY MR. GREGER:

5          **Q.**  Mr. Rennick, I'm going to proffer to

6    you, represent to you this is page 14 of the Joint

7    Appendix page 121.  Does your use of that curse

8    word appear at line 15?

9          **A.**  Yes.

10          **Q.**  And are there any shh that you say Mr.

11    Gallagher told you to do reflected on that?

12          **A.**  Yes, on line 23.

13          **Q.**  And what did you say to Mr. Gallagher?

14          **A.**  I can't shh I've got to tell them about

15    Mercado.

16          **Q.**  Did Mr. Gallagher tell you that at your

17    sentencing Mr. Brichler would agree that you should

18    get some time off of your sentence?

19          **A.**  Yes.

20          **Q.**  Did Mr. Brichler agree to give you that

21    time off?

22          **A.**  No.

23          **Q.**  Tell the judge why you used the word,

24    profanity, S-H word in open court.

25          **A.**  Because everything that Gallagher told

1    me was not true.  I mean nothing was right.

2         **Q.**  And when the judge started to pronounce

3    a 63-month sentence is that when you used that

4    profanity?

5         **A.**  Yes.

6         **Q.**  Did the court give your attorney the

7    right to call Agent Mercado to the stand to ask him

8    questions?

9         **A.**  Yes.

10         **Q.**  Was that to support your motion for

11    substantial assistance or lesser sentence?

12         **A.**  Yes.

13         **Q.**  Did your attorney decline that right?

14         **A.**  Yes.

15         **Q.**  Did Matthew Elliott tell you on the

16    morning of trial that one of the reasons that you

17    should plead is that if you did not do so you would

18    mess up Elliott's future and ruin his life?

19         **A.**  Yes.

20         **Q.**  Did Matthew Elliott tell you on the

21    morning of trial that you would be able to

22    cooperate, that you would never do much time and

23    that you might get probation?

24         **A.**  Yes.

25             MR. GLASSMAN:  Objection.  I think

1    that is hearsay.

2              MR. GREGER:  Your Honor, it's not

3    used for the truth of the matter asserted it's that

4    he took action as a result of that.

5              JUDGE MERZ:  Also it's a verbal

6    act by Mr. Elliott.  Overruled.

7              MR. GREGER:  Thank you.

8    BY MR. GREGER:

9         Q.  Mr. Rennick, tell the Court about the

10   involvement of the New Mexico Department of

11   Transportation?

12        A.  Well, when we were on our way back from

13   Arizona --

14        Q.  Who is we?

15        A.  Kareem and I and we were pulling, we

16   had to go through weigh stations.  We went through

17   the weighing stations.  I didn't have any placards

18   or numbers on the tractor so when I pulled in to

19   the scale, the guy said pull around back and come

20   in. So I took my paperwork in and he seen it had a

21   motor home license.  He asked why I didn't have a

22   placard.  It was going to be a race car and it had

23   a motor home license plate on it.  He said I need

24   to see what it is.  He came out in the lot, got up

25   in the truck and looked at it.  I told him that I

1     had the state of Ohio patrol inspect it and they

2     said it was fine.  He said, well if that's the way

3     they do it in Ohio, it had to be all right.  So we

4     went ahead and left.

5          Q.  Mr. Rennick, is this the time that the

6     government says you are transporting 500 pounds of

7     marijuana in the same tractor that has now been

8     inspected by the New Mexico Department of

9     Transportation?

10          A.  Yes.

11          Q.  Did you hire or pay to hire an

12     accountant or a CPA for any purpose of defending

13     you at your trial?

14          A.  Yes.

15          Q.  What was the use of the CPA or

16     accountant supposed to be for?

17          A.  He did the S and S Racing account and

18     he was to go over all of the cash that was in for

19     the sponsorship of the car into, see where the

20     deposits were and who it went to and he did the

21     checkbook and income tax statement on it.  He filed

22     the taxes and everything on S and S Racing.

23          Q.  The accountant or CPA, did you

24     understand was going to be prepared to testify that

25     all of the alleged currency transactions were, in

CaseCase3:07-cv-00255-WHR-SLBMKH-Document3s(2-200-only) filed 08/45/20802007age Pageof 295 of 295

1    fact, not related to marijuana, that they were

2    related to sponsorships and he could trace the

3    money?

4         A.  Yes.

5         Q.  Did you learn on the morning of your

6    trial that Kenneth Lawson, Matthew Elliott, William

7    Gallagher and Robert Brichler met to discuss the

8    resolution of your case by way of a plea?

9         A.  The morning of the trial?

10        Q.  Morning of the trial.

11        A.  Yes.

12        Q.  Were you invited to that meeting?

13        A.  No.

14        Q.  Did you know about the meeting before

15   it occurred?

16        A.  No.

17        Q.  Did you authorize that meeting?

18        A.  No.

19        Q.  Let's talk about Matt Elliott for a

20   moment.  Were you close with Mr. Elliott?

21        A.  Yes.

22        Q.  Did you consider him like a son?

23        A.  Yes.

24        Q.  Did he come to you at the time of the

25   pleas?

1      A.   Yes.

2      Q.   Did he tell you what you've already

3  testified to about his life being ruined and his

4  young children?

5      A.   Yes.

6      Q.   Was he crying?

7      A.   Yes.

8      Q.   Did he tell you it was a package deal,

9  if you didn't plead, he couldn't get his deal?

10     A.   Yes.

11     Q.   Was Wayne Benjamin initially charged

12  with any criminal offense in the first indictment?

13     A.   No.

14     Q.   What do you understand happened to

15  cause him to be included in the second indictment?

16     A.   Wayne had called me and said that he

17  called down to Mr. Brichler and he was going to go

18  down and talk to him.  We never brought, there was

19  never no marijuana in the camper or anything when

20  we went to Arizona so he went down and talked to

21  Mr. Brichler and he called me when he got back and

22  said he talked to Mr. Brichler and he sat there at

23  the table and said here's what we want you to say,

24  and Wayne said, I can't do that, it's a lie and Mr.

25  Brichler got up and said, you go on home, we'll

1    indict you later, and the next day or two he was

2    indicted.

3         Q.  Was your son going to be compelled to

4    testify at trial?

5         A.  Yes.

6         Q.  Your son had previously been indicted

7    and then was dismissed from the indictment; is that

8    true?

9         A.  Yes.

10        Q.  Did you conspire with your son to

11   distribute marijuana?

12        A.  No.

13        Q.  Did you conspire with anyone to possess

14   with the intent to distribute marijuana?

15        A.  No, never.

16        Q.  Did you give a pound of marijuana to

17   Wayne Benjamin?

18        A.  No.

19        Q.  Did you make sure that there was a

20   supply of marijuana in a locked and leased portion

21   of the warehouse in College Hill from which Matt

22   Elliott got his 50 pounds?

23        A.  No.

24        Q.  Did the fact that the government was

25   going to compel your son to testify against you

Case Case 3:07-cv-00535-SMR-MRW Document 8 (Court only) Filed 04/17/2013 Page 71 of 295

1    affect your decision in making your plea?

2          A.   Yes.

3          Q.   What way?

4          A.   Well, I felt like I had three sons who

5    was going to get, between Matt, Wayne and my son,

6    it just, it got -- I just didn't know what was

7    going on.  I was getting squeezed and pressured by

8    Matt, crying.  He was just, you know, next thing I

9    knew I didn't have a choice and I had to say yes.

10         Q.   Was your son represented by counsel?

11         A.   Yes.

12         Q.   Who selected your son's counsel?

13         A.   I did.

14         Q.   Tell the Court about that.

15         A.   Well, when we got arrested, I called

16   Mr. Goldberg and said, don't say nothing to them.

17   I said, I want you to represent my son, I need you

18   to pick somebody for me.  So he said he would.  He

19   told us do not say anything to the police and they

20   kept my son handcuffed to the sheriff with ten

21   hours and kept badgering him and badgering him.  I

22   told him, I called a lawyer and we were not going

23   to say no more until the lawyer came, until the

24   lawyer came and they said they had talked to Mr.

25   Goldberg and he said we could go ahead and talk to

CaseCase3:07-cv-00590-SLTMR-BMRDocumeDtotumtec(Oatent onofyiledFildet45/20/0820PageeIagef 2251 295

1      them.

2                        I said, let me call Mr. Goldberg

3      one more time to verify this.  This is John

4      Mercado.  He said no, we can't let you call again.

5      To make a long story short, the next day or two, I

6      called Goldberg.  I told him that he said we could

7      talk to him.  I told you, Steve, at the beginning

8      not to say anything.  I never told them nothing

9      about talking to you.

10          Q.  Is Richard Goldberg at your trial on

11     the day that it was supposed to start?

12          A.  Yes.

13          Q.  What caused Mr. Goldberg to be at that

14     trial even though he was representing your son?

15          A.  We wanted, I wanted him there just to

16     represent, you know, Steve's interest, to protect

17     him and that and make sure that everything was

18     going all right.

19          Q.  Who paid him?

20          A.  Earth Management Trucking.

21          Q.  How much did you pay Goldberg to be at

22     your hearing to protect your son's interest?

23          A.  $2,500.

24          Q.  What happened on the morning of trial

25     as it related to your son?

Case Case 3:07-cv-00035-WHR-SLO Document Document 30-1 (Court only) Filed Filed 05/03/2010 05/03/2010 Page Page 173 of 295 of 295

1          A.   The morning of the trial?

2          Q.   Is that when the immunity was sought or

3     do you know?

4          A.   I don't know for sure.  Mr. Goldberg

5     said he was representing Steve so he didn't really

6     tell me too much.

7          Q.   Fair enough.  Did your relationship

8     with Mr. Elliott have an effect on your decision to

9     enter into a fictional plea?

10         A.   Yes.

11         Q.   Did the actions of the government

12    toward your son have an effect on your decision to

13    enter into the fictional plea?

14         A.   Yes.

15         Q.   Did you know that Mr. Elliott was going

16    to receive a benefit from the government if he got

17    you to plead?

18         A.   No.

19         Q.   After you entered your plea, did you go

20    out in the hallway?

21         A.   Yes.

22         Q.   Were the lawyers gathered there?

23         A.   Yes.

24         Q.   Were the defendants gathered there?

25         A.   Yes.

1          Q.  Tell the Court what happened.

2          A.  Well, all three of us started asking

3     the lawyers why did they read these lies to the

4     judge and they said, don't worry, it's just a

5     fictional plea and we all just lost it.  We want

6     that taken out.  We never knew they were going to

7     say that to begin with.  So, again, they just told

8     us, don't worry, it's just a fictional plea.

9               JUDGE MERZ:  And all three of you,

10    you, Elliott, and Benjamin all said that?

11               THE WITNESS:  Yes, sir.

12               MR. GREGER:  And we know Benjamin

13    should have said that because that was a Holy

14    concocted crime and date.

15    BY MR. GREGER:

16         Q.  Were you upset with your attorney after

17    the pleas?

18         A.  Yes, I was.

19         Q.  Were you present when the discussion

20    happened in court about Mr. Elliott getting his 5K

21    or substantial assistance motion?

22         A.  Yes.

23         Q.  Did you hear that discussion on the

24    record between Mr. Lawson and Mr. Brichler that is

25    contained in the exhibit that we've already talked

CaseCase3:17-cv-00520350335D-SLEMMRIDocuBaentrSo(t200-onlyFiledFiHe4l/520BZ00PageRageo120f 295

1    about?

2         A.   Yes, I did.

3         Q.   Did you hear Mr. Brichler say that the

4    substantial assistance for Matthew Elliott was only

5    limited to what he got you to do on the day of your

6    trial?

7         A.   Make the trial go away, he said.  He

8    said Matt wasn't getting no award for me talking

9    into being a CI.  It was just for making the trial

10   go away.

11        Q.   Was Mr. Elliott rewarded for getting

12   you to plead?

13        A.   Yes.

14        Q.   He got a sentence of 14 months, did he

15   not?

16        A.   Yes.

17        Q.   That was after Mr. Brichler suggested

18   to the court about a one third reduction; is that

19   true?

20        A.   Yes.

21        Q.   So he would have been in a 21 to

22   27-month, taking a third off, would have been

23   seven.  He should have been 14 range and then

24   agreed on a sentencing guideline range of 12 to 18

25   that would have then contained the 14; is that

```
 1      true?

 2              A.   Yes.

 3                      MR. GREGER:  Your Honor, I'm going

 4      to ask the Court to take judicial notice that the

 5      time the court took the pleas, August 18th, the

 6      federal sentencing guidelines were still mandatory.

 7                      JUDGE MERZ:  So ordered.

 8                      THE WITNESS:  Can I take a minute

 9      to get a drink.

10      BY MR. GREGER:

11              Q.   Did your attorney make any --

12                      JUDGE MERZ:  Hold on just a

13      second.

14                      MR. GREGER:  I apologize.

15                      JUDGE MERZ:  Does the marshall

16      service have a need to switch?

17                      UNIDENTIFIED SPEAKER: We do.

18                      JUDGE MERZ: Okay.  Go ahead, Mr.

19      Greger.

20      BY MR. GREGER:

21              Q.   Did your attorney make any

22      recommendations to you at the time of the plea

23      discussions as to what the sentence might be?

24              A.   No.

25              Q.   Did you ever have a discussion with
```

1    anyone about what the term minimum mandatory meant?

2         A.   No.

3         Q.   When the judge was going through your

4    pleas, all three of you, did she throw that in at

5    the end, oh, by the way, I almost forgot there is a

6    five-year minimum mandatory here?

7         A.   Yes.

8         Q.   How many lawyers were present out in

9    the hallway after you entered your pleas, three or

10   four?

11        A.   Four.

12        Q.   Who were the four?

13        A.   Kenny Lawson, Bill Gallagher, Richard

14   Goldberg, and Greg Cohen.

15        Q.   Did you ask your lawyer to accompany

16   you to the meeting with Agent Mercado so the terms

17   of what you were supposed to do to qualify for the

18   downward departure were fully understood?

19        A.   Yes, I begged him.

20        Q.   Did he go with you?

21        A.   No.

22        Q.   Mr. Rennick, did you, in fact, make

23   trips to Arizona with other individuals?

24        A.   Yes.

25        Q.   Did you admit, in fact, that you had

1    made those trips?

2          A.   Yes, sir.

3          Q.   Were those trips for drug

4    transportation purposes?

5          A.   No, sir.

6          Q.   What were they for?

7          A.   We had taken, Phillip had a promotion,

8    Wild African Promotions for the reggae.  He put out

9    reggae shows out in Phoenix.  He had artists come

10   over from Jamaica and they would do one in

11   Cincinnati and do one in Arizona, and go to

12   California.  What we did we took, there were four

13   guys plus Phillip and Kareem and Wayne.  We take

14   them.  While on the way out, they would get their

15   program together.  They were back in the back and

16   do their music selection.  So then we drop them

17   off.

18               Very first one we went to we

19   helped them set up.  It was at like a bar with a

20   big opening where they were having this at and we

21   were there for probably an hour.  It was so loud, I

22   said this is not for me.

23         Q.   Did you actually attend one of the

24   reggae concerts that they told you that was their

25   business?

1      A.   Yes.   I really, I went to two in
2   Cincinnati and I went to one of the ones in
3   Arizona.
4           Q.   Did you help set up for one of the
5   concerts?
6           A.   Yes.
7           Q.   Are these the individuals to whom you
8   leased a portion of the warehouse to?
9           A.   Yes.
10          Q.   Is that Mr. Cole and Mr. Davidson?
11          A.   Yes.
12          Q.   How did you know what name did Davidson
13  use with you?
14          A.   Phillip.
15          Q.   Phillip Davidson?
16          A.   Yes.
17          Q.   Did you until the indictment was
18  returned know that he had other names?
19          A.   Never.
20          Q.   Have you ever heard him called anything
21  but Phillip?
22          A.   Never.
23          Q.   Did you do anything but lease them
24  space?
25          A.   No, that's all I did.

Case Case 3:07-cv-00053-JD-SMM Document 3 Document 3 (Court only) Filed 04/17/2007 Filed 04/12/2007 Page Page 180 of 295 of 295

1          Q.  Did you ever bring 500 pounds of

2     marijuana from Arizona and put it in the locked

3     portion of the warehouse in College Hill that you

4     had leased to them?

5          A.  No.

6          Q.  Did you purchase a Freightliner

7     tractor?

8          A.  Yes.

9          Q.  What purpose?

10          A.  To hall our race cars.

11          Q.  How many race cars does the team have?

12          A.  Three.

13          Q.  Was there ever a trailer attached to

14     the fifth wheel of the tractor?

15          A.  No, sir.

16          Q.  Was it in the pristine condition that

17     Mr. Cohen testified to this morning?

18          A.  Yes, sir, there was no scratch on the

19     metal.

