IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NO: 1:02-CR-157 |
| Plaintiff | : | Judge Dlott |
| | | Chief Magistrate Judge Michael R. Merz |
| - vs - | : | |
| STEVEN RENNICK, SENIOR | : | |
| Defendant | : | |

_____

### DEFENDANT'S POST-HEARING MEMORANDUM
_____

"Two things are fundamentally clear. One, either Mr. Rennick is absolutely innocent or two, he's absolutely crazy to persist in this motion in the twilight of his 63-month sentence knowing that this Court could vacate, remand and he faces the gauntlet again with no guarantees that he would get credit for the time served on the sentence that this Court, I pray, will absolutely vacate and order a new trial…I am convinced that Mr. Rennick is not absolutely crazy, [H]e must therefore be absolutely innocent" (Evidentiary Hearing Transcript[1] at 4-5).

The defendant filed his 28 U.S.C. §2255 motion to vacate, set aside or correct sentence by a person in federal custody on July 30, 2007 (Doc. 261) after being re-sentenced by the District Court. The Defendant raised the following grounds in his motion:

---

[1] Hereinafter "EHT".

1)  His guilty plea was not knowingly or voluntarily entered;

2)  Defendant received ineffective assistance of counsel in advising him he was entering a fictional plea;

3)  Defendant's 5th and 6th amendment rights were violated in calculating his sentence;

4)  The Government breached the plea agreement by failing to file a substantial assistance motion.

The Sixth Circuit Court of Appeals disposed of several of the Defendant's grounds for relief in his direct appeal. The Sixth Circuit found the District Court "fully complied with Rule 11 in accepting the plea and Rennick is bound by his responses indicating that his plea was knowing and voluntary". (*United States of America v. Rennick*, 06-3186 at p. 4 (March 12, 2007)).  "[B]ecause Rennick's sentence was authorized solely on the basis of the drug quantity he admitted, it does not violate his constitutional rights". (*United States of America v. Rennick*, 06-3186 at p. 6 (March 12, 2007)). Finally, "…the government did not breach the plea agreement and Rennick is not entitled to vacation of his sentence on that basis". (*Id*. at 7).

Thus the only bases which remain for the vacation, setting aside, or correction of Defendant's sentence are:

1)  "…Rennick's claim that he was coerced into pleading guilty by the prosecution's offer of a "package deal" cannot be resolved without further factual development. *See, Cornett v. Lindamood,* 203 F.App'x 691 (6th Cir. 2006). Accordingly, that claim is most appropriately raised in a petition filed pursuant to 28 U.S.C. §2255";

2)  "Second, Rennick argues that he received ineffective assistance of counsel in pleading guilty."[2]

---

[2] We ordinarily "will not review a claim of ineffective assistance of counsel on direct appeal because the record is usually insufficient to permit an adequate review of such a claim". *United States v. Gardner,* 417 F.3d 541, 545 (6th Cir. 2005). That is the case here, where the record

This court's granting of the evidentiary hearing herein clearly demonstrates that there was a package deal and the benefits to Defendant Elliot from that package deal, remained undisclosed to this Defendant by his counsel and as a result, Defendant received the ineffective assistance of his counsel. Likewise Defendant Rennick received the ineffective assistance of counsel because Defendant Rennick was advised by counsel that he was entering a "fictional plea" which would result in a lesser sentence. Finally Defendant received the ineffective assistance of counsel when his counsel permitted conferences between co-defendants and their counsel when defendant was in a fragile mental state and susceptible to the pressure to plead.

## BRANCH I. THE PACKAGE DEAL

> It was presented to me on the day of trial that any plea agreement was going to be entered into only if all three defendants entered a plea.

(EHT at p. 226-227).

> Earlier on prior to sitting down for trial, it was, it was pitched to defense counsel this was a package deal. All three of you plead or all three of you go to trial…

(EHT at p. 22)

> "…that's what it seemed like it was" [It was a package deal, everybody pled]

(EHT at p. 78-79).

> Q:    Let's say they entered the plea as happened and sometime down the road one of the others withdrew their plea. Would Mr. Rennick have been entitled to withdraw his plea on the basis that somebody else withdrew their plea?

---

contains little evidence that would allow us to assess Gallagher's performance. Of course, Rennick is free to develop a record in support of his ineffective assistance claim in a postconviction proceeding brought pursuant to 28 U.S.C. §2255. *See, United States v. Hall,* 200 F.3d 962, 965 (6th Cir. 2000). *United States v. Rennick,* 06-3186 at p. 5 (March 12, 2007).