20          Q.  Did you ever purchase a trailer that

21     would be pulled by the Freightliner tractor?

22          A.  No.

23          Q.  Did you understand it that the

24     government's contention was that you hauled

25     500 pounds of marijuana in the Freightliner tractor

Case 3:07-cv-00535-WHR Document 24 (Court only) Filed 05/12/2003 Page 1 of 295

1     not a trailer?

2            A.   No.

3            Q.   Is that what you understood the

4     government's contention was, it was in the tractor?

5            A.   They said it was in a tractor trailer.

6     So there was never a trailer on it.

7            Q.   Because --

8            A.   Because, because I didn't own a

9     trailer.

10           Q.   Was a pre-sentence report prepared in

11    your case?

12           A.   Yes.

13           Q.   Did you review that report with your

14    attorney?

15           A.   No.

16           Q.   Did you tell the judge that you had?

17           A.   Yes.

18           Q.   When did you first see your

19    pre-sentence report?

20           A.   When I was in Lexington.

21           Q.   How did you receive that pre-sentence

22    report when you were in Lexington?

23           A.   My sister sent it to me in the mail.

24           Q.   Did you look through that pre-sentence

25    report and read it when you received it from your

1       sister by mail in Lexington?

2               A.   Yes.

3               Q.   Were there any facts in that

4       pre-sentence report that you disagreed with?

5               A.   Yes.

6               Q.   Give me an example.

7               A.   I think there was like 23 of them, and

8       I never knew you could disagree with anything on

9       it.  It would be hard for me to say right now

10      without looking at it.

11              Q.   Were there facts surrounding a camper,

12      if you recall?

13              A.   Oh, yes, camper went to Arizona and

14      picked up marijuana and it wasn't true.

15                      JUDGE MERZ:  Let me make sure I

16      understand what you are saying to me, Mr. Rennick.

17      You had a chance to review this report before you

18      were sentenced.  You lied to Judge Dlott and said

19      that you had reviewed it and then you found later

20      23 things in it that you don't think are true.

21                      MR. GREGER:  That's not correct,

22      your Honor.

23                      JUDGE MERZ:  My question --

24                      MR. GREGER:  I understand, but

25      that assumes --

Case: 1:07-cv-00035-SSB-MRM Doc #: 9 Filed: 05/12/08 Page: 183 of 295

 1                    JUDGE MERZ:  My question --

 2                    THE WITNESS:  When Bill Gallagher

 3      had me sign it he said you don't need to read it,

 4      everything is fine.

 5                    JUDGE MERZ:  All right.

 6                    THE WITNESS:  So I didn't read it.

 7                    JUDGE MERZ:  Okay.

 8      BY MR. GREGER:

 9           Q.  The judge assumes that you knew you had

10      a right to review it.  Did you know you had a right

11      to review your pre-sentence investigation?

12           A.  No.

13           Q.  The judge, when she was asking

14      questions at sentencing, asked if you reviewed

15      documents, didn't she?  Let me refresh your

16      recollection.  I think it's Joint Appendix page

17      110.

18                    JUDGE MERZ: I think before we do

19      that we are going to take ten minutes.  We are in

20      recess.

21                    (Discussion held in chambers

22      between Judge and Counsel appearing under separate

23      cover.)

24                    (WHEREUPON, a recess was taken.)

25                    MR. GREGER:  I'd like to cite the

1    Court to the Joint Appendix pages 110 through 112

2    which is a portion of the sentencing transcript

3    where Judge Dlott mentions what she has reviewed,

4    one of which is the pre-sentence report but that

5    she sites two other documents relevant to

6    sentencing and her questions are whether or not

7    they have received copies of the documents.

8              Defendant says yes, your Honor,

9    because one of the documents he authored which is

10   the December 2, 2003 letter and, secondly, he's

11   aware of the motion for downward departure which

12   was filed on January 26th this year.  As he so

13   testified it was going to be prepared by his

14   attorney.  If the Court then looks at 111 and 112

15   there is never an engagement of Mr. Rennick again

16   as it relates to objections in the pre-sentence

17   report.  The court simply asks counsel whether or

18   not there are objections.

19             JUDGE MERZ:  I have that, thank

20   you.

21             MR. GREGER:  You are welcome.

22   BY MR. GREGER:

23        Q.  Have you ever been prosecuted in

24   federal court before this crime?

25        A.  Yes.

Case Case 3:07-cv-00053030-5D-GHEMMR Document 3c/Document 3 only filed filed 045/5200D 200 Page Page of of 295 1295

1        Q.   When?

2        A.   I can't remember.  '89, I think.

3        Q.    '89?

4        A.   Yes.

5        Q.   Did you go through the same

6   pre-sentence report process in '89?

7        A.   I don't remember.

8        Q.   Let me ask you, Mr. Rennick, was one of

9   the facts that was read by the government at the

10  time all three of you pled that Mr. Benjamin

11  obtained a pound of marijuana from you on or about

12  July 18, 2002.  Was that one of the facts that you

13  heard read?

14       A.   Yes.

15       Q.   Were you in the state of Ohio on that

16  date?

17       A.   No.

18       Q.   Where were you?

19       A.   On our way to Phoenix, Arizona to pick

20  up the tractor.

21       Q.   Was that one of the facts that you

22  brought to the attention of Mr. Gallagher after

23  court as having caused your anxiety or upsetedness

24  for lack of a better term after the pleas?

25       A.   Yes.

CaseCase37-cv-020509033B-SWHMRDocuDocume36(R208 only)iledFile45/25/2007agePage 450 f 295

1     Q.   Did Mr. Gallagher talk to you about the

2     medications that you were on at the VA?

3          A.   Yes.

4          Q.   How many pages of medical records did

5     you deliver to Mr. Gallagher, you or one of your

6     family members, deliver to Mr. Gallagher so he

7     could get a complete picture of your medical

8     background?

9          A.   380.

10         Q.   What did he tell you about the

11    medications, if the court asked about them?

12         A.   He said I had to say that I wasn't

13    taking any medications that would effect my

14    judgment or anything.

15         Q.   Was there evidence, Mr. Rennick, that

16    Matthew Elliott had engaged in illegal conduct

17    between himself and Mr. Moore?

18         A.   I think there was a letter from Eddie

19    Moore.

20         Q.   Had Mr. Elliott discussed with you

21    before August 18, 2003 resolving his case by way of

22    plea?

23         A.   I'm sorry?

24         Q.   Did Mr. Elliott talk to you before

25    August 18, 2003 that he wanted to resolve his case

1    by pleading to something?

2          **A.**  No.

3          **Q.**  Did Wayne Benjamin talk to you before

4    August 18, 2003 that he wanted to resolve his case

5    by way of a plea?

6          **A.**  No.

7          **Q.**  Was, in fact, Mr. Elliott adamant about

8    going to trial that morning?

9          **A.**  Very, yes.

10          **Q.**  Mr. Lawson did not misrepresent Mr.

11    Elliott's desire, strong desire, to go to trial

12    that morning?

13          **A.**  No, he didn't.

14          **Q.**  Mr. Rennick, do you want this Court to

15    vacate your plea?

16          **A.**  Yes.

17          **Q.**  Mr. Rennick, why?

18          **A.**  Because I wasn't guilty.

19          **Q.**  Do you believe that you had the

20    effective assistance of counsel in the plea

21    process?

22          **A.**  I'm sorry?

23          **Q.**  Do you believe you had effective

24    assistance of counsel in the plea process?

25          **A.**  No.

1    Q.  Do you believe that the government

2    agent, Mr. Elliott, brought pressure to bear on

3    you --

4                  JUDGE MERZ:  Sustained,

5    characterization.

6    BY MR. GREGER:

7    Q.  Did you know that Mr. Elliott was going

8    to be benefit by getting you to plead?

9    A.  No.

10   Q.  When for the first time did you find

11   out that Mr. Elliott was going to benefit from the

12   government if he could convince you to plead?

13   A.  At the sentencing.

14   Q.  Do you realize if this court vacates

15   the plea and returns this case to the district

16   court, you could end up going to trial on this

17   matter?

18   A.  Yes.

19   Q.  Is that what you want to do?

20   A.  Yes.

21                  JUDGE MERZ:  You have an

22   understanding what your sentence could be if you

23   went to trial or convicted?

24                  THE WITNESS:  Yes.

25                  JUDGE MERZ:  What is it?

1              THE WITNESS:  5 to 40.  I don't

2    know for sure, I'm sorry, your Honor, I don't know.

3              JUDGE MERZ:  Okay.

4              MR. GREGER:  It's 5 to 40, minimum

5    five years.  Do you know whether or not there is a

6    statute that mandates you get credit for the almost

7    63 months that you've already done?

8              THE WITNESS:  No.

9    BY MR. GREGER:

10         Q.  You are willing to take that risk?

11         A.  Yes.

12              MR. GREGER:  Are we on 9?

13              JUDGE MERZ:  Yes, the next one

14    will be 9.

15              MR. GREGER:  Thank you, your

16    Honor.

17    BY MR. GREGER:

18         Q.  Mr. Rennick, I've handed you what is

19    marked for identification as Rennick's Exhibit 9

20    for the purposes of this hearing.  Can you identify

21    that for the record, please?

22         A.  It's a check from Provident Bank for

23    the payment of a Freightliner in Phoenix, Arizona,

24    Cunningham Truck Service.

25         Q.  From what account was this check drawn?

Case Case 1:07-cv-00259-SSB-TSB Doc Document 3c (Court 8-2 only) Filed 05/14/2008 Page Page 100 of 295 of 295

1          A.   S and S Racing.

2          Q.   Were the funds $83,993 derived from

3     illegal proceeds of marijuana distribution?

4          A.   No, sir.

5          Q.   Handing you what is marked for purposes

6     of the record as Exhibit 10, can you identify that

7     for the record, please?

8          A.   It's page six out of my VA medical

9     records.

10              JUDGE MERZ:  And seven?

11              THE WITNESS:  I'm sorry, yes.

12    BY MR. GREGER:

13         Q.   Page six and seven?

14         A.   Yes, sir.

15         Q.   Who, is this a portion of the 380 pages

16    that you gave to Mr. Gallagher?

17         A.   Yes.

18         Q.   Now, the date of this is after your

19    plea, the date in the right-hand corner is

20    January 26, 2004; is that correct?

21         A.   Yes.

22         Q.   Do the medications, however, cover the

23    period, covered by the plea agreement?

24         A.   Yes.

25         Q.   And is this just a portion of your

Case Case 3:07-cv-00835-WHR-MRM Document 8 Document 6(filed only) filed File #:4/3/2008 2008 Page Page 1 of 1 295

1   medical chart from the VA?

2           A.   Yes.

3           Q.   Were you on any kind of psychiatric or

4   psychotropic medications at the time that you went

5   before the court on the morning of your plea?

6           A.   Yes.

7           Q.   What are you being treated for, Mr.

8   Rennick?

9           A.   PTSD from Vietnam.

10               JUDGE MERZ:   What are or were --

11  BY MR. GREGER:

12          Q.   What were you at the time, thank you,

13  your Honor, what were you at the time being treated

14  for and that would be August of 2003 period.

15          A.   PTSD.

16          Q.   That is post traumatic stress disorder?

17          A.   Yes.

18          Q.   Does that arrive from your Vietnam

19  experience?

20          A.   Yes.

21          Q.   Did you, Mr. Rennick, have to shoot a

22  fellow soldier who was burning up before your eyes

23  and whose face was starting to melt to put him out

24  of his agony?

25          A.   Yes.  I'm sorry.

1          Q.  Was there any other traumatic event

2    involving a truck that contributed to your PTSD?

3          A.  Yes.

4          Q.  Were you charged with vehicular

5    homicide in the death of a person who was in a

6    truck with you?

7          A.  Yes.

8          Q.  Did that truck slide off of the road?

9          A.  Yes.

10         Q.  Did you go to trial on that man's

11   death?

12         A.  Yes.

13         Q.  What was the result?

14         A.  Not guilty.

15         Q.  Do your Vietnam buddies visit you?

16         A.  Yes.

17         Q.  What are you currently being treated

18   for?

19         A.  PTSD flashbacks and depression.

20         Q.  I'm going to hand you what is marked

21   for identification -- are you okay?

22         A.  I'm all right.

23         Q.  I'm going to hand you what is marked

24   for identification as Rennick's Exhibit 11 for

25   purposes of this hearing.  Can you identify that

1 for the record, please.

2    A. It's a page out of a national dragster

3 with an advertisement for race car trailers,

4 Michael Brotherton in Texas.

5    Q. Michael Brotherton,

6 B-R-O-T-H-E-R-T-O-N, in Texas?

7    A. Yes, sir.

8    Q. Did you and Wayne Benjamin make a trip

9 to Texas and then to Arizona and back for purposes

10 of picking up the Freightliner tractor and looking

11 at, through Mr. Brotherton trailers to go along

12 with that tractor?

13    A. Yes.

14    Q. Is this an example of the magazine that

15 drew your attention to Mr. Brotherton in Texas?

16    A. Yes.

17    Q. Did you travel leaving the state of

18 Ohio in middle July of 2002 and return toward the

19 end of July, 2002?

20    A. Yes.

21    Q. That is a period where Mr. Benjamin

22 said you gave him a pound of marijuana, did you

23 give him that pound of marijuana while you two were

24 traveling across the United States to pick up the

25 Freightliner tractor and look at trailers?

1          A.   No, sir.

2          Q.   Did you actually go to Mr. Brotherton's

3    business?

4          A.   Yes.

5          Q.   How many days did you spend at or about

6    Mr. Brotherton's house?

7          A.   We were there about one day.  We got

8    there on, I think, the 17th or 18th.

9          Q.   Of July of 2002?

10         A.   Yes.

11         Q.   After Mr. Brotherton's business in

12   Texas, where did you go?

13         A.   To Phoenix, Arizona.

14         Q.   Did you pick up the Freightliner in

15   Arizona?

16         A.   It wasn't ready yet, we had to wait out

17   there until, I think, the 23rd.

18         Q.   Handing you what's been marked for

19   purposes of the record as Rennick's Exhibit 12 for

20   this hearing, can you identify that for the report?

21         A.   It's a delivery receipt when we picked

22   up the tractor.  I had to sign for it when we gave

23   them the check.

24         Q.   That date of 7/23/02 is written next to

25   your signature, isn't it?

1         **A.**   Yes.

2         **Q.**   Did you sign this delivery receipt?

3         **A.**   Yes, sir.

4         **Q.**   Does that acknowledge receipt of the

5 Freightliner?

6         **A.**   Yes, sir.

7         **Q.**   And that's just the tractor portion?

8         **A.**   Yes, sir.

9         **Q.**   Is that the trip that Mr. Benjamin was

10 on with you?

11         **A.**   Yes, sir.

12         **Q.**   Handing you what's been marked for

13 purposes of the record as Rennick's Exhibit 13 for

14 this hearing, can you identify that for the record,

15 please.

16         **A.**   It's a vehicle invoice showing how the

17 payments were made on the truck, the down payment

18 and the final payment due.

19         **Q.**   Mr. Rennick, was there anything about

20 the purchase of the Freightliner that you needed to

21 hide or disguise in any way?

22         **A.**   No, sir.

23         **Q.**   Did you turn over all of these

24 documents to the accountant or the CPA for purposes

25 of him being then able to track the dollars in from

CaseCase37-tv0205530635D-SLEMMRIocuBanunt8e(G200nonTiledEiledBHe454320E5208TageeRagecofa295f 295

1    where the dollars originated for purposes of

2    disputing or defending against the government's

3    accusations that the money used to purchase the

4    Freightliner came from illegal activity of the

5    distribution of marijuana?

6         A.   I gave everything to the bookkeeper,

7    yes.

8              MR. GREGER:   Thank you, Mr.

9    Rennick, I appreciate it.

10              JUDGE MERZ:   Cross?

11              CROSS EXAMINATION

12   BY MR. GLASSMAN:

13        Q.   Good afternoon.   Make sure I understand

14   a few points of your testimony.   So Bill Gallagher

15   didn't tell you about the mandatory minimum before

16   the plea?

17        A.   No, sir.

18        Q.   And he didn't tell you about

19   substantial assistance before the time of the plea?

20        A.   About the what?

21        Q.   The possibility of substantial

22   assistance to the government cooperating?

23        A.   No.

24        Q.   During the plea, during the change of

25   plea hearing when you pled guilty --

1          A.   Can I get a drink real quick?

2               JUDGE MERZ:  Sure.

3               THE WITNESS:  I'm sorry.

4  BY MR. GLASSMAN:

5          Q.   That's all right.  During the change of

6  plea hearing Bill Gallagher whispered in your ear

7  that you were entering a fictional plea?