> A:    I think it would have, that would be an interesting argument. I think if you wanted to make it, I'd certainly attempt to make it.

(EHT at p. 280).

> "It had to be all or none"

(EHT at p. 138).

None of the defendants considered resolving their respective case by way of a plea, prior to the day their jury trial was set to begin. (EHT at p.  7-8; 81-82; 135-136). In fact, it was the government that called a "time out" to discuss resolving the cases by way of plea for the first time on the morning of trial. (EHT at p. 8). Judge Dlott was actually on the bench to begin trial, at the time the government asked for time to discuss resolving the cases by way of plea with defense counsel and their clients. (Id. at 8-9).

> I suspect having done enough federal work to make it to trial and have a prosecutor even in a state case offer me a deal right before the jury, typically that does mean there is a question of the strength of their case. I guess one would safely assume they were worried about Mr. Benjamin's case which may have an impact on the remaining defendants.

(EHT at p. 15).

With the jury present and the judge ready to start a multi-defendant drug conspiracy case, the pressure to move towards trial or plea was great; the jury and judge awaited the plea negotiations.

Discussion of the "package" occurred on the morning of trial, at the meeting of Defendant Elliot, Elliot's attorney Ken Lawson, Steven Rennick's attorney William Gallagher and Robert Brichler from the United States Attorney's office.  (EHT at p. 72-73). The discussion among these individuals was "what each one of us was going to plead to". (Id. at 73). Noticeably absent from these discussions was Defendant Rennick.

Defendant Rennick was not invited to the meeting(s), did not know about the meeting(s) before it/they occurred and never authorized the meeting to occur. (EHT at p. 168).

"Because nothing was going to happen unless Mr. Rennick was also going to do it. I wasn't pushing a plea. The other two were pushing trying to work out their case."

> Q:    Mr. Elliot's attorney, Mr. Lawson, and Mr. Benjamin's attorney, Mr. Cohen were pushing to work their cases out?
> A:    I would agree with that.
> Q:    And their cases could not be worked out unless Mr. Rennick likewise pled?
> A:    You are correct.

(EHT at p. 251).

## BRANCH II. THE COERCION AND FICTIONAL PLEA

Permission was given by Attorney Gallagher, to Defendant Elliott and his attorney, to speak privately with Defendant Rennick; Attorney Gallagher was not privy (EHT at p. 248) to this/these "private" discussion(s). (EHT at pgs. 224; 234). Defendant Rennick had a father/son-like relationship with Defendant Elliott (EHT p. 234); Defendant Rennick and Defendant Benjamin "were close". (Id.). They were like the "three musketeers"; "[I]t was all for one and one for all. In the minds of the government we were either going to have a trial or a plea". (Id. at 235).

The Defendant's will, was over-born to achieve the package deal, because the Defendant was adamant about going to trial because of his belief he was actually innocent. Defendant was not alone in his belief that no conspiracy existed among the Defendants and no money had been laundered as alleged in the superceding indictment.

Defendant Elliot had no information that Steven Rennick Jr. had conspired with him and others to distribute marijuana. (EHT at p. 65). Defendant Elliot had no information that Wayne Benjamin conspired with him or others to possess with intent to

distribute marijuana. (EHT at p. 66). Defendant Elliot did not know what information he had that he and Defendant Steven Rennick, Sr. had formed a conspiracy to distribute marijuana. (EHT at p. 67). Attorney Cohen believed "there was a total lack of evidence in terms of his [Benjamin's] involvement other than being close to what was going on, but we had an alternative reason for being where a lot of this stuff was going on". (EHT at p. 50). "…[B]ased on my preparation for trial, I don't believe there was ever any credible evidence that Mr. Rennick transferred marijuana to Mr. Benjamin". (EHT at p. 34). "With the detective that worked on it with Mr. Gallagher, talking to all of the witnesses, I was not guilty". (EHT at p. 136).