8          A.   Yes, after Mr. Brichler read the thing

9  and the judge was asking me if that was true.

10        Q.   And so just tell me specifically what

11  happened.

12        A.   Well, I was shaking my head no when she

13  was asking me and Mr. Brichler said I had to say

14  yes, it was just a fictional plea.

15        Q.   Mr. Brichler said that?

16        A.   I mean Mr. Gallagher.

17        Q.   Mr. Gallagher told you that during the

18  plea hearing?

19        A.   He was reading when Mr. Brichler read

20  the paper, I don't know what it is called.

21        Q.   What did it mean to you when he said

22  that?

23        A.   I was confused.  I didn't know, really.

24  I'm thinking fictional means I'm lying but, you

25  know, I thought it was a lie.

1       Q. And did you speak up at that point and

2 say anything?

3       A. No, he told me everything would be all

4 right.

5       Q. After the change of plea you talked

6 about how you were supposed to cooperate with the

7 RENU agent. How did it come about that that was

8 proposed?

9       A. When we were out in the hallway and I

10 was loosing it with Mr. Gallagher on fictional plea

11 thing, he came in and said he talked to Mr.

12 Brichler. If I could work with them to give some

13 assistance, I would get, I could possibly get

14 probation.

15       Q. That's the first time that you talked

16 about cooperating?

17       A. Yes.

18       Q. And what did you say in response to

19 that?

20       A. I said yes, I would.

21       Q. Did you have any ideas about how you

22 were going to go about doing that?

23       A. No.

24       Q. Did you have any idea as to how the

25 RENU agent thought you would do it?

Case 3:07-cv-00355-D-BF Document 32 Filed 04/13/09 Page 199 of 295

1      **A.**  When Bill did say that, I told Bill all

2   I could do is take them to where I dropped off

3   Phillip and Kareem, that's all I knew.  That was

4   evidently going to be good enough.  I'm sorry.

5      **Q.**  Sometime after you pled guilty but

6   before sentencing, you looked over the pre-sentence

7   report?

8      **A.**  No.

9      **Q.**  You never looked it over?

10     **A.**  No.

11     **Q.**  And you never discussed it with your

12  lawyer?

13     **A.**  No, sir.

14     **Q.**  But the night before sentencing, you

15  were, you did meet with your lawyer, Bill

16  Gallagher?

17     **A.**  Yes.

18     **Q.**  And do I understand correctly that he

19  said that at the sentencing hearing Brichler would

20  move for a reduction based on substantial

21  assistance?

22     **A.**  When Duke and I went down to Mr.

23  Gallagher's office, I told him for months I wanted

24  those accusations taken out of those plea

25  agreements or I was going to take back my plea and

1    that night when we went down there and I lost it

2    with him he said he talked to Mr. Brichler and Mr.

3    Brichler had agreed to give a downward departure to

4    me.  He was going to do a motion on it.

5              So Duke and I both said, you know,

6    Mr. Gallagher you finally sound like you got a set

7    of balls.  Pardon me.

8              JUDGE MERZ:  No, tell us what you

9    said.

10              THE WITNESS:  And it sounded like

11    the old Bill Gallagher, like he was a fighter.  So

12    we figured it was going to happen and the next day

13    came and it just kept going the same way as it

14    always did and I'm thinking anytime Judge Dlott is

15    going to say she's going to abide by the motion

16    that he put in and this and that and nothing

17    happened.

18    BY MR. GLASSMAN:

19         Q.  Now, before the judge actually

20    announced the sentence on that day, did she give

21    you an opportunity to say something?

22         A.  I can't remember.

23         Q.  Did she ask you if you had anything

24    that you wanted to say prior to her announcing the

25    sentence?

1          A.   I'm pretty sure she did.

2          Q.   And what did you say?

3          A.   No, because I kept thinking she's going

4     to come up with the sentence reduction but then

5     when she gave me the 63 months and I said this is

6     bullshit, I said this isn't, now, everything is

7     just nothing like it's supposed to be.  So I just,

8     I kind of lost it.

9          Q.   Okay.  So I'm sorry for hopping back

10    and forth, but let me go back to the change of plea

11    hearing.  During the change of plea hearing, did

12    the district judge ask you if you had discussed the

13    charges with your lawyer?

14         A.   I don't remember, I don't remember.

15         Q.   Had you --

16         A.   At the sentencing?

17         Q.   At your change of plea hearing when you

18    entered the guilty plea?

19         A.   No.

20         Q.   You had not discussed the charges with

21    your lawyer?

22         A.   No.

23         Q.   Did she ask you at that time whether

24    you were satisfied with your lawyer's

25    representation?

CaseCase6:17-cv02035943635B-SFMM Document 36cument 9(Page 306-1 Filed Filed 06/1572005/205Page Page 26ge 2826 205f 295

1          A.   I'm pretty sure she did.

2          Q.   What did you say to that?

3          A.   I thought I was.

4          Q.   And did she ask you whether you were

5    pleading guilty because you were in fact guilty?

6          A.   I don't remember, but, I don't

7    remember.

8          Q.   Did the district judge ask you if you

9    were pleading guilty because it was your own free

10   and voluntary act?

11         A.   I think I remember her saying that.

12   But, yes.

13         Q.   And what did you tell her?

14         A.   I had to tell her why.

15         Q.   Did you tell her yes?

16         A.   I'm pretty sure.

17         Q.   And was that true?

18         A.   No.

19         Q.   Why was it not true?

20         A.   Because it wasn't correct.  I'm sorry,

21   go ahead.

22         Q.   Please answer.

23         A.   Because I wasn't involved in anything,

24   like I say, it just wasn't true.

25         Q.   Let me put that to one side for a

CaseCase3:17-cv-00550350-WHR-MRDocumeocuner8t(Page230 only)iledFiled0/45/2405/2007age F2ge 42351 295

1    moment and ask, she asked you if you were pleading

2    guilty.  Did she ask you if it was your own free

3    and voluntary act?

4           A.   I think she did.

5           Q.   What did you say to that?

6           A.   Yes.

7           Q.   Was that true?

8           A.   No.

9           Q.   Why not?

10          A.   Because it wasn't a voluntary act.  I

11   was forced into it, talked into by Matt to plead.

12          Q.   You were talked into by Matt to plead?

13          A.   Yes.

14          Q.   And how did that make it not voluntary?

15          A.   When I went down there I was planning

16   on going to trial.  I didn't plan on plea

17   bargaining.

18          Q.   During the change of plea hearing did

19   the district judge or the prosecutor read the plea

20   agreement?

21          A.   Yeah, I'm almost positive that Mr.

22   Brichler read the plea agreement.

23          Q.   And did the district judge ask you if

24   there were any promises other than what was in the

25   plea agreement that caused you to plead guilty?

1          A.   Yes.

2          Q.   And what did you say to that?

3          A.   I was told by Mr. Gallagher I had to

4     say no. There was no promises.

5          Q.   Were there other promises?

6          A.   Yes.

7          Q.   What was that?

8          A.   That I was going to get 36 months and

9     Matt and Wayne were going to get probation.

10         Q.   Who promised you the 36 months?

11         A.   Mr. Brichler.

12         Q.   Mr. Brichler promised you that?

13         A.   I don't know if Bill Gallagher did.  He

14    conveyed it to me.

15         Q.   Did Mr. Brichler actually tell you that

16    you will receive 36 months?

17         A.   No.

18         Q.   You said earlier when during the change

19    of plea hearing you lied to Judge Dlott?

20         A.   Yes.

21         Q.   What specifically did you lie about?

22         A.   Whenever she asked me if it was the

23    truth, if I had been promised anything or I was

24    doing this on my own free will and this and that,

25    you know, at the beginning when I shook my head no

1    and Bill Gallagher said you have to say what she

2    wants to hear, you are not going to get your plea

3    bargain, it was basically everything she asked me

4    about, I didn't tell the truth.

5        Q.   Pretty much everything she asked you

6    about you didn't tell the truth?

7        A.   Right.

8        Q.   You were shot?

9        A.   Yes, sir.

10        Q.   Subsequent to entering your guilty

11   plea?

12        A.   Yes, sir.

13        Q.   Did you ever solicit anyone to shoot

14   you?

15        A.   No, sir.

16        Q.   Did you ever solicit anyone to find

17   another person to shoot you?

18        A.   No, sir.

19        Q.   Other than Matt Elliott talking to you

20   and telling you that you should plead guilty, was

21   there anything else?  Was that, that was pretty

22   much what he talked you into doing or was there

23   anything else that --

24        A.   No, sir.

25        Q.   That was it?

1          A.   That was it.

2          Q.   That he just talked to you and said you

3     really need to plead guilty?

4          A.   Yes, sir.  Because he would lose his

5     family and he would do, you know, he would have to

6     do a bunch of time.  He cried and pushed me, I just

7     said yes, I'll do it.

8                    MR. GLASSMAN:  No further

9     questions.

10                   JUDGE MERZ:  Thank you.  Mr.

11    Greger?

12                   MR. GREGER:  Nothing, your Honor.

13    Thank you.

14                   JUDGE MERZ:  I want to clear up

15    one point.  You were under, you were taking

16    psychotropic medication, Trazodone?

17                   THE WITNESS:  Yes, sir.

18    BY MR. GLASSMAN:

19         Q.   At the time of the plea?

20         A.   Yes, sir.

21         Q.   Taking any psychotropic medication now?

22         A.   I take two of the, I'd have to look at

23    the thing.  I take two now.  They've got me

24    regulated where they keep the depression and that

25    down so they've got me where it works pretty good.

```
 1      The Trazodone was killing me.  I was not knowing
 2      what I was doing, I couldn't keep my eyes open.
 3                      JUDGE MERZ:  You taking something
 4      else now though?
 5                      THE WITNESS:  Yes.
 6                      JUDGE MERZ:  Do you know what it
 7      is?  It's on that medical sheet?
 8                      THE WITNESS:  Yes.  On page six
 9      it's S-E-R-T-R-A, I'm up to 200 milligrams on that.
10                      JUDGE MERZ:  Sertraline?
11                      THE WITNESS:  Yes.  And then I
12      take the other one which isn't on here, your Honor,
13      the one that Lexington down at the medical center
14      put me on, it's ten milligrams of both.
15                      JUDGE MERZ:  Is it for your mental
16      health though?
17                      THE WITNESS:  It's for my
18      depression, yes, sir.
19                      MR. GREGER:  Nothing left, your
20      Honor.
21                      JUDGE MERZ:  You were finished,
22      were you not?
23                      MR. GREGER:  Yes, your Honor.  I
24      was, thank you.  I call William Gallagher to the
25      stand.
```

Case 3:07-cv-02053-EMR Document 3(Page only) Filed 04/04/2003 Page 209 of 295

1             JUDGE MERZ:  Mr. Gallagher,

2    please.

3    <u>WHEREUPON</u>:

4                   <u>WILLIAM GALLAGHER</u>,

5    of lawful age, a witness herein, being first duly

6    sworn testified as follows:

7             JUDGE MERZ:  State your full name

8    and spell last name for the record.

9             THE WITNESS:  William R.

10   Gallagher, G-A-L-L-A-G-H-E-R.

11            JUDGE MERZ: Your witness, Mr.

12   Greger.

13                  <u>DIRECT EXAMINATION</u>

14   BY MR. GREGER:

15        Q.   Mr. Gallagher, are you an attorney

16   licensed to practice in the state of Ohio?

17        A.   Yes, sir.

18        Q.   When were you first licensed?

19        A.   In the state of Ohio in June of 1995.

20        Q.   Have you been continuously licensed and

21   by that I mean has your licensed ever been

22   suspended, revoked for any reason since its

23   issuance?

24        A.   No, sir.

25        Q.   Mr. Gallagher, were you the attorney of

Case Case 1:07-cv-00555-SJD-SKB Doc Document 309-3 Filed 04/31/2008 Filed 04/31/2008 Page Page 42 of 295

1    record in the case captioned United States of

2    America versus Steven Rennick, Senior?

3         A.   Yes.

4         Q.   Is that a criminal case before Judge

5    Dlott?

6         A.   Yes, sir.

7         Q.   Were you retained or appointed to

8    represent Rennick?

9         A.   I was retained.

10        Q.   What were the total fees paid to you by

11   Mr. Rennick for your representation?

12        A.   I believe it was $25,000.

13        Q.   Total?

14        A.   Well, there were expenses of a thousand

15   dollars he put into my alternative account for an

16   investigator.  He reimbursed me for some mailing

17   expenses for the recovery of some court records

18   from Brooklyn or the Bronx, New York and accident

19   report in Arizona and some other records in New

20   Mexico.  There was then a video deposition done of

21   a state employee from New Mexico that he had to pay

22   for but in terms of the representation or my fees,

23   I collected, I believe, it was $25,000.

24        Q.   Any portion of those fees paid in cash?

25        A.   No, sir.

1          Q.   Did you ever ask that any of the fees

2     be paid in cash?

3          A.   No, sir.

4          Q.   What was the largest single installment

5     of fees paid?  Did you get the 25,000 in a lump

6     sum?

7          A.   No, I did not.

8          Q.   What was the largest single

9     installment?

10         A.   I'm sorry, I don't recall at this

11    point.

12         Q.   Did you provide receipts to Mr. Rennick

13    for his payments?

14         A.   If he asked for them, I would have.

15    But at this point, I have no independent memory of

16    that.

17         Q.   Did a portion of the fees paid to you

18    also pay for the fees of investigators?

19         A.   I believe that was separate.

20         Q.   How much was paid to the investigators?

21         A.   I remember a check or requesting a

22    check for a thousand dollars be put in my ALTA

23    account to reimburse Mr. Dorning.  I don't know if

24    there were any other fees or direct billing from

25    Mr. Dorning.

Case Case: 3:07-cv-00535-JGC-MRB Document 8 (Court only) Filed: 05/05/2009 Page: 211 of 295

1          Q.  What were the name or names of the

2     investigators that you hired to assist in the

3     Rennick case to trial?

4          A.  Dorning, I'm not sure if he was

5     incorporated at that point.  He was also known as

6     Precision Investigations.

7          Q.  What did their investigation, his

8     investigation, show as to the strength or weakness

9     of the government's case as against Mr. Rennick?

10         A.  Dale's involvement primarily was the

11    location and interview of some witnesses that I was

12    having some difficulty in contacting.  So in terms

13    of what it exactly showed, I think that's a

14    difficult question to answer.  But that's what I

15    had him do is locate and interview witnesses on my

16    behalf.

17              JUDGE MERZ:  The record ought to

18    be clear at this point, I noticed that Mr.

19    Gallagher paused somewhat before answering that

20    question.  You are aware, sir, in this proceeding

21    Mr. Rennick has claimed that you provided him with

22    constitutionally ineffective assistance of counsel.

23    By doing that he has waived any attorney/client

24    privilege with respect to your communications.

25              THE WITNESS:  Yes, sir.

Case: 3:07-cv-00053-WHR Doc #: 200 Filed: 05/13/2008 Page: 212 of 295

1           JUDGE MERZ:  I'm assuming you

2     understood that but it's important to make it clear

3     for the record.

4           THE WITNESS:  Yes, sir, thank you.

5     BY MR. GREGER:

6           Q.  How many witnesses, did you know

7     whether or not Mr. Rennick or his family members

8     had taken witnesses down to the investigators or to

9     your office to be tape recorded and interviewed?

10          A.  I met with a number of witnesses in my

11    office.  I don't think any was in the company of

12    Mr. Dorning.

13          Q.  Would you estimate that number of

14    witnesses to be eight or nine?

15          A.  Not at one point but that's probably

16    true, about a fair number, yes, sir.  I just want

17    to, Mr. Dorning for a while was a tenant.  I own a

18    building in Cincinnati.  Mr. Dorning and Precision

19    Investigators rented space from me.  I don't know

20    if that was at the same time or not.  That would

21    make sense if he was a tenant of mine at the time

22    he would see Mr. Dorning at that building.

23          Q.  Did you ever share your opinions about

24    the strength or weakness of the government's case

25    with your client, Mr. Rennick?

1          A.   Yes, sir.

2          Q.   What did you tell him?

3          A.   I think I gave him a frank review of

4    the case.  I told him where I thought a lot of the

5    weaknesses for us or strength of the government

6    case were.  They had witnesses who were cooperating

7    with them.  Kareem Cole I was aware of who had a

8    number of other names.  Mr. Davidson who I think

9    was also known as Mr. Jones, they were two

10   gentlemen from Jamaica who had been arrested and

11   cooperated and signed plea agreements and had

12   already pled.