Defendant Rennick had prepared his defense well and although no defense is perfect, Defendant had substantial evidence to support his innocence. He paid at least $25,000.00 to defense counsel[3]—hardly the charge for a plea. The evidence in support of Defendant's innocence included:

1) Canine searches of the Freightliner tractor, that was alleged by the government as being the mode of transportation for 500 pounds of marijuana, were all negative (EHT at p. 13);

2) A New Mexico Department of Transportation officer, who searched the tractor that was alleged to have been the mode of transportation for the 500 pounds of marijuana, was deposed and

---

[3] Defense counsel admitted to this amount as his fee, which was in addition to the fees for the investigators, deposition of a witness located out of state, and other costs. (EHT at p. 209). However, Defendant testified that he paid defense counsel in excess of $100,000.00, a portion of which was in cash at the request of defense counsel to be used for a vacation in Colorado and an additional $10,000.00 because they were going to trial. (EHT at p. 133-134). In fact defense counsel has been to Colorado with his wife. (EHT at p. 256).

would have testified that he detected no evidence of marijuana being transported in the tractor; (Id. at 13-14; 216-217; 218);

3)    Mr. Cole, one of the anticipated witnesses to be called by the government to support their theory of a conspiracy, had a "checkered past. He had lied in open court about who he was, he had an insurance card he obtained in fraud. He had done a number of things that…would have discredited him as potential witness" (Id. at 214);

4)    Mr. Jones, one of the anticipated witnesses to be called by the government to support their theory of a conspiracy , "could be discredited or his truthfulness would be called into question". (Id. at 215);

5)    The President of WCIN and sales director believed, like Defendant Rennick, that Mr. Cole was a legitimate businessman (Id.);

6)    An individual who had signed a contract with Mr. Cole for a concert/production was prepared to testify; (Id.);

7)    There was never a trailer hooked to the tractor portion of the Freightliner; the fifth wheel was in "pristine" condition (Id. at 218);

8)    A forensic accountant was prepared to testify to the source of all cash deposits coming from legitimate sponsorship and not from any illegal activities (Id. at p. 167-168).

When Defendant pled, he pled to "information that was new" to defense counsel. (Id. at p. 236). Why then did he plead; because of the ineffectiveness of his counsel, the pressure of the government's agent Matthew Elliot, his "fragile" mental state that he possessed since his days in Vietnam and because he was told the plea was "fictional".

Defendant's counsel was objectively ineffective when he permitted the private conversations to occur between Matthew Elliott and Steven Rennick wherein the coercion started.

Attorney Gallagher knew Mr. Rennick "was worried, truly, about what was going to happen to Wayne and Mr. Elliot" (Id. at p. 234). Attorney Gallagher knew of the close relationship between Defendant Elliott and Defendant Rennick. Attorney Gallagher permitted the Defendants to speak privately, without monitoring the conversation. These private conversations, which occurred for the first time on the morning of trial, unconstitutionally tainted the plea process.

At these private conversations, Defendant Elliot informed Defendant Rennick that it was a "package deal" (Id. at 169). Defendant Elliot "started to cry" and informed Defendant Rennick that if they get found guilty that he could do "up to forty years and he'd lose his kids and not be able to see them" (Id. at 138). Defendant Elliot persuaded Defendant Rennick that Elliot's "life would be ruined" (EHT at p. 165). Defendant Rennick persisted in his innocence, "you guys go ahead and plea and I'll just go to court by myself"; I can't plead" (Id.). The deal changed twice (EHT at p. 75-77; 147); the pressure increased deal to deal.

> First deal the way I understand Wayne was going to get thirty-six months, Matt was going to get, I think, thirty some months and I was going to get forty-eight or something like that. And I just told them, I can't plead to something that is not true.

(EHT at p. 147).

The first package deal was rejected. Elliot returned with the second package deal. Elliot informed the Defendant that Elliot would get probation, Benjamin would get probation and Defendant Rennick would get thirty-six months; "I mean he was pushing me so hard". (Id. at 139). The thirty-six months was confirmed by both Attorney Gallagher and Lawson. (EHT at p. 140).

Undisclosed to Defendant Rennick, was the agreement between the government and Defendant Elliot, that if Elliot was successful in getting Rennick to plead, Elliot would receive a 5K, substantial assistance motion, that would lessen his potential sentence. Elliot, as he was pressuring Defendant to change his plea, was acting as an agent for the government with an undisclosed benefit. Defendant relented. The defendants were told to go to lunch and the plea paperwork would be prepared by the time they returned to court.