13                   There were statements that were

14   allegedly by Mr. Rennick or made to a regional

15   narcotics agent concerning the boxes that contained

16   marijuana.  The marijuana were on premises that he

17   owned.  They allegedly were in a truck that he

18   bought and owned.  The witnesses had claimed that

19   he had transported that marijuana from the

20   southwest and then driven to Cincinnati and there

21   was corroboration of that fact.  He was unable or

22   he would have been, I think, impeached had he

23   testified because he had some convictions.  He had

24   some, there was, I think there was a notice of an

25   intent to use some additional fraud based behavior

1    by Mr. Rennick.

2                    There was an allegation that he

3    staged a theft of a camper and filed a false

4    insurance claim on it.  There was, I had been lead

5    to believe that Mr. Rennick outside of my knowledge

6    had been contacting witnesses and there was some

7    question as to what he had been saying to them and

8    whether or not they were statements that were going

9    to come back to court.  I was unaware of those.  I

10   don't get discovery of those in federal court, I

11   had a lot of concern.

12                   At one point I got a letter from

13   Mr. Lawson directing me to tell Mr. Rennick to stop

14   talking to his client.  There was times when

15   Rennick didn't want to follow the advice and was

16   talking to witnesses and I wasn't sure what they

17   were going to claim he said.  Those were some of

18   the things that I thought were weaknesses.

19                   Some of the strengths were, Mr.

20   Cole had a very checkered past.  He had lied in

21   open court about who he was, he had an insurance

22   card he obtained in fraud.  He had done a number of

23   things that I would have discredited him as

24   potential witness.

25                   I think Mr. Jones, I uncovered a

1    lot of evidence that he could be discredited or his

2    truthfulness would be called into question.  Mr.

3    Rennick, our defense had the fact that he had been

4    conned by Mr. Cole in believing Mr. Cole was a

5    legitimate businessman who was going to invest in

6    Mr. Rennick's race car, advertise on that race car.

7               I had proof that Mr. Cole

8    successfully conned other people.  The president of

9    WCIN radio signed a contract with Cole with his

10    radio ads.  Cole's company was called something in

11    the area of West African or Wild African Production

12    but it had done shows, I found a number of those

13    posters.  Mr. Rennick helped me find some of the

14    posters.  The president of WCIN and sales director

15    believed that Cole was a legitimate businessman.

16               Mr. Cole, we had one of the places

17    where a show had been sponsored by Mr. Cole and was

18    going to be called as a witness to say that he

19    signed a contract for a production and believed Mr.

20    Cole was a legitimate businessman.  I wanted to be

21    able to argue to a jury that Rennick believed that

22    Cole was a legitimate businessman and we had proof

23    that what Mr. Rennick had been doing in trying to

24    get advertisers for his race car he had been

25    legitimately doing.

1          We had a contract, proposed

2     contract with Burger King where they were going to

3     do work with S and S Racing.  Mr. Rennick and

4     Michelle Benjamin had visited with, I think it was

5     either anti-drug group or some group connected with

6     the federal government that was an anti-drug

7     education policy that considered advertising on

8     Rennick's cars.  We had obtained two ESPN's sports

9     moments.  Mr. Rennick gave me where ESPN

10    highlighted S and S Racing as up and coming team.

11    It was a legitimate enterprise.

12          There was no one that I was aware

13    that ever saw Mr. Rennick involved with Mr. Cole or

14    Mr. Davidson in that garage.  We had some witnesses

15    who lived around that area that could testify to

16    that.  We had, as I mentioned, a New Mexico state

17    trooper, it was like a customs official.  It was my

18    understanding after the video deposition and before

19    that that tractor trailers going through the state

20    of New Mexico have to be stopped and inspected and

21    that would have been the case in Mr. Rennick's

22    case, and there was some question because all he

23    had was a tractor portion, there was no trailer.

24    That whether or not it would be treated as a

25    tractor.

1          It was registered as a camper and

2    that trooper remembered, therefore, a question of

3    how can a semi tractor be a camper and Mr. Rennick

4    explained to him without pulling the trailer and

5    other ways, I guess it could be.  Mr. Rennick had

6    remembered that on his way back from New Mexico to

7    Cincinnati that there was another tractor trailer,

8    I think it hit an elk if I remember correctly, the

9    driver of that tractor trailer waiting for repairs

10   or police came over, had been in his, inside of his

11   tractor trailer and didn't see boxes and boxes of

12   marijuana, didn't smell marijuana as you would

13   expect hundreds of pounds of marijuana to smell.

14          So we had evidence and witnesses

15   prepared to testify concerning the defense.  I

16   thought those were the strengths of our case.

17        Q.  Did you ever undercover, did you ever

18   uncover evidence that Mr. Rennick had given Wayne

19   Benjamin a pound of marijuana?

20        A.  No.

21        Q.  Did you uncover evidence that Mr.

22   Elliott had conspired with Mr. Rennick, Senior to

23   distribute marijuana?

24        A.  Directly, no.

25        Q.  Were you present when Steven Rennick,

1    Junior, showed up at trial on the morning that

2    trial was to begin for purposes of being compelled

3    to testify and getting a grant of immunity?

4        A.   Steve, Junior was represented by Rich

5    Goldberg.  I was aware that Steve's case was going

6    to be dismissed and yes, he was there.  I don't

7    remember that was the specific purpose.  That may

8    have been related to Mr. Goldberg.  At the time I

9    don't know that it was relayed to me that that was

10   the purpose.

11       Q.   Did you understand that the New Mexico

12   Department of Transportation official who got into

13   that tractor for purposes of an inspection that was

14   on the trip where this 500 pounds of marijuana

15   allegedly was being transported back from Arizona

16   to the Southern District of Ohio?

17       A.   That was my understanding, that was my

18   belief.

19       Q.   And did you go out with Mr. Cohen and

20   take photographs of the fifth wheel on that

21   tractor?

22       A.   Yes, sir.

23       Q.   Was that fifth wheel in pristine

24   condition, didn't even have a mark on it?

25       A.   That's what I believe our photographs

Case 3:07-cv-00353-WHR Document 306 Filed 05/26/20 Page 412 of 295

1       indicated, yes, sir.

2               Q.   And Mr. Gallagher, did you form the

3       opinion that there could not have ever been a

4       trailer hooked up to that because of the pristine

5       condition of the fifth wheel?

6               A.   Without knowing anything about trucks

7       that would have been my opinion, yes, sir.

8               Q.   Had Mr. Rennick ever been stopped and

9       found in possession of marijuana, any quantity?

10              A.   Not to my knowledge, no, sir.

11              Q.   Was there a lease for the portion of

12      the premises upon which marijuana was found?

13              A.   Yes, sir.

14              Q.   At the College Hill warehouse?

15              A.   Yes, sir.

16              Q.   Was that portion of the warehouse a

17      locked portion of the warehouse?

18              A.   You are testing my memory.  I believe

19      it was, yeah, I remember things about keys and

20      padlocks, I'm sure exactly that's the case.

21              Q.   Keys and padlock is what you remember?

22              A.   You are testing my memory on all of

23      this.  I know there was discussions about it.  I

24      know it was locked and I can't remember if Steve,

25      Mr. Rennick, Senior had a key or not.  But it was

1       definitely a locked area.  I don't remember who had

2       access to it but at this point, yes, sir, I know it

3       was a locked facility.

4              Q.   How did plea discussions -- strike

5       that.  Did you discuss resolving Mr. Rennick's case

6       by way of a plea before the morning of trial?

7              A.   Yes, sir.

8              Q.   In what way?

9              A.   Well, I know there were discussions at

10      some point with Mr. Brichler, who the United States

11      assigned to the case before trial.  I know there

12      were discussions with my client.  We had talked

13      about where he was in the guidelines in my belief

14      if he went to trial and lost.  If he went to trial

15      or, as opposed to pleading, and the third would be

16      obviously a plea with what I believe to predict

17      what happened if he cooperated in some form or

18      fashion with the government.

19                   The other thing that was going on

20      at the same time as I mentioned earlier there was

21      an allegation that Steve owned a camper that was

22      stolen, I think, in the state of Indiana or

23      reported stolen while another gentleman was driving

24      it.  I had been lead to believe that by Brichler

25      there was an ongoing investigation into potential

1    insurance fraud.  The insurance company had denied

2    the claim that had been filed.

3              Mr. Rennick hired a civil firm to

4    represent him on that claim.  Mr. Brichler believed

5    he might be successful in obtaining an indictment

6    for fraud and that was a concern about whether to

7    go to trial and then seek to indict him for

8    insurance fraud or whether we get some sort of plea

9    arrangement where they decide not to indict him and

10    just take that.  So, yeah, there were discussions

11    about that.

12        Q.  Were you ever given a plea agreement

13    prior to the morning of trial?

14        A.  I'm pretty sure.  I, at some point I

15    was given one by Mr. Brichler, yes, sir.

16        Q.  You believe you had a plea agreement

17    given to you prior to the morning of trial?

18        A.  I believe as I sit here today that I

19    had at a some point before trial sent a copy of a

20    proposed plea agreement by Mr. Brichler to

21    consider, discussions to consider.  That's what I

22    believe, yes, sir.

23        Q.  And what count was contained in that

24    proposed plea agreement, what did your client have

25    to plead to?

1      A.   I believe it was a conspiracy count to

2   distribute marijuana.

3      Q.   Did you discuss that proposed plea

4   agreement with Mr. Rennick, Senior?

5      A.   I believe I did, yes.

6      Q.   Did he reject that proposed resolution?

7      A.   Oh, yes, sir.

8      Q.   Vehemently?

9      A.   Steve wanted to go to trial.

10     Q.   He was adamant about it?

11     A.   I think that's fair.

12     Q.   Mr. Elliott, likewise adamant about

13  going to trial?

14     A.   I never had a discussion with Mr.

15  Elliott about going to trial before the day of

16  court, the day of trial.

17     Q.   Until the day of trial or ever?

18     A.   I have no, boy, I don't remember ever

19  talking to Mr. Elliott about whether he should go

20  to trial or not.

21     Q.   Not whether he should or not, did you

22  ever hear Mr. Elliott express his desire, strong

23  desire to go to trial?

24     A.   No. No, I don't believe I did.

25     Q.   How far before the day of trial were

1 you provided with a proposed plea agreement from

2 Mr. Brichler?

3   A. I couldn't tell you.

4   Q. Was there a proposed statement of facts

5 that accompanied the proposed plea agreement?

6   A. That, I don't know.

7   Q. On the morning of trial when you showed

8 up, how did plea discussions occur?

9   A. We had, Judge Dlott at the time was in

10 a smaller courtroom and Judge Beckwith decided we

11 could use her courtroom because of the number of

12 defendants and the size.  I beat the government

13 there, I though that.  And I know Mr. Brichler at

14 some point came up and sort of, why can't we work

15 this out fashion, and I know there were

16 discussions.

17     How they got initiated, I don't

18 remember exactly who initiated it or what, other

19 than that.

20   Q. Did Matthew Elliott ever speak to your

21 client Mr. Rennick, Senior on the morning that

22 trial was supposed to start for purposes of

23 discussing resolution of their cases by way of a

24 plea?

25   A. I believe they did.

1          Q.   Did they do that privately?

2          A.   I believe --

3          Q.   Mr. Elliott and Mr. Rennick alone?

4          A.   I believe they did.

5          Q.   Did the offer from the government to

6     Mr. Elliott ever change that morning?

7          A.   I believe it did.

8          Q.   How many different offers did the

9     government make to Mr. Elliott that morning, if you

10    can recall?

11         A.   I was not party to all conversations of

12    Mr. Lawson and Bob Brichler had.  I know there was

13    at least one change.  I know it went from something

14    related to the conspiracy eventually to what Mr.

15    Elliott pled which was the possession.  How many

16    variations in between, I could not tell you because

17    I wasn't a party to those conversations.

18         Q.   Were you ever party to a conversation

19    where the result, the sentence that was going to be

20    rendered was discussed?

21         A.   I know Mr. Lawson was attempting to put

22    Mr. Elliott in a position where he could end up

23    with probation.  That was Mr. Lawson's push to Bob

24    Brichler, that what he wanted for his client was

25    the potential for probation.

1    Q.  Do you know whether or not Mr. Elliott

2    got any credit toward his sentence for the result

3    achieved that Mr. Rennick, Senior pled?

4    A.  Let me see if I understand your

5    question correctly.  Toward, on the day of trial,

6    getting credit on a reduction?

7    Q.  Poorly phrased question.

8    A.  Charged or sentencing?

9    Q.  Let me try again.  Were you part of a

10   discussion among one or more attorneys and/or one

11   or more defendants where Mr. Elliott was told that

12   if he could get Mr. Rennick to plead, he could get

13   the benefit of that by a 5K or reduced sentence?

14   A.  No.

15   Q.  You do not know whether or not that was

16   conveyed from Mr. Brichler to Lawson to Elliott, to

17   Rennick, Senior?

18   A.  I was never party or aware of that

19   statement, no, sir.

20   Q.  Were you ever aware that there was an

21   offer from the government that if Mr. Elliott could

22   get Mr. Rennick to plead, that Mr. Elliott could

23   get a downward departure?

24   A.  No.

25   Q.  Were you then surprised on the day of

1     sentencing when Mr. Elliott was, in fact, granted a

2     downward departure for his efforts at getting Mr.

3     Rennick to change his plea?

4         A. I was not present in the courtroom when

5     Mr. Elliott was sentenced. Mr. Rennick was first.

6     Mr. Elliott's sentencing hearing began when I was

7     there. There was a recess and I did not stick

8     around so I was not, until you just said that, if

9     that's the case, I was unaware of even as we sit

10     here today the reason for the downward departure.

11         Q. You were unaware even to today there

12     had been an agreement made, allegedly made, between

13     the government and Mr. Elliott that he would

14     benefit if he could get Mr. Rennick to plead?

15         A. If I could, I might be able to answer

16     the question this way. Maybe it will answer and if

17     it doesn't, I apologize. It was presented to me on

18     the day of trial that any plea agreement was going

19     to be entered into only if all three defendants

20     entered a plea. If one wanted to enter a plea, it

21     had to be to the conspiracy. There would be no

22     amendments of any charge unless all entered a plea.

23     Mr. Brichler did not want to go to trial. So the

24     reduction in sentence for Mr. Elliott or charge of

25     Mr. Elliott and Benjamin in essence was a result of

1    Mr. Rennick to enter a plea.

2                    They would never in my mind gotten

3    the charge reduced if Mr. Rennick had not decided

4    to enter a plea.  I don't know if that answers your

5    question.  That's my understanding that day.

6            Q.  Well, then at least the deal changed in

7    that regard because Mr. Benjamin didn't plead to

8    anything that was in the superseding indictment,

9    correct?

10           A.  That's correct.

11           Q.  And the deal changed as to Mr. Elliott

12   because he didn't have to plead to the conspiracy

13   count?

14           A.  Correct.

15           Q.  And the only person who had to plead to

16   the conspiracy count was Mr. Rennick?

17           A.  That's correct.

18           Q.  But you understood it was a package

19   deal?

20           A.  I understood if anybody was going to

21   see a charge amended, it was only if all three had

22   decided to enter a plea, correct.

23           Q.  Describe Mr. Elliott, did you get an

24   opportunity to view him on the morning of trial?

25           A.  I'm sure I did.  We were all present at

1    one time in the morning.

2              Q.  Did you ever see him cry or --

3              A.  I don't remember that.

4              Q.  -- or be teary eyed or be weeping when

5    he spoke to Mr. Rennick.

6              A.  I have no independent memory of that,

7    I'm sorry.

8              Q.  Fair enough.  When the discussions of

9    pleading started on the morning of August 18, 2003,

10   was the paperwork already prepared to effectuate

11   that plea?

12             A.  I know things had to be changed.  To

13   who exactly it had to be changed, I don't remember.

14   I know I, they filed information for Mr. Benjamin

15   but other than that I don't remember if all of the

16   paperwork was done or not, sir.

17                  MR. GREGER:  If I may have a

18   moment, your Honor.

19                  JUDGE MERZ:  Yes, sir.

20                  MR. GREGER:  Could the clerk hand

21   the witness Exhibit 6, please.

22                  THE WITNESS:  Thanks.

23   BY MR. GREGER:

24             Q.  This is previously identified as the

25   plea agreement signed by Matthew Elliott that

1    resolved his case.  Do you see in paragraph two

2    where the conspiracy count which was count one has

3    been changed?

4          A.  Yes, sir.

5          Q.  Do you see initials around that change?

6          A.  Hang on just a second.  Yes, sir.

7          Q.  RCD, ME?

8          A.  Yes, sir.

9          Q.  Bob Brichler, Ken Lawson?

10         A.  Right.

11         Q.  Matthew Elliott?

12         A.  Yes, sir.

13         Q.  Count one was the conspiracy count?

14         A.  Yes, sir.

15         Q.  Count seven was the possession count

16    that Mr. Elliott ultimately pled to?