The Defendants reappeared from lunch and were immediately placed before the court, the judge was prepared to start the plea process. The plea colloquy was seriatim; all defendants were lined up and all pleas were taken at the same time. Defendant was unaware of the factual bases for the other defendant's plea agreements. When he heard that Defendant Benjamin was admitting that he received a pound of marijuana from Defendant Rennick on a date where they were both together on a trip to purchase the Freightliner and that Defendant Elliot was admitting he received 50 pounds of marijuana from a building under the Defendant's control, with the implication that the marijuana was part of the alleged 500 pounds that the Defendant was charged with importing from

Arizona, the Defendant physically reacted; Defendant Rennick shook his head no to what he was hearing.

Demetrius Ball, a long-time friend of Defendant Rennick, testified to witnessing the Defendant shake his head no, when listening to the facts which formed the basis for the co-Defendant's pleas and to the facts that supported Rennick's plea. (EHT at p. 123). The facts that Defendant Rennick was hearing were false. Not only did Defendant know they were false, but so too did the government and Attorney Cohen who invented the quantity, date and substance of the crime to which Benjamin pled.

Attorney Cohen acknowledged that he helped create a "legal fiction" before the court as a means to an end and permitted his client to testify under oath, to the fiction so created. (EHT at p. 16-18).

To obtain the benefit of the government's bargain, Defendant Benjamin had to agree to plead to a fictitious crime, which occurred on a fictitious date, with a fictitious weight for the fictitious controlled substance—which directly involved Defendant Rennick. (EHT at p. 29-30). Thus although Attorney Cohen testified that a legal fiction is created and permitted so long as it does not harm a third party, this legal fiction directly tied Defendant Rennick to the distribution of marijuana; the harm was actual in this case. Defendant would be hard-pressed to deny involvement in marijuana when his co-defendant and good friend admitted receiving a pound of same on a date certain from him.

To Defendant Benjamin's credit, although he admitted to the truth of the facts while under oath before the court, he persisted in his innocence to the probation officer who wrote his pre-sentence report, causing him to lose the two points for acceptance of

responsibility. (EHT at p. 27). Apparently Defendant Benjamin understood that his plea was as fictional as the crime, date, and weight he acknowledged as true, under oath, before the District Court Judge.

> All three of us starting asking the lawyers why did they read these lies to the judge and they said, don't worry, it's just a fictional plea and we all just lost it. We want that taken out. We never knew they were going to say that to begin with. So, again, they just told us, don't worry, it's just a fictional plea.

(EHT at p. 174).

Attorney Cohen commented on the "confusing nature of how this process took place" (EHT at p. 29) to describe how his client came to plead. The confusion was not limited solely to his client Wayne Benjamin.

Even though there were written plea agreements, neither Defendant Elliott nor Rennick were permitted to read the agreements before they were signed. It was immaterial what Defendant Benjamin's plea agreement stated as it was pure fiction. Defendant Elliott testified that when he approached the podium to begin the plea process he was told by his attorney to "sign this", he signed it and handed it back. (EHT at p. 102; 104). He did not read it before he signed it (EHT at p. 98). Elliot's plea agreement, that he did not read, was marked as Exhibit 6 for the Rennick 2255 hearing. Elliot does not recall ever knowing or seeing what facts supported the plea until they were read into the record by the Assistant United States Attorney. (EHT at p. 108). Likewise Defendant Rennick upon returning from lunch, had a document placed before him and was told by his attorney, "sign this". "What is it? It's a plea. I'd like to read it. Don't worry, it's just what we talked about" (EHT at p. 141). Rennick signed the plea agreement.

Mr. Rennick started to object during the plea colloquy; he was shaking his head

no to the questions asked by the judge; he needed to answer yes or the plea process would

stop and the package deal lost.

| | | |
|---|---|---|
| A. | | He shook his head constantly. |
| Q. | | Did you then see anything happen between Mr. Rennick, Senior and his attorney while they stood before the judge? |
| A. | | Yes. |
| Q. | | What did you see? |
| A. | | I saw Steve whisper in his ear. I couldn't tell what they were saying and afterwards he pled guilty. |
| Q. | | Was the speaking or the whispering from the attorney to Steve or from Steve to the attorney? |
| A. | | From the attorney to Steve.*** |
| Q. | | After this whispering or speaking and nudging, did Mr. Rennick answer yes to the same questions that he had been shaking his head no to? |
| A. | | Yes. |

(EHT at p. 123-124; 139).

What Attorney Gallagher whispered in Defendant Rennick's ear was "don't

worry, it's a fictional plea" and the colloquy concluded, by the court accepting the

Defendant's plea.