17         A.  I believe you are correct.

18         Q.  Is that an example of the changes that

19    had to be made in your recollection on the morning

20    of the pleas?

21         A.  I just remember there were some

22    changes.  Whether that was one of them or not, I

23    don't know.  But I thought what had to happen, if

24    I'm remembering this correctly, nothing else,

25    somebody had to run back and produce an information

1      for Mr. Benjamin, I think.

2              Q.   So the superseding information was

3      filed before Mr. Benjamin acted on it, that's your

4      recollection?

5              A.   That's my recollection.

6              Q.   Was there, in fact, a break taken so

7      that paperwork could be prepared before the pleas

8      were actually taken?

9              A.   I believe that's the case.

10             Q.   And did Mr. Benjamin, Mr. Elliott, and

11     Mr. Rennick then leave the court environment

12     approximately an hour and come back when the

13     paperwork was ready?

14             A.   That sounds right.

15             Q.   Were they immediately taken to the

16     podium when they re-entered the courtroom?

17             A.   I don't know, I don't remember that.

18             Q.   Do you recall the judge being on the

19     bench and ready to go and all three defendants

20     walked in and were immediately then put into the

21     plea process?

22             A.   I have no independent memory of that.

23     I have no argument with that though.

24             Q.   How long did Mr. Rennick, Senior have

25     to review the written plea agreement before the

1    plea colloquy started?

2          **A.**   I believe Mr. Rennick's plea agreement

3    was no different than the one that we had

4    previously discussed and was no different than the

5    discussions that I really had with him about where

6    I thought he would be between plea and trial.

7          **Q.**   Let's --

8          **A.**   On the day of the trial, all I know is,

9    I couldn't give you an exact time.  Whether it was

10   ten minutes or two hours and ten minutes, I was

11   satisfied that he understood the terms of it.

12         **Q.**   Was Mr. Rennick picked up at some

13   location on the morning of trial, was he brought

14   from his home or someplace else?

15         **A.**   I don't remember.

16         **Q.**   Do you know if he was an inpatient at

17   VA hospital that day?

18         **A.**   I don't remember.

19         **Q.**   Do you know if he was on psychotropic

20   medications?

21         **A.**   On that day I don't know.

22         **Q.**   Were you provided with 380 pages of

23   medical records from family members that detailed

24   his psychiatric history?

25         **A.**   Correct.

1      Q.   Was any portion of those records the

2   medication regimen that he was on?

3      A.   As I sit here today, I don't remember.

4      Q.   Was there a typewritten statement of

5   facts that was given to Mr. Rennick to review for

6   its accuracy before the plea colloquy started?

7      A.   Yes, sir.

8      Q.   Why isn't that typewritten statement of

9   facts then filed with the plea agreement in the

10  court?

11     A.   I don't know.  I'm not responsible for

12  that.

13     Q.   Did Mr. Rennick initial the written

14  statement of facts as being true and accurate

15  before it was then read into the record?

16     A.   I have no independent memory of at

17  that, I'm sorry.

18     Q.   Did you ever tell Mr. Rennick, Senior,

19  that Mr. Benjamin was going to plead by way of a

20  superseding information that Mr. Rennick had given

21  Mr. Benjamin a pound of marijuana on July 18, 2002?

22     A.   I don't remember.  I don't remember

23  telling Mr. Rennick that.  I'm not saying I didn't

24  tell him that, I just don't remember that

25  conversation.

CaseCase7:cv-0205500035D-SttEMMFocumDsuchersc(22200only)/iledF0le4/52000D20074age24age44295f 295

1    Q.   What was Mr. Rennick's reaction when in

2    court the statement of facts was read that he had

3    given Mr. Benjamin a pound of marijuana on July 18,

4    2002?

5    A.   If that's what was said, I remember

6    Steve being bothered by the fact that they were

7    pleading guilty to taking possession of marijuana

8    saying that they never took possession of

9    marijuana.  I remember that part of it.  I don't

10   remember about, in terms of him giving them

11   marijuana, our conversation about that but it was

12   his belief they never took possession of marijuana.

13   Q.   Was his belief that he never provided a

14   pound of marijuana to Wayne Benjamin regardless of

15   the date chosen?

16   A.   This is five years ago.  Oh, man.  You

17   know, I know he was bothered by what they were

18   plead to, yeah --

19   Q.   Because it wasn't true?

20   A.   I don't have the statement of facts in

21   front of me and the transcript and I'm trying to

22   remember all of the things that were bothering

23   Steve about those two.  He had a lot of concern

24   about what was happening to Mr. Elliott and Mr.

25   Benjamin.  His exact conversations about it, I'm

1 sorry, I remember, I'm trying to do the best I can

2 to tell you.

3       He was worried, truly, about what

4 was going to happen to Wayne and Mr. Elliott.

5   Q. Did you understand that he had a close

6 relationship, almost a father to son relationship

7 with Matthew Elliott?

8   A. Yes.

9   Q. Did you understand that he almost had a

10 father, son relationship with Mr. Benjamin?

11   A. They were close.  That was my

12 understanding, it was close.

13   Q. How many times did Mr. Elliott

14 privately speak with Mr. Rennick, Senior on the

15 morning that the pleas occurred?

16   A. I remember one for sure.  If there were

17 more I can't tell you.  But I know there was at

18 least one.

19   Q. Did Mr. Elliott get permission to talk

20 to Rennick, Senior?

21   A. It was either Elliott or Lawson.  But,

22 yes, they wanted to have a conversation amongst the

23 three of them, yes, sir.

24   Q. And what was the purpose, as you

25 understood it, of that conversation?

1          A.   It was because it was being discussed

2      that this was sort of, as I call it, the three

3      musketeers.  It was all for one and one for all.

4      In the minds of the government we were either going

5      to have a trial or a plea.  If it was a plea, it

6      was going to be all three and I think the

7      discussion was going to be, which was, what was in

8      the best interest of everyone and I think they

9      wanted to because of their closeness to be

10     comfortable with the decision that all three were

11     making.

12         Q.  And did you ever understand that Mr.

13     Rennick was comfortable with what Mr. Benjamin and

14     Mr. Elliott had agreement to do?

15         A.   He wanted to see them in a position

16     where they weren't incarcerated.

17         Q.  Do you know whether or not Mr. Benjamin

18     and/or Mr. Elliott told Mr. Rennick, Senior, that

19     they would, in fact, get probation if all three of

20     them pled as an incentive to insure Mr. Rennick,

21     Senior that they would, in fact, not be harmed by

22     the pleas?

23         A.   That, no.

24         Q.  Do you know if that occurred?

25         A.   I can't tell you that didn't occur but

1    you are asking me if I was told that, no, I was

2    not.

3         Q.   So it's your belief that Mr. Rennick,

4    Senior, was shown a typewritten statement of facts

5    that said he conspired with others to import in

6    excess of a hundred kilograms of marijuana from

7    Arizona to the Southern District of Ohio?

8         A.   Yes, sir.

9         Q.   And that Mr. Rennick was not agitated

10   over those facts?

11        A.   Would it be fair to say that Mr.

12   Rennick wasn't calm during any point during that

13   day?  I don't have an independent memory those

14   facts were unusually bothersome to him.  I guess

15   it's hard in representing a lot of defendants, when

16   they come to court they are thinking trial and now

17   in a position of entering a plea to say they were

18   not agitated about the concept of doing that.

19             Mr. Rennick, up until that point

20   had never confided in me.  He believed he was

21   guilty or being found guilty of this.  He was

22   admitting something new in terms of both of us.  In

23   the discussion he never said, Bill, I took this

24   marijuana from Arizona to Cincinnati so I'll gladly

25   plea.  This was when presented with the statement

1    of facts in the plea agreement, in essence he was

2    admitting to new information to me if that makes

3    sense.

4          Q.  Mr. Rennick had never told you in your

5    investigation and defense of him in this case that

6    he had, in fact, transported any marijuana from

7    Arizona to the Southern District of Ohio?

8          A.  That's correct.

9          Q.  Mr. Rennick had never told you in your

10    representation of him that he had provided any

11    marijuana, a pound, an ounce, a tenth of a gram to

12    Wayne Benjamin, ever?

13          A.  I can't say I agree with that.  I don't

14    have any memory of him making a statement in the

15    negative like that that I have never ever smoke

16    with him or given to him.

17          Q.  He wouldn't have said that before the

18    morning of trial because that set of facts was

19    invented on the morning of the pleas, correct?

20          A.  I don't know about it.  I don't

21    necessarily think it was invented.  There was

22    discussions about smoking marijuana, generally, and

23    I don't remember, I'm trying to remember who people

24    said were smoking marijuana and access to it and I

25    don't have any memory of who that was.  I'm having

Case Case 37-cv-02059635B-SMEMR Document 3-6(Page 200 only) Filed Filed 04/54/205/2015 Page Page 43851 295

1    a hard time saying I would agree with it that he

2    never gave -- I don't know there was a discussion,

3    hey, we smoked together or not.  I can't say that

4    was ever said.

5                On the invention of whether or not

6    someone gave someone marijuana for purposes of

7    Wayne Benjamin, I wasn't party to a discussion

8    about what facts would be necessary to support a

9    plea for Wayne Benjamin or for Matt Elliott.  I was

10   only concerned with my client at that point in time

11   and what facts were necessary that he would have to

12   agree to or accept as being true.

13        Q.  So tell me what you understood your

14   client had to accept as being true to facilitate

15   his plea.

16        A.  Was conspiring with others to bring

17   marijuana in excess of the statutory amount from

18   Arizona to Cincinnati, I believe.

19        Q.  And who were those others as you

20   understood it?

21        A.  I can't remember if it was named in the

22   statement of facts or not.  But I think it was

23   relatively clear that no one else, it was at least

24   Mr. Cole and Mr. Davidson.

25        Q.  And you had every reason to believe

CaseCase37-cv02053053D-SHDMMRE Documents(Claent9only)jiledDite405/2005/20Page Page 222 df2295f 295

1    that the two Jamaicans were liars?

2            A.   Well, no, I didn't say, I think I had a

3    lot of information to show that they were

4    definitely liars.  About this fact, I don't know.

5    I think I had a lot of information to show they

6    were liars, yes, sir.

7            Q.  Did you ever conclude yourself that the

8    Jamaicans were liars?

9            A.   Yeah, about many, many things, yes,

10   sir.

11           Q.  Did you understand that the government

12   intended to call Mr. Cole and Mr. Davidson?

13           A.   It was certainly my hope it was going

14   to be a trial that those two were there as opposed

15   to other people, yes, sir.

16           Q.  Who else could have possibly supported

17   the theory of conspiracy for the government?

18           A.   Because of the rules of discovery, I

19   don't know unless we have a trial.  I was unaware

20   of any others.  Mr. Rennick and I had a lot of

21   discussions about what other people, but I was

22   unaware of anyone else.

23           Q.  Mr. Rennick entered his plea before

24   Judge Dlott on August 18, 2003?

25           A.   That sounds right.

1    Q.   Were the federal sentencing guidelines

2    still mandatory at that point?

3    A.   Yes, sir.

4    Q.   Booker was not cited by the Supreme

5    Court until 2005, am I correct?

6    A.   I think you are right.

7    Q.   Even now under the advisory guidelines

8    what is your experience with the federal judges in

9    Cincinnati as it relates to deviations from the

10   advisory guideline sentences?

11   A.   I've had some success.  I think that

12   they are open to following that in appropriate

13   circumstances.

14   Q.   Did you tell Mr. Rennick, Senior how he

15   could get a sentence of less than five years?

16   A.   Yes, sir.

17   Q.   What did you tell him?

18   A.   Told him it required the government to

19   file a 5K most likely and to, there was discussion

20   that day by cooperating with the regional narcotics

21   unit.

22   Q.   John Mercado a member of that RENU

23   unit?

24   A.   Yes, sir.

25   Q.   Do you know whether or not your client

1    Mr. Rennick ever met with Mr. Mercado for purposes

2    of forming an alliance to start down the road

3    toward substantial assistance?

4         A.   Yes, sir.

5         Q.   Did you go with him?

6         A.   No, sir.

7         Q.   Why not?

8         A.   He was, I go with my client when they

9    are being debriefed about their activities or

10   offering proffers.  It was my understanding what

11   Mr. Mercado wanted to or Agent Mercado wanted to do

12   is to have Mr. Rennick to understand the rules of

13   being a cooperative individual and what was

14   expected of him in terms of abiding by the laws and

15   keeping in contract, trading in information and

16   contact information and a general, sort of outline

17   what Mr. Rennick might be able to do for them.  I

18   didn't think it was necessary for me to be there

19   for that.

20        Q.   Am I correct that the terms of

21   substantial assistance are engaged under contract

22   terms you do this and in consideration of you doing

23   this we are going to do that?

24        A.   I would agree with that, but

25   unfortunately federal law sort of allows the

1      government the discretion whether they are going to

2      file one, a 5K.  In essence it should be that way

3      and generally that's the way it's presented, yes,

4      sir.

5              Q.  So you did not deem it necessary to go

6      and understand what the terms of the contract was

7      going to be between Agent Mercado and your client?

8              A.  It doesn't quite work that way because

9      what is going to occur is Agent Mercado is going to

10     report to Mr. Brichler his satisfaction or

11     dissatisfaction with Mr. Rennick and Mr. Brichler

12     is going to make the determination whether he deems

13     it to be substantial assistance.

14                  I stayed in contact with Mr.

15     Rennick and we had lots of discussions about the

16     level of his cooperation and he was concerned and

17     asked about whether what he was attempting to do

18     could be deemed substantial and would be viewed

19     favorably by the government.  So, no, I didn't

20     think it was necessary to go to Agent Mercado to

21     see what the terms were.  I didn't think he was the

22     ultimate decider.  I thought it was Brichler.

23             Q.  How were you going to be able to engage

24     whether or not your client met the terms set out by

25     Agent Mercado for purposes of qualifying for

1     substantial assistance?

2          A.   One is the experience I've had with Mr.

3     Brichler as well as RENU and what they were

4     interested in.  Two, was informal general

5     discussions with Agent Mercado and Mr. Brichler on

6     the day of sentencing because that's the first day

7     that cooperation came up and they were looking for

8     substantial amount of marijuana to be brought into

9     Cincinnati because they thought Mr. Rennick was

10    part of a group of people that had connections with

11    people in southwest United States to bring them in.

12              They were also interested in

13    anyone else they thought, he thought, I'm sorry,

14    that they were interested in anyone Mr. Rennick

15    could identify locally that was a distributor or a

16    receiver of large amounts of marijuana.

17         Q.   And who, I'm sorry?

18         A.   I understood that's what he was going

19    to have to try to do.

20         Q.   Who did Rennick identify as a local

21    supplier in Cincinnati?

22         A.   Mr. Rennick told me that he didn't know

23    anyone locally at that point but he thought he

24    might be able to get someone outside of Cincinnati,

25    possibly.

1          Q.  Were they talking about 1,500 pounds of

2  marijuana?

3          A.  Initially no one specifically talked

4  about any necessary amount in order to determine

5  substantial assistance.

6          Q.  How then were you going to determine

7  whether or not your client had met the threshold to

8  qualify?

9          A.  Because I've never had a threshold with

10  any of the U.S. attorneys there.  It's really sort

11  of been, I'm sorry, it's a vague sort of situation

12  down there.  It's a case by case whether they think

13  there is substantial assistance.  I seen very small

14  amount based on effort and I've seen it very large

15  amount.  I told Mr. Rennick that I thought he was

16  going to have to find a substantial amount of

17  marijuana and I characterize that to be more than

18  what he was accused of being transporting from

19  Arizona to Cincinnati on the date that the agent

20  raided that garage.

21          Q.  Did you ever consult with Mr. Rennick's

22  treating physicians at the VA?

23          A.  I've been in contact with people at the

24  VA. I wouldn't determine it a consult.  I've been

25  in contact with some folks there and had records.

1            Q.  Were you notified on the pleas that the

2    government intended to use 404B evidence?

3            A.  I was aware of the 404B evidence.  What

4    day I was told I couldn't tell.

5            Q.  Is the evidence, the 404B evidence was

6    that Rennick paid witnesses to testify falsely?

7            A.  Yes, sir.

8            Q.  And was Duke Ball one of those people

9    who allegedly had been paid to falsely testify?

10           A.  You know, I don't know.  Mr. Brichler

11   wouldn't tell me the people that he was going to

12   call that day.

13           Q.  Were you ever shown two $6,000 checks

14   by the government to then show you evidence or

15   proof of what the 404B evidence was about?

16           A.  I don't remember that, I'm sorry.

17           Q.  Did you ever inquire to Mr. Brichler

18   what the 404 evidence was so that you could then

19   prepare your client for that evidence coming in

20   and/or to prepare to rebut it?