Defendant Rennick "lost it" with his attorney out in the hallway after the plea was

accepted. Rennick was "enraged".  Rennick immediately questioned his lawyer in the

hallway, "What do you mean fictional plea…[W]hat the hell is  a fictional plea?". (EHT

at p. 124-125). Witness Ball, Defendant Rennick's friend of twenty years,  likewise

questioned the attorneys, "what happened there, Greg [Cohen], Bill [Gallagher]?" (Id. at

125). Defendant Rennick " was in a rampage" (Id.).

Defendant was told to calm down, the next stop was the probation department

where Defendant was told by his attorney, "when we get down to the probation officer,

don't tell him it was a fictional plea. If you do, he won't accept your plea". (EHT at p. 153).

Defendant maintained the charade and received his acceptance of responsibility points for doing so. Defendant appeared for sentencing after the preparation of the pre-sentence report. Present in the mind of the Defendant at the time he appeared for sentencing was that he would receive thirty-six months, the last offer made by the government to obtain the package deal and a sentence he was told he would receive from his attorney in conjunction with Defendant Elliott's attorney. (EHT at p. 140).

On the night prior to sentencing, Defendant Rennick went to his attorney's office. Defendant Rennick was told his attorney had spoken to Mr. Brichler and "that he [Brichler] was going to give me a sentence reduction". (EHT at p. 161). Rennick's attorney had to file a motion for the reduction and that filing was discussed the night before sentencing. (EHT at p. 162). Gallagher told Defendant that "[H]e [Gallagher] was going to get it all straightened out" and Rennick "would get a sentence reduction". (Id.).

> When Duke and I went down to Mr. Gallagher's office, I told him for months I wanted those accusations taken out of those plea agreements or I was going to take back my plea and that night when we went down there and I lost it with him he said he talked to Mr. Brichler and Mr. Brichler had agreed to give a downward departure to me. He was going to do a motion on it. So Duke and I both said, you know Mr. Gallagher you finally sound like you got a set of balls…and it sounded like the old Bill Gallagher, like he was a fighter. So we figured it was going to happen and the next day came and it just kept going the same way as it always did and I'm thinking anytime Judge Dlott is going to say she's going to abide by the motion that he put in and this and that and nothing happened.

(EHT at p. 199-200).

In fact Attorney Gallagher filed a motion for a downward departure that was filed simply to give the Defendant the appearance of getting it all "straightened out", but

which in reality had no legal effect because, 1) the federal sentencing guidelines were mandatory at the time Defendant was sentenced, 2) the Defendant pled to a mandatory minimum which could only be deviated from, by the government's filing of a 5K motion for substantial assistance or by the use of the provisions of the safety valve provisions of USSG §5C1.2, neither of which applied in this case[4]. The filing of the motion simply continued the charade; the charade however would end at the sentencing phase of Defendant's case.

The defendants appeared as a group for sentencing just as they had when they entered their pleas. Defendant Rennick was sentenced first. The court reviewed all that was required[5] and pronounced sentence as follows:

> Then it is the duty of the Court to sentence the defendant at this time. However, counsel will have a final chance to make legal objections before the sentence is actually imposed.
> Pursuant to the Sentencing Reform Act of 1984, it's the judgment of the Court that the defendant be hereby committed to the custody of the Bureau of Prisons for a term of 63 months on count one.
> THE DEFENDANT: Oh, shit, Your Honor—
> THE COURT: And let me explain to you, I have reviewed your case very carefully, Mr. Rennick. This was a complicated drug deal, and, from all that I have read, all that I can determine from the documents, I think you played a major part in it, if not the major part.
> THE DEFENDANT: But, Your Honor, I was promised by Mercado probation.
> MR. GALLAGHER: Shhhhh.
> THE DEFENDANT: No. I can't shhhhh. I've got witnesses that Mr. Mercado told me I would get probation… (Appendix Vol. I at JA-121)

---

[4] The safety valve provisions did not and would not apply because Defendant had more than one criminal history point. See USSG §5C1.2(a)(1).

[5] Although it appears from the record that the court reviewed all it was required to review, there is a serious question whether the Defendant and his counsel did, as the Defendant is adamant that he never reviewed the final presentence investigation report with his attorney and the court inquired only about "documents" (See EHT at p. 183-184) and not specifically about the presentence report. When Defendant did finally review the report, he called to the court's attention twenty-three objections that the court found were untimely. (See EHT at p. 182).