21           A.  I apologize, I don't remember the

22   timing of the discussions about the 404B whether it

23   was that day or days before.

24           Q.  Did you prepare a sentencing memoranda

25   for the court's use at sentencing?

1          A.   Yes, sir.

2          Q.   Did you mention in that sentencing

3     memoranda any of the psychological background of

4     the client Mr. Rennick, Senior?

5          A.   I believe I did.

6          Q.   Mr. Gallagher, would you agree that one

7     of the rules of counsel in resolving a criminal

8     case by way of a plea is to provide the defendant

9     accurate factual picture as possible so that client

10    can assess whether to proceed to trial or accept a

11    plea agreement?

12         A.   I would agree with you.

13         Q.   Going to trial usually costs the

14    defendant his acceptance of responsibility and

15    timely notification of a plea reduction under the

16    advisory guidelines, doesn't it?

17         A.   Yes, sir.

18         Q.   So there is a real cost based on the

19    then mandatory guidelines, now advisory guidelines

20    of going to trial unless the result is an

21    acquittal, correct?

22         A.   There can be, yes, sir.

23         Q.   The application notes to the sentencing

24    guidelines provide the defendant can still receive

25    his acceptance of responsibility reductions if he

1    goes to trial to protect a constitutional right,

2    correct?

3           **A.**   Correct.

4           **Q.**   Were there any constitutional issues

5    that had been argued pretrial that needed to be

6    protected by going to trial?

7           **A.**   No, sir.

8           **Q.**   Was there ever any motion to suppress

9    any evidence filed in this matter?

10          **A.**   No, sir.

11          **Q.**   Did the government ever tell you that

12    they had evidence that Mr. Rennick was in

13    possession of marijuana?  They had a witness who

14    was going to place him in direct contact with

15    marijuana?

16          **A.**   They never told me about evidence of

17    that sort, no, sir.

18          **Q.**   Mr. Gallagher, did you ever attempt to

19    separate Elliott and Benjamin's cases from

20    Rennick's?

21          **A.**   No, sir.

22          **Q.**   When did you learn for the first time

23    that Elliott and Benjamin wanted to resolve their

24    cases by way of plea?

25          **A.**   Day of trial.

1          Q.  And is it, were their deals contingent

2     on Rennick's plea because if the government is

3     going to go to trial and prove a conspiracy, it's

4     just as easy to go to trial to prove it as to one

5     as it is three?

6          A.  I would agree with that.

7          Q.  Why did you give consent for Elliott to

8     speak directly to Rennick about resolving their

9     cases?

10          A.  They were very, very close.  Steve was

11     concerned about their welfare and what was going to

12     happen to them and he didn't seem to mind about

13     finding out what their feelings were about how,

14     whether they wanted to proceed to trial or not.  I

15     didn't think it was right to shield him from the

16     people that he was concerned about.

17          Q.  Were you present for the discussion

18     between, any of the discussions between Elliott and

19     Rennick?

20          A.  No, sir.

21          Q.  Describe Mr. Rennick's emotional state

22     after the pleas were accepted.

23          A.  He wasn't relieved, I'll tell you that.

24     I'm trying to put a good word to it.

25          Q.  Was he irate?

```
1              A.   I don't think he was irate.

2              Q.   Was he agitated?

3              A.   I'd agree with that.

4              Q.   Was he upset?

5              A.   He was not happy.

6              Q.   Was he angry?

7              A.   I wouldn't go that far.

8              Q.   Was there a confrontation among all

9     three defendants and three counsel outside of the

10    courtroom in the hallway after th pleas?

11             A.   I don't remember that ever happening,

12    no, sir, I'm sorry.

13             Q.   Have you ever used the term legal

14    fiction to describe what occurred on August 18,

15    2003?

16             A.   I don't believe so.

17             Q.   Did you ever use the term legal --

18    strike that.

19                   Fictional plea to describe what

20    occurred on August 18, 2003?

21             A.   Fictional plea?  No, sir.

22             Q.   Have you ever used the term fiction in

23    any of its forms to describe --

24             A.   As it relates to this case?

25             Q.   Yes.
```

1          A.   As it relates to Steve, no. As it

2     relates to Wayne Benjamin, I can't say no in terms

3     of questions about what Wayne and Mr. Elliott had

4     to admit to, I was being told did not occur.  I

5     have no independent knowledge whether that's true

6     or not.  But I know Mr. Rennick was concerned

7     about, they didn't do what they were pleading to,

8     why are they pleading to it?

9          Q.   Did anybody besides Mr. Rennick,

10    Senior, tell you that what Benjamin and Elliott

11    were pleading to they did not do?

12         A.   No.

13         Q.   Did you have a discussion with Mr.

14    Cohen that morning about the facts that his client

15    was going to admit to that harmed your client?

16         A.   I don't believe so, no.

17         Q.   When did you know for the first time

18    that Mr. Benjamin was going to plead to receiving a

19    pound of marijuana from Mr. Rennick on July 19, 18,

20    2002?

21         A.   After Mr. Rennick told me that he was

22    going to enter the plea.  That's when I found out

23    it was after that, sometime after, whether it was

24    immediately or when they prepared the documents or

25    went back and got the bill of information from Mr.

1    Benjamin, I found out.  Because nothing was going

2    to happen unless Mr. Rennick was also going to do

3    it.  I wasn't pushing a plea.  The other two were

4    pushing trying to work out their case.

5         Q.  Mr. Elliott's attorney, Mr. Lawson, and

6    Mr. Benjamin's attorney, Mr. Cohen, were push to

7    work their cases out?

8         A.  I would agree with that.

9         Q.  And their cases could not be worked out

10   unless Mr. Rennick likewise pled?

11        A.  You are correct.

12        Q.  Did you have input to the statement of

13   facts that Mr. Rennick ultimately pled to?

14        A.  I don't remember if we accepted them as

15   drafted by the government or whether we had asked

16   for corrections or amendments to it.  I don't

17   remember doing that.  It may or may not have

18   occurred.

19        Q.  Both Elliott -- strike that.  When did

20   you learn that what Mr. Benjamin was pleading to

21   was false or invented or fictional?

22        A.  I don't know if I ever came to that

23   conclusion.  I remember being told by Mr. Rennick

24   that what we were pleading to --

25        Q.  Never occurred?

```
 1              A.   -- never occurred in his mind, that's
 2        correct.
 3              Q.   Did you --
 4                   JUDGE MERZ:   What did you
 5        understand Wayne Benjamin was pleading to?
 6                   THE WITNESS:   I think it was
 7        taking possession.  I'm trying to remember.  It was
 8        five years ago, I wasn't concerned about them.  I
 9        think it was taking possession of a pound of
10        marijuana.  At some point, I don't remember the
11        dates that he was alleged to have taken the pound
12        or all of the circumstances, but I believe he was
13        taking possession.
14                   JUDGE MERZ: Go ahead, sir.
15        BY MR. GREGER:
16              Q.   Directly from Mr. Rennick?
17              A.   That sounds right but it's kind of hard
18        to say.  I don't remember.  I wasn't really
19        concerned about those two, I was concerned about
20        Steve.
21              Q.   Did you hear the statement of facts
22        read into the record by Mr. Brichler to support
23        Benjamin's plea?
24              A.   I was there.
25              Q.   Did you know from your investigation
```

1    that that could not have occurred on the date that

2    was read into the record because Mr. Benjamin and

3    Mr. Rennick, Senior were not even in the state of

4    Ohio?

5          A.  I'm sure I was aware of all of the

6    dates back then.  I'm not aware of the dates now.

7    I can't answer that question, I don't remember.

8          Q.  Do you know why Elliott was used to

9    sell the plea package and not Mr. Benjamin?

10         A.  I don't remember anybody having to sell

11    anything.  I wasn't party with the conversation

12    with Mr. Elliott and Mr. Benjamin and Mr. Rennick.

13    I don't know anything about a selling of a plea.

14         Q.  Let me ask you whether Mr. Benjamin's

15    attorneys approached you, attorney approached you

16    for permission to have Mr. Rennick, Senior and

17    Wayne Benjamin speak privately?

18         A.  I don't remember that happening.

19         Q.  Only Mr. Elliott's counsel asked for

20    that permission?

21         A.  I guess I should, I'm not saying it

22    didn't happen.  I don't remember that happening.

23         Q.  Did you bring any objections to the

24    attention of the court at the time of sentencing

25    that were contained in the pre-sentence

1    investigation report?

2          A.   I reviewed it with Steve, I know that.

3    I just don't remember if we made objections or not.

4          Q.   Where did you review it at?

5          A.   My office.

6          Q.   When?  Or, I don't expect a date at

7    this point, Mr. Gallagher, how far in advance of

8    sentencing did you review the pre-sentence report?

9          A.   We reviewed the initial because if

10   there were objections due I review them always with

11   my clients before the date due back before the

12   probation, the final date of the probation report

13   is done.  Steve's sentencing was delayed for a

14   while.  Steve got hurt, Steve was incapacitated in

15   a hospital both before the plea for a while as well

16   as at the time of sentencing.

17                It is possible, I'm trying to

18   remember or not, whether it was in our office or

19   whether we had to correspond by mail.  I don't

20   remember.

21         Q.   Why was Mr. Rennick, Senior

22   hospitalized before the plea?

23         A.   Before the plea Steve got hospitalized

24   for a period of time after he got out on bond.  He

25   was not, he was having some mental health issues

CaseCase7-tcv02053403035D-GHEMMRDocuBeuansc(9a29-only)filed 0814/512005/200PageP256-4225f 295

1     and went into the hospital for a period of time. I

2     can't remember how long. I remember he went into

3     the hospital for a period of time.

4            Q.  VA?

5            A.  Yes, sir.

6            Q.  Did you know what medications Mr.

7     Rennick was on on the morning of his plea?

8            A.  I'm sure I did at the time. I couldn't

9     recall them to you now.

10          Q.  You told the court that in your opinion

11    none of those medications affected his ability to

12    know what he was doing that morning; is that true?

13         A.  That would be true.

14         Q.  How did you determine that?

15         A.  My conversations with Steve were always

16    relatively consistent in nature. He always seemed

17    to understand what I was talking to him about. His

18    responses and his questions of me were appropriate

19    in all settings. I saw nothing about his demeanor,

20    manner of speech, or anything that was different in

21    the times that I'd seen him before, other than

22    obviously being nervous and somewhat agitated on

23    the day of trial which was typical, I think, for

24    any client facing what he was facing.

25         Q.  Did you charge Mr. Rennick any

Case 3:07-cv-00355-MRB Document 2(0-20 only Filed 05/20/10 Page 256 of 295

1    differently because you were going to go to trial

2    than if it had been a plea?

3            A.   I don't think at that time I was

4    charging, I'm positive I wasn't charging per diem

5    for days of trial or difference between plea and

6    trial, no, sir.

7            Q.   I know this is a little off beat.  Have

8    you and your family ever been out to Colorado?

9            A.   I've been, I've been out there with my

10   wife but not my kids.

11           Q.   You and your wife have been to

12   Colorado?

13           A.   Yeah.

14           Q.   What did you understand the basis for

15   Mr. Rennick's diagnosis of PTSD was?

16           A.   He was injured while serving in Vietnam

17   and was still having issues dealing with that,

18   mentally.

19           Q.   Flashbacks?

20           A.   Yes, sir.

21           Q.   Nightmares?

22           A.   Yes, sir.

23           Q.   He had to actually shoot one of his

24   buddies because the buddy had caught on fire and

25   his face was melting, did you know that?

1          A.   That sounds exactly, that sounds very,

2   very familiar.  I'm going to apologize, I have

3   three Vietnam vet clients that had bad experiences.

4          Q.   He was also charged with vehicular

5   homicide because of a truck went over the edge, the

6   man was killed when he was trying to teach him to

7   drive?

8          A.   Yes, sir.

9          Q.   He was found guilty of that death,

10   didn't he?

11          A.   He only had the conviction for the

12   tractor theft, you are right.

13          Q.   Did you ever have to get continuances

14   on courts dates based on Mr. Rennick's

15   psychological treatments?

16          A.   I believe we did have to delay the

17   trial as a result of him being hospitalized.

18          Q.   Why did you file a motion for a

19   downward departure?

20          A.   I believe the circumstances warranted

21   one that I could argue hopefully effectively for

22   Judge Dlott to go downward.

23          Q.   What circumstances warranted the filing

24   of your motion for a downward departure?

25          A.   I believe based on Mr. Rennick's

1    service to his country, I believe based on his

2    mental health status, that I would characterize

3    being somewhat fragile that he attempted to assist

4    himself by working with the government in

5    attracting drug dealers to bring narcotics to

6    Cincinnati, and it was my understanding based on

7    what Mr. Rennick told me that he was shot during

8    the course of his attempting to assist himself with

9    the government.  That warranted an unusual

10   circumstance where Judge Dlott could feel justified

11   in departing below the guidelines.

12        Q.   She was statutorily bound, wasn't she?

13        A.   To follow the guidelines?

14        Q.   To impose a mandatory minimum sentence?

15        A.   I think she can depart below that in

16   unusual circumstances and I think there was an

17   argument in an attempt to do so.

18        Q.   It was your belief that Judge Dlott

19   could depart below a statutorily mandated minimum

20   mandatory sentence by your filing of a motion for a

21   downward departure, is that what you said?

22        A.   I got it, that's what I said.  I guess

23   I should correct that.  I'm trying to remember

24   where we were in the guidelines or where I was

25   trying to get him down a level.  We were trying to

1    go down from what the sentence was from probation

2    because of that.

3         Q.   Were there any discussions about what

4    sentences could be given to Mr. Rennick before he

5    entered his plea --

6         A.   Yes.

7         Q.   -- that you were participating in?

8         A.   Yes.

9         Q.   What were the months that were

10   discussed Mr. Rennick could get if he pled?

11        A.   If he entered the plea he was facing a

12   mandatory minimum of five years.  If he cooperated

13   with the government and they were satisfied to the

14   point where they wanted to file a 5K, historically

15   speaking in Cincinnati in the Southern District you

16   normally saw a 5K motion of approximately

17   30 percent of a reduction from where the guideline

18   proposal was from the probation department.

19                    I think that we were probably in

20   the area of about 42 months.  Three, to three and a

21   half years with assistance.

22        Q.   36 months?

23        A.   That would be, that would be about

24   right, I think.

25        Q.   Did you mention that 36 months to Mr.

1    Rennick before he pled?

2        A.   There was discussions about pleas and

3    where he might be if he cooperated so I'm sure we

4    did.  I know we talked about what assistance would

5    normally mean to somebody.

6        Q.   And did you tell Mr. Rennick before he

7    pled, now, Steve, you've got to understand that

8    this is a shot in the dark.  The government either

9    files the motion or they don't and I don't really

10   have a whole heck of a lot of control over it?

11       A.   I don't think I would have said a shot

12   in the dark.  I don't have any control over the

13   government filing one.  I know I would have told

14   him that.  It's in the plea agreement, normally.

15       Q.   If the government's assertion under

16   404B was correct, how could Mr. Rennick avoid the

17   assignment of two points for obstruction of

18   justice?

19       A.   Well, it would depend on the government

20   whether or not they wanted to present that

21   information to probation and many times they choose

22   not to.

23       Q.   But Mr. Brichler had actually filed his

24   notice to use 404B in the docket of the court,

25   hadn't he?

1      **A.**  I can't remember if Mr. Brichler filed

2  it or just informed me of it.  I can't say for

3  sure, but I was aware of it.

4      **Q.**  Did you listen to the tapes that Mr.

5  Rennick provided surrounding his substantial

6  assistance?

7      **A.**  Yes, sir.

8      **Q.**  Did you have them transcribed?

9      **A.**  No, sir.

10      **Q.**  Did you put them before the court?

11      **A.**  No, sir.

12      **Q.**  Did you call Agent Mercado to back up

13  your assertion that this was a case where she

14  should depart downward because of the extraordinary

15  efforts of your client?

16      **A.**  On behalf of law enforcement?

17      **Q.**  Did you have an opportunity to call

18  Agent Mercado to the stand for an evidentiary

19  hearing in support of your motion for a downward

20  departure?

21      **A.**  He was available.  I could have called

22  him, yes, sir.

23      **Q.**  Did you?

24      **A.**  No, sir.

25      **Q.**  You listened to the tapes but you

1   didn't put any of that evidence before the court?

2            A.   Correct.

3            Q.   In your downward departure motion?

4            A.   That's correct.

5            Q.   Did you have evidence that, in fact,

6   Mr. Rennick set up the shooting, found somebody,

7   hired somebody to shoot him?

8            A.   No.

9            Q.   What was the down side, Mr. Gallagher,

10  in calling Agent Mercado to the stand since the

11  government had already refused to file the motion

12  for substantial assistance?