So when we got to the sentencing and she started reading everything off and Mr. Gallagher has just agreed and agreed and said he didn't blame nobody for anything. I said, shit, this is, something is not working like Mr. Gallagher said it was. I don't hear the sentence reduction in there and it just, you know, the gavel is ready to fall, something is not right and Mr. Gallagher leaned over to me and said, shhh, don't say no more, so I didn't. (EHT at p. 162-163).

Defendant Elliott was sentenced third. At his sentencing the following occurred:

MR. LAWSON:  Judge, this was a –if you recall when he entered the pleas, it was a date the morning of the trial on a case that had been ongoing for sometime and where my client and especially Mr. Gallagher's client were adamant about going to trial. In order to end up into these plea bargains, it was presented to my client, since he was closest to Mr. Rennick, that if he was able to get Mr. Rennick to enter a plea, voluntarily enter a plea and also provide sub—and get Mr. Rennick to provide substantial assistance, he would receive, he being Mr. Elliot, would receive a 5K1. So Mr. Elliot's plea bargain and 5K1 is based on what Mr. Rennick was to do…

MR. LAWSON: Judge, if I may, every defense attorney that was present for trial that morning, everybody was here ready to go to trial. And **Mr. Gallagher knows, and I don't know if Mr. Cohen remembers it or not, that that was the offer that was made to my client, because we had to come back out and let my client speak to Mr. Gallagher's client.**

THE COURT: All right. Here's what—

MR. BRICHLER: May I have a moment, Your Honor, with Mr. Lawson?...

MR. BRICHLER: Your Honor, I just had a discussion with Mr. Lawson, and he related to me that, on the morning of the pleas, that I had a conversation with him concerning his client's ability to basically make the case go away.

THE COURT: You mean make the trial go away?

MR. BRICHLER: Make the trial go away. If he was cooperative and if he was able to convince the other defendants that this is what they should do.

MR. LAWSON: Actually, it was Mr. Rennick, not the other defendants.

MR. BRICHLER: Okay. And Mr. Lawson indicated that I told him that, if that happened, that I would consider Mr. Elliot's conduct to be substantial assistance…

MR. BRICHLER: A one-third reduction would be 14 months, 7 from 21 would be 14 months. I would request the Court consider a sentence, therefore, within the range of offense level 12, which would be 12 to 18 months where 14 months would be.

MR. LAWSON: I have discussed that with my client your Honor, and there is no objection. I discussed that with him already. And I appreciate what Mr. Brichler just stated, **but Mr. Gallagher is also in the room. We talked briefly before we came in here and I just want Mr. Brichler to know that that is our recollection about what happened that day.**

MR. BRICHLER: And I want it clear that this motion for reduction is based upon what happened that day and it's not based upon any conduct that Mr. Rennick subsequently engaged in.

(Emphasis added) (Appendix Vol. I at pgs. JA 146-154).

At the sentencing of Defendant Elliot it was disclosed to Defendant Rennick that his close friend, a person with whom he shared a father/son-like relationship, was providing substantial assistance to the government, by convincing Defendant Rennick to plead. "Because, but for his [Elliot's] efforts, none of this would have went on, and I [Lawson] think the government knows this". (Id. at JA 150).

Underlying all of these activities is the Defendant's psychological condition. On the morning of trial, Defendant was picked up from the VA in Cincinnati and taken to court by two of his friends. (EHT at p.137). He was at the VA for treatment of his Post-Traumatic Stress Disorder condition. "He was having some problems, mental problems…psychological problems". (EHT at p. 128). Defendant's psychological condition was caused because Defendant "had to shoot a fellow soldier who was burning up before [his] eyes and whose face was starting to melt, to put him out of his agony". (EHT at p. 191). Defendant's "Vietnam buddies visit him". (Id. at 192).

His Vietnam-induced PTSD was exacerbated by the death of a man who Defendant was teaching to drive a truck, which slid off the road, killing the trainee. Defendant was charged with the death of the trainee, but found not guilty. (Id.).

Defendant has been on psychotropic medication for years. (EHT at p. 191).

Three hundred eighty pages of the Defendant's medical records were provided to defense counsel. (Id.). Exhibit 10 at the evidentiary hearing contains a list of medications the Defendant was receiving at the time of his plea. Defendant was taking Trazodone[6] at the time of his plea. (EHT at p. 206).

Defendant was told by defense counsel "I had to say that I wasn't taking any medications that would effect my judgment or anything." (EHT at p. 186).