13           A.   Agent Mercado, I think, would have

14  characterized Mr. Rennick in an extremely bad light

15  in front of Judge Dlott as a manipulator, as a

16  liar, as uncooperative.  He had stopped and talked

17  to me many times and I did not see any upside.  I

18  only saw a down side to Agent Mercado to being

19  allowed without the bounds of the rules of evidence

20  to testify.

21           Q.   The then mandatory guidelines called

22  for a sentence of 60 to 63 months, did it not?

23           A.   He was facing a five-year mandatory

24  minimum, you are correct.

25           Q.   So the floor was 60 months and based

1     upon the readily provable amount that the

2     government had, his ceiling was 63 months, correct?

3          A.   I'll accept what you are saying is

4     true.  I can't remember exactly where we were.

5          Q.   And the judge gave him the ceiling,

6     63 months, did she not?

7          A.   She gave him 63 months.  If that was

8     the ceiling, I know she gave him 63 months.  I

9     can't remember what the ceiling was at the time.

10         Q.   So even if Agent Mercado done what you

11    feared he might do, there was no down side because

12    he actually got the maximum mandatory sentencing

13    guidelines as his sentence, correct?

14         A.   In hindsight if that's what the ceiling

15    was, you would be correct.

16         Q.   Well, had you calculated what your

17    client's guideline range was so that you could

18    determine what the floor and the ceiling were?

19         A.   Yes, sir.

20         Q.   And so there is a three months

21    difference between the floor and the ceiling; is

22    that true?  Assuming that my representations to you

23    are correct?

24         A.   You would be correct, yes, sir.

25                   MR. GREGER: Where are we?

Case 3:07-cv-00355 D SLA EMR Document 3 (Court only) Filed 04/13/2005 Page 264 of 295

```
 1                    JUDGE MERZ:  We are at 5 o'clock

 2        is where we are.

 3                    MR. GREGER:  We are rounding home

 4        is where we are.

 5        BY MR. GREGER:

 6             Q.  Handing you what's marked for

 7        identification as Rennick's Exhibit 14 for this

 8        hearing, what is that?

 9             A.  It appears to be the plea agreement

10        that was signed and filed in this case.

11             Q.  So that's the plea agreement that Mr.

12        Rennick entered into on August 18, 2003?

13             A.  Excuse me, I'm sorry.

14             Q.  That was --

15             A.  I didn't hear the whole question.

16             Q.  That was the plea agreement that Mr.

17        Rennick entered into on August 18, 2003?

18             A.  What you've handed me doesn't have

19        anyone else's signature on it but mine and it's

20        dated October, I don't know if this is what was

21        filed or not.

22             Q.  It's not a plea to a drug count at all,

23        is it?

24             A.  Let me take a look.  It's a mail fraud

25        count, I'm sorry.
```

1    Q.  It's a mail fraud count.  How did you

2   get this plea agreement two months after Mr.

3   Rennick had already entered his plea and as part of

4   the bargain the government would not prosecute him

5   for any other charges?

6    A.  Couple of questions in that one

7   sentence.

8    Q.  Sorry.

9    A.  It's okay.

10    Q.  How did you get the plea agreement

11   that's marked as Exhibit 14?

12    A.  I don't remember, I would assume I

13   would have gotten it from Mr. Brichler.

14    Q.  Mr. Rennick ever charged with a

15   violation of 18 U.S.C. Section 1341 to your

16   knowledge?

17    A.  Not to my knowledge.

18    Q.  Whose signature appears on the plea

19   agreement?

20    A.  That's my signature.

21    Q.  What date did you sign it?

22    A.  It says October of '03.  That's when I

23   did it, I guess.

24    Q.  When did you present this plea

25   agreement to Mr. Rennick?

```
 1                A.   I don't remember.  I have no memory of
 2       this, I apologize.
 3                Q.   Is Steven M. Rennick, Senior the same
 4       person that you represented in the other cases?
 5                A.   Yes, sir, it is.
 6                Q.   What was the $770,000 intended loss
 7       that you were greeted with by affixing your
 8       signature to the plea agreement?
 9                A.   I believe that probably would have been
10       the value of the camper if that's what this relates
11       to.
12                Q.   Mr. Rennick had a $770,000 camper?
13                A.   I tried to remember.  I think -- I'm
14       sorry, I'm trying to remember all of the facts and
15       circumstances.  I honestly, Judge, I just don't
16       remember all of them.
17                Q.   Why would you sign another plea
18       agreement for your client Steven M. Rennick, Senior
19       when part of the plea bargain that he entered into
20       was that he would not be prosecuted for any other
21       crimes in the Southern District of Ohio?
22                A.   I don't think I ever said that was part
23       of the agreement on it.  I said we discussed a
24       potential of it.  I don't think we ever got -- I
25       had talked to Steve about a potential and with
```

1     Brichler about it.  I don't think we got a full

2     agreement not to do that.

3            Q.  So when Mr. Rennick, Senior entered his

4     plea to the conspiracy count it was not a

5     protection from prosecution for any other crime.

6     The government knew about that which was committed

7     in the Southern District of Ohio?

8            A.  I said I don't remember if it was or

9     not.  I don't know, Mr. Greger, I don't know.

10           Q.  Would you allow a plea that didn't

11    protect your client from the other offenses that

12    the government knew about?

13           A.  If I could prevent it, I would.

14           Q.  So did you tell Mr. Rennick, Mr.

15    Rennick, listen, you are going to plead to this

16    conspiracy count but if the government got fraud

17    count for the camper or a mail count or anything

18    else they got, I can't protect you from that by

19    pleading?

20           A.  If that were the case, I would have

21    told him that.

22           Q.  Did you ask Mr. Brichler why he didn't

23    join all of the offenses that he knew about in the

24    superseding indictment?

25           A.  I don't remember having a conversation

1    about that specifically.

2            Q.   Now, it says in Exhibit 14 that the

3    defendant will at the time he enters his plea of

4    guilty acknowledge the truth of the attached

5    statement of facts of paragraph 12.  Did I read

6    that correctly?

7            A.   Yes, sir.

8            Q.   Is there an attached statement of

9    facts?

10           A.   The document that you gave me, no, sir.

11           Q.   What were the attached statement of

12   facts that you might have seen to enable you to go

13   ahead and sign this plea agreement?

14           A.   I don't know.

15           Q.   When did you discuss this plea

16   agreement with Mr. Rennick?

17           A.   I don't know.

18           Q.   What did Mr. Rennick do that you, by

19   affixing your signature to, was acknowledging he

20   would plead to?

21           A.   I think I'd have to see the statement

22   of facts exactly.  I'm having, sorry, I'm having a

23   very hard time remembering the circumstances of

24   this document and what lead up to its execution by

25   me.

1          Q.  Would you have signed this plea

2    agreement without knowing what the statement of

3    facts were behind it?

4          A.  I don't, no, sir.

5          Q.  Was this in any way being held over Mr.

6    Rennick's head, if you recall, at the time that he

7    entered his pleas?

8          A.  I was aware that there was an

9    investigation concerning insurance fraud.  I knew

10   there were investigations concerning the tractor

11   and a lot of things hanging over his head.  I don't

12   remember that exactly in that manner.

13         Q.  What necessitated or caused you to

14   receive a plea agreement that you executed in

15   October of '03?

16         A.  I don't remember.

17         Q.  Well, was it because Mr. Rennick was

18   trying to back out of the plea that he had entered

19   on August 18, 2003 and if he did so he would be

20   prosecuted for additional charges?

21         A.  I don't think so.

22         Q.  How do you know?

23         A.  Because I don't remember Steve ever

24   telling me that he wanted to withdraw his plea.

25         Q.  Mr. Rennick, Senior, never communicated

CaseCase3:17-cv-00250300355D-SLEMMRMLDocuDocum3t3e6(122210 only)Filed File4/52605/20Page 2P3e 42P5f 295

1    to you that he wanted to withdraw his plea?

2          **A.**  He never told me to file a motion to

3    withdraw the plea.  He never told me that he wanted

4    it undone, I mean, there were discussions about him

5    trying to better his situation, there were his

6    avoiding penitentiary.  I don't remember him saying

7    we are done.  Saying, I can't say he never said he

8    wanted to withdraw his plea.  He never came to a

9    conclusion with me on that or I would have filed a

10    motion.

11          **Q.**  Were you ever terminated as Rennick's

12    attorney?

13          **A.**  Yes, I was.

14          **Q.**  He terminated you?

15          **A.**  Yes.

16          **Q.**  Who did he hire to replace you?

17          **A.**  Mr. Lawson.

18          **Q.**  How did it come about?

19          **A.**  After a sentencing hearing he showed up

20    with Ball in my office and told me that he wanted

21    the tapes that he provided me and he wanted

22    eventually for me to give all of the stuff to Mr.

23    Lawson.  He was going to take his case and Mr.

24    Lawson was going to correct everything.

25          **Q.**  Did you ever admit in the hallway of

1 the federal courthouse in Cincinnati that you had

2 not done your best effort on Mr. Rennick's behalf?

3   A. No.

4   Q. Did you ever tell him in the presence

5 of his sister that you had done things wrong in his

6 case?

7   A. No.

8     MR. GREGER:  Can I have a moment,

9 your Honor?

10     JUDGE MERZ:  Yes.

11 BY MR. GREGER:

12   Q. Can the witness be shown Exhibit 5,

13 please.  Start at the bottom of four going to the

14 top of five.  This has been marked and identified

15 as a sentencing transcript of Mr. Elliott so we've

16 got at the bottom of four top of five, in fact,

17 that Mr. Elliott was closest to Mr. Rennick.

18 That's what your recollection is as well, correct?

19   A. I'd agree with you, yes, sir.

20   Q. Mr. Elliott was able to get Mr. Rennick

21 to enter a plea, that's what you recall as well?

22   A. That's fair, I guess.

23   Q. Mr. Elliott's plea bargain and 5K1 was

24 based on what Mr. Rennick was to do, did you know

25 that?

```
1              A.   No, sir.  Wait, I'm sorry.
2              Q.   Did you know that Mr. Elliott's plea
3      bargain included a 5K1 based on what Mr. Rennick
4      was to do?
5              A.   My understanding Mr. Elliott would
6      receive some benefit if Mr. Rennick was able to
7      provide substantial assistance to the government.
8      That's my belief, yes, sir.
9              Q.   So it was not your belief that a
10     portion of that substantial assistance was likewise
11     getting Mr. Rennick to plead?
12             A.   That's correct.
13             Q.   Go to page eight lines five through
14     nine.  Did you know but for Mr. Elliott's efforts
15     none of this would have went on?
16             A.   Did I know that?
17             Q.   Did you know that?
18             A.   No.
19             Q.   Did you know that, in fact, the
20     government moved for a downward departure for Mr.
21     Elliott?
22             A.   I believe I was told that at some point
23     by somebody.
24             Q.   Mr. Lawson says on page 12 that you are
25     also in the room.  We talked briefly before we came
```

1      up here and I want Mr. Brichler to know that is our

2      recollection about what happened that day.  Is it

3      your recollection that what happened that day was

4      that Mr. Elliott was going to get the benefit of a

5      5K if he could convince Mr. Rennick to plead?

6              A.   No, it was my recollection that Mr.

7      Elliott would receive the benefit of any

8      cooperation Mr. Rennick provided the government.

9              Q.   Okay, so if Mr. Rennick didn't provide

10     substantial assistance to the government --

11             A.   Correct.

12             Q.   -- Elliott couldn't get a 5K?

13             A.   Correct.

14             Q.   And the government never filed a motion

15     for downward departure, 5K1 for Mr. Rennick?

16             A.   That's correct.

17             Q.   So how did Mr. Elliott, why did Mr.

18     Elliott get any benefit of that bargain if the

19     bargain, as you understood it, was that, in fact,

20     it all depended on the substantial assistance of

21     Mr. Rennick?

22             A.   My understanding and not being present

23     at the time that occurred because there was a

24     break, I left, I went back to my office because my

25     sentencing was over with and I spoke with Mr.

1    Rennick and his family out in the hallway.

2                    During the break was that Mr.

3    Lawson was claiming to have conversations with Mr.

4    Brichler that Brichler didn't recall.  There was a

5    break.  Elliott did whatever he did and Mr.

6    Brichler spoke.  Whether Brichler asked for a

7    downward on the day of sentencing, I don't know.

8    You'll have to ask him that.

9         Q.  It says in page 12 you were in the

10   room?

11        A.  I was in the room what Mr. Lawson was

12   arguing for.  There was no 5K motion at that time.

13   My understanding later on, Brichler gave some sort

14   of benefit.  You told me Elliott got a reduction.

15   He got a reduction.  I learned of that, why, I

16   don't know why Mr. Elliott got a reduction.  I was

17   there when Mr. Lawson thought and argued that his

18   client was entitled to one.

19        Q.  Well, if you are present on page 12 of

20   the transcript, aren't you likewise present on page

21   11 of the transcript?

22        A.  Okay.

23        Q.  Where Mr. Brichler moves for downward

24   departure on the basis of assistance in that case

25   and you were present when Mr. Brichler motioned for

Case 3:07-cv-00053-WHR-MRM Document 9 Filed 05/24/2010 Page 275 of 295

1    it.  It's not that you learned about it later.

2         A.   I may have been in the room.  I may

3    have been in the room when they argued about it,

4    maybe you are right.

5         Q.   More than argued about it, you were

6    present because it comes on page 11 of the

7    transcript and we are on page 12.  You are also in

8    the room.  You were actually present when Mr.

9    Brichler moved for the downward departure based

10   upon Mr. Lawson's argument and the deal that was

11   struck on August 18, 2003?

12        A.   I can't disagree, you say I was in the

13   room, it looks like I was.

14             JUDGE MERZ:  At least Mr. Lawson

15   says you were, right?

16             THE WITNESS:  Right.

17   BY MR. GREGER:

18        Q.   And you talked briefly before they

19   meaning Mr. Elliott and Mr. Lawson came up there.

20   And Mr. Lawson --

21        A.   That's what Mr. Lawson said.  I have no

22   memory of talking to him on the day of.  You are

23   correct that Mr. Lawson says he talked to me.

24        Q.   And he represented to the court that it

25   was your joint recollection about what happened

1    that day, true?

2         A.   You are correct, he did make that

3    representation.

4         Q.   Have you ever corrected the record made

5    before Judge Dlott in that regard that A, you

6    weren't in the room, two, Mr. Lawson's

7    representation of your recollection is in error?

8         A.   Being this is the first time I've ever

9    seen this transcript, no, sir, I've not.  I don't

10   know if it needs to be corrected as Ia sit here

11   today.

12        Q.   The next lines, 11 through 14 --

13        A.   Which page?

14        Q.   Page 12.  Mr. Brichler said and I want

15   to make it clear, that this motion for reduction is

16   based upon what happened that day and is not based

17   upon any conduct that Mr. Rennick subsequently

18   engaged in. Does that refresh your recollection

19   about what the offer was to Mr. Elliott?

20        A.   I wasn't party to a conversation with

21   Mr. Elliott and Mr. Brichler or Mr. Lawson and Mr.

22   Brichler.  So I don't know there is anything that

23   refreshes my memory about an agreement that I

24   wasn't party to, I don't believe.

25        Q.   Wouldn't it have been important to find

1    out what Mr. Elliott's incentives were when you

2    gave him consent to talk to your client on at least

3    one and perhaps two occasions on August 18, 2003?

4         A.   Being they were good friends like that,

5    no, I didn't think so.

6         Q.   Until today's date, you never knew that

7    Mr. Elliott had a deal with the government that if

8    Mr. Rennick and only if Mr. Rennick pled guilty was

9    he going to get a benefit; is that true?

10        A.   If you are assuming I wasn't in the

11   room on the day of the sentencing then that would

12   be true.  I don't remember being at a hearing by

13   Mr. Lawson on the day of the sentencing, but that

14   would be true.

15                  MR. GREGER:  I have nothing

16   further of this witness.

17                  JUDGE MERZ:  Cross?

18                  CROSS EXAMINATION

19   BY MR. GLASSMAN:

20        Q.   A few points.  In preparing for the

21   case at some point you would have reviewed the

22   criminal complaint that was filed upon the initial

23   arrest?

24        A.   Yes, sir.

25        Q.   And so you would recall if that

CaseCase7-cv02053/06035D-SHEMRocuDewench(Glannyfiled Die4/52/4EBD203PageP50e4ZD5f 295

1      criminal complaint, you would have read that the

2      affidavit in support said that 450 pounds of

3      marijuana was seized from any one side of a locked

4      area of the warehouse?