Defense counsel could not recall at the evidentiary hearing whether he knew his client was in-patient at the local VA or was taking psychotropic medications at the time of the plea. (EHT at p. 231). Defense counsel did however recall receiving 380 pages of medical records from family members that detailed Defendant's psychiatric history. (Id.). Defense counsel knew that his client was suffering from PTSD as a result of injuries received in Vietnam. (EHT at p. 256). Defense counsel knew the trial had to be continued because of the Defendant's hospitalization for psychological treatments. (EHT at p. 257). Finally, defense counsel believed based on Defendant Rennick's mental health status, he was "fragile". (EHT at p. 258).

    A.    Because I wasn't involved in anything, like I say, it just wasn't true

(EHT at p. 202)

    A.    Because it wasn't a voluntary act. I was forced into it, talked into by Matt to plead.

(EHT at p. 203).

    A.    I was told by Mr. Gallagher I had to say no. There was no promises.

(EHT at p. 204).

---

[6] "The Trazodone was killing me. I was not knowing what I was doing. I couldn't keep my eyes open" (EHT at p. 207).

> A.   That I was going to get 36 months and Matt and Wayne were going to get probation.

(EHT at p. 204).

> A.   Whenever she asked me if it was the truth, if I had been promised anything or I was doing this on my own free will and this and that, you know, at the beginning when I shook my head no and Bill Gallagher said you have to say what she wants to hear, you are not going to get your plea bargain, it was basically everything she asked me about. I didn't tell the truth.

(EHT at p. 204-205).

> A.   Yes, sir. Because he would lose his family and he would do, you know, he would have to do a bunch of time. He cried and pushed me, I just said yes, I'll do it.

(EHT at p. 206).

Finally, defense counsel cannot eliminate coercion as the reason that Defendant tendered his plea on the morning trial was to begin:

> It appears that way. The only other thing that I can tell you, Mr. Greger, is this. In the Southern District of Ohio it would be routine at times in order to facilitate a plea to give people just sort of credit for pleading and what I mean by that is this. Which is, look at, we've had situations where people got 5KI's sort of cross fingering each other where they didn't provide substantial assistance to the government, but the two of you were basically allowed to get the benefit of each other pleading.
>
> I don't know if that's the case or it was Mr. Elliott had to do some undue pressure to Mr. Rennick. I don't know which two circumstances it was, you're right.

(EHT at p. 290). If there is even a chance that it was undue pressure, the sentence should be vacated.

## <u>BRANCH III. THE OCTOBER PLEA AGREEMENT</u>

Defendant was adamant about going to trial. His counsel had investigated his defense and prepared for trial. There was never a discussion about resolving Defendant's

case by way of plea prior to the day trial was to begin. Based on the defendant's fragile mental condition, the coercion by the government's agent and the ineffectiveness of Defendant's counsel at the plea proceeding and the "confusing nature" of how all of that occurred, Defendant changed his plea to guilty. He immediately knew that what had just occurred in open court was false and confronted counsel in the hallway outside the courtroom in an angry, confrontational scene where he was admonished by counsel to calm down. Defendant wanted the record corrected; he was not a drug dealer.

Knowing that the "fictional plea" process was as fragile as the Defendant's mental condition, the government tendered to defense counsel, another plea agreement in October of 2003 that was marked as Petitioner's exhibit 14 at the evidentiary hearing. Defense counsel was at a loss to explain this exhibit, even though it contains his signature, he has "no memory of this" (EHT at 266). This exhibit sheds additional light on counsel's ineffectiveness:

1) Only counsel signed the agreement;

2) Counsel was unaware whether the plea agreement that Defendant accepted on August 18, 2003 protected Defendant from any other criminal offenses that the government was aware of (EHT p. 267);

3) There is no evidence that exhibit 14 was ever discussed with Defendant (EHT at p. 268). Counsel accepted, without question and without any discussion with his client, yet another plea agreement from the government concerning another criminal violation less than two months after he accepted, without question, the conviction Defendant seeks to have vacated;

19

4) Counsel was unaware of the facts underlying the mail fraud plea

agreement that he executed as Defendant's counsel (EHT at p. 268).

Why would defense counsel sign another plea agreement tendered to him by the government, without discussing same with his client? Why would defense counsel negotiate in August a resolution of the then-pending criminal matter, without protecting his client from any and all other criminal violations of which the government had evidence and to which his client might have exposure? Why would there be only one signature on the plea agreement? Why would defense counsel affix his signature to the agreement without discussing same with his client?