5          A.   If that's what is in the complaint.

6      I'm sure --

7          Q.   Would you recall if the criminal

8      complaint says that Rennick, Senior had a key to

9      the locked area?

10         A.   If it's in the complaint, yeah.

11         Q.   And would you recall that according to

12     the criminal complaint Steve Rennick, Senior stated

13     he transported the boxes containing the marijuana

14     in a truck from Arizona to Cincinnati?

15         A.   Yes, sir.

16         Q.   Prior to the date on which Mr. Rennick

17     entered a change of plea and decided to plead

18     guilty, had you told him about a mandatory minimum?

19         A.   Yes, sir.

20         Q.   You had told him there was a mandatory

21     minimum penalty?

22         A.   Yes, sir.

23         Q.   During the change of plea hearing, did

24     you tell Mr. Rennick at any point that he was

25     entering a fictional plea?

1        A.   No.

2        Q.   So there was no time during the plea

3   hearing when Mr. Rennick either turned to you or

4   waited for your advice and you whispered in his

5   ear, don't worry, you must do this, this is just a

6   fictional plea?

7        A.   That's correct, I never said that.

8        Q.   Now, I know that you discussed earlier

9   on the plea negotiations or the initiation of plea

10  negotiations on the morning that trial was set to

11  begin?

12       A.   Yes, sir.

13       Q.   And would it be accurate to say that

14  your testimony was that the government was not

15  interested in entering into plea negotiations

16  unless all three defendants were to plead guilty?

17       A.   That's correct.

18       Q.   Now, the plea agreement that you

19  ultimately reached with the government, that was

20  entered as record in this case, did that plea

21  agreement depend on the government giving favorable

22  treatment to any of the other co-defendants?

23       A.   I think Mr. Rennick would have always

24  been able to plea to the conspiracy count.  So, you

25  know, his ability to plead to the conspiracy wasn't

1 necessarily conditioned on the other two entering

2 the plea.

3   Q. I'm asking an even simpler question, I

4 think, so the three defendants entered three

5 agreements?

6   A. Right.

7   Q. Let's say one of the other ones other

8 than Mr. Rennick sought to withdraw his plea and

9 withdrew his plea, just imagine that hypothetical.

10   A. Okay.

11   Q. Would Mr. Rennick have been entitled to

12 withdraw his plea on that basis?

13   A. Did, they all entered their pleas and

14 now one wants to go forward and no longer wants to

15 go to trial?

16   Q. Let's say they entered the plea as

17 happened and sometime down the road one of the

18 others withdraw their plea.  Would Mr. Rennick have

19 been entitled to withdraw his plea on the basis

20 that somebody else withdrew their plea?

21   A. I think it would have, that would be an

22 interesting argument.  I think if you wanted to

23 make it, I'd certainly attempt to make it.  I mean,

24 one of the reasons that Steve wanted to enter the

25 plea that day, he saw favorable treatment for two

Case 3:17-cv-00253-SERB-WRD Document 3 (Court only) Filed 04/52/20 Page 281 of 295

1    people he cared about.  That was, I'll agree, that
2    was a motivating factor for Mr. Rennick to enter a
3    plea was his concern for Elliott and Benjamin's
4    futures.
5         Q.   Sure.  All right, let me ask it this
6    way.  The plea agreement that was written and read
7    into the record?
8         A.   Okay.
9         Q.   Was that accurate?
10        A.   I'd agree it was, yeah.
11        Q.   During the course of plea negotiations,
12   did you at any point meet with the other defense
13   lawyers and Mr. Elliott and Mr. Brichler, perhaps
14   Mr. Benjamin, but everyone except for Mr. Rennick
15   and come up with a plan to get Mr. Rennick to plead
16   guilty?
17        A.   No.
18        Q.   Did Mr. Brichler ever present to you
19   any sort of plan or strategy to tell you that you
20   had to get Rennick to plead guilty one way or the
21   other?
22        A.   No.
23        Q.   Was it your understanding that Rennick
24   entered his plea voluntarily?
25        A.   Yes.

1   Q. It was not the result of any threat or

2 coercion?

3   A. Correct.

4   Q. After Rennick pled guilty and was then,

5 actually, I'm sorry.  Prior to the time that he

6 formally entered the guilty plea when you were in

7 plea negotiations, did you discuss the idea of

8 cooperation?

9   A. Yes.

10   Q. You discussed that with Rennick?

11   A. Yes.

12   Q. And Rennick said he'd try to cooperate?

13   A. Correct.

14   Q. And subsequent to the entry of the

15 guilty plea, did Rennick, in fact, go on about the

16 cooperation?

17   A. Yes, sir.

18   Q. And did he tell, and he was in frequent

19 contact with you throughout this time?

20   A. Yes, sir.

21   Q. Did he ever say I want to withdraw my

22 guilty plea?

23   A. As I said earlier it sounds weird as a

24 conclusion, no, I've had lots of discussions with

25 lots of clients who has a buyers remorse, I think

1    I'm withdrawing my plea.  What do you, we've

2    discussed that.  I can't say that he never said it

3    to me after conclusions of discussions with hey,

4    I'm done with this, get me out of this, no. I hope

5    that makes some sense.

6            Q.  Sure.  Prior to the sentencing hearing,

7    did you discuss the PSR with Rennick?

8            A.  Yes.

9            Q.  So he had seen the PSR prior to the

10   sentencing hearing?

11           A.  Uh-huh.  Yes, I'm sorry.

12           Q.  Did you discuss with him what you were

13   going to argue at the sentencing hearing?

14           A.  Yes, sir.

15           Q.  Did you tell him that you would get

16   Brichler to file a 5K1.1 for substantial

17   assistance?

18           A.  No, sir.

19           Q.  You did not tell him that?

20           A.  No, sir.

21           Q.  What did you tell him?

22           A.  I told him that he was not going to get

23   the benefit of a 5K1 motion.  I had lots of

24   discussions with Rennick, Brichler, with Mercado

25   and about the plea and the progress of his

1    cooperation.  Mr. Brichler and Agent Mercado

2    expressed on one occasion that they did not think

3    that what Mr. Rennick was doing amounted to

4    substantial assistance.

5              Mr. Rennick and I had a

6    conversation in short time before answering.  It

7    was within days or a week or so about what I

8    thought was a better course.  I was somewhat

9    concerned about the tapes.  I wasn't completely

10   satisfied with them.  They were all in essence one

11   sided types.  Mr. Rennick was recording his voice

12   essentially.  And you can't force the government to

13   file a 5K1 and he wanted me to try to force them.

14             I don't believe that the case law

15   supports my ability to force the government to file

16   a 5K1.1 or have a hearing on what did amount to

17   substantial assistance for a judge to order the

18   government to file one.  I didn't think that was it

19   and I explained that to Steve.

20        Q.  You explained that to him before the

21   sentencing hearing?

22        A.  I explained to him what I wanted to

23   attempt to do is mitigate the circumstances about

24   his military history.  We gave to the judge the

25   entire, I don't know how much VA record she had.  I

1    don't know if she had all or some of it.  She had

2    our sentencing memorandum, but we had discussed all

3    of the choices and I told him what I thought was in

4    his best interest.

5         Q.  And what did he say in response to

6    that?

7         A.  I think he still thought that somehow

8    we can enforce some sort of contract relationship

9    in what he had done was substantial assistance and

10    he didn't agree with that tactic.  I don't think he

11    agreed with that tactic.

12         Q.  Let's see, what was handed to you and I

13    believe marked as Defendant's Exhibit 14?

14         A.  Yes, sir.

15         Q.  Did I hear you correctly that you don't

16    have any independent recollection of this document?

17         A.  I'm trying to remember the

18    circumstances of this and I'm sorry, I don't, I

19    just really, really don't.

20         Q.  Turning to the last page of that

21    document.

22         A.  Yes, sir.

23         Q.  The signature page?

24         A.  Yes, sir.

25         Q.  Does appear to have your signature on

Case Case: 07-cv-00353-035B-SUEMMR EDocument s c(12 200 only) Filed File: 07/320D200 Page Page 200 49386 f 295

1      that page?

2              A.   Yes, sir, it does.

3              Q.   In your experience in dealing with plea

4      agreements from the U.S. attorney's office for the

5      Southern District of Ohio, are the signature pages

6      particularly blank, in other words, there is

7      nothing on a page other than signatures or do they

8      typically start by saying this is the entire plea

9      agreement, there are no other agreements besides

10     this?

11             A.   I would say it's normally the latter.

12             Q.   Did, I believe, I heard your testimony

13     that you did not ever solicit Rennick to pay you in

14     cash for your services?

15             A.   That would be correct.

16             Q.   Did you ever, just following up, did

17     you ever specifically say, I would like you to pay

18     me in cash that I can take a trip to Colorado, I

19     need to go, I need the cash to go to Colorado?

20             A.   No.

21             Q.   To the best of your knowledge, you were

22     representing Rennick throughout the course of the

23     proceedings until Rennick terminated your

24     representation?

25             A.   Yes, sir.

1          Q.   And Elliott had separate counsel?

2          A.   Correct.

3          Q.   And Benjamin had separate counsel?

4          A.   Yes, sir.

5          Q.   And there was no plot that you were

6     involved in at the behest of the United States

7     attorney's office to force Rennick to plead guilty?

8          A.   That would be fair.

9          Q.   And, again, your best understanding is

10    that Rennick pled guilty as a free and voluntary

11    act, his own choice?

12                    MR. GREGER:  Objection, your

13    Honor, asked and answered.

14                    JUDGE MERZ:  Overruled.

15                    THE WITNESS:  Yes, sir, I do

16    believe that.

17                    MR. GLASSMAN:  No further

18    questions.

19                    JUDGE MERZ:  Thank you.  Redirect?

20                    REDIRECT EXAMINATION

21    BY MR. GREGER:

22          Q.   Thank you, your Honor.  Do you still

23    have Exhibit 14 in front of you, Mr. Gallagher?

24          A.   I do.

25          Q.   What does paragraph 13 state?

```
1              A.   Hang on just a second.

2                   JUDGE MERZ:  13 or 15?

3                   MR. GREGER:  I'm referring to the

4    plea agreement that was signed by Mr. Gallagher.

5                   THE WITNESS:  Talking about

6    Exhibit 14 and now paragraph 13 of that is --

7    BY MR. GREGER:

8              Q.   That's exactly right.

9                   JUDGE MERZ:  Beg your pardon?

10             Q.   I apologize.  Paragraph 15 page three

11   of that exhibit.

12             A.   Right.

13             Q.   Read that into the record.

14             A.   This written agreement embodies all of

15   the agreements and understandings between the

16   United States attorney for the Southern District of

17   Ohio and the defendant.  No conversations,

18   discussions, understandings, or other documents

19   extraneous to the agreement shall be considered

20   part of this agreement.

21             Q.   Is that what Mr. Benjamin was referring

22   to?

23                  JUDGE MERZ:  Mr. Benjamin or Mr.

24   Glassman?

25                  MR. GREGER:  Glassman.
```

CaseCase3:07-cv-000530635B-WHMRMDocuBearent3c(Page3 8Bonfly)Filed File4/52/0/02005PagePage3c41295 of 295

1    BY MR. GREGER:

2           Q.   Typically appearing on a page of a plea

3    agreement in the Southern District of Ohio?

4           A.   What we see, we normally see something

5    like that on the signature page.  You'd see the

6    signature page.  That's what you would see most,

7    yes, sir.

8           Q.   In this case, the signature pages just

9    went to page four because they couldn't fit it on

10   page three?

11          A.   That appears to be the case, you are

12   correct.

13          Q.   How do you know whether or not

14   coercion, force, pressure, was brought to bear on

15   Mr. Rennick by the government's agent Mr. Elliott

16   if you weren't privy to the conversations?

17          A.   All I --

18                    MR. GLASSMAN:  Objection.

19                    JUDGE MERZ:  Sustained.

20   Characterization, form of the question.

21   BY MR. GREGER:

22          Q.   You now understand because you were in

23   court that the government rewarded Mr. Elliott for

24   his efforts on the day of the change of pleas,

25   correct?

1      A.   It appears that way.  The only other

2   thing I can tell you, Mr. Greger, is this.  In the

3   Southern District of Ohio it would be routine at

4   times in order to facilitate a plea to give people

5   just sort of credit for pleading and what I mean by

6   that is this.  Which is, look at, we've had

7   situations where people got 5K's sort of cross

8   fingering each other where they didn't provide

9   substantial assistance to the government, but the

10  two of you were basically allowed to get the

11  benefit of each other pleading.

12              I don't know if that's the case or

13  it was Mr. Elliott had to do some undue pressure to

14  Mr. Rennick.  I don't know which two circumstances

15  it was, you're right.

16      Q.   One of the two circumstances could

17  exist because you were not privy to the

18  conversations between Elliott and Rennick?

19      A.   I'd agree with you.

20      Q.   And the government favored Mr. Elliott

21  by a downward departure or really moved under 5K1

22  only because of what Mr. Elliott did on the morning

23  of the pleas and nothing that Mr. Rennick did after

24  the pleas, correct?

25      A.   That appears to be the case, yes, sir.

1     Q.  Do you recall in your investigation of

2     this matter whether or not the lock that secured

3     the locked area of the warehouse had, in fact, been

4     cut off so that no keys were necessary?

5     A.  Wow.  I know they executed a search

6     warrant.  I don't know how the thing was opened.

7     That's very possible, yes, sir.

8     Q.  Mr. Gallagher, do you believe every

9     affidavit that's attached to a criminal complaint?

10    A.  No, sir.

11              MR. GREGER:  Thank you, I have

12    nothing further.

13              JUDGE MERZ:  Recross?

14              RECROSS EXAMINATION

15    BY MR. GLASSMAN:

16    Q.  One brief question.  After Rennick and

17    Elliott had their conversation that you alluded to

18    on the change of plea?

19    A.  Yes.

20    Q.  After that point your view was that

21    Rennick wanted to enter a plea agreement as his own

22    free and voluntary choice?

23    A.  That would be yes.

24              MR. GREGER: No further questions.

25              JUDGE MERZ:  Thank you.  Mr.

1    Gallagher, you may step down and you are excused.

2                    THE WITNESS:  Thank you, sir.

3                    JUDGE MERZ:  The understanding

4    that the Petitioner has no additional witnesses to

5    call; is that correct?

6                    MR. GREGER: It's correct.  We move

7    for admission of Exhibits 1 through 14.

8                    JUDGE MERZ:  Any objection, Mr.

9    Glassman?

10                   MR. GLASSMAN:  No, sir.

11                   JUDGE MERZ:  Does the Petitioner

12   rest?

13                   MR. GREGER:  They do, your Honor.

14                   JUDGE MERZ:  Any evidence on

15   behalf of the United States?

16                   MR. GLASSMAN:  No, sir.

17                   JUDGE MERZ:  Mr. Greger, does the

18   Petitioner desire an opportunity to brief this

19   matter.

20                   MR. GREGER: You know, your Honor,

21   I think I do and I may ask for additional judicial

22   notices be taken in that briefing as to what or was

23   not filed as a matter of record in the docket of

24   the court.

25                   JUDGE MERZ: How much time would

1    you need to prepare that memorandum?

2                    MR. GREGER:  Judge, I'm presently

3    scheduled to start trial with Dlott April 4th.

4    That's four solid weeks except for the week of the

5    14th.  She's going to be in chief judge training

6    school and then we get back and start again.  That

7    case is not resolved.  I don't know how quickly the

8    transcript will be ready, but I can't possibly file

9    anything with this court until the middle or end of

10   June.  I just can't.

11                   JUDGE MERZ:  June 15, 30, you

12   pick.

13                   MR. GREGER:  June 30th.

14                   JUDGE MERZ:  June 30th it is.  The

15   transcript will be prepared for the use of the

16   court and copy provided to both Mr. Glassman and

17   Mr. Greger.  Mr. Glassman, do you need more than

18   30 days to respond?

19                   MR. GLASSMAN:  That's fine, your

20   Honor.

21                   JUDGE MERZ:  Very good.  We are in

22   recess.

23                   MR. GREGER:  Thank you, your

24   Honor.

25                   JUDGE MERZ:  For the record, the

Case Case 3:17-cv-00259-SMR-HEMR Document 290 on Filed 04/17/20 Page 294 of 295

1    writ of habeas corpus testificandum for Mr. Rennick

2    is dissolved and he's returned to custody.

3                         (Hearing adjourned at 5:35 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4               I, Paula A. Blosser, a Registered

5    Professional Reporter and Notary Public do hereby

6    certify that the foregoing is a full, true and

7    correct transcript of my notes taken in the

8    above-styled case and thereafter transcribed by me.

9

10

11
                    __ /s/ Paula A. Blosser _
12                  Paula A. Blosser, RPR

13

14

15

16

17

18

19

20

21

22

23

24

25