One explanation might be that the government was fully aware that the "fictional plea" and the confusing nature of the process by which that plea was obtained was subject to a successful collateral attack (See this proceeding generally) and thus sought to bind the Defendant to a plea agreement that was not "fictional". However, at the time exhibit 14 was signed by defense counsel, there was no charge of mail fraud then pending against the Defendant, so that in fact, defense counsel did agree to a "fictional plea" agreement with respect to the mail fraud allegation, the exact conduct about which Defendant complains in this 2255 proceeding with respect to his alleged drug activities.

October of 2003, when exhibit 14 was executed, was after the Defendant had tendered his "fictional plea" to the drug conspiracy, but before he was sentenced. It was during this same period that Defendant Rennick was demanding that his counsel either get the factual basis for the conspiracy plea changed or move to withdraw his plea. Thus the government sought to have a fallback position; if the drug activities were successfully attacked and the defendant sought to vacate his plea and the court permitted same, they

had waiting, a plea agreement for mail fraud that defense counsel had already accepted, with an alleged "loss" of $770,000.00 thereby placing the Defendant in a potential sentencing range that approximated the thirty-six months[7] that was discussed at the time his "drug" plea was obtained. The government knew exactly what it was doing and the one-two punch was effective.

The government in its rehabilitation of Attorney Gallagher (recall the government needs the testimony of Attorney Gallagher to refute the Defendant's allegations made in this 2255 proceeding) suggested that exhibit 14 was somehow not the product of the United States Attorney's office (See, EHT at p. 286); that rehabilitation failed. (See, EHT at p. 289).

For all the foregoing reasons, Defendant has sustained his burden as to each prong of *Strickland v. Washington,* 466 U.S. 668 (1984). Defendant has demonstrated his counsel's performance was deficient and he has demonstrated that his counsel's performance fell below an objective standard of reasonableness as compared with prevailing professional norms. Evidence in support of the first prong includes:

1) Permitting the private conferences between Matt Elliot and Elliot's counsel and Defendant Rennick, without monitoring the contents of the conversations;

---

[7] Assuming a base offense level of 6 and a "loss" of $770,000.00, USSG 2B1.1 requires a 14 point increase in the base offense level. If there were "sophisticated means" used, the offense level would be increased two additional levels per 2B1.1 (b)(1)(9). Assuming that there was no obstruction of justice in the investigation or prosecution, the resulting offense level would be 22, less three for acceptance of responsibility and timely notification of a plea (assumption only) the resulting offense level would be 19, with a criminal offense level of II, with a resulting range of 33-41 months: 36 months would fall in the low end of that range.

2)   Permitting the conferences knowing that Elliot and his counsel and Benjamin and his counsel were pushing to work their cases out by way of pleas;

3)   Permitting the conferences knowing that Defendant Rennick had a father/son-like relationship with at least Defendant Elliot;

4)   Permitting the conferences knowing that if Elliot and Benjamin were to receive their plea bargains, it was a package deal and Rennick had to likewise plead;

5)   Permitting the conferences knowing that his client suffered from PTSD, and had a "fragile" mental status;

6)   Not knowing if Mr. Elliott "had to do some undue pressure to Mr. Rennick" (EHT at p. 290) in these conferences.

There is no question that the Defendant was prejudiced by the ineffective assistance of his counsel, as the evidence strongly suggested that Defendant had not committed the offenses alleged in the indictment. Wayne Benjamin continued after his plea to deny acceptance of responsibility for the crime to which he pled, thereby denying him additional points off his offense level—he knew that Defendant Rennick had not provided marijuana to him although telling the District Judge under oath to the contrary. The marijuana that Matthew Elliot obtained by and through Defendant Moore, came from a separately locked and leased portion of a garage that Defendant's family leased from the Jamaicans, who all parties acknowledged were liars.

Defendant having met both prongs of the *Strickland* test, his motion to vacate, set aside or correct sentence by a person in federal custody should be granted and further proceedings consistent with this decision should occur in the district court.

Respectfully submitted:

S/:Lawrence J. Greger
Attorney at Law 0002592
Suite 1100 Liberty Tower
120 W. Second Street
Dayton, OH 45402
(937) 223-3153

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon Benjamin Glassman, Assistant United States Attorney by filing same with the Court using the Court's CM/ECF system.

S/:Lawrence J. Greger